## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| BRUCE RUSH, as a participant in and on behalf of the Segerdahl Corporation Employee Stock Ownership Plan, and on behalf of a class of all others who are similarly situated,<br><br>      Plaintiff,<br><br>   v.<br><br>GREATBANC TRUST COMPANY; MARY LEE SCHNEIDER; RICHARD JOUTRAS; RODNEY GOLDSTEIN; PETER MASON; ROBERT CRONIN; JOHN DOE DEFENDANTS 1-10; and SEGERDAHL CORP. (d/b/a SG360)<br><br>      Defendants. | Case No.<br><br><br><br>**CLASS ACTION COMPLAINT**<br><br><br><br>**JURY TRIAL DEMANDED** |

1.  Plaintiff Bruce Rush, a participant in the Segerdahl Corporation Employee Stock Ownership Plan (the "ESOP"), brings this action in a representative capacity on behalf of the ESOP and as a class action on behalf of all other similarly situated participants in and beneficiaries of the ESOP. He brings this action under Sections 502(a)(2) and 502(a)(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1132(a)(2) and 1132(a)(3), against Defendants Greatbanc Trust Company ("Greatbanc"), Mary Lee Schneider, Richard Joutras, Rodney Goldstein, Peter Mason, Robert Cronin (together Schneider, Joutras, Goldstein, Mason and Cronin are the "Board of Directors Defendants") and John Does 1-10 (together, "Defendants"). Segerdahl Corp. ("Segerdahl"), was the sponsor of the ESOP, and is a nominal defendant in this matter.

2.  Segerdahl was established in 1956 and is headquartered in Wheeling, Illinois. Segerdahl is one of the largest and most successful printing companies in the United States.

1

3.      Segerdahl has roughly 770 employees, and is the fourth-largest, fully-integrated direct mail printer in North America and the largest company focused on medium and high volume direct mail printing, holding approximately 10% of this market segment. Segerdahl's customers include Fortune 500 companies across a variety of industries. By 2015, Segerdahl had more than $300 million per year in sales.

4.      In 2003, Segerdahl established the ESOP to help its employees save for retirement and enjoy an ownership interest in Segerdahl.

5.      Plaintiff Bruce Rush is a former employee of Segerdahl and a participant in the ESOP.

6.      From 2003 until December 7, 2016, the ESOP owned 100% of the outstanding common stock of Segerdahl.

7.      On December 7, 2016, ICV Partners, an investment capital firm, purchased Segerdahl from the ESOP (the "ESOP Buyout").

8.      In the ESOP Buyout, ICV Partners paid less than the fair market value of the ESOP's shares, and paid less than what other willing buyers would have paid for the ESOP's shares.

9.      At all relevant times leading up to the ESOP Buyout, and despite the ESOP's ownership of 100% of Segerdahl's shares, Defendants Schneider and Joutras (together, the "Segerdahl Defendants") exercised effective control over Segerdahl. The control in substance that the Segerdahl Defendants wielded gave them the effective ability to hire and fire board members and retain or remove the ESOP's trustee and other fiduciaries. At all relevant times leading up to the ESOP Buyout, the Segerdahl Defendants actually exercised this control, and in fact appointed or retained all members of Segerdahl's board of directors as well as the ESOP's trustee and other

fiduciaries. In addition, the Segerdahl Defendants' control over Segerdahl permitted them to control their own compensation and bonuses.

10.     The Segerdahl Defendants engaged in a deeply flawed process in marketing Segerdahl to potential buyers leading up to the ESOP Buyout. Instead of seeking to maximize the price the ESOP received for its shares, the Segerdahl Defendants marketed the company primarily to investment firms and intentionally avoided marketing Segerdahl to its competitors. Even though a competitor would have paid more for the company than an investment firm like ICV Partners, the competitor would have taken over day to day control of the company's operations from the Segerdahl Defendants. Losing control would come at real cost for the Segerdahl Defendants, who would lose the ability to set their own compensation and bonuses. Moreover, the Segerdahl Defendants ran a risk of losing their jobs if the company was sold to a competitor, as the buying competitor would eventually consolidate the Segerdahl Defendants' jobs functions into the buyers' existing management structure to realize synergistic value from the deal. By contrast, an investment capital firm, like ICV Partners, with less experience in the printing industry, would likely leave management in place and in control over the company's operations.

11.     The Segerdahl Defendants also agreed to the ESOP Buyout transaction knowing that ICV Partners planned to engage in sale-leaseback transactions of Segerdahl's primary real estate after the ESOP Buyout. However, the Segerdahl Defendants failed to ensure that ICV Partners paid an appropriate price for the ESOP's Segerdahl shares in light of the immediately realizable cash value of Segerdahl's real estate assets.

12.     Moreover, on information and belief, a significant portion of the purchase price paid by ICV Partners was wrongfully diverted from the ESOP by the Segerdahl Defendants, perhaps totaling millions of dollars. On information and belief, the total purchase price ICV

Partners paid for Segerdahl was in excess of $265 million. However, only approximately $151 million was paid to the ESOP. On information and belief, all or a significant portion of the difference between the $265 million ICV agreed to pay and the $151 million actually distributed to the ESOP was wrongfully diverted from the ESOP. The Segerdahl Defendants used their control over Segerdahl and the ESOP to divert tens of millions of dollars away from the ESOP and to themselves and other insiders during the ESOP Buyout. This diversion of the ESOP's assets came in the form of transaction bonuses and as payment for stock appreciation rights that matured in the event of a change in control.

