**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| BRUCE RUSH, as a participant in and on behalf of the Segerdahl Corporation employee stock ownership plan, and on behalf of a class of all others who are similarly situated, | |
| Plaintiff, | Case No.: 1:19-cv-00738 |
| v. | Judge Andrea R. Wood |
| GREATBANC TRUST COMPANY; MARY LEE SCHNEIDER; RICHARD JOUTRAS; RODNEY GOLDSTEIN; PETER MASON; ROBERT CRONIN; JOHN DOE DEFENDANTS 1-10; and SEGERDAHL CORP. (d/b/a SG360), | Magistrate Judge Susan E. Cox |
| Defendants. | |

**DEFENDANTS' ANSWER TO PLAINTIFF'S CLASS ACTION COMPLAINT,
STATEMENT OF AFFIRMATIVE DEFENSES AND
COMPULSORY COUNTERCLAIM AGAINST PLAINTIFF**

Defendants, GreatBanc Trust Company ("GreatBanc"), Mary Lee Schneider and Richard

Joutras (the "Executive Officer Defendants"), Rodney Goldstein, Peter Mason, and Robert Cronin

(the "Outside Director Defendants"), and the Segerdahl Corp. d/b/a SG 360 ("Segerdahl"),

(collectively "Defendants") hereby respond to Plaintiff's Complaint as follows:

**PRELIMINARY STATEMENT**

The Complaint spans thirty pages and sets forth various counts under federal law.

Throughout the Complaint, factual allegations are intertwined with legal conclusions, and in many

cases, those allegations and conclusions are not clearly directed at one or more particular

Defendants. Throughout the Complaint, Plaintiff Bruce Rush resorts extensively to argumentative

prose, instead of concise, neutral allegations of fact that would permit simple, clear responses.

Faced with these (and other) pleading challenges inherent to the Complaint, Defendants aver that this pleading is intended to constitute a general denial of liability under any legal theory, as well as a general denial of any and all factual allegations giving rise to such liability. Any statement, conclusion, allegation, etc. set forth in the Complaint is denied, except where explicitly admitted, and then, only insofar as it is consistent with Defendants' general denial of liability. Statements by Defendants that they aver or admit to something reflect that one or more of the Defendants has the knowledge or factual basis to make that statement, not that all Defendants have collectively the same knowledge on that matter. The Complaint also includes allegations against otherwise-unidentified "Doe" defendants, which does not require any response from Defendants. Any factual averment admitted herein is admitted only as to those specific facts and not as to any conclusions, arguments, characterizations, implications, or speculations that are contained in any averment or in the Complaint as a whole.

With respect to the numbered allegations of the Complaint, Defendants respectfully aver:

1.    Plaintiff Bruce Rush, a participant in the Segerdahl Corp. Employee Stock Ownership Plan (the "ESOP"), brings this action in a representative capacity on behalf of the ESOP and as a class action on behalf of all other similarly situated participants in and beneficiaries of the ESOP. He brings this action under Sections 502(a)(2) and 502(a)(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1132(a)(2) and 1132(a)(3), against Defendants GreatBanc Trust Company ("GreatBanc"), Mary Lee Schneider, Richard Joutras, Rodney Goldstein, Peter Mason, Robert Cronin (together Schneider, Joutras, Goldstein, Mason and Cronin are the "Board of Directors Defendants") and John Does 1-10 (together, "Defendants"). Segerdahl Corp. ("Segerdahl"), was the sponsor of the ESOP, and is a nominal defendant in this matter.

**ANSWER: Defendants admit that this case is governed by ERISA and that jurisdiction is proper in this case as a result. Except as expressly admitted herein, Defendants deny the allegations of paragraph 1 of Plaintiff's Complaint.**

2. Segerdahl was established in 1956 and is headquartered in Wheeling, Illinois. Segerdahl is one of the largest and most successful printing companies in the United States.

**ANSWER: Defendants admit that the Segerdahl Corp. was established in 1956 and is headquartered in Wheeling, Illinois. Except as expressly admitted herein, Defendants deny the allegations of paragraph 2 of Plaintiff's Complaint.**

3. Segerdahl has roughly 770 employees, and is the fourth-largest, fully-integrated direct mail printer in North America and the largest company focused on medium and high volume direct mail printing, holding approximately 10% of this market segment. Segerdahl's customers include Fortune 500 companies across a variety of industries. By 2015, Segerdahl had more than $300 million per year in sales.

**ANSWER: Segerdahl denies the allegations of paragraph 3 as written. Segerdahl has roughly 870 employees, and had approximately $293 million in sales in 2015. It is also one of the largest fully-integrated direct mail printers in North America, and its customers do include Fortune 500 companies across a variety of industries.**

4. In 2003, Segerdahl established the ESOP to help its employees save for retirement and enjoy an ownership interest in Segerdahl.

**ANSWER: Defendants admit that Segerdahl established an Employee Stock Ownership Plan for its employees. Further, answering, Defendants aver that this was a highly successful ESOP for the employees. During the ESOP's thirteen-year history, Segerdahl's stock price grew 8,044%, from $162.50 a share when the ESOP acquired Segerdahl in 2003,**

to $13,072 a share by the time the ESOP sold its shares to ICV Partners in December 2016. This outstanding growth in ESOP value occurred because of the long-standing exercise of sound business judgment by Defendant Richard Joutras and other officers and directors of Segerdahl, which sound business judgment was applied to selling Segerdahl in 2016. This outstanding growth in ESOP value, including the very rapid increase in Segerdahl's share price from $7,792.45 a share at mid-year 2015 to $12,638 a share at year-end 2015, also created very large repurchase exposure on Segerdahl of approximately $80,000,000 by the time the company was sold. These capital needs were resolved by selling Segerdahl to ICV Partners, and thus locking in these profits and retirement benefits for the ESOP participants. Except as expressly admitted herein, Defendants deny the allegations of paragraph 4 of Plaintiff's Complaint.

5.      Plaintiff Bruce Rush is a former employee of Segerdahl and a participant in the ESOP.

**ANSWER: Defendants admit the allegations contained in paragraph 5 of Plaintiff's Complaint. Further answering, Plaintiff Bruce Rush was a former senior vice president of manufacturing at Segerdahl who received stock appreciation rights for which he received $1,809,142 from the proceeds of the sale of Segerdahl.**

6.      From 2003 until December 7, 2016, the ESOP owned 100% of the outstanding common stock of Segerdahl.

**ANSWER: Defendants admit the allegations contained in paragraph 6 of Plaintiff's Complaint.**

7.      On December 7, 2016, ICV Partners, an investment capital firm, purchased Segerdahl from the ESOP (the "ESOP Buyout").

**ANSWER: Defendants admit the allegations contained in paragraph 7 of Plaintiff's Complaint.**

8.     In the ESOP Buyout, ICV Partners paid less than the fair market value of the ESOP's shares, and paid less than what other willing buyers would have paid for the ESOP's shares.

**ANSWER: Defendants deny the allegations contained in paragraph 8 of Plaintiff's Complaint.  Further answering, Defendants aver that Segerdahl was sold to an outside buyer through a prudent process, by parties who had substantial financial incentivizes to maximize Segerdahl's sales price, and with the advice and guidance of experienced legal and financial advisors. This sale was further subject to review and approval on behalf of the ESOP by the independent institutional trustee GreatBanc, which had its own legal advisor, and an independent financial advisor review the ESOP Buyout for fair market value and financial fairness to the ESOP.**

9.     At all relevant times leading up to the ESOP Buyout, and despite the ESOP's ownership of 100% of Segerdahl's shares, Defendants Schneider and Joutras (together, the "Segerdahl Defendants") exercised effective control over Segerdahl. The control in substance that the Segerdahl Defendants wielded gave them the effective ability to hire and fire board members and retain or remove the ESOP's trustee and other fiduciaries. At all relevant times leading up to the ESOP Buyout, the Segerdahl Defendants actually exercised this control, and in fact appointed or retained all members of Segerdahl's board of directors as well as the ESOP's trustee and other fiduciaries. In addition, the Segerdahl Defendants' control over Segerdahl permitted them to control their own compensation and bonuses.

**ANSWER: Defendants deny the allegations contained in paragraph 9 of Plaintiff's Complaint.**

10.     The Segerdahl Defendants engaged in a deeply flawed process in marketing Segerdahl to potential buyers leading up to the ESOP Buyout. Instead of seeking to maximize the price the ESOP received for its shares, the Segerdahl Defendants marketed the company primarily to investment firms and intentionally avoided marketing Segerdahl to its competitors. Even though a competitor would have paid more for the company than an investment firm like ICV Partners, the competitor would have taken over day to day control of the company's operations from the Segerdahl Defendants. Losing control would come at real cost for the Segerdahl Defendants, who would lose the ability to set their own compensation and bonuses. Moreover, the Segerdahl Defendants ran a risk of losing their jobs if the company was sold to a competitor, as the buying competitor would eventually consolidate the Segerdahl Defendants' jobs functions into the buyers' existing management structure to realize synergistic value from the deal. By contrast, an investment capital firm, like ICV Partners, with less experience in the printing industry, would likely leave management in place and in control over the company's operations.

**ANSWER: Defendants admit Segerdahl was primarily marketed to investment buyers rather than to competitors, but not for the reasons articulated by Plaintiff Rush (who posts mere speculation for his assertion).   Further answering, Defendants aver that the Executive Officer Defendants (Joutras and Schneider) and the Outside Director Defendants (Goldstein, Mason and Cronin) had substantial, concrete financial incentivizes to maximize Segerdahl's sales price that were worth many millions, far more than the speculative value of continuing any employment with an unknown financial buyer (in fact, only one of these five Defendants was employed by the ultimate buyer), and that they exercised their sound**

business judgment to decide to exclude competitors from this process. This business judgment reflected the Executive Officer Defendants' and the Outside Director Defendants' substantial concerns that in Segerdahl's highly competitive market, shopping to competitors risked devaluing Segerdahl through competitors' acquisition of Segerdahl's sensitive information, including on customer pricing, customer lists, and employee pay and sales incentives as Segerdahl's sales model had no customer contracts with committed volume.

The Executive Officer Defendants and the Outside Director Defendants further aver that against this known risk of loss, that Segerdahl was more profitable than any likely possible competitive buyer, and that these and other business factors and contemporaneous market conditions made it unlikely that any competitor would bid a premium for Segerdahl, instead of using this as an opportunity to acquire Segerdahl's highly valuable confidential competitive information, and thereby devalue Segerdahl to other, financial bidders. The other business factors and contemporaneous market conditions included that Segerdahl's two most successful competitors, RR Donnelley & Sons Company and Quad Graphics Inc., were trading at lower multiples around the time of the Segerdahl sale than Segerdahl received in the sale. Also, Donnelley was in the process of a breakup into three separate companies in 2015 and 2016, and did not appear to be in a financial position to purchase a company trading at as high a multiple as Segerdahl expected and received in when its sale was contemplated. Finally, Quad had recently purchased a direct printing company with a similar business model to that of Segerdahl, and the purchase of Segerdahl would have been duplicative for Quad. The Executive Officer Defendants and the Outside Director Defendants further aver that their decision was a reasonable and prudent exercise of business judgment, made by those whose financial incentives were strongly aligned with the

**ESOP. Except as expressly admitted herein, Defendants deny the allegations of paragraph 10 of Plaintiff's Complaint.**

11.     The Segerdahl Defendants also agreed to the ESOP Buyout transaction knowing that ICV Partners planned to engage in sale-leaseback transactions of Segerdahl's primary real estate after the ESOP Buyout. However, the Segerdahl Defendants failed to ensure that ICV Partners paid an appropriate price for the ESOP's Segerdahl shares in light of the immediately realizable cash value of Segerdahl's real estate assets.

**ANSWER: Defendants admit knowledge of the potential for a sale-leaseback transaction involving the real property owned by Segerdahl. Defendants further aver that the potential for this sale-leaseback transaction was discussed with ICV during negotiations for the purchase of Segerdahl, and that Segerdahl used this potential value to negotiate the final purchase price with ICV. Further answering, Defendants aver that this real estate was part of the operating assets of Segerdahl, managed by those whose financial incentives were strongly aligned with the ESOP to maximize its value in use and through any sale, and that they exercised their reasonable and prudent business judgment in doing so. Further answering, Defendants also aver that this real estate was part of the operating assets include in Segerdahl's value determined by the independent financial advisor to the independent trustee, GreatBanc, which independent financial advisor further found the sale to be for fair market value and financially fair to the ESOP. Except as expressly admitted herein, Defendants deny the allegations of paragraph 11 of Plaintiff's Complaint.**

12.     Moreover, on information and belief, a significant portion of the purchase price paid by ICV Partners was wrongfully diverted from the ESOP by the Segerdahl Defendants, perhaps totaling millions of dollars. On information and belief, the total purchase price ICV

Partners paid for Segerdahl was in excess of $265 million. However, only approximately $151 million was paid to the ESOP. On information and belief, all or a significant portion of the difference between the $265 million ICV agreed to pay and the $151 million actually distributed to the ESOP was wrongfully diverted from the ESOP. The Segerdahl Defendants used their control over Segerdahl and the ESOP to divert tens of millions of dollars away from the ESOP and to themselves and other insiders during the ESOP Buyout. This diversion of the ESOP's assets came in the form of transaction bonuses and as payment for stock appreciation rights that matured in the event of a change in control.