13. Defendant Greatbanc and/or John Does 1-10 were the ESOP fiduciaries responsible for approving the ESOP Buyout on behalf of the Plan. Defendant Greatbanc and John Does 1-10 knew or should have known: (a) that the ESOP Buyout was the result of a flawed sales process; (b) that the price the ESOP received from ICV Partners was below what other buyers would have paid for those shares, (c) that the transaction did not appropriately credit the value of Segerdahl's real estate assets in the sale price for Segerdahl itself, and (d) millions of dollars that should have been paid to the ESOP would be diverted from the ESOP to the Segerdahl Defendants and other Segerdahl insiders. Defendant Greatbanc and John Does 1-10, as the ESOP's primary fiduciaries, had an affirmative duty to ensure the fairness of the ESOP Buyout to the ESOP—a duty they failed to fulfill.

14. As fiduciaries of the ESOP, Defendants Greatbanc and John Does 1-10 failed to ensure that the ESOP received the fair market value of its shares. Fair market value measures what a hypothetical willing buyer would pay to a hypothetical willing seller, when neither party is under any compulsion to buy or sell. Determining fair market value requires considering the highest and best use of the asset in question, which requires evaluating the characteristics of likely potential

buyers, and should take into account the population of potential willing buyers. That includes buyers who, for a variety of reasons, might want to pay more than others. This certainly requires evaluating the characteristics of types of likely potential willing buyers. Determining fair market value in the context of the ESOP Buyout was especially important, because all of the ESOP's assets were to be liquidated in that transaction, and the ESOP was permanently giving up its stake in Segerdahl. Because other types of buyers, such as competitors, would have paid a higher price for the ESOP's shares than did ICV Partners, the fair market value of the ESOP's shares was higher than what ICV Partners would have paid. On information and belief, Defendants Greatbanc and John Does 1-10 relied on a valuation of the ESOP in approving the transaction that failed to consider the characteristics of likely potential buyers, including operating companies like competitors, and failed to consider what those likely potential buyers would have paid. Defendants Greatbanc and John Does 1-10 knew or should have known that the valuation failed to take that higher potential price into account, and knew or should have known that the valuation failed to represent the fair market value of the ESOP's shares for that reason.

15. The Board of Director Defendants were responsible for appointing, retaining and overseeing Defendant Greatbanc and John Does 1-10. The Board of Director Defendants, including the Segerdahl Defendants, had interests in the ESOP Buyout that conflicted with the ESOP's interests, and failed to ensure that Greatbanc and John Does 1-10 acted solely in the interests of the ESOP.

## JURISDICTION

16. Plaintiff brings this action pursuant to ERISA §§ 502(a)(2) and 502(a)(3), 29 U.S.C. §§ 1132(a)(2) and (3).

17. This Court has subject matter jurisdiction over Plaintiff's claims pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because this action arises under the laws of the United States.

18. This Court has general personal jurisdiction over Greatbanc, the Board of Director Defendants, and John Does 1-10 because those Defendants reside in this District. This Court has specific personal jurisdiction over all Defendants because they took the actions described herein in this District or directed those actions specifically at this District.

19. Pursuant to 29 U.S.C. § 1132(e)(2) venue is proper in this District because the Plan is administered in this District and the misconduct described herein occurred in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because, for the same reasons, a substantial part of the events or omissions giving rise to the claim occurred in this District.

## THE PARTIES AND THE ESOP

20. The ESOP is an employee benefit plan and an employee pension benefit plan covered by ERISA within the meaning of ERISA § 3(2)(A) & (7), 29 U.S.C. § 1002(2)(A) & (7).

21. At all relevant times, Plaintiff Bruce Rush has been a participant in the ESOP. Rush is a citizen and resident of Illinois.

22. Defendant Greatbanc Trust Company is an Illinois corporation with its principal place of business in Lisle, Illinois.

23. Defendant Mary Lee Schneider was the Chief Executive Officer and President of Segerdahl from November 30, 2015 until sometime during November or December of 2018. Defendant Schneider is a citizen and resident of Illinois.

24.     At all relevant times, Defendant Richard Joutras has been the President and Chairman of Segerdahl, and, prior to November 30, 2015, Joutras was also the CEO of Segerdahl. Joutras is a citizen and resident of Illinois.

25.     Defendants Rodney Goldstein, Peter Mason, Robert Cronin (together with Schneider and Joutras, the "Board of Directors Defendants"), are on information and belief, citizens and residents of Illinois.

26.     John Doe Defendants 1-10 are individuals who served on Segerdahl's Board of Directors (the "Board") and/or the ESOP Committee (the "Committee") between 2014 and 2016. In those capacities, as explained in more detail below, John Does 1-10 were named or de facto fiduciaries for the ESOP with whole or partial authority for approving the ESOP Buyout on behalf of the ESOP.

27.     Nominal Defendant Segerdahl Corp. is an Illinois corporation with its principal place of business in Wheeling, Illinois.

## GENERAL ALLEGATIONS

28.     During 2003, the ESOP was established to benefit the employees. At around the same time, the ESOP, on behalf of Segerdahl's employees, bought out the other owners of the company and became the sole owner of Segerdahl's common stock.

29.     From 2003 until 2016, the ESOP owned 100% of the common stock of Segerdahl.

30.     After the ESOP purchased Segerdahl, Defendant Joutras became Segerdahl's CEO and President and Chairman of Segerdahl's Board of Directors.