**ANSWER: Defendants admit that the total purchase price ICV Partners paid for Segerdahl was $265 million, and that the ESOP received approximately $151 million in this sale for ESOP stock and paying off ESOP notes. Further answering, Defendants aver that approximately $83 million of these remaining sale proceeds went to pay off term loans and other debt of Segerdahl at the time of the sale, and $2.6 million went for various transaction expenses related to this sale. Defendants further aver that a portion of the remaining sales proceeds were for stock appreciation rights and transaction bonuses that were structured to incentivize the investment banker JP Morgan and Segerdahl's officers, executives and directors to obtain the highest possible price for Segerdahl in the sale of the company.**

**Further answering, Defendants aver that Segerdahl's senior leadership had a long standing, successful practice of exercising their business judgment to award stock appreciation rights to incentivize officers, executives and directors to grow the value of Segerdahl. During the ESOP's thirteen-year history, Segerdahl's stock price grew 8,044%, from $162.50 a share when the ESOP acquired Segerdahl in 2003, to $13,072 a share by the time the ESOP sold its shares to ICV Partners in December 2016. Segerdahl's obligations**

**on these stock appreciation rights existed before any buyer was found for Segerdahl, and include the $1,809,142 paid to Plaintiff Bruce Rush for his stock appreciation rights. Except as expressly admitted herein, Defendants deny the allegations of paragraph 12 of Plaintiff's Complaint.**

13.     Defendant GreatBanc and/or John Does 1-10 were the ESOP fiduciaries responsible for approving the ESOP Buyout on behalf of the Plan. Defendant GreatBanc and John Does 1-10 knew or should have known: (a) that the ESOP Buyout was the result of a flawed sales process; (b) that the price the ESOP received from ICV Partners was below what other buyers would have paid for those shares, (c) that the transaction did not appropriately credit the value of Segerdahl's real estate assets in the sale price for Segerdahl itself, and (d) millions of dollars that should have been paid to the ESOP would be diverted from the ESOP to the Segerdahl Defendants and other Segerdahl insiders. Defendant GreatBanc and John Does 1-10, as the ESOP's primary fiduciaries, had an affirmative duty to ensure the fairness of the ESOP Buyout to the ESOP—a duty they failed to fulfill.

**ANSWER: Defendants admit that GreatBanc was the ESOP fiduciary delegated the exclusive authority to determine whether to approve the ESOP Buyout on behalf of the ESOP. Except as expressly admitted herein, Defendants deny the allegations of paragraph 13 of Plaintiff's Complaint.**

14.     As fiduciaries of the ESOP, Defendants GreatBanc and John Does 1-10 failed to ensure that the ESOP received the fair market value of its shares. Fair market value measures what a hypothetical willing buyer would pay to a hypothetical willing seller, when neither party is under any compulsion to buy or sell. Determining fair market value requires considering the highest and best use of the asset in question, which requires evaluating the characteristics of likely potential

buyers, and should take into account the population of potential willing buyers. That includes buyers who, for a variety of reasons, might want to pay more than others. This certainly requires evaluating the characteristics of types of likely potential willing buyers. Determining fair market value in the context of the ESOP Buyout was especially important, because all of the ESOP's assets were to be liquidated in that transaction, and the ESOP was permanently giving up its stake in Segerdahl. Because other types of buyers, such as competitors, would have paid a higher price for the ESOP's shares than did ICV Partners, the fair market value of the ESOP's shares was higher than what ICV Partners would have paid. On information and belief, Defendants GreatBanc and John Does 1-10 relied on a valuation of the ESOP in approving the transaction that failed to consider the characteristics of likely potential buyers, including operating companies like competitors, and failed to consider what those likely potential buyers would have paid. Defendants GreatBanc and John Does 1-10 knew or should have known that the valuation failed to take that higher potential price into account, and knew or should have known that the valuation failed to represent the fair market value of the ESOP's shares for that reason.

**ANSWER: Paragraph 14 of the Complaint states argument and conclusions of law, to which no response is required. If, however, a response is required, Defendants deny the allegations of paragraph 14 of Plaintiff's Complaint.**

15.     The Board of Director Defendants were responsible for appointing, retaining and overseeing Defendant GreatBanc and John Does 1-10. The Board of Director Defendants, including the Segerdahl Defendants, had interests in the ESOP Buyout that conflicted with the ESOP's interests, and failed to ensure that GreatBanc and John Does 1-10 acted solely in the interests of the ESOP.

**ANSWER: The Administrator of the ESOP delegated to GreatBanc the exclusive authority to decide whether to approve the ESOP Buyout. Defendants deny the remaining allegations of paragraph 15 of Plaintiff's Complaint.**

## JURISDICTION

16.     Plaintiff brings this action pursuant to ERISA §§ 502(a)(2) and 502(a)(3), 29 U.S.C. §§ 1132(a)(2) and (3).

**ANSWER: Defendants admit that this case is governed by ERISA and that jurisdiction is proper in this case as a result. Except as expressly admitted herein, Defendants deny the allegations of paragraph 16 of Plaintiff's Complaint.**

17.     This Court has subject matter jurisdiction over Plaintiff's claims pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because this action arises under the laws of the United States.

**ANSWER: Defendants admit that this case is governed by ERISA and that jurisdiction is proper in this case as a result. Except as expressly admitted herein, Defendants deny the allegations of paragraph 17 of Plaintiff's Complaint.**

18.     This Court has general personal jurisdiction over GreatBanc, the Board of Director Defendants, and John Does 1-10 because those Defendants reside in this District. This Court has specific personal jurisdiction over all Defendants because they took the actions described herein in this District or directed those actions specifically at this District.

**ANSWER: Other than for the John Doe Defendants to which no response is required, Defendants admit the allegations contained in paragraph 18 of Plaintiff's Complaint, except to deny plaintiff's allegations regarding the residency of defendants Robert Cronin and Peter**

Mason. Defendants aver that defendants Robert Cronin and Peter Mason are citizens and residents of the state of Florida.

19.     Pursuant to 29 U.S.C. § 1132(e)(2) venue is proper in this District because the Plan is administered in this District and the misconduct described herein occurred in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because, for the same reasons, a substantial part of the events or omissions giving rise to the claim occurred in this District.

**ANSWER: Defendants admit that venue is proper in this District. Defendants deny the remaining allegations contained in paragraph 19 of Plaintiff's Complaint.**

### THE PARTIES AND THE ESOP

20.     The ESOP is an employee benefit plan and an employee pension benefit plan covered by ERISA within the meaning of ERISA § 3(2)(A) & (7), 29 U.S.C. § 1002(2)(A) & (7).

**ANSWER: Defendants admit the allegations contained in paragraph 20 of Plaintiff's Complaint.**

21.     At all relevant times, Plaintiff Bruce Rush has been a participant in the ESOP. Rush is a citizen and resident of Illinois.

**ANSWER: Defendants admit Plaintiff Bruce Rush has been a participant in the ESOP. Defendants deny the remaining allegations contained in paragraph 21 of Plaintiff's Complaint for lack of information as to Plaintiff Rush's citizenship and residency.**

22.     Defendant GreatBanc Trust Company is an Illinois corporation with its principal place of business in Lisle, Illinois.

**ANSWER: Defendants admit the allegations contained in paragraph 22 of Plaintiff's Complaint.**

23.     Defendant Mary Lee Schneider was the Chief Executive Officer and President of Segerdahl from November 30, 2015 until sometime during November or December of 2018. Defendant Schneider is a citizen and resident of Illinois.

**ANSWER: Defendants admit that Mary Lee Schneider was the President and Chief Executive Officer of Segerdahl from December 1, 2015 until December 1, 2018 and is a citizen and resident of Illinois.  Except as expressly admitted herein, Defendants deny the allegations of paragraph 23 of Plaintiff's Complaint.**

24.     At all relevant times, Defendant Richard Joutras has been the President and Chairman of Segerdahl, and, prior to November 30, 2015, Joutras was also the CEO of Segerdahl. Joutras is a citizen and resident of Illinois.

**ANSWER: Defendants admit that Richard Joutras was President and CEO of Segerdahl prior to December 1, 2015, and that Richard Joutras is a citizen and resident of Illinois.**

25.     Defendants Rodney Goldstein, Peter Mason, Robert Cronin (together with Schneider and Joutras, the "Board of Directors Defendants"), are on information and belief, citizens and residents of Illinois.

**ANSWER: Defendants admit that Rodney Goldstein is a citizen and resident of the state of Illinois. Defendants deny that Peter Mason or Robert Cronin are residents of the state of Illinois.  Except as expressly admitted herein, Defendants deny the allegations of paragraph 25 of Plaintiff's Complaint.**

26.     John Doe Defendants 1-10 are individuals who served on Segerdahl's Board of Directors (the "Board") and/or the ESOP Committee (the "Committee") between 2014 and 2016. In those capacities, as explained in more detail below, John Does 1-10 were named or de facto

fiduciaries for the ESOP with whole or partial authority for approving the ESOP Buyout on behalf of the ESOP.

**ANSWER: Defendants do not need to respond to the allegations against the unidentified John Doe Defendants. To the extent a response is required, Defendants deny the allegations contained in paragraph 26 of Plaintiff's Complaint. Further answering, Defendants aver that the Administrator of the ESOP delegated to GreatBanc the exclusive authority to decide whether to approve the ESOP Buyout.**

27.     Nominal Defendant Segerdahl Corp. is an Illinois corporation with its principal place of business in Wheeling, Illinois.

**ANSWER: Defendants admit the allegations contained in paragraph 27 of Plaintiff's Complaint.**

## GENERAL ALLEGATIONS

28.     During 2003, the ESOP was established to benefit the employees. At around the same time, the ESOP, on behalf of Segerdahl's employees, bought out the other owners of the company and became the sole owner of Segerdahl's common stock.

**ANSWER: Defendants admit that the ESOP was established in 2003 to provide an ownership interest in Segerdahl to the Segerdahl employees, and that at this time the ESOP bought out the other owners of Segerdahl and became the sole owner of Segerdahl's common stock. Except as expressly admitted herein, Defendants deny the allegations of paragraph 28 of Plaintiff's Complaint.**

29.     From 2003 until 2016, the ESOP owned 100% of the common stock of Segerdahl.

**ANSWER: Defendants admit that the ESOP owned 100% of the common stock of Segerdahl from January 1, 2003 until December 7, 2016.**

30. After the ESOP purchased Segerdahl, Defendant Joutras became Segerdahl's CEO and President and Chairman of Segerdahl's Board of Directors.

**ANSWER: Defendants admit the allegations of paragraph 30 of Plaintiff's Complaint.**

31. No later than 2014, Joutras began investigating a buyout of the ESOP's shares of Segerdahl stock.

**ANSWER: Defendants deny the vague and conclusory allegations contained in paragraph 31 of Plaintiff's Complaint.**

32. In preparation for a sale, Joutras retained outside counsel which produced a conformed plan document for the ESOP through the Eleventh Amendment (the "Conformed Plan").

**ANSWER: Defendants admit that outside counsel produced a conformed plan document for the ESOP through the Eleventh Amendment (the "Conformed Plan"), but specifically deny that the document was produced in preparation for a sale. Except as expressly admitted herein, Defendants deny the allegations of paragraph 32 of Plaintiff's Complaint.**

33. The Conformed Plan was adopted by Segerdahl on August 27, 2014.

**ANSWER: Defendants admit that a Conformed Plan signed in 2014 was the operative plan in 2016.**

34. No later than early 2015, Joutras found a potential buyer—an investment capital firm called Windpoint Partners.

**ANSWER: Defendants admit that Richard Joutras was contacted by Wind Point Partners in 2015. Except as expressly admitted herein, Defendants deny the allegations of paragraph 34 of Plaintiff's Complaint.**

35. Defendant Schneider, who had previously been the CEO of one of Segerdahl's competitors, worked with Windpoint as a consultant on Windpoint's potential acquisition of Segerdahl from the ESOP.