31.     No later than 2014, Joutras began investigating a buyout of the ESOP's shares of Segerdahl stock.

32.     In preparation for a sale, Joutras retained outside counsel which produced a conformed plan document for the ESOP through the Eleventh Amendment (the "Conformed Plan").

33.     The Conformed Plan was adopted by Segerdahl on August 27, 2014.

34.     No later than early 2015, Joutras found a potential buyer—an investment capital firm called Windpoint Partners.

35.     Defendant Schneider, who had previously been the CEO of one of Segerdahl's competitors, worked with Windpoint as a consultant on Windpoint's potential acquisition of Segerdahl from the ESOP.

36.     During 2015, the deal with Windpoint fell through.

37.     On information and belief, Joutras decided to hire Schneider as CEO and President of Segerdahl in order to help him sell the company.

38.     Accordingly, Schneider was appointed CEO and President of Segerdahl on November 30, 2015.

39.     At that time, Joutras became chairman of the newly constituted Segerdahl board of directors, and Joutras, Schneider and the Board of Director Defendants all became members of Segerdahl's board.

40.     During an interview with a journalist on or about December 15, 2015, Schneider described her plans as the new CEO and President of Segerdahl.

41.     In the interview, Schneider described Segerdahl as a "$300 million company."

42.     The Segerdahl Defendants retained Jeff Vergamini from JP Morgan Securities to help advise them with respect to selling Segerdahl.

43.     At some point during early 2016, Joutras, Schneider and JP Morgan Securities began exploring the transaction with ICV Partners that eventually became the ESOP Buyout.

44.     On information and belief, at some point during the fall 2016, the Segerdahl Defendants reached an agreement in principal with ICV Partners for ICV Partners to purchase the ESOP's shares.

45.     The ESOP Buyout transaction closed on December 7, 2016.

46.     On information and belief, the ESOP received roughly $151 million for its shares of Segerdahl.

47.     However, the ESOP should have received much more than $151 million for its shares of Segerdahl. The amount the ESOP received was reduced for several reasons, including:

   a.   the Segerdahl Defendants and their advisors engaged in a flawed sale process that included, among other things, a failure to market Segerdahl to many potential buyers to obtain the best price for the ESOP's shares, and an unjustified focus on a buyer that, after the transaction, would allow the Segerdahl Defendants to maintain control over the company's day to day operations, and would allow the Segerdahl Defendants and other insiders to remain at their positions; *see* ¶¶ 48-53 *infra*;

   b.   the purchase price ICV Partners paid for the ESOP's shares did not appropriately include the value of certain real estate owned by Segerdahl, which ICV Partners was able to sell immediately after the ESOP Buyout; *see* ¶¶ 54-67, *infra*; and

   c.   the Segerdahl Defendants diverted millions of dollars of the purchase price paid by ICV Partners away from the ESOP to the Segerdahl Defendants themselves and other company insiders. *See* ¶¶ 68-71, *infra*.

*The Segerdahl Defendants' Failure to Market the ESOP's Segerdahl Shares Appropriately*

48.     On information and belief, the Segerdahl Defendants and their advisors engaged in a flawed process leading up to the sale of the ESOP's shares of Segerdahl to ICV Partners. Instead of taking reasonable steps to market the ESOP's shares in order to find a buyer that would pay the highest price, the Segerdahl Defendants limited their efforts to finding a buyer that, after the transaction had closed, would allow the Segerdahl Defendants to maintain control over the company's day to day operations, and likely remain at their jobs much longer than would a competitor.

49.     On December 1, 2016, Vergamini, the employee of JPMorgan advising the Segerdahl Defendants on the transaction, led an information session with Schneider for many of Segerdahl's senior managers about the pending transaction with ICV Partners.

50.     At that information session, Vergamini stated that the total purchase price for the ESOP's shares in the ESOP Buyout, which Vergamini quoted as $265 million, would have been much higher, even as high as $320 million, had Segerdahl been sold to a competitor.

51.     On several occasions, including during round table discussions with senior management, Defendant Schneider stated that marketing efforts had focused on buyers—like ICV Partners—that would allow management to remain in place, and that no attempt had been made to market Segerdahl to any of Segerdahl's competitors, who would have paid a much higher price.

52.     Defendant Schneider also stated that they did not put out a deal book about the potential sale to RR Donnelly, Quad or other competitors to see if those companies were interested in making an offer for Segerdahl.

53.     After the ESOP Buyout, ICV Partners in fact retained Schneider and the great majority of other Segerdahl insiders as CEO and management, and left them in control of Segerdahl's operations after the ESOP Buyout.

*Segerdahl's Real Estate*

54.     In the ESOP Buyout, ICV Partners did not pay a price for the ESOP's shares of Segerdahl that adequately reflected the value of certain real estate owned by Segerdahl.

55.     Instead, ICV Partners was able to purchase Segerdahl, and thereby the real estate it owned, at a lower price than it would have paid had the real estate been appropriately included in the price of the company.

56.     By purchasing Segerdahl for a price that did not adequately reflect the realizable cash value of Segerdahl's real estate assets, ICV Partners was able to profit by, shortly after the ESOP Buyout, selling the real estate that had belonged to Segerdahl and causing Segerdahl to lease that property from the purchasers.