**ANSWER: Defendants admit that Mary Lee Schneider was an unpaid advisor with Wind Point Partners in 2015, and admit that several years prior to 2015 she was the President of a unit of one of Segerdahl's competitors. Except as expressly admitted herein, defendants deny the allegations of paragraph 35 of Plaintiff's Complaint.**

36. During 2015, the deal with Windpoint fell through.

**ANSWER: Defendants admit that Wind Point Partners did not purchase Segerdahl. Except as expressly admitted herein, defendants deny the allegations of paragraph 36 of Plaintiff's Complaint.**

37. On information and belief, Joutras decided to hire Schneider as CEO and President of Segerdahl in order to help him sell the company.

**ANSWER: Defendants admit that Mary Lee Schneider became President and CEO of Segerdahl effective December 1, 2015. Except as expressly admitted herein, defendants deny the allegations of paragraph 37 of Plaintiff's Complaint.**

38. Accordingly, Schneider was appointed CEO and President of Segerdahl on November 30, 2015.

**ANSWER: Defendants admit that Mary Lee Schneider became President and CEO of Segerdahl effective December 1, 2015. Except as expressly admitted herein, defendants deny the allegations of paragraph 38 of Plaintiff's Complaint.**

39.    At that time, Joutras became chairman of the newly constituted Segerdahl board of directors, and Joutras, Schneider and the Board of Director Defendants all became members of Segerdahl's board.

**ANSWER: Defendants admit that Mary Lee Schneider, Robert Cronin, Rodney Goldstein, and Peter Mason became members of the Segerdahl Board of Directors effective April 1, 2015, and that Richard Joutras became chairman of the Board of Directors on December 1, 2015. Defendants deny any assertion that the Board was "newly constituted" in December 2015, as a Board of Directors existed prior to this date. Except as expressly admitted herein, defendants deny the allegations of paragraph 39 of Plaintiff's Complaint.**

40.    During an interview with a journalist on or about December 15, 2015, Schneider described her plans as the new CEO and President of Segerdahl.

**ANSWER: Defendants admit that Printing Industry World interviewed Mary Lee Schneider in December 2015. Except as expressly admitted herein, defendants deny the allegations of paragraph 40 of the Complaint.**

41.    In the interview, Schneider described Segerdahl as a "$300 million company."

**ANSWER: Defendants admit that in the December 2015 Printing Industry World interview Mary Lee Schneider, and Defendants admit that Mary Lee Schneider discussed that Segerdahl had almost $300 million in sales in 2015. Except as expressly admitted herein, defendants deny the allegations of paragraph 41 of the Complaint.**

42.     The Segerdahl Defendants retained Jeff Vergamini from JP Morgan Securities to help advise them with respect to selling Segerdahl.

**ANSWER: Defendants admit that Jeff Vergamini of JP Morgan Securities met with Richard Joutras in May or June of 2015 to begin discussing the potential sale of Segerdahl. Except as expressly admitted herein, defendants deny the allegations of paragraph 42 of the Complaint.**

43.     At some point during early 2016, Joutras, Schneider and JP Morgan Securities began exploring the transaction with ICV Partners that eventually became the ESOP Buyout.

**ANSWER: Defendants admit that ICV Partners was one of eighteen possible buyers of Segerdahl that Jeff Vergamini and JP Morgan proposed and contacted in 2016. Except as expressly admitted herein, defendants deny the allegations of paragraph 43 of the Complaint.**

44.     On information and belief, at some point during the fall of 2016, the Segerdahl Defendants reached an agreement in principal with ICV Partners for ICV Partners to purchase the ESOP's shares.

**ANSWER: Defendants admit that ICV Partners purchased Segerdahl in a transaction dated December 7, 2016.  Further answering, GreatBanc on behalf of the ESOP decided whether to approve this sale.   Except as expressly admitted herein, defendants deny the allegations of paragraph 44 of the Complaint.**

45.     The ESOP Buyout transaction closed on December 7, 2016.

**ANSWER: Defendants admit that ICV Partners purchased Segerdahl in a transaction dated December 7, 2016. Except as expressly admitted herein, defendants deny the allegations of paragraph 45 of the Complaint.**

46.     On information and belief, the ESOP received roughly $151 million for its shares of Segerdahl.

**ANSWER: Defendants admit that ICV Partners purchased Segerdahl in a transaction dated December 7, 2016, and that the ESOP received approximately $151 million in this sale for ESOP stock and paying off ESOP notes. Except as expressly admitted herein, defendants deny the allegations of paragraph 46 of the Complaint.**

47.     However, the ESOP should have received much more than $151 million for its shares of Segerdahl. The amount the ESOP received was reduced for several reasons, including:

a.  the Segerdahl Defendants and their advisors engaged in a flawed sale process that included, among other things, a failure to market Segerdahl to many potential buyers to obtain the best price for the ESOP's shares, and an unjustified focus on a buyer that, after the transaction, would allow the Segerdahl Defendants to maintain control over the company's day to day operations, and would allow the Segerdahl Defendants and other insiders to remain at their positions; *see* ¶¶ 48-53 *infra*;

b.  the purchase price ICV Partners paid for the ESOP's shares did not appropriately include the value of certain real estate owned by Segerdahl, which ICV Partners was able to sell immediately after the ESOP Buyout; *see* ¶¶ 54-67, *infra*; and

c.  the Segerdahl Defendants diverted millions of dollars of the purchase price paid by ICV Partners away from the ESOP to the Segerdahl Defendants themselves and other company insiders. *See* ¶¶ 68-71, *infra*.

**ANSWER: Defendants deny the vague allegations contained in paragraph 47 of Plaintiff's Complaint, including that Defendants deny the allegations as written and deny whatever "other things" to which plaintiff refers.**

*The Segerdahl Defendants' Failure to Market the ESOP's Segerdahl Shares Appropriately*

48.     On information and belief, the Segerdahl Defendants and their advisors engaged in a flawed process leading up to the sale of the ESOP's shares of Segerdahl to ICV Partners. Instead of taking reasonable steps to market the ESOP's shares in order to find a buyer that would pay the highest price, the Segerdahl Defendants limited their efforts to finding a buyer that, after the transaction had closed, would allow the Segerdahl Defendants to maintain control over the company's day to day operations, and likely remain at their jobs much longer than would a competitor.

**ANSWER: Defendants deny the allegations contained in paragraph 48 of Plaintiff's Complaint.   Further answering, Defendants aver that the Executive Officer Defendants (Joutras and Schneider) and the Outside Director Defendants (Goldstein, Mason and Cronin) had substantial, concrete financial incentivizes to maximize Segerdahl's sales price that were worth far more than the speculative value of continuing any employment with an unknown financial buyer (in fact, only one of these five Defendants was employed by the ultimate buyer), and that they exercised their sound business judgment to decide to exclude competitors from this process. This business judgment included the Executive Officer Defendants and the Outside Director Defendants' substantial concerns that in Segerdahl's highly competitive market, shopping to competitors risked devaluing Segerdahl through competitors' acquisition of Segerdahl's sensitive information, including on customer pricing, customer lists, and employee pay and sales incentives.  The Executive Officer Defendants and the Outside Director Defendants further aver that against this known risk of loss, that Segerdahl was more profitable than any likely possible competitive buyer, and that these and other business factors and market conditions made it unlikely that any competitor would bid**

**a premium for Segerdahl, instead of using this as an opportunity to acquire Segerdahl's highly valuable confidential competitive information, and thereby devalue Segerdahl to other, financial bidders. The Executive Officer Defendants and the Outside Director Defendants further aver that this decision was a reasonable and prudent exercise of business judgment, made by those whose financial incentives were strongly aligned with the ESOP.**

49.     On December 1, 2016, Vergamini, the employee of JP Morgan advising the Segerdahl Defendants on the transaction, led an information session with Schneider for many of Segerdahl's senior managers about the pending transaction with ICV Partners.

**ANSWER: Defendants admit that Jeff Vergamini led an information session on or about December 1, 2016 for the purpose of discussing the ICV Purchase of Segerdahl. Except as expressly admitted herein, defendants deny the allegations of paragraph 49 of the Complaint.**

50.     At that information session, Vergamini stated that the total purchase price for the ESOP's shares in the ESOP Buyout, which Vergamini quoted as $265 million, would have been much higher, even as high as $320 million, had Segerdahl been sold to a competitor.

**ANSWER: Defendants deny the allegations contained in paragraph 50 of Plaintiff's Complaint.**

51.     On several occasions, including during round table discussions with senior management, Defendant Schneider stated that marketing efforts had focused on buyers—like ICV Partners—that would allow management to remain in place, and that no attempt had been made to market Segerdahl to any of Segerdahl's competitors, who would have paid a much higher price.

**ANSWER: Defendants deny the allegations of paragraph 51 of the Complaint.**

52.     Defendant Schneider also stated that they did not put out a deal book about the potential sale to RR Donnelly, Quad or other competitors to see if those companies were interested in making an offer for Segerdahl.

**ANSWER: Defendants admit that Segerdahl was not marketed to competitors, including for the reasons stated in their Answer above. Except as expressly admitted herein, Defendants deny the allegations of paragraph 52 of the Complaint.**

53.     After the ESOP Buyout, ICV Partners in fact retained Schneider and the great majority of other Segerdahl insiders as CEO and management, and left them in control of Segerdahl's operations after the ESOP Buyout.

**ANSWER: Defendants admit that Mary Lee Schneider remained as CEO and President of Segerdahl for a period of time after the sale to ICV Partners. Defendants also aver that Bruce Rush continued his employment at Segerdahl for approximately two years after the sale to ICV. Except as expressly admitted herein, Defendants deny the allegations of paragraph 53 of the Complaint.**

### *Segerdahl's Real Estate*

54.     In the ESOP Buyout, ICV Partners did not pay a price for the ESOP's shares of Segerdahl that adequately reflected the value of certain real estate owned by Segerdahl.

**ANSWER: Defendants deny the allegations contained in paragraph 54 of Plaintiff's Complaint. Further answering, Defendants aver that they knew of the potential for a sale-leaseback transaction involving certain real property owned by Segerdahl, as this transaction facilitated ensuring that ICV Partners paid the highest possible price for Segerdahl. Defendants further aver that this real estate was part of the operating assets of Segerdahl, managed by those whose financial incentives were strongly aligned with the**

ESOP to maximize its value in use and through any sale, and that they exercised their reasonable and prudent business judgment in doing so. Further answering, Defendants also aver that this real estate was part of the operating assets include in Segerdahl's value determined by the independent financial advisor to the independent trustee, GreatBanc, which independent financial advisor further found the sale to be for fair market value and financially fair to the ESOP.

55.     Instead, ICV Partners was able to purchase Segerdahl, and thereby the real estate it owned, at a lower price than it would have paid had the real estate been appropriately included in the price of the company.

ANSWER:  Defendants deny the allegations contained in paragraph 55 of Plaintiff's Complaint.

56.     By purchasing Segerdahl for a price that did not adequately reflect the realizable cash value of Segerdahl's real estate assets, ICV Partners was able to profit by, shortly after the ESOP Buyout, selling the real estate that had belonged to Segerdahl and causing Segerdahl to lease that property from the purchasers.

ANSWER: Defendants deny the allegations contained in paragraph 56 of Plaintiff's Complaint.

57.     ICV Partners, as such, underpaid for Segerdahl's shares at the ESOP's expense.

ANSWER:  Defendants deny the allegations contained in paragraph 57 of Plaintiff's Complaint.

58.     During a meeting of Segerdahl executives in December of 2016, just a few days prior to the ESOP Buyout, at which Vergamini and representatives of ICV Partners were present, Plaintiff Rush heard one of the representatives of ICV Partners discussing the real estate aspects

of the pending ESOP Buyout. Vergamini explained that the real estate portion of the transaction represented a "$7 million arbitrage opportunity" for the buyer, who could immediately realize the cash value of those properties through a sale-leaseback arrangement.

**ANSWER: Defendants admit knowledge of the potential for a sale-leaseback transaction involving the real property owned by Segerdahl. Defendants further aver that the potential for this sale-leaseback transaction was discussed with ICV during negotiations for the purchase of Segerdahl, and that Segerdahl used this potential value to negotiate the final purchase price with ICV. Further answering, Defendants aver that this real estate was part of the operating assets of Segerdahl, managed by those whose financial incentives were strongly aligned with the ESOP to maximize its value in use and through any sale, and that they exercised their reasonable and prudent business judgment in doing so. Further answering, Defendants also aver that this real estate was part of the operating assets include in Segerdahl's value determined by the independent financial advisor to the independent trustee, GreatBanc, which independent financial advisor further found the sale to be for fair market value and financially fair to the ESOP. Except as expressly admitted herein, Defendants deny the allegations of paragraph 58 of Plaintiff's Complaint.**

59.     The two parcels of real estate involved were large industrial facilities owned by Segerdahl. One of the properties is located at 1351 Wheeling Road, in Wheeling, Illinois ("1351 Wheeling"). The other property is located at 1900 S. 25th Avenue, in Broadview, Illinois ("1900 Broadview").