57.     ICV Partners, as such, underpaid for Segerdahl's shares at the ESOP's expense.

58.     During a meeting of Segerdahl executives in December of 2016, just a few days prior to the ESOP Buyout, at which Vergamini and representatives of ICV Partners were present, Plaintiff Rush heard one of the representatives of ICV Partners discussing the real estate aspects of the pending ESOP Buyout. Vergamini explained that the real estate portion of the transaction represented a "$7 million arbitrage opportunity" for the buyer, who could immediately realize the cash value of those properties through a sale-leaseback arrangement.

59.     The two parcels of real estate involved were large industrial facilities owned by Segerdahl. One of the properties is located at 1351 Wheeling Road, in Wheeling, Illinois ("1351

Wheeling"). The other property is located at 1900 S. 25th Avenue, in Broadview, Illinois ("1900/Broadview").

60.     1351 Wheeling serves, and has served, as Segerdahl's corporate headquarters and is Segerdahl's largest manufacturing site by size and revenue. 1351 Wheeling has a clear height of 16 to 24 feet, 27 loading docks and 279 surface parking spaces. 1351 Wheeling houses nine printing presses including a newly acquired printing press that prints or has printed advertising for Costco of approximately 28 million pieces per month.

61.     1900/Broadview is Segerdahl's second largest manufacturing site by size and revenue and is located 12 miles from downtown Chicago. 1900/Broadview has clear heights of 14 to 23 feet, 11 loading docks and 195 surface parking spaces. 1900/Broadview houses eight printing presses as well as a secured analytics server room which houses significant customer data.

62.     And, in fact, just three months after the ESOP Buyout, on February 7, 2017, Segerdahl did sell 1351 Wheeling and 1900/Broadview to AGNL Mail, LLC.

63.     Segerdahl entered into lease agreements with AGNL Mail, LLC for both properties that same day.

64.     1351 Wheeling and 1900/Broadview appraised on March 1, 2017 for $14.9 million and $10.1 million, respectively (for a total of $25 million).

65.     On information and belief, the price ICV Partners paid for Segerdahl failed to include a reasonable adjustment for the cash value of Segerdahl's real estate.

66.     Thus when ICV Partners sold the real estate, it received millions of dollars for the two properties that it should have paid, but did not pay, for the Segerdahl shares during the ESOP Buyout.

67. On information and belief, the Board of Director Defendants, Greatbanc, and John Does 1-10 were actually or constructively aware of ICV Partners' plans to sell the real estate, and were aware of the value of the real estate. Despite that awareness, the Board of Director Defendants, Greatbanc, and John Does 1-10 took no action to ensure that ICV Partners paid a price for the Segerdahl shares the appropriately reflected the value of Segerdahl's real estate assets.

### The Diverted Purchase Proceeds

68. As alleged above, Vergamini stated that the total purchase price for Segerdahl was approximately $265 million.

69. According to the ESOP's final Form 5500 annual report for 2016, the ESOP received only approximately $151 million in the transaction.

70. On information and belief, the Segerdahl Defendants used their control over Segerdahl and the ESOP to wrongfully divert from the ESOP millions of dollars of the proceeds of the ESOP Buyout paid by ICV Partners.

71. This diversion of the ESOP's assets came in the form of transaction bonuses paid to the Segerdahl Defendants and Segerdahl insiders when the ESOP Buyout closed, as well as payments to the Segerdahl Defendants and other insiders for stock appreciation rights that matured in the event of a change in control.

### DEFENDANTS' FIDUCIARY STATUS UNDER ERISA

72. ERISA requires that every plan identify "one or more" "named fiduciaries" with general responsibility for administering the plan. ERISA § 402(a)(1).

73. According to the Conformed Plan, Segerdahl's Board of Directors created an "ESOP Committee" and appointed the members of the ESOP Committee. Under the terms of the Conformed Plan, the ESOP Committee was the plan administrator of the ESOP and the ESOP's

13

named fiduciary, with general authority to carry out essentially all fiduciary functions for the ESOP.

74. John Doe Defendants 1-10 include the members of Segerdahl's ESOP Committee.

75. The Conformed Plan provided that "[i]n the event of a tender offer or other offer to purchase shares of [Segerdahl] Stock held by the Trust, the Trustee shall tender or sell shares as it is directed by the Administrator [the ESOP Committee], subject to the Trustee's fiduciary duties under ERISA."

76. Thus the ESOP Committee and the Trustee Greatbanc both had express fiduciary duties with respect to the ESOP Buyout. While the ESOP Committee had responsibility to direct Greatbanc to accept or reject any tender offer, Greatbanc could only accept such a direction consistent with its own ERISA fiduciary duties.

77. ERISA also defines fiduciary status so that anyone is a fiduciary "to the extent" they *in fact* perform a fiduciary function. *See* ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Thus in addition to expressly designated fiduciaries, anyone is a fiduciary "to the extent" he "exercises any discretionary authority or discretionary control respecting management of such plan" or "exercises any authority or control respecting management or disposition of its assets" or "has any discretionary authority or discretionary responsibility in the administration of such plan." *Id*.

78. The Seventh Circuit has applied a "consistently broad reading" to the functional definition of fiduciary under ERISA. *Baker v. Kingsley*, 387 F.3d 649, 663–64 (7th Cir. 2004)).

79. In particular, appointing another ERISA fiduciary is itself a fiduciary function, and carries with it fiduciary duties to prudently and loyalty appoint, monitor the performance of, and, if necessary, remove an appointee. *Leigh v. Engle*, 727 F.2d 113, 133 (7th Cir. 1984) ("selecting and retaining plan administrators" is an ERISA fiduciary function).