**ANSWER: Defendants admit that there were two parcels of real estate involved in the sale transaction, and that one of the properties is located at 1351 Wheeling Road, in Wheeling, Illinois and the other property is located at 1900 S. 25th Avenue, in Broadview,**

**Illinois. Except as expressly admitted herein, Defendants deny the allegations of paragraph 59 of Plaintiff's Complaint.**

60.     1351 Wheeling serves, and has served, as Segerdahl's corporate headquarters and is Segerdahl's largest manufacturing site by size and revenue. 1351 Wheeling has a clear height of 16 to 24 feet, 27 loading docks and 279 surface parking spaces. 1351 Wheeling houses nine printing presses including a newly acquired printing press that prints or has printed advertising for Costco of approximately 28 million pieces per month.

**ANSWER:   Defendants admit the allegations contained in paragraph 60 of the Complaint, other than to clarify that the "newly acquired printing press" is approximately six years old.**

61.     1900 Broadview is Segerdahl's second largest manufacturing site by size and revenue and is located 12 miles from downtown Chicago. 1900 Broadview has clear heights of 14 to 23 feet, 11 loading docks and 195 surface parking spaces. 1900 Broadview houses eight printing presses as well as a secured analytics server room which houses significant customer data.

**ANSWER: Defendants admit the allegations contained in paragraph 61 of the Complaint.**

62.     And, in fact, just three months after the ESOP Buyout, on February 7, 2017, Segerdahl did sell 1351 Wheeling and 1900 Broadview to AGNL Mail, LLC.

**ANSWER:   Defendants admit that on February 7, 2017, Segerdahl sold 1351 Wheeling and 1900 Broadview to AGNL Mail, LLC  Except as expressly admitted herein, defendants deny the allegations of paragraph 62 of the Complaint. Further answering, Defendants aver that they knew of the potential for a sale-leaseback transaction involving**

certain real property owned by Segerdahl, as this transaction facilitated ensuring that ICV Partners paid the highest possible price for Segerdahl.

63.     Segerdahl entered into lease agreements with AGNL Mail, LLC for both properties that same day.

**ANSWER:  Defendants admit that Segerdahl entered into lease agreements with AGNL Mail, LLC on February 7, 2017.  Except as expressly admitted herein, defendants deny the allegations of paragraph 63 of the Complaint.**

64.     1351 Wheeling and 1900 Broadview appraised on March 1, 2017 for $14.9 million and $10.1 million, respectively (for a total of $25 million).

**ANSWER:  Defendants admit 1351 Wheeling and 1900 Broadview appraised on March 1, 2017 for $14.9 million and $10.1 million, respectively. Except as expressly admitted herein, defendants deny the allegations of paragraph 64 of the Complaint.**

65.     On information and belief, the price ICV Partners paid for Segerdahl failed to include a reasonable adjustment for the cash value of Segerdahl's real estate.

**ANSWER:  Defendants deny the allegations contained in paragraph 65 of Plaintiff's Complaint. Further answering, Defendants aver that they knew of the potential for a sale-leaseback transaction involving certain real property owned by Segerdahl, as this transaction facilitated ensuring that ICV Partners paid the highest possible price for Segerdahl.**

66.     Thus when ICV Partners sold the real estate, it received millions of dollars for the two properties that it should have paid, but did not pay, for the Segerdahl shares during the ESOP Buyout.

**ANSWER: Defendants deny the allegations contained in paragraph 66 of Plaintiff's Complaint. Further answering, Defendants aver that they knew of the potential for a sale-leaseback transaction involving certain real property owned by Segerdahl, as this transaction facilitated ensuring that ICV Partners paid the highest possible price for Segerdahl.**

67.     On information and belief, the Board of Director Defendants, GreatBanc, and John Does 1-10 were actually or constructively aware of ICV Partners' plans to sell the real estate, and were aware of the value of the real estate. Despite that awareness, the Board of Director Defendants, GreatBanc, and John Does 1-10 took no action to ensure that ICV Partners paid a price for the Segerdahl shares the appropriately reflected the value of Segerdahl's real estate assets.

**ANSWER: Defendants deny the allegations contained in paragraph 67 of Plaintiff's Complaint. Further answering, Defendants aver that they knew of the potential for a sale-leaseback transaction involving certain real property owned by Segerdahl, as this transaction facilitated ensuring that ICV Partners paid the highest possible price for Segerdahl.**

### *The Diverted Purchase Proceeds*

68.     As alleged above, Vergamini stated that the total purchase price for Segerdahl was approximately $265 million.

**ANSWER: Defendants admit that the total purchase price ICV Partners paid for Segerdahl was $265 million. Except as expressly admitted herein, defendants deny the allegations of paragraph 68 of the Complaint.**

69.     According to the ESOP's final Form 5500 annual report for 2016, the ESOP received only approximately $151 million in the transaction.

**ANSWER: Defendants admit that the ESOP received approximately $151 million in this sale for ESOP stock and paying off ESOP notes. Except as expressly admitted herein, defendants deny the allegations of paragraph 69 of the Complaint.**

70.     On information and belief, the Segerdahl Defendants used their control over Segerdahl and the ESOP to wrongfully divert from the ESOP millions of dollars of the proceeds of the ESOP Buyout paid by ICV Partners.

**ANSWER:  Defendants deny the allegations contained in paragraph 70 of Plaintiff's Complaint.**

71.     This diversion of the ESOP's assets came in the form of transaction bonuses paid to the Segerdahl Defendants and Segerdahl insiders when the ESOP Buyout closed, as well as payments to the Segerdahl Defendants and other insiders for stock appreciation rights that matured in the event of a change in control.

**ANSWER:  Defendants deny the allegations contained in paragraph 71 of Plaintiff's Complaint.  Further answering, Defendants aver that a portion of the sales proceeds were for stock appreciation rights and transaction bonuses that were structured to incentivize the investment banker JP Morgan and Segerdahl's officers, executives and directors to obtain the highest possible price for Segerdahl in the sale of the company.**

**Further answering, Defendants aver that Segerdahl's senior leadership had a long standing, successful practice of using their business judgment to award stock appreciation rights to incentivize officers, executives and directors to grow the value of Segerdahl. During the ESOP's thirteen-year history, Segerdahl's stock price grew 8,044% from $162.50 a share when the ESOP acquired Segerdahl in 2003, to $13,072 a share by the time the ESOP sold its shares to ICV Partners in December 2016.  Segerdahl's obligations on these stock**

appreciation rights existed before any buyer was found for Segerdahl, and include the $1,809,142 paid to Plaintiff Bruce Rush for his stock appreciation rights.

## DEFENDANTS' FIDUCIARY STATUS UNDER ERISA

72.     ERISA requires that every plan identify "one or more" "named fiduciaries" with general responsibility for administering the plan. ERISA § 402(a)(1).

**ANSWER:   Paragraph 72 of the Complaint states argument and conclusions of law to which no response is required. If, however, a response is required, Defendants deny the allegations in paragraph 72 of the Complaint and rely on the statutes and rules identified in paragraph 72 to speak for themselves, including in relation to the rest of applicable ERISA law, rather than on Plaintiff's characterization thereof.**

73.     According to the Conformed Plan, Segerdahl's Board of Directors created an "ESOP Committee" and appointed the members of the ESOP Committee. Under the terms of the Conformed Plan, the ESOP Committee was the plan administrator of the ESOP and the ESOP's named fiduciary, with general authority to carry out essentially all fiduciary functions for the ESOP.

**ANSWER: Defendants admit that under the Conformed Plan Segerdahl's Board of Directors appoints an Administrator to administer the ESOP. Further answering, Defendants aver that GreatBanc was delegated the exclusive authority on behalf of the ESOP to determine whether to approve the sale. Except as expressly admitted herein, defendants deny the allegations of paragraph 73 of the Complaint.**

74.     John Doe Defendants 1-10 include the members of Segerdahl's ESOP Committee.

**ANSWER:   Paragraph 74 sets forth allegations against otherwise-unidentified "Doe" defendants, which does not require any response from Defendants.**

75.    The Conformed Plan provided that "[i]n the event of a tender offer or other offer to purchase shares of [Segerdahl] Stock held by the Trust, the Trustee shall tender or sell shares as it is directed by the Administrator [the ESOP Committee], subject to the Trustee's fiduciary duties under ERISA."

**ANSWER:  Defendants admit that this section of the Conformed Plan is accurately quoted, but deny that it applied to the ESOP Buyout.  Further answering, Defendants aver that GreatBanc was delegated the exclusive authority to decide whether to approve the ESOP Buyout. Except as expressly admitted herein, defendants deny the allegations of paragraph 75 of the Complaint.**

76.    Thus the ESOP Committee and the Trustee GreatBanc both had express fiduciary duties with respect to the ESOP Buyout. While the ESOP Committee had responsibility to direct GreatBanc to accept or reject any tender offer, GreatBanc could only accept such a direction consistent with its own ERISA fiduciary duties.

**ANSWER: Defendants deny the allegations contained in paragraph 76 of Plaintiff's Complaint.**

77.    ERISA also defines fiduciary status so that anyone is a fiduciary "to the extent" they *in fact* perform a fiduciary function. *See* ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Thus in addition to expressly designated fiduciaries, anyone is a fiduciary "to the extent" he "exercises any discretionary authority or discretionary control respecting management of such plan" or "exercises any authority or control respecting management or disposition of its assets" or "has any discretionary authority or discretionary responsibility in the administration of such plan." *Id*.

**ANSWER:  Paragraph 77 of the Complaint states argument and conclusions of law to which no response is required. If, however, a response is required, Defendants deny the**

allegations in paragraph 77 of the Complaint and rely on the statutes and rules identified in paragraph 77 to speak for themselves, including in relation to the rest of applicable ERISA law, rather than on Plaintiff's characterization thereof.

78.     The Seventh Circuit has applied a "consistently broad reading" to the functional definition of fiduciary under ERISA. *Baker v. Kingsley*, 387 F.3d 649, 663–64 (7th Cir. 2004)).

**ANSWER:  Paragraph 78 of the Complaint states argument and conclusions of law to which no response is required. If, however, a response is required, Defendants deny the allegations in paragraph 78 of the Complaint and rely on the case identified in paragraph 78 to speak for itself, including in relation to the rest of applicable ERISA law, rather than on Plaintiff's characterization thereof.**

79.     In particular, appointing another ERISA fiduciary is itself a fiduciary function, and carries with it fiduciary duties to prudently and loyalty appoint, monitor the performance of, and, if necessary, remove an appointee. *Leigh v. Engle*, 727 F.2d 113, 133 (7th Cir. 1984) ("selecting and retaining plan administrators" is an ERISA fiduciary function).

**ANSWER:  Paragraph 79 of the Complaint states argument and conclusions of law to which no response is required. If, however, a response is required, Defendants deny the allegations in paragraph 79 of the Complaint and rely on the case identified in paragraph 79 to speak for itself, including in relation to the rest of applicable ERISA law, rather than on Plaintiff's characterization thereof.**

80.     Here, Schneider and Joutras effectively exercised complete control over Segerdahl and the ESOP, including appointments to the Board of Directors and ESOP Committee. Schneider and Joutras used that control to ensure that the Board of Directors and ESOP Committee included only members who were primarily loyal to Schneider and Joutras, not the ESOP.

**ANSWER: Defendants deny the allegations contained in paragraph 80 of Plaintiff's Complaint.**

81.     Schneider and Joutras are also ERISA fiduciaries by virtue of their appointment and effective control over the ESOP's other fiduciaries, including the Board of Directors, ESOP Committee and Trustee. Schneider and Joutras are also fiduciaries by virtue of their control over Segerdahl itself, which was a plan asset of the ESOP.

**ANSWER: Defendants deny the allegations contained in paragraph 81 of Plaintiff's Complaint. Further answering, paragraph 81 of the Complaint also states argument and conclusions of law to which no response is required. If, however, a response is required, Defendants deny the allegations in paragraph 81 of the Complaint and rely on the law referred to in paragraph 81 to speak for itself, including in relation to the rest of applicable ERISA law, rather than on Plaintiff's characterization thereof. Further answering, Segerdahl is an operating company that is not a plan asset of the ESOP.**

82.     The Board of Directors Defendants, in turn, are fiduciaries because they had formal authority under the Plan to appoint the ESOP's Trustee as well as the members of the ESOP Committee, and thus had fiduciary duties with respect to those appoints, duties to monitor the performance of the Trustee and the ESOP Committee members and duties to remove the Trustee and ESOP Committee members if they failed to fulfill their fiduciary duties.