14

80. Here, Schneider and Joutras effectively exercised complete control over Segerdahl and the ESOP, including appointments to the Board of Directors and ESOP Committee. Schneider and Joutras used that control to ensure that the Board of Directors and ESOP Committee included only members who were primarily loyal to Schneider and Joutras, not the ESOP.

81. Schneider and Joutras are also ERISA fiduciaries by virtue of their appointment and effective control over the ESOP's other fiduciaries, including the Board of Directors, ESOP Committee and Trustee. Schneider and Joutras are also fiduciaries by virtue of their control over Segerdahl itself, which was a plan asset of the ESOP.

82. The Board of Directors Defendants, in turn, are fiduciaries because they had formal authority under the Plan to appoint the ESOP's Trustee as well as the members of the ESOP Committee, and thus had fiduciary duties with respect to those appoints, duties to monitor the performance of the Trustee and the ESOP Committee members and duties to remove the Trustee and ESOP Committee members if they failed to fulfill their fiduciary duties.

## ERISA'S FIDUCIARY DUTIES

83. ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

84. These fiduciary duties under ERISA §§ 404(a)(1)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence.

85. "[T]he duties charged to an ERISA fiduciary are 'the highest known to the law.'" *George v. Kraft Foods Glob., Inc.*, 814 F. Supp. 2d 832, 852 (N.D. Ill. 2011). ERISA's duty of prudence "is not that of a prudent layperson but rather that of a prudent fiduciary with experience dealing with a similar enterprise." *Whitfield v. Cohen*, 682 F. Supp. 188, 194 (S.D.N.Y. 1988). Put another way, ERISA fiduciaries must "act in good faith as an objectively prudent fiduciary would act, not simply as a prudent layperson would act." *Chesemore v. All. Holdings, Inc.*, 886 F. Supp. 2d 1007, 1041 (W.D. Wis. 2012), *aff'd* 829 F.3d 803 (7th Cir. 2016).

86. ERISA's fiduciary duties entail, among other things:

a. The duty to conduct an independent and thorough investigation into, and to continually monitor the merits of all the investment alternatives of a plan;

b. The duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor; and

c. The duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

87. According to Department of Labor ("DOL") regulations and case law interpreting these statutory provisions, in order to comply with the prudence requirement under ERISA §404(a), a fiduciary must show that: (a) he has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved,

16

including the role the investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties; and (b) he has acted accordingly.

88.     Again, according to DOL regulations, "appropriate consideration" in this context includes, but is not necessarily limited to:

- o   A determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or, where applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties), to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action; and

- o   Consideration of the following factors as they relate to such portion of the portfolio:

  - ▪   The composition of the portfolio with regard to diversification;

  - ▪   The liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the plan; and

  - ▪   The projected return of the portfolio relative to the funding objectives of the plan.

89.     A fiduciary that undertakes to sell plan assets is bound by the duties of prudence and loyalty when they do so. A prudent and loyal fiduciary with experience selling large private companies would make sure that they identified and solicited offers from all types of potential buyers, including competitors.

90.     ERISA § 405 renders Plan fiduciaries liable for the breaches of other fiduciaries under certain circumstances, such as when a fiduciary knowingly participates in or conceals the

breach of another fiduciary, if the fiduciary's own breach enables the breach by the other fiduciary, or if the fiduciary is aware of the other fiduciary's breach yet makes no reasonable effort to correct the breach.

91.     ERISA § 406 prohibits Plan fiduciaries from entering into transactions between the plan and a party in interest or from entering into various transactions involving the plan and a fiduciary that directly involve, or raise a heightened risk of, self-dealing by the plan's fiduciary.

92.     ERISA § 206(d)(4) provides that courts may order an offset of all or part of a participant's benefits against the amount the participant is ordered or required to pay to the plan, if, among other things, the participant breached his ERISA fiduciary duties.

## CLASS ACTION ALLEGATIONS

93.     ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), authorizes any participant or beneficiary of a retirement plan to bring an action individually on behalf of that plan to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109(a). Such claims are brought "in a representative capacity on behalf of the plan as a whole." *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 142 (1985).

94.     The claims set forth in this action meet the requirements of Rule 23, and class certification would be appropriate with respect to the following class (the "Class"):

> All participants in and beneficiaries of the Segerdahl Corporation Employee Stock Ownership Plan at the time the ESOP was terminated, with the exception of Defendants in this action and their beneficiaries.

95.     The Class includes at least 400 participants in the ESOP, and is therefore so numerous that joinder of all class members would be impracticable.

96.     There are numerous questions of law and fact common to the Class because the claims asserted herein arise out of a singular course of common conduct by Defendants that

affected all class members through their participation in the ESOP in precisely the same way, in violation of precisely the same legal duties. Common questions of law and fact include the following:

  a. whether Defendants Greatbanc, John Does 1-10 or the Board of Directors Defendants breached their fiduciary duties with respect to the ESOP Buyout;

  b. whether Defendants Schneider and Joutras were fiduciaries with respect to the Plan and if so, whether they breached their fiduciary duties or engaged in self-dealing prohibited transactions;

  c. whether Defendants Greatbanc, the Board of Directors Defendants, John Does 1-10, Schneider or Joutras breached their duties as cofiduciaries; and

  d. whether Defendants Schneider or Joutras knowingly participated in and benefitted from the ESOP Buyout and the other misconduct described above, and, if so, whether they are subject to equitable remedies for such conduct.