**ANSWER: Defendants admit that under the Conformed Plan Segerdahl's Board of Directors appoints the trustee as well as the Administrator. Paragraph 82 of the Complaint otherwise states argument and conclusions of law to which no response is required. If, however, a response is required, Defendants deny the allegations in paragraph 82 of the Complaint and rely on the statutes and rules referred to in paragraph 82 to speak for**

themselves, including in relation to the rest of applicable ERISA law, rather than on Plaintiff's characterization thereof.

## ERISA'S FIDUCIARY DUTIES

83.     ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

**ANSWER: Paragraph 83 of the Complaint states argument and conclusions of law to which no response is required. If, however, a response is required, Defendants deny the allegations in paragraph 83 of the Complaint and rely on the statutes and rules identified in paragraph 83 to speak for themselves, including in relation to the rest of applicable ERISA law, rather than on Plaintiff's characterization thereof.**

84.     These fiduciary duties under ERISA §§ 404(a)(1)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence.

**ANSWER: Paragraph 84 of the Complaint states argument and conclusions of law to which no response is required. If, however, a response is required, Defendants deny the allegations in paragraph 84 of the Complaint and rely on the statutes and rules identified in paragraph 84 to speak for themselves, including in relation to the rest of applicable ERISA law, rather than on Plaintiff's characterization thereof.**

85.     "[T]he duties charged to an ERISA fiduciary are 'the highest known to the law.'" *George v. Kraft Foods Glob., Inc.*, 814 F. Supp. 2d 832, 852 (N.D. Ill. 2011). ERISA's duty of

prudence "is not that of a prudent layperson but rather that of a prudent fiduciary with experience dealing with a similar enterprise." Whitfield *v. Cohen*, 682 F. Supp. 188, 194 (S.D.N.Y. 1988). Put another way, ERISA fiduciaries must "act in good faith as an objectively prudent fiduciary would act, not simply as a prudent layperson would act." *Chesemore v. All. Holdings, Inc.*, 886 F. Supp. 2d 1007, 1041 (W.D. Wis. 2012), *aff'd* 829 F.3d 803 (7th Cir. 2016).

**ANSWER: Paragraph 85 of the Complaint states argument and conclusions of law to which no response is required. If, however, a response is required, Defendants deny the allegations in paragraph 85 of the Complaint and rely on the cases identified in paragraph 85 to speak for themselves, including in relation to the rest of applicable ERISA law, rather than on Plaintiff's characterization thereof.**

86.     ERISA's fiduciary duties entail, among other things:

a. The duty to conduct an independent and thorough investigation into, and to continually monitor the merits of all the investment alternatives of a plan;

b. The duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor; and

c. The duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

**ANSWER: Paragraph 86 of the Complaint states argument and conclusions of law to which no response is required. If, however, a response is required, Defendants deny the**

**allegations in paragraph 86 of the Complaint and rely on the statutes and rules identified in paragraph 86 to speak for themselves, including in relation to the rest of applicable ERISA law, rather than on Plaintiff's characterization thereof.**

87.     According to Department of Labor ("DOL") regulations and case law interpreting these statutory provisions, in order to comply with the prudence requirement under ERISA §404(a), a fiduciary must show that: (a) he has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role the investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties; and (b) he has acted accordingly.

**ANSWER: Paragraph 87 of the Complaint states argument and conclusions of law to which no response is required. If, however, a response is required, Defendants deny the allegations in paragraph 87 of the Complaint and rely on the statutes and rules identified in paragraph 87 to speak for themselves, including in relation to the rest of applicable ERISA law, rather than on Plaintiff's characterization thereof.**

88.     Again, according to DOL regulations, "appropriate consideration" in this context includes, but is not necessarily limited to:

> o A determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or, where applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties), to further the purposes of the plan, taking into consideration the risk of loss

and the opportunity for gain (or other return) associated with the investment or investment course of action; and

o Consideration of the following factors as they relate to such portion of the portfolio:

▪ The composition of the portfolio with regard to diversification;

▪ The liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the plan; and

▪ The projected return of the portfolio relative to the funding objectives of the plan.

**ANSWER: Paragraph 88 of the Complaint states argument and conclusions of law to which no response is required. If, however, a response is required, Defendants deny the allegations in paragraph 88 of the Complaint and rely on the statutes and rules identified in paragraph 88 to speak for themselves, including in relation to the rest of applicable ERISA law, rather than on Plaintiff's characterization thereof.**

89.    A fiduciary that undertakes to sell plan assets is bound by the duties of prudence and loyalty when they do so. A prudent and loyal fiduciary with experience selling large private companies would make sure that they identified and solicited offers from all types of potential buyers, including competitors.

**ANSWER: Paragraph 89 of the Complaint states argument and conclusions of law to which no response is required. If, however, a response is required, Defendants deny the allegations in paragraph 89 of the Complaint and rely on the law referred to in paragraph 92 to speak for itself, including in relation to the rest of applicable ERISA law, rather than on Plaintiff's characterization thereof.**

90.     ERISA § 405 renders Plan fiduciaries liable for the breaches of other fiduciaries under certain circumstances, such as when a fiduciary knowingly participates in or conceals the breach of another fiduciary, if the fiduciary's own breach enables the breach by the other fiduciary, or if the fiduciary is aware of the other fiduciary's breach yet makes no reasonable effort to correct the breach.

**ANSWER: Paragraph 90 of the Complaint states argument and conclusions of law to which no response is required. If, however, a response is required, Defendants deny the allegations in paragraph 90 of the Complaint and rely on the statutes and rules identified in paragraph 90 to speak for themselves, including in relation to the rest of applicable ERISA law, rather than on Plaintiff's characterization thereof.**

91.     ERISA § 406 prohibits Plan fiduciaries from entering into transactions between the plan and a party in interest or from entering into various transactions involving the plan and a fiduciary that directly involve, or raise a heightened risk of, self-dealing by the plan's fiduciary.

**ANSWER:  Paragraph 91 of the Complaint states argument and conclusions of law to which no response is required. If, however, a response is required, Defendants deny the allegations in paragraph 91 of the Complaint and rely on the statutes and rules identified in paragraph 91 to speak for themselves, including in relation to the rest of applicable ERISA law, rather than on Plaintiff's characterization thereof.**

92.     ERISA § 206(d)(4) provides that courts may order an offset of all or part of a participant's benefits against the amount the participant is ordered or required to pay to the plan, if, among other things, the participant breached his ERISA fiduciary duties.

**ANSWER: Paragraph 92 of the Complaint states argument and conclusions of law to which no response is required. If, however, a response is required, Defendants deny the**

allegations in paragraph 92 of the Complaint and rely on the statutes and rules identified in paragraph 92 to speak for themselves, including in relation to the rest of applicable ERISA law, rather than on Plaintiff's characterization thereof.

## CLASS ACTION ALLEGATIONS

93.     ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), authorizes any participant or beneficiary of a retirement plan to bring an action individually on behalf of that plan to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109(a). Such claims are brought "in a representative capacity on behalf of the plan as a whole." *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 142 (1985).

**ANSWER:  Paragraph 93 of the Complaint states argument and conclusions of law to which no response is required. If, however, a response is required, Defendants deny the allegations in paragraph 93 of the Complaint and rely on the statutes and rules identified in paragraph 93 to speak for themselves, including in relation to the rest of applicable ERISA law, rather than on Plaintiff's characterization thereof.**

94.     The claims set forth in this action meet the requirements of Rule 23, and class certification would be appropriate with respect to the following class (the "Class"):

> All participants in and beneficiaries of the Segerdahl Corporation Employee Stock Ownership Plan at the time the ESOP was terminated, with the exception of Defendants in this action and their beneficiaries.

**ANSWER:  Paragraph 94 of the Complaint states argument and conclusions of law to which no response is required. If, however, a response is required, Defendants deny the allegations in paragraph 94 of the Complaint and rely on the law identified in paragraph 94 to speak for itself, including in relation to the rest of the applicable federal procedural and**

ERISA law, rather than on Plaintiff's characterization thereof. Further answering, Defendants aver that Plaintiff and the putative class he purports to represent suffered no harm and are not entitled to any relief.

95. The Class includes at least 400 participants in the ESOP, and is therefore so numerous that joinder of all class members would be impracticable.

**ANSWER: Defendants admit that the ESOP had at least 400 participants. Paragraph 95 of the Complaint otherwise states argument and conclusions of law to which no response is required. If, however, a response is required, Defendants deny the allegations in paragraph 95 of the Complaint and rely on the law identified in paragraph 95 to speak for itself, including in relation to the rest of the applicable federal procedural and ERISA law, rather than on Plaintiff's characterization thereof. Further answering, Defendants aver that Plaintiff and the putative class he purports to represent suffered no harm and are not entitled to any relief.**

96. There are numerous questions of law and fact common to the Class because the claims asserted herein arise out of a singular course of common conduct by Defendants that affected all class members through their participation in the ESOP in precisely the same way, in violation of precisely the same legal duties. Common questions of law and fact include the following:

 a. whether Defendants GreatBanc, John Does 1-10 or the Board of Directors Defendants breached their fiduciary duties with respect to the ESOP Buyout;

 b. whether Defendants Schneider and Joutras were fiduciaries with respect to the Plan and if so, whether they breached their fiduciary duties or engaged in self-dealing prohibited transactions;

    c.   whether Defendants GreatBanc, the Board of Directors Defendants, John Does
110, Schneider or Joutras breached their duties as cofiduciaries; and

    d.   whether Defendants Schneider or Joutras knowingly participated in and benefitted
from the ESOP Buyout and the other misconduct described above, and, if so,
whether they are subject to equitable remedies for such conduct.

**ANSWER: Paragraph 96 of the Complaint states argument and conclusions of law
to which no response is required. If, however, a response is required, Defendants deny the
allegations in paragraph 96 of the Complaint and rely on the law identified in paragraph 96
to speak for itself, including in relation to the rest of the applicable federal procedural and
ERISA law, rather than on Plaintiff's characterization thereof. Further answering,
Defendants aver that Plaintiff and the putative class he purports to represent suffered no
harm and are not entitled to any relief.**

97.    Mr. Rush's claims are typical of the claims of the Class because Mr. Rush was an
ESOP participant who received less than adequate consideration for the shares of Segerdahl in his
ESOP account as a result of the ESOP Buyout and the other misconduct described herein in
precisely the same way that all other Class members received less than adequate consideration for
the shares of Segerdahl in their ESOP accounts as a result of the ESOP Buyout and the other
misconduct described herein.

**ANSWER: Paragraph 97 of the Complaint states argument and conclusions of law
to which no response is required. If, however, a response is required, Defendants deny the
allegations in paragraph 97 of the Complaint other than to admit that Plaintiff Rush was a
participant in the ESOP, and rely on the law identified in paragraph 97 to speak for itself,
including in relation to the rest of the applicable federal procedural and ERISA law, rather**

**than on Plaintiff's characterization thereof. Further answering, Defendants aver that Plaintiff and the putative class he purports to represent suffered no harm and are not entitled to any relief.**

98.    Mr. Rush is an adequate representative of the Class because he is a participant in the ESOP who received less than adequate consideration for the shares of Segerdahl in his ESOP account as a result of the ESOP Buyout and the other misconduct described herein; has no interest that conflicts with other members of the proposed Class; is committed to the vigorous representation of the Class; and has engaged experienced and competent attorneys to represent the Class.

**ANSWER:  Paragraph 98 of the Complaint states argument and conclusions of law to which no response is required. If, however, a response is required, Defendants deny the allegations in paragraph 98 of the Complaint other than to admit that Plaintiff Rush was a participant in the ESOP, and rely on the law identified in paragraph 98 to speak for itself, including in relation to the rest of the applicable federal procedural and ERISA law, rather than on Plaintiff's characterization thereof. Further answering, Defendants aver that Plaintiff and the putative class he purports to represent suffered no harm and are not entitled to any relief.**

99.    Certification of the claims asserted herein would be appropriate under Rule 23(b)(1)(A) or (B). Prosecution of separate actions by the ESOP participants for the breaches of fiduciary duty and prohibited transactions described herein would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct. In addition, an adjudication of the claims asserted herein by any ESOP participant would, as a practical matter, be dispositive of the interests of all other ESOP participants. As this Court has recognized several

times, "[b]ecause of ERISA's distinctive 'representative capacity' and remedial provisions, ERISA litigation of this nature presents a paradigmatic example of a [Rule 23](b)(1) class." *Neil v. Zell*, 275 F.R.D. 256, 267 (N.D. Ill. 2011).

**ANSWER: Paragraph 99 of the Complaint states argument and conclusions of law to which no response is required. If, however, a response is required, Defendants deny the allegations in paragraph 99 of the Complaint and rely on the law identified in paragraph 99 to speak for itself, including in relation to the rest of the applicable federal procedural and ERISA law, rather than on Plaintiff's characterization thereof. Further answering, Defendants aver that Plaintiff and the putative class he purports to represent suffered no harm and are not entitled to any relief.**

100. Alternatively, this action should be certified as a class under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) or (B). A class action is the superior method for the fair and efficient adjudication of this controversy because common questions of law and fact predominate over questions affecting only individual class members, and because, in light of the representative nature of the claims at issue, a class action would be superior to other available methods for fairly and efficiently adjudicating the controversy.