97. Mr. Rush's claims are typical of the claims of the Class because Mr. Rush was an ESOP participant who received less than adequate consideration for the shares of Segerdahl in his ESOP account as a result of the ESOP Buyout and the other misconduct described herein in precisely the same way that all other Class members received less than adequate consideration for the shares of Segerdahl in their ESOP accounts as a result of the ESOP Buyout and the other misconduct described herein.

98. Mr. Rush is an adequate representative of the Class because he is a participant in the ESOP who received less than adequate consideration for the shares of Segerdahl in his ESOP account as a result of the ESOP Buyout and the other misconduct described herein; has no interest that conflicts with other members of the proposed Class; is committed to the vigorous

representation of the Class; and has engaged experienced and competent attorneys to represent the Class.

99.     Certification of the claims asserted herein would be appropriate under Rule 23(b)(1)(A) or (B). Prosecution of separate actions by the ESOP participants for the breaches of fiduciary duty and prohibited transactions described herein would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct. In addition, an adjudication of the claims asserted herein by any ESOP participant would, as a practical matter, be dispositive of the interests of all other ESOP participants. As this Court has recognized several times, "[b]ecause of ERISA's distinctive 'representative capacity' and remedial provisions, ERISA litigation of this nature presents a paradigmatic example of a [Rule 23](b)(1) class." *Neil v. Zell*, 275 F.R.D. 256, 267 (N.D. Ill. 2011).

100.     Alternatively, this action should be certified as a class under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) or (B). A class action is the superior method for the fair and efficient adjudication of this controversy because common questions of law and fact predominate over questions affecting only individual class members, and because, in light of the representative nature of the claims at issue, a class action would be superior to other available methods for fairly and efficiently adjudicating the controversy.

101.     Mr. Rush's counsel will fairly and adequately represent the interests of the Class and is best able to represent the interests of the Class under Rule 23(g).

### COUNT I
### Breach of Fiduciary Duty
### ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1)
### Defendants Greatbanc, Board of Directors Defendants and John Does 1-10

102.     Plaintiff repeats and realleges each of the allegations in the foregoing paragraphs as if fully set forth herein.

103. ERISA § 404, 29 U.S.C. §1104, requires ERISA fiduciaries to perform their fiduciary duties and responsibilities prudently, as would an experienced ERISA fiduciary, and loyally, exclusively in the interest of the plan and its participants for the purpose of providing benefits.

104. As alleged above, Defendants Greatbanc, the Board of Directors Defendants, and John Does 1-10 were express or de facto fiduciaries for the ESOP.

105. As fiduciaries for the ESOP, Defendants Greatbanc and John Does 1-10 failed to prudently and loyally fulfill their fiduciary duties when, acting in a fiduciary capacity on behalf of the ESOP, they approved the ESOP Buyout despite actual or constructive knowledge that the sale process leading to the ESOP Buyout was flawed for at least the following reasons:

    a. they knew or should have known that the Segerdahl Defendants had focused on a sale to a buyer that would preserve management, including Schneider and other insiders, and that the Segerdahl Defendants did not market Segerdahl to other potential buyers, including competitors, who would have paid more but would likely have replaced management;

    b. they knew or should have known that a significant portion of the purchase price paid by ICV Partners was being diverted away from the ESOP to the Segerdahl Defendants and other Segerdahl insiders;

    c. they knew or should have known that the price the ESOP received for its Segerdahl shares in the ESOP Buyout did not take into account the immediately realizable fair market value of Segerdahl's real estate assets; and

    d. they knew or should have known that the Segerdahl Defendants planned to divert a significant portion of purchase price paid by ICV Partners away from the ESOP.

106. As alleged above, as fiduciaries of the ESOP, Defendants Greatbanc and John Does 1-10 failed to ensure that the ESOP received the fair market value of its shares. Fair market value measures what a hypothetical willing buyer would pay to a hypothetical willing seller, when neither party is under any compulsion to buy or sell. Determining fair market value requires considering the highest and best use of the asset in question, which requires evaluating the characteristics of likely potential buyers, and should take into account the population of potential willing buyers. That includes buyers who, for a variety of reasons, might want to pay more than others. This certainly requires evaluating the characteristics of types of likely potential willing buyers. Determining fair market value in the context of the ESOP Buyout was especially important, because all of the ESOP's assets were to be liquidated in that transaction, and the ESOP was permanently giving up its stake in Segerdahl. Because other types of buyers, such as competitors, would have paid a higher price for the ESOP's shares than did ICV Partners, the fair market value of the ESOP's shares was higher than what ICV Partners would have paid. On information and belief, Defendants Greatbanc and John Does 1-10 relied on a valuation of the ESOP in approving the transaction that failed to consider the characteristics of likely potential buyers, including operating companies like competitors, and failed to consider what those likely potential buyers would have paid. Defendants Greatbanc and John Does 1-10 knew or should have known that the valuation failed to take that higher potential price into account, and knew or should have known that the valuation failed to represent the fair market value of the ESOP's shares for that reason. In the case of the ESOP Buyout that obligation was especially important, because it represented a sale of 100% of the ESOP's Segerdahl shares.

107. In addition, as fiduciaries for the ESOP, Defendants Greatbanc and John Does 1-10 failed to prudently and loyally fulfill their fiduciary duties when they failed to act to protect the

ESOP's interests when the Segerdahl Defendants diverted millions of dollars of the purchase proceeds in the ESOP Buyout away from the ESOP and to themselves and other Segerdahl insiders.