**ANSWER: Paragraph 100 of the Complaint states argument and conclusions of law to which no response is required. If, however, a response is required, Defendants deny the allegations in paragraph 100 of the Complaint and rely on the law identified in paragraph 100 to speak for itself, including in relation to the rest of the applicable federal procedural and ERISA law, rather than on Plaintiff's characterization thereof. Further answering, Defendants aver that Plaintiff and the putative class he purports to represent suffered no harm and are not entitled to any relief.**

101.    Mr. Rush's counsel will fairly and adequately represent the interests of the Class and is best able to represent the interests of the Class under Rule 23(g).

**ANSWER:  Paragraph 101 of the Complaint states argument and conclusions of law to which no response is required. If, however, a response is required, Defendants deny the allegations in paragraph 101 of the Complaint and rely on the law identified in paragraph 101 to speak for itself, including in relation to the rest of the applicable federal procedural and ERISA law, rather than on Plaintiff's characterization thereof.  Further answering, Defendants aver that Plaintiff and the putative class he purports to represent suffered no harm and are not entitled to any relief.**

## COUNT I
### Breach of Fiduciary Duty
### ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1)
### Defendants GreatBanc, Board of Directors Defendants and John Does 1-10

102.    Plaintiff repeats and realleges each of the allegations in the foregoing paragraphs as if fully set forth herein.

**ANSWER:  Defendants reassert their responses to paragraphs 1 through 101 above and incorporate the same as if fully set forth herein, and further incorporate their affirmative defenses in response thereto.**

103.    ERISA § 404, 29 U.S.C. §1104, requires ERISA fiduciaries to perform their fiduciary duties and responsibilities prudently, as would an experienced ERISA fiduciary, and loyally, exclusively in the interest of the plan and its participants for the purpose of providing benefits.

**ANSWER: Paragraph 103 of the Complaint states argument and conclusions of law to which no response is required. If, however, a response is required, Defendants deny the allegations in paragraph 103 of the Complaint and rely on the law identified in paragraph**

**103 to speak for itself, including in relation to the rest of the applicable ERISA law, rather than on Plaintiff's characterization thereof. Further answering, Defendants aver that Plaintiff and the putative class he purports to represent suffered no harm and are not entitled to any relief.**

104.     As alleged above, Defendants GreatBanc, the Board of Directors Defendants, and John Does 1-10 were express or de facto fiduciaries for the ESOP.

**ANSWER: Paragraph 104 of the Complaint states argument and conclusions of law to which no response is required. If, however, a response is required, Defendants admit that GreatBanc was a fiduciary with the authority to decide whether to approve the ESOP Buyout, but otherwise deny the allegations in paragraph 104 of the Complaint and rely on the law identified in paragraph 104 to speak for itself, including in relation to the rest of the applicable ERISA law, rather than on Plaintiff's characterization thereof. Further answering, Defendants aver that Plaintiff and the putative class he purports to represent suffered no harm and are not entitled to any relief.**

105.     As fiduciaries for the ESOP, Defendants GreatBanc and John Does 1-10 failed to prudently and loyally fulfill their fiduciary duties when, acting in a fiduciary capacity on behalf of the ESOP, they approved the ESOP Buyout despite actual or constructive knowledge that the sale process leading to the ESOP Buyout was flawed for at least the following reasons:

a.   they knew or should have known that the Segerdahl Defendants had focused on a sale to a buyer that would preserve management, including Schneider and other insiders, and that the Segerdahl Defendants did not market Segerdahl to other potential buyers, including competitors, who would have paid more but would likely have replaced management;

    b.   they knew or should have known that a significant portion of the purchase price paid by ICV Partners was being diverted away from the ESOP to the Segerdahl Defendants and other Segerdahl insiders;

    c.   they knew or should have known that the price the ESOP received for its Segerdahl shares in the ESOP Buyout did not take into account the immediately realizable fair market value of Segerdahl's real estate assets; and

    d.   they knew or should have known that the Segerdahl Defendants planned to divert a significant portion of purchase price paid by ICV Partners away from the ESOP.

**ANSWER: Paragraph 105 of the Complaint states argument and conclusions of law to which no response is required. If, however, a response is required, Defendants deny the allegations in paragraph 105 of the Complaint, including any embedded factual assumptions for the reasons stated earlier in the Answer, and rely on the law identified in paragraph 105 to speak for itself, including in relation to the rest of the applicable ERISA law, rather than on Plaintiff's characterization thereof. Further answering, Defendants aver that Plaintiff and the putative class he purports to represent suffered no harm and are not entitled to any relief.**

106.    As alleged above, as fiduciaries of the ESOP, Defendants GreatBanc and John Does 1-10 failed to ensure that the ESOP received the fair market value of its shares. Fair market value measures what a hypothetical willing buyer would pay to a hypothetical willing seller, when neither party is under any compulsion to buy or sell. Determining fair market value requires considering the highest and best use of the asset in question, which requires evaluating the characteristics of likely potential buyers, and should take into account the population of potential willing buyers. That includes buyers who, for a variety of reasons, might want to pay more than

others. This certainly requires evaluating the characteristics of types of likely potential willing buyers. Determining fair market value in the context of the ESOP Buyout was especially important, because all of the ESOP's assets were to be liquidated in that transaction, and the ESOP was permanently giving up its stake in Segerdahl. Because other types of buyers, such as competitors, would have paid a higher price for the ESOP's shares than did ICV Partners, the fair market value of the ESOP's shares was higher than what ICV Partners would have paid. On information and belief, Defendants GreatBanc and John Does 1-10 relied on a valuation of the ESOP in approving the transaction that failed to consider the characteristics of likely potential buyers, including operating companies like competitors, and failed to consider what those likely potential buyers would have paid. Defendants GreatBanc and John Does 1-10 knew or should have known that the valuation failed to take that higher potential price into account, and knew or should have known that the valuation failed to represent the fair market value of the ESOP's shares for that reason. In the case of the ESOP Buyout that obligation was especially important, because it represented a sale of 100% of the ESOP's Segerdahl shares.

**ANSWER: Paragraph 106 of the Complaint states argument and conclusions of law to which no response is required. If, however, a response is required, Defendants deny the allegations in paragraph 106 of the Complaint, including any embedded factual assumptions for the reasons stated earlier in the Answer, and rely on the law identified in paragraph 106 to speak for itself, including in relation to the rest of the applicable ERISA law, rather than on Plaintiff's characterization thereof. Further answering, Defendants aver that Plaintiff and the putative class he purports to represent suffered no harm and are not entitled to any relief.**

107.    In addition, as fiduciaries for the ESOP, Defendants GreatBanc and John Does 110 failed to prudently and loyally fulfill their fiduciary duties when they failed to act to protect the ESOP's interests when the Segerdahl Defendants diverted millions of dollars of the purchase proceeds in the ESOP Buyout away from the ESOP and to themselves and other Segerdahl insiders.

**ANSWER: Paragraph 107 of the Complaint states argument and conclusions of law to which no response is required. If, however, a response is required, Defendants deny the allegations in paragraph 107 of the Complaint, including any embedded factual assumptions for the reasons stated earlier in the Answer, and rely on the law identified in paragraph 107 to speak for itself, including in relation to the rest of the applicable ERISA law, rather than on Plaintiff's characterization thereof. Further answering, Defendants aver that Plaintiff and the putative class he purports to represent suffered no harm and are not entitled to any relief.**

108.    The Board of Directors Defendants violated their duties of prudence and loyalty when they appointed and failed to monitor or remove Defendants GreatBanc and John Does 1-10, even though the Board of Directors Defendants knew or should have known that Defendants GreatBanc and John Does 1-10 were preparing to and in fact did approve the ESOP Buyout even though the ESOP Buyout was not fair to the ESOP.

**ANSWER: Paragraph 108 of the Complaint states argument and conclusions of law to which no response is required. If, however, a response is required, Defendants deny the allegations in paragraph 108 of the Complaint, including any embedded factual assumptions for the reasons stated earlier in the Answer, and rely on the law identified in paragraph 108 to speak for itself, including in relation to the rest of the applicable ERISA law, rather than on Plaintiff's characterization thereof. Further answering, Defendants aver that Plaintiff**

and the putative class he purports to represent suffered no harm and are not entitled to any relief.

109.     Any of these fiduciaries could, and should, have taken any number of actions to protect the ESOP's interests, but they did not. For example, a fiduciary uncertain of the proper course to take and confronted by a situation involving conflicts of interest—as was the case with the ESOP Buyout—could have come to court and obtained direction from the court as the appropriate course of action to protect the ESOP.

**ANSWER:  Paragraph 109 of the Complaint states argument and conclusions of law to which no response is required. If, however, a response is required, Defendants deny the allegations in paragraph 109 of the Complaint, including any embedded factual assumptions for the reasons stated earlier in the Answer, and rely on the law identified in paragraph 109 to speak for itself, including in relation to the rest of the applicable ERISA law, rather than on Plaintiff's characterization thereof.  Further answering, Defendants aver that Plaintiff and the putative class he purports to represent suffered no harm and are not entitled to any relief.**

110.     But Defendants GreatBanc, John Does 1-10 and the Board of Directors Defendants did not take action to protect the ESOP, and instead allowed the ESOP Buyout to close despite their actual or constructive knowledge of the flawed process leading to the ESOP Buyout described above.

**ANSWER: Paragraph 110 of the Complaint states argument and conclusions of law to which no response is required. If, however, a response is required, Defendants deny the allegations in paragraph 110 of the Complaint, including any embedded factual assumptions for the reasons stated earlier in the Answer, and rely on the law identified in paragraph 110**

**to speak for itself, including in relation to the rest of the applicable ERISA law, rather than on Plaintiff's characterization thereof. Further answering, Defendants aver that Plaintiff and the putative class he purports to represent suffered no harm and are not entitled to any relief.**

111. These actions, and failures to act, violated the duties of prudence and loyalty contained in ERISA § 404(a).

**ANSWER: Paragraph 111 of the Complaint states argument and conclusions of law to which no response is required. If, however, a response is required, Defendants deny the allegations in paragraph 111 of the Complaint, including any embedded factual assumptions for the reasons stated earlier in the Answer, and rely on the law identified in paragraph 111 to speak for itself, including in relation to the rest of the applicable ERISA law, rather than on Plaintiff's characterization thereof. Further answering, Defendants aver that Plaintiff and the putative class he purports to represent suffered no harm and are not entitled to any relief.**

112. Under ERISA § 409(a), 29 U.S.C. § 1109(a), a fiduciary that violates any of ERISA's duties, including ERISA § 404(a), must "make good" to the plan the losses to the plan resulting from its violations, and is "subject to such other equitable or remedial relief as the court may deem appropriate."

**ANSWER: Paragraph 112 of the Complaint states argument and conclusions of law to which no response is required. If, however, a response is required, Defendants deny the allegations in paragraph 112 of the Complaint, and rely on the law identified in paragraph 112 to speak for itself, including in relation to the rest of the applicable ERISA law, rather than on Plaintiff's characterization thereof. Further answering, Defendants aver that**

**Plaintiff and the putative class he purports to represent suffered no harm and are not entitled to any relief.**

113.     Thus, under ERISA §§ 502(a)(2) and 409(a), 29 U.S.C. §§ 1132(a)(2) and 1109(a), Defendants GreatBanc, John Does 1-10 and the Board of Directors Defendants are liable, in an amount to be determined at trial, for the losses to the Plan caused by their violations of ERISA § 404(a), and are "subject to such other equitable or remedial relief" as the Court "may deem appropriate."

**ANSWER:  Paragraph 113 of the Complaint states argument and conclusions of law to which no response is required. If, however, a response is required, Defendants deny the allegations in paragraph 113 of the Complaint, including any embedded factual assumptions for the reasons stated earlier in the Answer, and rely on the law identified in paragraph 113 to speak for itself, including in relation to the rest of the applicable ERISA law, rather than on Plaintiff's characterization thereof.  Further answering, Defendants aver that Plaintiff and the putative class he purports to represent suffered no harm and are not entitled to any relief.**

114.     Under ERISA § 502(a)(3), Defendants GreatBanc, John Does 1-10 and the Board of Directors Defendants are also subject to appropriate equitable relief including, but not limited to, constructive trust and equitable surcharge.