108. The Board of Directors Defendants violated their duties of prudence and loyalty when they appointed and failed to monitor or remove Defendants Greatbanc and John Does 1-10, even though the Board of Directors Defendants knew or should have known that Defendants Greatbanc and John Does 1-10 were preparing to and in fact did approve the ESOP Buyout even though the ESOP Buyout was not fair to the ESOP.

109. Any of these fiduciaries could, and should, have taken any number of actions to protect the ESOP's interests, but they did not. For example, a fiduciary uncertain of the proper course to take and confronted by a situation involving conflicts of interest—as was the case with the ESOP Buyout—could have come to court and obtained direction from the court as the appropriate course of action to protect the ESOP.

110. But Defendants Greatbanc, John Does 1-10 and the Board of Directors Defendants did not take action to protect the ESOP, and instead allowed the ESOP Buyout to close despite their actual or constructive knowledge of the flawed process leading to the ESOP Buyout described above.

111. These actions, and failures to act, violated the duties of prudence and loyalty contained in ERISA § 404(a).

112. Under ERISA § 409(a), 29 U.S.C. § 1109(a), a fiduciary that violates any of ERISA's duties, including ERISA § 404(a), must "make good" to the plan the losses to the plan resulting from its violations, and is "subject to such other equitable or remedial relief as the court may deem appropriate."

113.     Thus, under ERISA §§ 502(a)(2) and 409(a), 29 U.S.C. §§ 1132(a)(2) and 1109(a), Defendants Greatbanc, John Does 1-10 and the Board of Directors Defendants are liable, in an amount to be determined at trial, for the losses to the Plan caused by their violations of ERISA § 404(a), and are "subject to such other equitable or remedial relief" as the Court "may deem appropriate."

114.     Under ERISA § 502(a)(3), Defendants Greatbanc, John Does 1-10 and the Board of Directors Defendants are also subject to appropriate equitable relief including, but not limited to, constructive trust and equitable surcharge.

**COUNT II**
**Breach of Fiduciary Duty and Prohibited Transaction**
**ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1)**
**ERISA § 406(b), 29 U.S.C § 1106(b)**
**Defendants Schneider and Joutras**

115.     Plaintiff repeats and realleges each of the allegations in the foregoing paragraphs as if fully set forth herein.

116.     ERISA § 404, 29 U.S.C. §1104, requires ERISA fiduciaries to perform their fiduciary duties and responsibilities prudently, as would an experienced ERISA fiduciary, and loyally, exclusively in the interest of the plan and its participants for the purpose of providing benefits.

117.     ERISA § 406(b)(1) prohibits plan fiduciaries from "deal[ing] with the assets of the plan in [their] own interest or for [their] own account."

118.     As alleged above, Defendants Schneider and Joutras were de facto fiduciaries for the ESOP by virtue of the control they exercised over the ESOP and its assets.

119.     As fiduciaries for the ESOP, Defendants Schneider and Joutras used their control over the ESOP to influence the terms of the ESOP Buyout and preceding sales process and to cause

24

the ESOP to engage in the ESOP Buyout despite the fact that the ESOP Buyout was the result of a flawed sale process and was not in the ESOP's best interests.

120.     In addition, Defendants Schneider and Joutras used their control over the ESOP and Segerdahl to divert millions of dollars of the sale proceeds away from the ESOP and to themselves and other Segerdahl insiders, and used their control over the ESOP and Segerdahl to prevent the ESOP from protecting its rights as a shareholder of Segerdahl.

121.     This misconduct violated the duties of prudence and loyalty contained in ERISA § 404(a), and the prohibition on self-dealing with plan assets set forth in ERISA § 406(b)(1).

122.     Under ERISA § 409(a), 29 U.S.C. § 1109(a), a fiduciary that violates any of ERISA's duties, including ERISA § 404(a) or ERISA § 406(b)(1), must "make good" to the plan the losses to the plan resulting from its violations, and is "subject to such other equitable or remedial relief as the court may deem appropriate."

123.     Thus, under ERISA §§ 502(a)(2) and 409(a), 29 U.S.C. §§ 1132(a)(2) and 1109(a), Defendants Schneider and Joutras are liable, in an amount to be determined at trial, for the losses to the Plan caused by their violations of ERISA § 404(a) and ERISA § 406(b)(1), and are "subject to such other equitable or remedial relief" as the Court "may deem appropriate."

124.     Under ERISA § 502(a)(3), Defendants Schneider and Joutras are also subject to appropriate equitable relief including, but not limited to, constructive trust and equitable surcharge

**COUNT III**
**Breach of Co-Fiduciary Duty**
**ERISA § 405(a)(1)-(3), 29 U.S.C. § 1105(a)(1)-(3)**
**Defendants Greatbanc, Board of Directors Defendants, John Does 1-10, Schneider and Joutras**

125.     Plaintiff repeats and realleges each of the allegations in the foregoing paragraphs as if fully set forth herein.

126.     A fiduciary with respect to a plan is liable for the breach "of another fiduciary" for the same plan if "he participates knowingly in, or knowingly undertakes to conceal, an act or omissions of such other fiduciary, knowing such act or omission is a breach," ERISA § 405(a)(1), or if, "by his failure to comply with [his fiduciary duties] in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach," ERISA § 405(a)(2), or if "he has knowledge of a breach by some other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach." ERISA § 405(a)(3).