**ANSWER:  Paragraph 114 of the Complaint states argument and conclusions of law to which no response is required. If, however, a response is required, Defendants deny the allegations in paragraph 114 of the Complaint, including any embedded factual assumptions for the reasons stated earlier in the Answer, and rely on the law identified in paragraph 114 to speak for itself, including in relation to the rest of the applicable ERISA law, rather than**

on Plaintiff's characterization thereof.  Further answering, Defendants aver that Plaintiff and the putative class he purports to represent suffered no harm and are not entitled to any relief.

**COUNT II**
**Breach of Fiduciary Duty and Prohibited Transaction**
**ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1)**
**ERISA § 406(b), 29 U.S.C § 1106(b)**
**Defendants Schneider and Joutras**

115.    Plaintiff repeats and realleges each of the allegations in the foregoing paragraphs as if fully set forth herein.

**ANSWER:  Defendants reassert their responses to paragraphs 1 through 114 above and incorporate the same as if fully set forth herein, and further incorporate their affirmative defenses in response thereto.**

116.    ERISA § 404, 29 U.S.C. §1104, requires ERISA fiduciaries to perform their fiduciary duties and responsibilities prudently, as would an experienced ERISA fiduciary, and loyally, exclusively in the interest of the plan and its participants for the purpose of providing benefits.

**ANSWER:  Paragraph 116 of the Complaint states argument and conclusions of law to which no response is required. If, however, a response is required, Defendants deny the allegations in paragraph 116 of the Complaint, and rely on the law identified in paragraph 116 to speak for itself, including in relation to the rest of the applicable ERISA law, rather than on Plaintiff's characterization thereof.  Further answering, Defendants aver that Plaintiff and the putative class he purports to represent suffered no harm and are not entitled to any relief.**

117.    ERISA § 406(b)(1) prohibits plan fiduciaries from "deal[ing] with the assets of the plan in [their] own interest or for [their] own account."

**ANSWER:  Paragraph 117 of the Complaint states argument and conclusions of law to which no response is required. If, however, a response is required, Defendants deny the allegations in paragraph 117 of the Complaint, and rely on the law identified in paragraph 117 to speak for itself, including in relation to the rest of the applicable ERISA law, rather than on Plaintiff's characterization thereof.  Further answering, Defendants aver that Plaintiff and the putative class he purports to represent suffered no harm and are not entitled to any relief.**

118.    As alleged above, Defendants Schneider and Joutras were de facto fiduciaries for the ESOP by virtue of the control they exercised over the ESOP and its assets.

**ANSWER:  Paragraph 118 of the Complaint states argument and conclusions of law to which no response is required. If, however, a response is required, Defendants deny the allegations in paragraph 118 of the Complaint, including any embedded factual assumptions for the reasons stated earlier in the Answer, and rely on the law identified in paragraph 118 to speak for itself, including in relation to the rest of the applicable ERISA law, rather than on Plaintiff's characterization thereof.  Further answering, Defendants aver that Plaintiff and the putative class he purports to represent suffered no harm and are not entitled to any relief.**

119.    As fiduciaries for the ESOP, Defendants Schneider and Joutras used their control over the ESOP to influence the terms of the ESOP Buyout and preceding sales process and to cause the ESOP to engage in the ESOP Buyout despite the fact that the ESOP Buyout was the result of a flawed sale process and was not in the ESOP's best interests.

**ANSWER: Paragraph 119 of the Complaint states argument and conclusions of law to which no response is required. If, however, a response is required, Defendants deny the allegations in paragraph 119 of the Complaint, including any embedded factual assumptions for the reasons stated earlier in the Answer, and rely on the law identified in paragraph 119 to speak for itself, including in relation to the rest of the applicable ERISA law, rather than on Plaintiff's characterization thereof. Further answering, Defendants aver that Plaintiff and the putative class he purports to represent suffered no harm and are not entitled to any relief.**

120. In addition, Defendants Schneider and Joutras used their control over the ESOP and Segerdahl to divert millions of dollars of the sale proceeds away from the ESOP and to themselves and other Segerdahl insiders, and used their control over the ESOP and Segerdahl to prevent the ESOP from protecting its rights as a shareholder of Segerdahl.

**ANSWER: Paragraph 120 of the Complaint states argument and conclusions of law to which no response is required. If, however, a response is required, Defendants deny the allegations in paragraph 120 of the Complaint, including any embedded factual assumptions for the reasons stated earlier in the Answer, and rely on the law identified in paragraph 120 to speak for itself, including in relation to the rest of the applicable ERISA law, rather than on Plaintiff's characterization thereof. Further answering, Defendants aver that Plaintiff and the putative class he purports to represent suffered no harm and are not entitled to any relief.**

121. This misconduct violated the duties of prudence and loyalty contained in ERISA § 404(a), and the prohibition on self-dealing with plan assets set forth in ERISA § 406(b)(1).

**ANSWER: Paragraph 121 of the Complaint states argument and conclusions of law to which no response is required. If, however, a response is required, Defendants deny the allegations in paragraph 121 of the Complaint, including any embedded factual assumptions for the reasons stated earlier in the Answer, and rely on the law identified in paragraph 121 to speak for itself, including in relation to the rest of the applicable ERISA law, rather than on Plaintiff's characterization thereof. Further answering, Defendants aver that Plaintiff and the putative class he purports to represent suffered no harm and are not entitled to any relief.**

122.   Under ERISA § 409(a), 29 U.S.C. § 1109(a), a fiduciary that violates any of ERISA's duties, including ERISA § 404(a) or ERISA § 406(b)(1), must "make good" to the plan the losses to the plan resulting from its violations, and is "subject to such other equitable or remedial relief as the court may deem appropriate."

**ANSWER: Paragraph 122 of the Complaint states argument and conclusions of law to which no response is required. If, however, a response is required, Defendants deny the allegations in paragraph 122 of the Complaint, and rely on the law identified in paragraph 122 to speak for itself, including in relation to the rest of the applicable ERISA law, rather than on Plaintiff's characterization thereof. Further answering, Defendants aver that Plaintiff and the putative class he purports to represent suffered no harm and are not entitled to any relief.**

123.   Thus, under ERISA §§ 502(a)(2) and 409(a), 29 U.S.C. §§ 1132(a)(2) and 1109(a), Defendants Schneider and Joutras are liable, in an amount to be determined at trial, for the losses to the Plan caused by their violations of ERISA § 404(a) and ERISA § 406(b)(1), and are "subject to such other equitable or remedial relief" as the Court "may deem appropriate."

**ANSWER: Paragraph 123 of the Complaint states argument and conclusions of law to which no response is required. If, however, a response is required, Defendants deny the allegations in paragraph 123 of the Complaint, including any embedded factual assumptions for the reasons stated earlier in the Answer, and rely on the law identified in paragraph 123 to speak for itself, including in relation to the rest of the applicable ERISA law, rather than on Plaintiff's characterization thereof. Further answering, Defendants aver that Plaintiff and the putative class he purports to represent suffered no harm and are not entitled to any relief.**

124.   Under ERISA § 502(a)(3), Defendants Schneider and Joutras are also subject to appropriate equitable relief including, but not limited to, constructive trust and equitable surcharge.

**ANSWER: Paragraph 124 of the Complaint states argument and conclusions of law to which no response is required. If, however, a response is required, Defendants deny the allegations in paragraph 124 of the Complaint, including any embedded factual assumptions for the reasons stated earlier in the Answer, and rely on the law identified in paragraph 124 to speak for itself, including in relation to the rest of the applicable ERISA law, rather than on Plaintiff's characterization thereof. Further answering, Defendants aver that Plaintiff and the putative class he purports to represent suffered no harm and are not entitled to any relief.**

**COUNT III**
**Breach of Co-Fiduciary Duty**
**ERISA § 405(a)(1)-(3), 29 U.S.C. § 1105(a)(1)-(3)**
**Defendants GreatBanc, Board of Directors Defendants, John Does 1-10, Schneider and Joutras**

125.   Plaintiff repeats and realleges each of the allegations in the foregoing paragraphs as if fully set forth herein.

**ANSWER:  Defendants reassert their responses to paragraphs 1 through 124 above and incorporate the same as if fully set forth herein, and further incorporate their affirmative defenses in response thereto.**

126.    A fiduciary with respect to a plan is liable for the breach "of another fiduciary" for the same plan if "he participates knowingly in, or knowingly undertakes to conceal, an act or omissions of such other fiduciary, knowing such act or omission is a breach," ERISA § 405(a)(1), or if, "by his failure to comply with [his fiduciary duties] in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach," ERISA § 405(a)(2), or if "he has knowledge of a breach by some other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach." ERISA § 405(a)(3).

**ANSWER: Paragraph 126 of the Complaint states argument and conclusions of law to which no response is required. If, however, a response is required, Defendants deny the allegations in paragraph 126 of the Complaint, and rely on the law identified in paragraph 126 to speak for itself, including in relation to the rest of the applicable ERISA law, rather than on Plaintiff's characterization thereof.  Further answering, Defendants aver that Plaintiff and the putative class he purports to represent suffered no harm and are not entitled to any relief.**

127.    Pursuant to § 405 of ERISA, 29 U.S.C. § 1105, Defendants GreatBanc, the Board of Directors Defendants, John Does 1-10, Schneider and Joutras are also liable as co-fiduciaries with respect to the above-described violations because they participated knowingly in their co-fiduciaries' breaches; enabled other fiduciaries to violate ERISA by virtue of their own breaches

of fiduciary duty; knowingly undertook to conceal those breaches; enabled their co-fiduciaries to commit the breaches and failed to make any reasonable efforts to remedy the breaches.

**ANSWER:  Paragraph 127 of the Complaint states argument and conclusions of law to which no response is required. If, however, a response is required, Defendants deny the allegations in paragraph 127 of the Complaint, including any embedded factual assumptions for the reasons stated earlier in the Answer, and rely on the law identified in paragraph 127 to speak for itself, including in relation to the rest of the applicable ERISA law, rather than on Plaintiff's characterization thereof.  Further answering, Defendants aver that Plaintiff and the putative class he purports to represent suffered no harm and are not entitled to any relief.**

128.    ERISA § 502(a)(2) permits plan participants, such as Plaintiff, to bring civil actions for "appropriate relief" under ERISA § 409.

**ANSWER: Paragraph 128 of the Complaint states argument and conclusions of law to which no response is required. If, however, a response is required, Defendants deny the allegations in paragraph 128 of the Complaint, including any embedded factual assumptions for the reasons stated earlier in the Answer, and rely on the law identified in paragraph 128 to speak for itself, including in relation to the rest of the applicable ERISA law, rather than on Plaintiff's characterization thereof.  Further answering, Defendants aver that Plaintiff and the putative class he purports to represent suffered no harm and are not entitled to any relief.**

129.    Under ERISA § 409(a), a fiduciary that violates any of ERISA's duties, including ERISA § 405(a)(1), (a)(2) and (a)(3), must "make good" to the Plans the losses to the Plans

resulting from its violations of ERISA § 405(a)(1), (a)(2) and (a)(3), and is "subject to such other equitable or remedial relief as the court may deem appropriate."

**ANSWER: Paragraph 129 of the Complaint states argument and conclusions of law to which no response is required. If, however, a response is required, Defendants deny the allegations in paragraph 129 of the Complaint, and rely on the law identified in paragraph 129 to speak for itself, including in relation to the rest of the applicable ERISA law, rather than on Plaintiff's characterization thereof. Further answering, Defendants aver that Plaintiff and the putative class he purports to represent suffered no harm and are not entitled to any relief.**

130. Thus, Defendants GreatBanc, the Board of Directors Defendants, John Does 1-10, Schneider and Joutras are liable, in an amount to be determined at trial, for the losses to the ESOP caused by their violations of ERISA § 405(a)(1), (a)(2) and (a)(3), and are "subject to such other equitable or remedial relief" as the Court "may deem appropriate."

**ANSWER: Paragraph 130 of the Complaint states argument and conclusions of law to which no response is required. If, however, a response is required, Defendants deny the allegations in paragraph 130 of the Complaint, including any embedded factual assumptions for the reasons stated earlier in the Answer, and rely on the law identified in paragraph 130 to speak for itself, including in relation to the rest of the applicable ERISA law, rather than on Plaintiff's characterization thereof. Further answering, Defendants aver that Plaintiff and the putative class he purports to represent suffered no harm and are not entitled to any relief.**

131.     Under ERISA § 502(a)(3), Defendants GreatBanc, the Board of Directors Defendants, John Does 1-10, Schneider and Joutras are also subject to appropriate equitable relief including, but not limited to, constructive trust and equitable surcharge.