127.     Pursuant to § 405 of ERISA, 29 U.S.C. § 1105, Defendants Greatbanc, the Board of Directors Defendants, John Does 1-10, Schneider and Joutras are also liable as co-fiduciaries with respect to the above-described violations because they participated knowingly in their co-fiduciaries' breaches; enabled other fiduciaries to violate ERISA by virtue of their own breaches of fiduciary duty; knowingly undertook to conceal those breaches; enabled their co-fiduciaries to commit the breaches and failed to make any reasonable efforts to remedy the breaches.

128.     ERISA § 502(a)(2) permits plan participants, such as Plaintiff, to bring civil actions for "appropriate relief" under ERISA § 409.

129.     Under ERISA § 409(a), a fiduciary that violates any of ERISA's duties, including ERISA § 405(a)(1), (a)(2) and (a)(3), must "make good" to the Plans the losses to the Plans resulting from its violations of ERISA § 405(a)(1), (a)(2) and (a)(3), and is "subject to such other equitable or remedial relief as the court may deem appropriate."

130.     Thus, Defendants Greatbanc, the Board of Directors Defendants, John Does 1-10, Schneider and Joutras are liable, in an amount to be determined at trial, for the losses to the ESOP

caused by their violations of ERISA § 405(a)(1), (a)(2) and (a)(3), and are "subject to such other equitable or remedial relief" as the Court "may deem appropriate."

131.    Under ERISA § 502(a)(3), Defendants Greatbanc, the Board of Directors Defendants, John Does 1-10, Schneider and Joutras are also subject to appropriate equitable relief including, but not limited to, constructive trust and equitable surcharge.

**COUNT IV**
**Knowing Participation in and Receipt of Benefit from Violations of ERISA**
**ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)**
**Defendants Schneider and Joutras**

132.    Plaintiff repeats and realleges each of the allegations in the foregoing paragraphs as if fully set forth herein.

133.    ERISA § 502(a)(3) permits a plan participant to bring a civil action to obtain appropriate equitable relief to enforce the provisions of Title I of ERISA or to enforce the terms of a plan.

134.    The Supreme Court has held that anyone, including a non-fiduciary, who receives the benefit of conduct that violates ERISA may be subject to equitable remedies under ERISA § 502(a)(3) if they have "actual or constructive knowledge of the circumstances that rendered the transaction unlawful." *Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 251 (2000).

135.    As a result of the fiduciary breaches and prohibited transactions described herein, Defendants Schneider and Joutras received millions of dollars that otherwise would have been paid to the ESOP.

136.    Defendants Schneider and Joutras had full knowledge of the existence of the ESOP and the reasons why these transactions were unlawful and unfair to the ESOP.

137.    Defendants Schneider and Joutras have profited from these fiduciary breaches and prohibited transactions in an amount to be proven at trial, and on information and belief they remain in possession of at least some of the proceeds that belong in good conscience to the Plans. All such money that belongs in good conscience to the Plans is subject to a constructive trust in favor of the Plans, for which Defendants Schneider and Joutras serve as constructive trustees. As constructive trustees, under ERISA § 502(a)(3), Defendants must disgorge to the Plans all such money or the product thereof that is traceable to the prohibited transactions as well as any profits made thereon.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

A.    Certify this action as a class action pursuant to Fed. R. Civ. P. 23(a);

B.    Declare that Defendants breached their fiduciary duties to the ESOP;

C.    Enjoin Defendants from further violations of their fiduciary responsibilities, obligations, and duties and from further engaging in transactions prohibited by ERISA;

D.    Order that Defendants make good to the ESOP the losses resulting from their serial breaches of fiduciary duty;

E.    Order that Defendants disgorge any profits that they have made through their breaches of fiduciary duty and prohibited transactions and impose a constructive trust and/or equitable lien on any funds received by Defendants therefrom;

F.    Order any other available equitable relief, or remedies, including but not limited to, the imposition of a surcharge, the restoration of the ESOP to the position they would have been but for the breaches of fiduciary duty and self-dealing; and any other kind of relief and/or damages available pursuant to ERISA §§ 409 and 502(a)(2) and (3);

        G.      Order that Defendants' accounts in the ESOP be offset under ERISA § 206(d)(4) to cover the losses to the ESOP from Defendants' misconduct set forth herein;

        H.      Award Plaintiff reasonable attorneys' fees and costs of suit incurred herein pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g), and/or for the benefit obtained for the ESOP;

        I.      Order Defendants to pay prejudgment interest;  and

        J.      Award such other and further relief as the Court deems equitable and just.

DATED: February 5, 2019

Respectfully submitted,

Bruce Rush, as a participant in and on behalf of the Segerdahl Corporation Employee Stock Ownership Plan, and on behalf of a class of all others who are similarly situated,

By: */s/ Michael M. Mulder*

Michael M. Mulder
Elena N. Liveris
The Law Offices of Michael M. Mulder
1603 Orrington Avenue, Suite 600
Evanston, Illinois 60201
Telephone: (312) 263-0272
mmmulder@mmulderlaw.com
eliveris@mmulderlaw.com

Todd Schneider*
James A. Bloom*
Kyle G. Bates*
SCHNEIDER WALLACE COTTRELL
KONECKY WOTKYNS LLP
2000 Powell Street, Ste. 1400
Emeryville, California  94608
Telephone: (415) 421-7100
tschneider@schneiderwallace.com
jbloom@schneiderwallace.com
kbates@schneiderwallace.com

*Pro Hac Vice application forthcoming*

*Attorneys for Bruce Rush*