**ANSWER: Paragraph 131 of the Complaint states argument and conclusions of law to which no response is required. If, however, a response is required, Defendants deny the allegations in paragraph 131 of the Complaint, including any embedded factual assumptions for the reasons stated earlier in the Answer, and rely on the law identified in paragraph 131 to speak for itself, including in relation to the rest of the applicable ERISA law, rather than on Plaintiff's characterization thereof.  Further answering, Defendants aver that Plaintiff and the putative class he purports to represent suffered no harm and are not entitled to any relief.**

**COUNT IV**
**Knowing Participation in and Receipt of Benefit from Violations of ERISA**
**ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)**
**Defendants Schneider and Joutras**

132.     Plaintiff repeats and realleges each of the allegations in the foregoing paragraphs as if fully set forth herein.

**ANSWER:  Defendants reassert their responses to paragraphs 1 through 131 above and incorporate the same as if fully set forth herein, and further incorporate their affirmative defenses in response thereto.**

133.     ERISA § 502(a)(3) permits a plan participant to bring a civil action to obtain appropriate equitable relief to enforce the provisions of Title I of ERISA or to enforce the terms of a plan.

**ANSWER:  Paragraph 133 of the Complaint states argument and conclusions of law to which no response is required. If, however, a response is required, Defendants deny the**

**allegations in paragraph 133 of the Complaint, including any embedded factual assumptions for the reasons stated earlier in the Answer, and rely on the law identified in paragraph 133 to speak for itself, including in relation to the rest of the applicable ERISA law, rather than on Plaintiff's characterization thereof. Further answering, Defendants aver that Plaintiff and the putative class he purports to represent suffered no harm and are not entitled to any relief.**

134.    The Supreme Court has held that anyone, including a non-fiduciary, who receives the benefit of conduct that violates ERISA may be subject to equitable remedies under ERISA § 502(a)(3) if they have "actual or constructive knowledge of the circumstances that rendered the transaction unlawful." *Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 251 (2000).

**ANSWER: Paragraph 134 of the Complaint states argument and conclusions of law to which no response is required. If, however, a response is required, Defendants deny the allegations in paragraph 134 of the Complaint, and rely on the law identified in paragraph 134 to speak for itself, including in relation to the rest of the applicable ERISA law, rather than on Plaintiff's characterization thereof. Further answering, Defendants aver that Plaintiff and the putative class he purports to represent suffered no harm and are not entitled to any relief.**

135.    As a result of the fiduciary breaches and prohibited transactions described herein, Defendants Schneider and Joutras received millions of dollars that otherwise would have been paid to the ESOP.

**ANSWER: Paragraph 135 of the Complaint states argument and conclusions of law to which no response is required. If, however, a response is required, Defendants deny the**

**allegations in paragraph 135 of the Complaint, including any embedded factual assumptions for the reasons stated earlier in the Answer, and rely on the law identified in paragraph 135 to speak for itself, including in relation to the rest of the applicable ERISA law, rather than on Plaintiff's characterization thereof. Further answering, Defendants aver that Plaintiff and the putative class he purports to represent suffered no harm and are not entitled to any relief.**

136.    Defendants Schneider and Joutras had full knowledge of the existence of the ESOP and the reasons why these transactions were unlawful and unfair to the ESOP.

**ANSWER: Paragraph 136 of the Complaint states argument and conclusions of law to which no response is required. If, however, a response is required, Defendants deny the allegations in paragraph 136 of the Complaint, including any embedded factual assumptions for the reasons stated earlier in the Answer, and rely on the law identified in paragraph 136 to speak for itself, including in relation to the rest of the applicable ERISA law, rather than on Plaintiff's characterization thereof. Further answering, Defendants aver that Plaintiff and the putative class he purports to represent suffered no harm and are not entitled to any relief.**

137.    Defendants Schneider and Joutras have profited from these fiduciary breaches and prohibited transactions in an amount to be proven at trial, and on information and belief they remain in possession of at least some of the proceeds that belong in good conscience to the Plans. All such money that belongs in good conscience to the Plans is subject to a constructive trust in favor of the Plans, for which Defendants Schneider and Joutras serve as constructive trustees. As constructive trustees, under ERISA § 502(a)(3), Defendants must disgorge to the Plans all such

money or the product thereof that is traceable to the prohibited transactions as well as any profits made thereon.

**ANSWER: Paragraph 137 of the Complaint states argument and conclusions of law to which no response is required. If, however, a response is required, Defendants deny the allegations in paragraph 137 of the Complaint, including any embedded factual assumptions for the reasons stated earlier in the Answer, and rely on the law identified in paragraph 137 to speak for itself, including in relation to the rest of the applicable ERISA law, rather than on Plaintiff's characterization thereof. Further answering, Defendants aver that Plaintiff and the putative class he purports to represent suffered no harm and are not entitled to any relief.**

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A. Certify this action as a class action pursuant to Fed. R. Civ. P. 23(a);

B. Declare that Defendants breached their fiduciary duties to the ESOP;

C. Enjoin Defendants from further violations of their fiduciary responsibilities, obligations, and duties and from further engaging in transactions prohibited by ERISA;

D. Order that Defendants make good to the ESOP the losses resulting from their serial breaches of fiduciary duty;

E. Order that Defendants disgorge any profits that they have made through their breaches of fiduciary duty and prohibited transactions and impose a constructive trust and/or equitable lien on any funds received by Defendants therefrom;

F. Order any other available equitable relief, or remedies, including but not limited to, the imposition of a surcharge, the restoration of the ESOP to the position they would have

been but for the breaches of fiduciary duty and self-dealing; and any other kind of relief and/or damages available pursuant to ERISA §§ 409 and 502(a)(2) and (3);

  G. Order that Defendants' accounts in the ESOP be offset under ERISA § 206(d)(4) to cover the losses to the ESOP from Defendants' misconduct set forth herein;

  H. Award Plaintiff reasonable attorneys' fees and costs of suit incurred herein pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g), and/or for the benefit obtained for the ESOP;

  I. Order Defendants to pay prejudgment interest; and

  J. Award such other and further relief as the Court deems equitable and just

**ANSWER: Defendants deny that Plaintiff is entitled to any of the relief set forth in the "Prayer for Relief," including its constituent sub-parts.  Defendants aver that Plaintiff is not entitled to any relief whatsoever, whether on his own behalf or on behalf of any other person(s), including a putative class or the ESOP itself.**

## ADDITIONAL DEFENSES

Without assuming the burden of proof on any matters that would otherwise rest with Plaintiff and the purported class members, and expressly denying any and all wrongdoing, Defendants allege the following additional and/or affirmative defenses.  Accordingly, in further response to the Complaint, Defendants aver as follows:

### First Defense

Plaintiff Rush's claims are barred, in whole or in part, for failure to state a claim upon which relief may be granted.

### Second Defense

Defendants other than GreatBanc were not ERISA fiduciaries, or were not acting in an ERISA fiduciary capacity, with respect to the complained-of conduct.

### Third Defense

To the extent that Defendants were acting as ERISA fiduciaries, they are entitled to substantial deference for their decisions, including to the business judgment or fiduciary discretion they exercised in making these decisions.

### Fourth Defense

Plaintiff Rush's putative class-action claims are barred because Plaintiff cannot satisfy the requirements of Rule 23(a) or Rule 23(b) of the Federal Rules of Civil Procedure.

### Fifth Defense

Plaintiff Rush's claims are barred in whole or in part by the doctrine of unclean hands, since he participated in the very conduct of which he complains.

### Sixth Defense

Defendants are entitled to offset against any recovery the amounts Plaintiff Rush received from this ESOP Buyout, including the $1,809,142 he received for his stock appreciation rights paid as part of this ESOP Buyout.

### Seventh Defense

Any alleged loss, injury and/or damages suffered by Plaintiff Rush was not caused by, or a result of, any fault, act, or omission by Defendant(s), but was caused by circumstances, persons, or entities, including Plaintiff Rush, for which Defendants are not responsible, and for which Defendants cannot be held liable.

### Eighth Defense

Plaintiff Rush's claimed relief does not constitute "appropriate equitable relief" under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3).

### Ninth Defense

Plaintiff Rush's Count II claim for a prohibited transaction under ERISA § 406(b), 29 U.S.C. § 1106(b) against Defendants Joutras and Schneider fails because neither Joutras nor Schneider caused the ESOP to agree to the ESOP Buyout or to make payments under their pre-existing employment or stock appreciation right agreements with Segerdahl.

### Tenth Defense

Plaintiff Rush's Count II claim for a fiduciary breach under ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1) against Defendants Joutras and Schneider fails because neither Joutras nor Schneider caused the ESOP to agree to the ESOP Buyout or to make payments under their pre-existing employment or stock appreciation right agreements with Segerdahl.

### Eleventh Defense

Plaintiff Rush's Count IV claim against Defendants Joutras and Schneider as non-fiduciaries fails because the receipt of amounts due under their pre-existing employment or stock appreciation right agreements with Segerdahl does not violate ERISA, or constitute ill-gotten proceeds subject to disgorgement or restitution.

### Twelfth Defense

ICV Partners was an outside buyer, and was not a party-in-interest to the ESOP Plan at the time of the ESOP Buyout. Thus, this sale to ICV Partners was not a prohibited transaction under ERISA § 406 for which Defendants have to prove the applicability of the exemption in ERISA § 408. Defendant GreatBanc nonetheless complied with this exemption by confirming

the sale to ICV Partners was for at least fair market value and that the terms and conditions of this transaction were, taken as a whole, fair to the ESOP from a financial point of view. This compliance provides a safe harbor and an additional reason why GreatBanc did not breach any fiduciary duties when it approved this sale.

## RESERVATION OF DEFENSES

Defendants reserve the right to assert any additional affirmative defenses and matters in avoidance that may be discovered or disclosed during the course of additional investigation and discovery.

## COMPULSORY COUNTERCLAIM AGAINST PLAINTIFF RUSH

Defendants specifically deny liability for Plaintiff Rush's claim in Paragraphs 70 to 71 of his Complaint that any proceeds to the ESOP were improperly diverted to Segerdahl officers, executives or directors, including through the payment for stock appreciation rights that matured in the event of a change in control. However, if Plaintiff Rush were deemed to state a valid claim here, then Defendants allege:

1.      As Segerdahl's senior vice president of manufacturing, Plaintiff Bruce Rush is a party-in-interest to the ESOP.

2.      Plaintiff Rush was granted 200 shares of stock appreciation rights effective December 1, 2014.

3.      Upon the change in control from the ESOP Buyout, all of Plaintiff Rush's stock appreciation rights ("SARS") fully vested.

4.      As part of the ESOP Buyout, the buyer ICV Partners caused $1,809,142 out of the $265 million in sales proceeds to be paid to Plaintiff Rush for his SARS shares.

5.      If Plaintiff Rush has stated a valid claim that the buyer's payment for these SARS shares constituted an illegal diversion of ESOP proceeds from the ESOP and the putative class he purports to represent, which Defendants again specially deny, then Plaintiff Rush knowingly participated in and profited from this breach, and he is liable to repay to the ESOP and the putative class he represents the $1,809,142 he received as part of this claimed illegal diversion, as well as interest, attorneys fees, and any other relief the Court deems equitable.  In addition or in the alternative, Plaintiff Rush is liable to contribute to and share in any payments made by Defendants related to Plaintiff Rush's claim of an illegal diversion, which to avoid any doubt, Defendants again specifically deny.

WHEREFORE, Defendants pray for a judgment against Plaintiff dismissing this case with prejudice and awarding any further relief as the Court deems just and proper, including an award of costs and attorneys' fees.

Dated: May 24, 2019

Respectfully submitted,

**GREATBANC TRUST COMPANY, MARY LEE SCHNEIDER, RICHARD JOUTRAS, RODNEY GOLDSTEIN, PETER MASON, ROBERT CRONIN, AND SEGERDAHL CORP D/B/A SG360°**

 s/ Charles F. Seemann III

Sarah J. Gasperini (local counsel)
JACKSON LEWIS P.C.
150 N. Michigan Ave., Suite 2500
Chicago, Illinois 60601
Tel:     312.787.4949
Fax:     312.787.4995
Email: Sarah.Gasperini@jacksonlewis.com

Charles F. Seemann III
Robert W. Rachal
Katelyn W. Harrell
JACKSON LEWIS P.C.
650 Poydras Street, Suite 1900
New Orleans, Louisiana 70130
Tel:     504.208.1755
Fax:     504. 208.1759
Email:  Charles.Seemann@jacksonlewis.com
           Robert.Rachal@jacksonlewis.com
           Katelyn.Harrell@jacksonlewis.com

## <u>CERTIFICATE OF SERVICE</u>

I, Charles F. Seemann III, certify that on May 24, 2019, I caused Defendants' Answer to Plaintiff's Complaint, Statement of Affirmative Defenses, and Compulsory Counterclaim to be filed with the Court by electronic filing protocols, and that same will therefore be electronically served upon all attorneys of record registered with the Court's ECF/CM system.

<u>s/ Charles F. Seemann III</u>

4851-3470-0047, x. 1