## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| BRUCE RUSH, as a participant in and on behalf of the Segerdahl Corporation Employee Stock Ownership Plan, and on behalf of a class of all others who are similarly situated, | ) ) ) ) | Case No. 1:19-cv-738 |
| | ) | Judge Andrea R. Wood |
| | ) | Magistrate Judge Susan E. Cox |
| Plaintiff, | ) ) | |
| | ) | |
| v. | ) | |
| | ) | **FIRST AMENDED CLASS ACTION** |
| GREATBANC TRUST COMPANY; MARY LEE SCHNEIDER; RICHARD JOUTRAS; RODNEY GOLDSTEIN; PETER MASON; ROBERT CRONIN; and SEGERDAHL CORP. (d/b/a SG360) | ) ) ) ) ) | **COMPLAINT** |
| | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendants. | ) | |

1

## TABLE OF CONTENTS

**INTRODUCTION** ................................................................................................................ 4

**JURISDICTION** ............................................................................................................... 14

**THE PARTIES AND THE ESOP** ................................................................................. 14

**GENERAL ALLEGATIONS** ........................................................................................ 16

   A.     Background ........................................................................................... 17

       The 2014 SARS Plan ............................................................................. 18

       Removal of Former Employees from the ESOP in 2014 ..................... 19

       Segerdahl's 2014 Acquisition of Lehigh Direct ................................. 21

   B.     Defendants' Failure to Appropriately Market Segerdahl ................... 22

       Segerdahl's Board & the Decision to Market Segerdahl ................... 22

       The 2015 Wind Point Offer ................................................................. 22

       The Retention of Defendant Schneider as CEO ................................ 26

       Defendants Reject Vergamini's Suggestion to Explore a Transaction with a Strategic Buyer and Instruct Vergamini Only to Contact Investment Buyers that Will Retain Management and Promote Management's Strategies ................................................. 28

       Vergamini Contacts Investment Buyers that Will Preserve Management ........................... 33

       GreatBanc's Imprudent and Disloyal Decision to Approve the ESOP Buyout ................... 38

       Vergamini Confirms that No Strategic Buyers Were Contacted and that a Strategic Buyer Would Have Paid Much More than ICV Did ....................... 47

       Defendant Schneider Confirmed that No Strategic Buyers Were Contacted ....................... 47

       The Equity Interests and Employment Contracts Received by Defendant Schneider and Bradshaw, Segerdahl's CFO ................................................. 48

   C.     The Sale-Leaseback of Segerdahl's Real Estate ............................... 51

   D.     The Section 338(h)(10) Election ....................................................... 58

   E.     The Wolf Road Fraud......................................................................... 59

   F.    The Diverted Purchase Proceeds ....................................................... 60

   G.    SRR's Flawed Valuation .................................................................... 61

**DEFENDANTS' FIDUCIARY STATUS UNDER ERISA** .................................... 68

**ERISA'S FIDUCIARY DUTIES** ................................................................................ 70

**CLASS ACTION ALLEGATIONS** ............................................................................ 72

2

**CLAIMS FOR RELIEF** ................................................................................................. 75

**COUNT I** .............................................................................................................................. 75

**COUNT II** ........................................................................................................................... 80

**COUNT III** ......................................................................................................................... 82

**COUNT IV** .......................................................................................................................... 83

**COUNT V** ............................................................................................................................ 84

**PRAYER FOR RELIEF** ................................................................................................... 85

## INTRODUCTION

1.      Plaintiff Bruce Rush, a participant in the Segerdahl Corporation Employee Stock Ownership Plan (the "ESOP"), brings this action in a representative capacity on behalf of the ESOP and as a class action on behalf of all other similarly situated participants in and beneficiaries of the ESOP. He brings this action under Sections 502(a)(2) and 502(a)(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1132(a)(2) and 1132(a)(3), against Defendants GreatBanc Trust Company ("GreatBanc"), Mary Lee Schneider, Richard Joutras (together Schneider and Joutras are the "Segerdahl Fiduciary Defendants"), Rodney Goldstein, Peter Mason, Robert Cronin (together Schneider, Joutras, Goldstein, Mason and Cronin are the "Board of Directors Defendants"). Segerdahl Corp. ("Segerdahl"), was the sponsor of the ESOP, and is a nominal defendant in this matter.

2.      Segerdahl was established in 1956 and is headquartered in Wheeling, Illinois. Segerdahl is one of the largest and most successful printing companies in the United States.

3.      In 2003, Segerdahl established the ESOP to help its employees save for retirement and enjoy an ownership interest in Segerdahl.

4.      An employee stock ownership plan, like the ESOP here, is a type of trust covered by ERISA. ESOPs are designed to hold and safeguard the retirement savings of the company's employee participants and give the participants an ownership stake in their employer.

5.      As the Seventh Circuit has explained:

To accomplish the desired remedial and protective purposes of ERISA, Congress required that all assets of the employee benefit plans "be held in trust by one or more trustees," 29 U.S.C. 1103(a), subject to comprehensive standards of conduct wherein a fiduciary or trustee must discharge his duties solely in the interests of the participants "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters were to use. . . ." 29 U.S.C. § 1104(a).

4

*Sec'y of Labor v. Fitzsimmons*, 805 F.2d 682, 690 (7th Cir. 1986).

6.     From January 1, 2003 until December 7, 2016, the ESOP owned 100% of the outstanding common stock of Segerdahl.

7.     The Segerdahl ESOP was funded by rollover contributions from its participants' other retirement plans, including 401(k) plans. Thus the participants shares' in the ESOP were not simply a gratuity provided by their employer, or even exclusively just a form of negotiated compensation. Instead, the majority of the funds in the Segerdahl ESOP represented the employee-participants' already earned and vested retirement savings.

8.     Plaintiff Bruce Rush is a former employee of Segerdahl and a participant in the ESOP. The majority of Plaintiff Rush's account balance was, like that of the other participants, rolled over from other retirement savings plans.

9.     On December 7, 2016, the fiduciaries of the ESOP sold the ESOP's 100% stake in Segerdahl to an outside investment capital firm called ICV Partners, LLC ("ICV" or "ICV Partners").

10.     In the transaction, called the "ESOP Buyout" herein, and "Project Insight" at the time, the ESOP received less than adequate consideration for its shares of Segerdahl.

11.     By 2015, Segerdahl had more than $300 million per year in sales. Segerdahl had more than 700 employees, and was the fourth largest, fully integrated direct mail printer in North America and the largest company focused on medium and high-volume direct mail printing, holding approximately 10% of this market segment. Segerdahl's customers included Fortune 500 companies across a variety of industries.

12.     At all relevant times leading up to the ESOP Buyout, and despite the ESOP's ownership of 100% of Segerdahl's shares, Defendants Schneider and Joutras (together, the

"Segerdahl Fiduciary Defendants") exercised effective control over Segerdahl. The control in substance that the Segerdahl Fiduciary Defendants wielded gave them the effective ability to hire and fire board members and retain or remove the ESOP's trustee and other fiduciaries. At all relevant times leading up to the ESOP Buyout, the Segerdahl Fiduciary Defendants actually exercised this control, and in fact appointed or retained all members of Segerdahl's board of directors as well as the ESOP's trustee and other fiduciaries.

13.     The Segerdahl Fiduciary Defendants engaged in a deeply flawed process in marketing Segerdahl to potential buyers leading up to the ESOP Buyout. Instead of seeking to maximize the price the ESOP received for its shares, the Segerdahl Fiduciary Defendants marketed the company primarily to investment firms and intentionally avoided marketing Segerdahl to its competitors. Even though competitor companies typically pay more than an investment firm like ICV Partners, the competitor would have taken over day to day control of the company's operations from the Segerdahl Fiduciary Defendants, especially from Defendant Schneider, who wanted to retain her role as Segerdahl's chief executive officer after the ESOP Buyout. In addition to the loss of prestige, losing control would come at real cost for Defendant Schneider, who would lose her lucrative compensation arrangement as CEO. Moreover, Defendant Schneider and Segerdahl's other top executives ran a risk of losing their jobs if the company was sold to a competitor, as the buying competitor would eventually consolidate their job functions into the buyers' existing management structure to realize synergistic value from the deal. By contrast, an investment capital firm, like ICV Partners, with less experience in the printing industry, would likely leave management in place and in control over the company's operations for at least several years after the transaction.

14.    During the negotiation of the ESOP Buyout, Defendant Schneider and Segerdahl's other top executives all demanded, and received, lucrative employment contracts with Segerdahl post-transaction. In addition, Defendant Schneider and many of Segerdahl's other top executives received an equity ownership interest in post-transaction Segerdahl. Those employment agreements and equity interests gave Defendant Schneider and the other executives an interest directly contrary to the interests of the ESOP.

15.    The Defendants also agreed to the ESOP Buyout transaction knowing that ICV Partners planned to engage in a sale-leaseback transaction of Segerdahl's primary real estate after the ESOP Buyout. However, the Segerdahl Fiduciary Defendants failed to ensure that ICV Partners paid an appropriate price for the ESOP's Segerdahl shares in light of the immediately realizable cash value of Segerdahl's real estate assets. By the time of the ESOP Buyout, Segerdahl had received five offers for the real estate in the $22-25 million range, and had in fact *accepted* one of the offers. Yet the record is clear that Defendants did not obtain *any* additional value from ICV Partners for the real estate. GreatBanc's determination of the fairness of the ESOP Buyout ultimately assigned no value to the potential sale-leaseback, despite its initial determination that the sale-leaseback "[h]as to be factored into purchase price."

16.    Three months after the ESOP Buyout, Segerdahl completed the sale-leaseback transaction, and the benefits of that transaction inured to ICV Partners, Defendant Schneider, and the other Segerdahl insiders who received equity interests in the ESOP Buyout, including Segerdahl's CFO, Marcus Bradshaw.

17.    In addition, the Segerdahl Fiduciary Defendants agreed to the ESOP Buyout transaction knowing that ICV Partners planned to make a Section 338(h)(10) election. A 338(h)(10) election is a tax mechanism that allows the buyers of an S Corporation, like Segerdahl

was before the ESOP Buyout, to obtain millions of dollars in tax savings. The Defendants understood the value of the 338(h)(10) election to ICV Partners and other potential buyers, and indeed marketed Segerdahl to potential buyers emphasizing that the 338(h)(10) election would be worth tens of millions of dollars. An October of 2016 presentation created by Defendants' advisors estimated that the 338(h)(10) election was worth more than $46 million to ICV. Yet the Segerdahl Fiduciary Defendants made no effort to obtain any value from ICV Partners in exchange, and indeed made the conscious decision not to seek anything from ICV Partners in exchange for that value.

18.     Discovery has also shown that, prior to the ESOP Buyout, Defendants had realized they had been the victims of fraudulent overbilling by a temporary employment agency at their Wolf Road facility (the "Wolf Road Fraud"). By the time of the ESOP Buyout, Defendants knew they would be able to obtain significant cost savings at that facility simply from ending the fraud, and expected to receive significant compensation from the agency. Again, however, Defendants made no effort to obtain value from any buyer corresponding to that value, despite their awareness that it "likely the result will be a positive to EBITDA," and this source of value, like the 338(h)(10) election and the sale-leaseback, was "not currently reflected in the purchase price formula."

19.     Section 338(h)(10) elections are commonly made when the target company is an S corporation, and sale-leaseback deals are increasingly common in many private equity transactions. Prudent sellers understand the benefit of the Section 338(h)(10) election and the value of sale-leaseback transactions to buyers and consider this benefit to negotiate for a higher purchase price. But Defendants did not do so. Defendant GreatBanc was actually aware of the value of the sale-leaseback and 338(h)(10) election and made an affirmative decision to disregard those sources of value in order to justify its approval of the unreasonably low price the ESOP received for its

shares of Segerdahl. Prudent sellers also ensure that they obtain value for their shares consistent with the company's full financial situation—claims like the Wolf Road Fraud were an important part of that picture for Segerdahl and yet Defendants did nothing to obtain value for that from ICV or any other potential buyer.

20.     Moreover, a significant portion of the purchase price paid by ICV Partners was wrongfully diverted from the ESOP by the Segerdahl Fiduciary Defendants, totaling millions of dollars. In particular, former CEO Defendant Joutras and his relative Paul White received cash payments of $1.225 million out of the purchase proceeds. Joutras and White, who stopped functioning as Segerdahl employees in December of 2015, were allowed to keep all of their stock appreciation rights ("SARs") awards, instead of forfeiting the unvested portion of their awards. Joutras and White received at least $4.4 million for their unforfeited SARs during the ESOP Buyout. In addition, a "transaction bonus" of $1 million was paid to Segerdahl's CFO, Marcus Bradshaw, who was instrumental in helping Defendant Schneider sell Segerdahl to an investment buyer that would retain Bradshaw and Schneider in their management roles. *See also* ¶¶ 321-325, *infra*.

21.     Defendant GreatBanc was an ESOP fiduciary and had responsibility for approving the ESOP Buyout on behalf of the Plan. Defendant GreatBanc knew or should have known: (a) that the ESOP Buyout was the result of a flawed sales process; (b) that the price the ESOP received from ICV Partners was below what other buyers would have paid for those shares, (c) that the transaction did not appropriately credit the value of Segerdahl's real estate assets, the value of the 338(h)(10) election, or the value of the Wolf Road Fraud in the sale price for Segerdahl itself, and (d) millions of dollars that should have been paid to the ESOP would be diverted from the ESOP to the Segerdahl Fiduciary Defendants and other Segerdahl insiders (*see* ¶¶ 321-325). Defendant

9

GreatBanc had an affirmative duty to ensure the fairness of the ESOP Buyout to the ESOP—a duty they failed to fulfill.

22.     As fiduciaries of the ESOP, Defendants failed to ensure that the ESOP received the fair market value of its shares. Fair market value measures what a hypothetical willing buyer would pay to a hypothetical willing seller, when neither party is under any compulsion to buy or sell. Determining fair market value requires considering the highest and best use of the asset in question, which requires evaluating the characteristics of likely potential buyers, and should take into account the population of potential willing buyers. That includes buyers who, for a variety of reasons, might be willing to pay more than others. This certainly requires evaluating the characteristics of types of likely potential willing buyers. In addition, as this Court has held, in the context of a sale of ESOP stock, determining the fair market value of the ESOP's shares requires the evaluation of the benefits of the transaction of the counterparties. *Montgomery v. Aetna Plywood, Inc.*, 39 F. Supp. 2d 915, 938 (N.D. Ill. 1998). Determining fair market value in the context of the ESOP Buyout was especially important, because all of the ESOP's assets were to be liquidated in that transaction, and the ESOP was permanently giving up its stake in Segerdahl. Because other types of buyers, such as competitors, would have paid a higher price for the ESOP's shares than did ICV Partners, the fair market value of the ESOP's shares was higher than what ICV Partners would have paid. Defendants GreatBanc relied on a valuation of the ESOP in approving the transaction that failed to consider the characteristics of likely potential buyers, including operating companies like competitors, and failed to consider what those likely potential buyers would have paid. Defendant GreatBanc also failed to appropriately consider the specific benefits of the transaction to the ESOP's counterparties, including Defendant Schneider, the other Segerdahl executives who received equity awards in post-transaction Segerdahl, and ICV Partners.

Defendants GreatBanc knew or should have known that the valuation failed to take that higher potential price into account, and knew or should have known that the valuation failed to represent the fair market value of the ESOP's shares for that reason.

23.    The Board of Director Defendants were responsible for appointing, retaining and overseeing Defendant GreatBanc and the members of the ESOP Committee, which served as the named fiduciary of the ESOP and was the ESOP's only discretionary fiduciary before GreatBanc was retained to approve the ESOP Buyout in August of 2016. The Board of Director Defendants, including the Segerdahl Fiduciary Defendants, had interests in the ESOP Buyout that conflicted with the ESOP's interests, and failed to ensure that GreatBanc and the Segerdahl Fiduciary Defendants acted solely in the interests of the ESOP.

24.    Defendant Schneider's equity and employment interests in the post-sale company gave her a financial interest contrary to the ESOP, yet she, more than anyone else, was primarily responsible for marketing the company to investors only as well as the negotiations with ICV. Moreover, discovery has revealed numerous troubling instances in which Defendants put management's interests ahead of the interests of the ESOP—including failing to pursue an in-hand indication of interest from a potential buyer at a higher price than the ultimate deal price due to concerns about the bidder's compatibility with existing management.

25.    Stout Risius Ross ("SRR"), the valuation firm hired by GreatBanc to evaluate the ESOP Buyout, set out two methodologies to estimate the value of Segerdahl as a check to the fairness of the ESOP Buyout—a guideline public company method and a discounted cash flow method. Both of those methodologies yielded prices higher than the $265 million ICV was going to pay. SRR simply overrode the guideline public company analysis, and manipulated the results to justify the too-low price. As set forth in more detail below, SRR's manipulation of its results is

apparent on the face of SRR's valuation. SRR also ignored numerous precedent transactions in the printing industry which could have served as guideposts for the fair market value of Segerdahl, but which also would have shown that the price in the ESOP Buyout was much too low.

26.     Moreover, discovery has shown that SRR and GreatBanc were well-aware of the sale-leaseback transaction, the 338(h)(10) election and the Wolf Road Fraud. Despite determining in August of 2016 that the 338(h)(10) election and sale-leaseback "[h]as to be factored into the purchase price," the sale-leaseback and the 338(h)(10) election were "not included in the valuation" and "had not been incorporated into the analysis" when the final valuation was prepared in December of 2016.  The sale-leaseback was worth up to $13 million, the 338(h)(10) election was worth tens of millions of dollars (Vergamini estimated the value of the 338(h)(10) election alone at $46 million in October of 2016), and the Wolf Road Fraud which was worth several million dollars more, and yet SRR and GreatBanc chose to ignore them in order to make the transaction look fair to the ESOP.

27.     SRR's manipulation of its valuation methodology and its intentional failure to include these major sources of value were a whitewash designed to protect the fiduciary misconduct of the Segerdahl Fiduciary Defendants and Defendant GreatBanc. Defendant GreatBanc was well aware of these problems and elected to approve the transaction anyway.

28.     At the heart of ERISA's legislative framework are broadly applicable, stringent fiduciary standards. ERISA requires that plan assets be held in trust, and imposes strict fiduciary duties of prudence and loyalty on trustees and fiduciaries with any authority or control over the plan's assets in the trust. 29 U.S.C. § 1104 (a)(1)(A)-(D). ERISA's fiduciary duties have repeatedly been characterized by the courts of appeal as the "highest known to the law." *E.g.*, *Donovan v.*

*Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982) (Friendly, J.); *see also George v. Kraft Foods Glob., Inc.*, 814 F. Supp. 2d 832, 852 (N.D. Ill. 2011).

29.     The Seventh Circuit has explained that "[w]hether an ERISA fiduciary has acted prudently requires consideration of both the substantive reasonableness of the fiduciary's actions and the procedures by which the fiduciary made its decision: In reviewing the acts of ESOP fiduciaries under the objective prudent person standard, courts examine both the process used by the fiduciaries to reach their decision as well as an evaluation of the merits." *Fish v. Greatbanc Tr. Co.*, 749 F.3d 671, 680 (7th Cir. 2014) (quotations omitted). ERISA's duty of prudence requires fiduciaries to "act in good faith as an objectively prudent fiduciary would act, not simply as a prudent layperson would act." *Chesemore v. All. Holdings, Inc.*, 886 F. Supp. 2d 1007, 1041 (W.D. Wis. 2012), *aff'd* 829 F.3d 803 (7th Cir. 2016).

30.     ERISA's "duty of loyalty 'requires that fiduciaries keep the interests of beneficiaries foremost in their minds, taking all steps necessary to prevent conflicting interests from entering into the decision-making process…[i]n other words, conflicts of interest must be shunned." *Perez v. Bruister*, 823 F.3d 250, 261 (5th Cir. 2016). And "[w]here it might be possible to question the fiduciaries' loyalty, they are obliged at a minimum to engage in an intensive and scrupulous independent investigation of their options to insure that they act in the best interests of the plan beneficiaries." *Leigh v. Engle*, 727 F.2d 113, 125–26 (7th Cir. 1984)

31.     As set forth in more detail below, Defendants breached their fiduciary duties of loyalty and prudence in conducting a self-interested and disloyal sale process and by approving a transaction that was procedurally and substantively unreasonable and unfair to the ESOP, and thereby cost the ESOP and its participants tens of millions of dollars.

## JURISDICTION

32.     Plaintiff brings this action pursuant to ERISA §§ 502(a)(2) and 502(a)(3), 29 U.S.C.

§§ 1132(a)(2) and (3).

33.     This Court has subject matter jurisdiction over Plaintiff's claims pursuant to ERISA

§ 502(e)(1), 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because this action arises under the laws

of the United States.

34.     This Court has general personal jurisdiction over Defendant GreatBanc, the Board

of Director Defendants, and the Segerdahl Fiduciary Defendants because those Defendants reside

in this District. This Court has specific personal jurisdiction over all Defendants because they took

the actions described herein in this District or directed those actions specifically at this District.

35.     Pursuant to 29 U.S.C. § 1132(e)(2) venue is proper in this District because the Plan

is administered in this District and the misconduct described herein occurred in this District. Venue

is also proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because, for the same reasons, a

substantial part of the events or omissions giving rise to the claims occurred in this District.

## THE PARTIES AND THE ESOP

36.     The ESOP is an employee benefit plan and an employee pension benefit plan

covered by ERISA within the meaning of ERISA § 3(2)(A) & (7), 29 U.S.C. § 1002(2)(A) & (7).

37.     The ESOP's assets were held in the Segerdahl Corp. Employee Stock Ownership

Trust (the "ESOT"). The ESOP and the ESOT are referred to collectively herein as the "ESOP"

unless otherwise specified.

38.     At all relevant times, Plaintiff Bruce Rush has been a participant in the ESOP. At

the time of the filing of the Complaint in this action in February of 2019, Rush was a citizen and

resident of Illinois. Rush has subsequently moved to Florida and is now a citizen and resident of

Florida.

39.    Defendant GreatBanc Trust Company ("GreatBanc") is an Illinois corporation with its principal place of business in Lisle, Illinois. At all relevant times prior to December 7, 2016, Defendant GreatBanc served as the trustee of the ESOP.

40.    Defendant Mary Lee Schneider was the Chief Executive Officer and President of Segerdahl from December 1, 2015 until December 1, 2018. Defendant Schneider was a member of the committee serving as Administrator of the ESOP starting April 11, 2016, until the termination of the ESOP in December of 2016. Defendant Schneider is a citizen and resident of Illinois.

41.    Defendant Richard Joutras was the President and Chief Executive Officer of Segerdahl until December 1, 2015. Defendant Joutras was the Chairman of Segerdahl's Board of Directors from prior to December 1, 2015 until December 7, 2016. Defendant Joutras was the Administrator of the ESOP until April 11, 2016. Defendant Joutras is a citizen and resident of Illinois.

42.    Defendants Rodney Goldstein, Peter Mason, Robert Cronin were members of Segerdahl's Board of Directors (and together with Schneider and Joutras, are referred to herein as the "Board of Directors Defendants") starting in 2016, until December 7, 2016.

   a.   Defendant Goldstein is a citizen and resident of Illinois.

   b.   Defendant Mason practices law in Chicago, Illinois at the firm Freeborn & Peters, LLC ("Freeborn"). According to Freeborn's website, Defendant Mason is a member of the State Bar of Illinois.

   c.   Defendant Cronin is the Managing Partner of the Open Approach, LLC, and Illinois limited liability company with its principal office in Oak Brook, Illinois.

43. Nominal Defendant Segerdahl Corp. is an Illinois corporation with its principal place of business in Wheeling, Illinois.

## GENERAL ALLEGATIONS

44. ICV paid $265 million for the ESOP's shares of Segerdahl in the ESOP Buyout.

45. However, the fair market value of the ESOP's shares of Segerdahl was much higher than $265 million. The sale price was too low for several reasons, including:

    a. the Segerdahl Fiduciary Defendants and their advisors engaged in a flawed sale process that included, among other things, a failure to market Segerdahl to many potential buyers to obtain the best price for the ESOP's shares, and an unjustified focused on a buyer that, after the transaction, would allow the Segerdahl Fiduciary Defendants to maintain control over the company's day to day operations, and would allow the Segerdahl Fiduciary Defendants and other insiders to remain at their positions; *see* ¶¶ 85-262 *infra*;

    b. the Segerdahl Fiduciary Defendants and their advisors failed to pursue in-hand indications of interest to purchase at a higher price than ICV eventually paid because of concerns that the buyer was incompatible with existing management; *see* ¶¶ 192-202, *infra*;

    c. the purchase price ICV Partners paid for the ESOP's shares did not appropriately include the value of certain real estate owned by Segerdahl, which any prospective buyer including ICV would be able to sell and which ICV Partners was in fact able to sell for $25 million immediately after the ESOP Buyout; *see* ¶¶ 263-300, *infra*;

d.   the purchase price ICV Partners paid for the ESOP's shares did not appropriately include the value of the 338(h)(10) election ICV Partners planned to make after the sale; *see* ¶¶ 301-314, *infra*;

e.   the purchase price ICV Partners paid for the ESOP's shares did not appropriately include the value of a settlement with a staffing agency responsible for providing employees to Segerdahl's Wolf Road facility (the "Wolf Road Fraud"); *see* ¶¶ 315-320, *infra*;

f.   the Segerdahl Fiduciary Defendants diverted millions of dollars of the purchase price paid by ICV Partners away from the ESOP to the Segerdahl Fiduciary Defendants themselves and other company insiders. *See* ¶¶ 321-325, *infra*.

46.   Defendant Schneider pushed the sale through under these terms unfavorable to the ESOP because she stood to receive significantly more in equity, compensation and prestige from serving as CEO under ICV Partners or another investment buyer than she would have made from her SARs in a sale at a higher price to a strategic buyer, who likely would have replaced her, and had other conflicts of interest with the ESOP regarding the ESOP Buyout transaction. *See* ¶¶ 240-262, *infra*

47.   Instead of fulfilling their obligation to protect the ESOP, Defendants failed to ensure that the ESOP received the fair market value of its 100% ownership interest of Segerdahl.

## A.  Background

48.   Effective January 1, 2003, the ESOP was established to benefit Segerdahl's employees, provide Segerdahl's employees with an ownership interest in Segerdahl, and to help Segerdahl's employees save for retirement.

17

49.     On January 1, 2003, the ESOP bought out the other owners of the company and became the sole owner of Segerdahl's common stock.

50.     From 2003 until December 7, 2016, the ESOP owned 100% of the common stock of Segerdahl.

51.     After the ESOP purchased Segerdahl, Defendant Joutras became Segerdahl's CEO and President and Chairman of Segerdahl's Board of Directors.

52.     Defendant GreatBanc served as the trustee of the ESOT, which held the ESOP's assets in trust, at all relevant times.

53.     Before August of 2016, Defendant GreatBanc served as a directed trustee. In that capacity, it was entitled to take action only at the direction of the ESOP's named fiduciary.

54.     The ESOP's named fiduciary was the Plan Administrator, which was the ESOP Committee.

55.     Because the ESOP owned 100% of Segerdahl's shares, which were not publicly traded, the shares had no readily ascertainable market value.

56.     During the relevant time, Defendant GreatBanc received valuation reports from the valuation firm SRR every six months that estimated the value of the ESOP's Segerdahl stock.

57.     The share price determined by SRR became the official value of Segerdahl stock for the ESOP.

58.     Segerdahl hired Marcus Bradshaw at its Chief Financial Officer in early 2014.

### The 2014 SARS Plan

59.     In early 2014, Segerdahl adopted a new stock appreciation rights plan, the 2014 SARs Plan.

60.     The 2014 SARs Plan granted appreciation rights that vested over three years or completely at a change in control.

18

61.     The appreciation rights, or SARs, under the 2014 SARs Plan were issued with a strike price equal to the then current price of Segerdahl's shares, or $4,025.90 per share.

62.     The 2014 SARs Plan capped the number of SARs that could be issued at 20% of the outstanding shares of common stock.

63.     At exercise, the holder of the SARs received the difference between the share price at vesting and the strike price.

64.     The SARs could be exercised if they had vested without previously expiring.

65.     The SARs had a three-year vesting cliff vesting period, vesting "upon the third anniversary of the Grant Date," provided that the holder "continue[d] to be employed" by Segerdahl "on that date."

66.     However, the SARs would immediately vest in the event of a change in control of Segerdahl.

67.     The SARs also expired on the third anniversary of the grant date, or days following termination of employment.

68.     The SARs were exercisable on the earlier of expiration or a change in control.

69.     The primary drawback to the SARs from the ESOP's perspective was that the SARs could dilute the ESOP's interest. However, the SARs were designed to incentivize the employees who received the SARs to increase the value of the Segerdahl, which would, theoretically, benefit both the ESOP and the SARs holders.

### Removal of Former Employees from the ESOP in 2014

70.     Until 2014, the Segerdahl ESOP permitted former employees to continue participating in the ESOP.

71.     By 2014, a number of former employees were participants in the ESOP.

72. Bradshaw undertook to remove the former employees from the ESOP, and at which point they would be required to put their ESOP shares.

73. Segerdahl adopted a conformed plan document for the ESOP through the Eleventh Amendment (the "Conformed Plan") on August 27, 2014.

74. The Conformed Plan did not permit former employees to remain as participants, and required former employees to put the Segerdahl stock in their ESOP accounts back to the ESOP.

75. Accordingly, after the adoption of the Conformed Plan, Segerdahl was forced to repurchase the interests of the former employee participants.

76. Segerdahl did not pay the former employees 100% of the value of their ESOP accounts immediately. Instead, it paid 20% immediately, and issued notes with a four-year payment cycle for the remainder of the balance, with one-fourth of the remaining balance due each year.

77. This materially altered Segerdahl's capital structure because:

   a. the notes obligated Segerdahl to pay in excess of $40 million, significantly increasing Segerdahl's debt load; and

   b. the number of outstanding shares dropped from 19,623.41 to 11,950.23.

78. By decreasing the number of outstanding shares, forcing the former participants out of the ESOP concentrated the remaining equity interest in the hands of the remaining participants. Thus if Segerdahl increased in value after the force-out, the value of the remaining shares would increase much more.

79. These changes to the capital structure left Segerdahl more exposed in the event share prices did increase, for two related reasons. If Segerdahl's price increased, the remaining

20

ESOP participants might retire so that they could put their ESOP shares and realize the increased share price (sometimes called "redemption liability"). However, Segerdahl would have to borrow to pay out those departing ESOP participants, and when added to the already increasing debt load, it would impair Segerdahl's ability to function absent further changes to the capital structure, such as a sale of the Company.

80.     On information and belief, Defendant Joutras and Bradshaw decided to remove the former participants in the ESOP because they were already planning to sell Segerdahl, and wanted to obtain more of the proceeds of the eventual sale for Joutras and the remaining participants.

81.     Regardless of the merits of that decision, Defendant Joutras and Bradshaw knew or should have known that it would increase the ESOP's exposure to significantly higher repurchase liability and the resulting debt burden in the event of an increase in share price.

### Segerdahl's 2014 Acquisition of Lehigh Direct

82.     In July 2014, Segerdahl acquired its competitor Lehigh Direct, a direct mail printing company.

83.     Segerdahl's discussions and negotiations with Lehigh Direct were conducted on a closed book basis. In particular, Segerdahl was not permitted to access key customer or pricing information until well into the negotiations. On information and belief, Segerdahl entered into various agreements with Lehigh Direct preventing Segerdahl from poaching Lehigh Direct's employees or contacting Lehigh Direct's customers until after the sale was complete.

84.     Such closed book transactions are common among competitors in the printing industry, and permit companies to seriously discuss potential mergers without risking the harm to business that could come from premature access to competitive data.

## B. Defendants' Failure to Appropriately Market Segerdahl

### *Segerdahl's Board & the Decision to Market Segerdahl*

85.     In April of 2015, Segerdahl formed a Board of Directors including Defendants Cronin, Goldstein and Mason (the "Board of Director Defendants"), chaired by Defendant Joutras.

86.     The Board of Directors was charged with helping ensure Segerdahl's continued growth.

87.     The Board of Directors held its first meeting on April 13, 2015.

88.     The Board discussed its goals and objectives, including "providing guidance on possible transactions."

89.     The Board also "noted that the current financing environment in which to enter into a transaction was very favorable and that this 'situation' would probably last for 12-18 months. Several opportunities were discussed."

90.     Each of the three new Board members, Defendants Cronin, Goldstein and Mason, received 100 shares of SARs.

91.     The 300 shares of SARs awarded to Defendants Cronin, Goldstein and Mason further diluted the ESOP's ownership of Segerdahl.

### *The 2015 Wind Point Offer*

92.     On June 10, 2015, Segerdahl's Board discussed upcoming meetings with Wind Point Partners ("Wind Point").

93.     Defendant Joutras retained J.P. Morgan Securities, LLC ("JP Morgan") to serve as an advisor during discussions with Wind Point.

94.     JP Morgan's key employee on the Wind Point deal was Jeff Vergamini.

95. During a special meeting of the Board of Directors on July 21, 2015, Defendant Joutras informed the board members that he was concerned about potential ESOP redemption liability.

96. At the July 21, 2015 Board meeting, Defendant Joutras told the other members of the Board that, as a result of the potential redemption liability, Joutras "believes it is important that the Board consider strategic alternatives, including the possibility of selling the Company."

97. At the meeting, Vergamini gave a presentation about Segerdahl's strategic options to address the repurchase liability.

98. Vergamini identified options including:

    a. Execute standalone strategic plan;

    b. Significant acquisition;

    c. Leverage recapitalization;

    d. Sale to a financial sponsor (LBO);

    e. Strategic merger; and

    f. Sale to a strategic buyer.

99. Vergamini stated that it was "an opportune time to evaluate a potential transaction to create and unlock value for SG360's shareholders" because, among other reasons, "[s]trategic buyers with health balance sheets fac[e] stagnant organic growth."

100. Vergamini stated that "SG360 is an attractive acquisition opportunity for potential financial sponsors, family investors and strategic buyers."

101. Looking at sales to strategic buyers, Vergamini explained that benefits included:

    a. "immediate significant liquidity and control premium for shareholders"

    b. "ability to receive premium valuation given synergy potential" and

23

     c.    "likely strategic buyers looking for growth given limited organic growth opportunities."

102.    For drawbacks to a sale to a strategic buyer, Vergamini identified:

     a.    "forgo future value creation potential to the extent value not paid in control premium" and

     b.    "potentially disruptive to company culture/employees."

103.    Vergamini did not identify risk of loss of competitive information or employees as a risk in a sale to a strategic buyer.

104.    Vergamini did not identify synergistic value premiums as a benefit to a sale to a financial sponsor, and noted that drawbacks to a sale to a financial sponsor included "potentially lower valuation compared to sale to strategic buyer."

105.    Vergamini identified 11 of Segerdahl's competitors as "comparable," and noted that in 2015 they were valued at a mean 7.3x EBITDA and median 7.7x EBITDA.

106.    EBITDA stands for "Earnings Before Interest, Taxes, Depreciation and Amortization."

107.    EBITDA is a measure of a company's overall financial performance commonly used by investors and business valuation firms.

108.    Vergamini then listed 20 precedent transaction in the printing industry between 1999 and 2015. The overall median EBITDA multiplier in those transactions was 7.3x.

109.    Vergamini identified several potential strategic buyers, including IWCO Direct, Quad Graphics, RR Donnelley, MacAndrews & Forbes and AllianceData.

110.    Vergamini also included his biography with the presentation, which emphasized that he had previously worked on a transaction in which a printing company called World Color

Press had been sold to Quad Graphics.

111.    On August 10, 2015, Segerdahl received an offer from Wind Point to purchase 100% of Segerdahl's stock for an aggregate purchase price of $280 million.

112.    Wind Point's $280 million offer was based on an implied value of roughly seven times (7.0x) Segerdahl's expected 2015 EBITDA.

113.    During a Board meeting on August 26, 2015, Vergamini "summarized negotiations with Wind Point Partners on a letter of intent to acquire the Company" and the Board discussed "the terms of a possible acquisition."

114.    The Board then authorized Joutras "to execute the letter of intent on behalf of the Company," after incorporating certain revisions requested by the Board.

115.    During a Board meeting on October 7, 2015, the Board discussed "ongoing due diligence being done by Wind Point."

116.    Vergamini then "led a discussion on the value of the 338(h)(10) election to Wind Point."

117.    As explained above, a 338(h)(10) election is a tax election that can provide significant tax savings to the buyer of an S Corporation like Segerdahl.

118.    Vergamini noted they had a goal of "an October 22 signing" with Wind Point.

119.    Prior to that time, Defendants had not discussed the potential sale of the ESOP's shares of Segerdahl with Defendant GreatBanc, the ESOP trustee.

120.    At the October 7, 2015 Board meeting, the Board authorized Defendant Mason to speak to Jim Staruk, the CEO of Defendant GreatBanc, "to explain the transactions being contemplated with Wind Point and their impact on the ESOP."

121.    By October 23, 2015, the deal with Wind Point had fallen through due to issues unrelated to Segerdahl.

### The Retention of Defendant Schneider as CEO

122.    From 2006 to 2012, Defendant Schneider had served the president, digital solutions and chief technology officer, of RR Donnelly, one of Segerdahl's competitors.

123.    During 2015, Defendant Schneider worked as an advisor for Wind Point regarding Wind Point's potential acquisition of Segerdahl from the ESOP.

124.    Defendant Joutras decided to bring Defendant Schneider in as the new CEO to help sell Segerdahl.

125.    During the October 23, 2015 meeting of Segerdahl's Board, Defendant Schneider was introduced to the Board of Directors. She confirmed that she did not have an ongoing relationship with Wind Point, and that she was free to work with Segerdahl.

126.    Defendant Schneider then "made a high level presentation on her view of the Company's market, its potential and strategies for future growth."

127.    Later during the Board meeting on October 23, 2015, at Defendant Joutras's request, Vergamini addressed the topic of strategic alternatives and "whether the Wind Point deal terms could be fulfilled by a different private equity firm."

128.    Defendant Schneider was appointed CEO and President of Segerdahl on December 1, 2015, and on or about that time became a member of Segerdahl's Board of Directors.

129.    Defendant Joutras simultaneously resigned as CEO and President.

130.    Joutras retained the title of "Chairman" of Segerdahl's Board.

131.    However, company marketing materials identify Joutras as a "Non-Executive Chairman."

132.    In his capacity as Chairman, Joutras was no longer a Segerdahl employee.

133. When Schneider became the CEO, the Board awarded her 800 SARs, the same number Joutras had received in April of 2014.

134. However, only one-third (1/3) of Defendant Joutras's 2014 SARs had vested by the time he stepped down in favor of Schneider in December of 2015.

135. And, under the terms of the 2014 SARs, employees who left before fully vesting forfeited their unvested SARs.

136. Nevertheless, Joutras did not forfeit any of his unvested SARs.

137. Accordingly, Segerdahl then had 1,600 outstanding SARs awarded to its current and former CEO.

138. The awards to Defendant Schneider and certain other employees on December 1, 2015 pushed the total outstanding SARs awards over the 20% limit set out in the 2014 SARs Plan, yet the Board of Directors did nothing to ensure that any dilution to the ESOP's interest from the new 2015 SARs awards was no more than necessary.

139. Any of the Defendants could have helped ameliorate the dilutive effect of the new SARs awards to Defendant Schneider by demanding that, if Joutras would no longer serve as CEO, he forfeit his unvested SARs awards under the 2014 SARs plan.

140. Instead, the Defendants, including the Board of Director Defendants who had been hand-picked by Joutras, did nothing, and allowed Joutras to retain all of his 800 SARs.

141. Defendant Joutras was instead able to exert his influence to retain that valuable compensation for services as an executive he was no longer providing, and to obtain similar treatment for his relative Paul White, who also switched to a non-employment role at the same time.

142. During an interview with a journalist on or about December 15, 2015, Defendant Schneider described her plans as the new CEO and President of Segerdahl.

143. In the interview, Defendant Schneider described Segerdahl as a "$300 million company."

### *Defendants Reject Vergamini's Suggestion to Explore a Transaction with a Strategic Buyer and Instruct Vergamini Only to Contact Investment Buyers that Will Retain Management and Promote Management's Strategies*

144. The Segerdahl Fiduciary Defendants and their advisors engaged in a flawed process leading up to the sale of the ESOP's shares of Segerdahl to ICV Partners. Instead of taking reasonable steps to market the ESOP's shares in order to find a buyer that would pay the highest price, the Segerdahl Fiduciary Defendants limited their efforts to finding a buyer that, after the transaction had closed, would allow the Segerdahl Fiduciary Defendants, especially Defendant Schneider, to maintain control over the company's day to day operations, and likely remain at their jobs much longer than would a competitor.

145. During a Board meeting on January 20, 2016—Schneider's first meeting as President, CEO and a member of the Board—Vergamini "reviewed the market for a potential sale of or private equity investment in the Company."

146. At that meeting, Vergamini delivered a presentation similar to the presentation he had given during the July 21, 2015 Board meeting, identifying the same benefits and drawbacks to sales to strategic buyers and investment buyers, and identifying the same five potential strategic buyers.

147. Vergamini suggested that, among other things, Segerdahl should explore a sale to a strategic buyer, such as a competitor, and provided a timeframe during the sales process for doing so.

148.    However, Vergamini's presentation noted that a determination had not yet been made "whether the process will include both financial sponsor and / or strategic buyers."

149.    At the January 20, 2016 meeting, the Board of Directors asked Vergamini "to present options that would enable Segerdahl to continue to invest in the business" while managing ESOP repurchase liability.

150.    The Board asked that Vergamini be ready to initiate the sales process "early in the second calendar quarter of 2016.

151.    At a Board meeting on April 11, 2016, Vergamini gave an updated presentation and "reviewed the current state of the anticipated process to explore a potential sale of the Company."

152.    Vergamini's presentation noted that "strategic acquirers [were] aggressively pursuing M&A to augment stagnant organic growth."

153.    Vergamini's presentation also noted that there was a "significant lack of high quality businesses available with EBITDA of ~$30-$60 million," as Segerdahl had.

154.    Essentially, Vergamini indicated that Segerdahl was an outstanding and desirable target in a sale to a competitor and that such strategic acquirers were "aggressively" pursuing merger transactions.

155.    Vergamini's presentation again provided a suggested timeline for contacting potential strategic buyers, and, like his July 2015 presentation, showed EBITDA multiples for publicly traded competitors (mean of 7.1x and median of 7.5x for 2016) and in 20 "precedent" printing industry transactions between 1999 and 2016 (median of 7.3x).

156.    At that meeting, the Board of Director Defendants instructed Vergamini not to explore a sale to a strategic buyer.

157.  The Board minutes stated that "for competitive and strategic reasons the sale process should be limited initially to potential acquirers specifically identified by JP Morgan and agree to by the Board."

158.  SRR's Analysis of Transaction Fairness, discussed at greater length below, *see infra* ¶¶ 326-364, states that Segerdahl "considered the disclosure of information to a competitor (e.g., customer lists, sales personnel, profit margins) to be too damaging to the Company if strategic buyers were approached and a transaction was not completed."

159.  The Board of Director Defendants instead instructed Vergamini to consider the following criteria when determining potential acquirers:

   a.  Growth oriented firm with similar philosophies regarding investment and debt that are consistent with Segerdahl's management's views for running the business.

   b.  Segerdahl would fit within the firm's investment strategy.

   c.  Experience in or exposure to direct marketing / advertising industries.

   d.  Ability to accelerate management's growth strategy through access to capital.

   e.  Ability to complete a transaction.

160.  These criteria all assumed that a buyer would retain management and support management's existing strategy.

161.  Obtaining the best price for the ESOP was not among the criteria identified.

162.  The ESOP had no interest whatsoever in who managed Segerdahl after the ESOP Buyout.

163.  The ESOP would be giving up its entire, 100% ownership interest in Segerdahl.

164.  The ESOP's only interest was in obtaining the best possible price for its shares.

165.    It is clear from these criteria on the face of the Board's meeting minutes that the Board of Directors, Schneider and Joutras had already determined to focus on a deal that primarily served management's interests, and not the ESOP's.

166.    The only people that benefitted from selling to a company with the criteria set down by the Board of Director Defendants were Segerdahl's management, and the investment buyer that would be able to buy Segerdahl at a discount and sell in a few years at a significant profit.

167.    Defendants attempted to justify their refusal to explore a sale to a strategic buyer on the grounds that it could be damaging to Segerdahl if a strategic buyer were approached but the transaction was not completed, on the grounds that, Defendants stated, a competitor might use the sales process to obtain customer lists, profit information, or to poach sales personnel.

168.    However, Defendants' refusal to even explore a sale to a strategic buyer was not related to any potential competitive harm.

169.    Many of the precedent transactions presented by Vergamini involved purchases of printing companies by their competitors.

170.    There is no reason that Segerdahl would have been more likely to experience competitive harm than the numerous other printing companies that were sold to other printing companies—most of whom, as explained below, obtained a much better price than did Segerdahl in the ESOP Buyout.

171.    As noted above, it is common to negotiate potential transactions among competitors in the printing industry on a closed book basis to protect those interests.

172.    Instead, Defendants' refusal to explore a sale to a strategic buyer was motivated to preserve their own roles managing Segerdahl.

173.    Strategic buyers often pay a higher price when they purchase a competitor than do financial or investment buyers, because strategic buyers will be able to quickly achieve economies of scale and synergistic business opportunities that allow them to make more from the acquisition than a financial buyer will make.

174.    However, strategic buyers often eliminate upper management from companies they purchase, in part because the buyers' management can manage both enterprises—thereby providing additional efficiencies and making the acquisition even more profitable for the strategic buyer.

175.    By contrast, financial or investment buyers typically retain management to continue operating the company.

176.    Instead, financial buyers hope that the company will continue to grow after the acquisition, and often intend to resell the company at a profit after a few years.

177.    In addition to instructing Vergamini to focus his search on investment buyers to the exclusion of strategic buyers, during its April 11, 2016 meeting Segerdahl's Board accepted Defendant Joutras's resignation as Administrator of the ESOP, and appointed Defendant Schneider and another Segerdahl employee instead.

178.    Thus, during the very meeting on April 11, 2016 at which Segerdahl's Board committed to sacrificing the ESOP's interest for the benefit of management, every member of Segerdahl's Board served as an express or *de facto* ERISA fiduciary for the ESOP.

179.    ERISA's fiduciary duties are derived from, but are more exacting than, the fiduciary duties imposed on common law trustees under the common law of trusts. *Varity Corp. v. Howe*, 516 U.S. 489, 497 (1996). Under the common law of trusts, when a trustee determines to sell trust assets, "[t]he principal object of the sale is to obtain the maximum price. The trustee

should do his best to secure competitive bidding and to surround the sale with such other factors as will tend to cause the property to sell to the greatest advantage." Amy M. Hess & George T. Bogert, The Law of Trusts and Trustees § 745, at 488 (3d ed. 2009). The Restatement (Third) of Trusts § 77 provides that:

> It is entirely proper for the trustee to conduct a study for the purpose of ascertaining intrinsic worth, but the trustee must recognize the limitations of such an appraisal. He must also test the market. The courts of the United States have given full recognition to the duty to test the market….

180.    Instead of engaging in a process to "test the market" to "obtain the maximum price" for the ESOP's shares or to "cause the [ESOP's shares] to sell to the greatest advantage" for the ESOP, Segerdahl's Board made the conscious and intentional decision to focus on a sale to an investment buyer that would preserve management after the deal.

181.    An ERISA fiduciary is obligated to carry out their obligations "with an 'eye single to the interests of the participants and beneficiaries.'" *Leigh*, 727 F.2d at 128. Here, Defendants did not sell Segerdahl "with an eye single" to the ESOP's interests. Instead, they conducted themselves at every turn to benefit management, even including at the ESOP's expense.

### *Vergamini Contacts Investment Buyers that Will Preserve Management*

182.    Applying the criteria set down by the Board of Director Defendants, JPMorgan contacted 18 firms.

183.    Between May and June of 2016, eleven of the eighteen firms JPMorgan contacted received management presentations and facility tours.

184.    The management presentation highlighted that:

    a.    Segerdahl was the "fourth largest fully-integrated provider of direct mail marketing programs in North America";

b. Segerdahl's 2016 estimated revenue was $311 million and estimated 2016 EBITDA was $46 million;

c. Segerdahl had a "strong, highly experienced management team with significant competitive knowledge/insight";

d. Potential new competitors would face "significant barriers to entry";

e. Segerdahl's management estimated that Segerdahl's EBITDA would grow to $64 million by 2020;

f. Segerdahl was an "attractive platform for additional future growth";

g. Segerdahl had an "industry leading management team" and was "an ideal consolidator";

h. The printing industry was "fragmented" and comprised of "numerous weaker regional and local companies that can easily be acquired and integrated to create significant value"; and

i. There was an "actionable pipeline of potential value-accretive targets that would immediately add customer accounts, sales professionals, sales volumes and additional equipment."

185. JPMorgan also sent an updated version of its presentation about "comparable company trading and operating metrics" and "selected precedent transactions" which

a. identified eight of Segerdahl's competitors and explained that they traded at a median 8.7x LTM EBITDA multiple and a mean 8.4x LTM EBITDA multiple; and

b. identified twenty transactions in the printing industry between 1999 and 2016, with a median 7.8x EBITDA multiple.

186. Vergamini's correspondence with the prospective purchasers emphasized fit with management. For example,

    a. On May 20, 2016, Vergamini told one prospective bidder that Defendant Schneider "felt that [the prospective bidder] would be a great partner for her and her management team" and that the bidder would be a "great cultural fit with Mary Lee and SG360"

    b. Another prospective bidder, Wynnchurch Capital ("Wynnchurch"), told Vergamini that:

        i. "We were very impressed by Mary Lee and excited by the potential business opportunity. She really has a firm grasp of the business and industry, and there seems to be clear opportunity for SG360 to continue its growth, perhaps, even improve upon its overall efficiency and profitability performance"

        ii. "At Wynnchurch, we often say that we're in the 'people selection' business, rather than the 'asset or company selection' business, because the most important decision we can make is to partner with a top notch, operationally focused CEO. … Our best CEO partnerships are those in which we have a strong operational leader in the CEO chair and Wynnchurch can simply play the role of supportive board members, strategic sounding boards, and M&A and integration resource."

187. As set forth in more detail below, Vergamini also highlighted the value a potential bidder could obtain through a sale-leaseback of Segerdahl's real estate and making a 338(h)(10)

election, and provided materials to the prospective bidders detailing the financial benefits those bidders would receive from a sale-leaseback and 338(h)(10) transaction.

188.    Of the eleven firms to which JPMorgan provided presentations, four (4) submitted indications of interest.

189.    The indications of interest were non-binding but could be accepted by Segerdahl as a conditional offer.

190.    All four firms that submitted indications of interest were prospective investment buyers, none were strategic buyers.

191.    The contemplated purchase prices in the four proposals ranged from $250 million to $300 million.

192.    One of the four proposals came from Wynnchurch.

193.    Wynnchurch offered $270-293 million, representing a 5.8x – 6.3x multiple over 2016 estimated EBITDA of $46.4 million.

194.    The Board of Directors, however, decided not to pursue discussions further with Wynnchurch because it was a "poor strategic fit" because its focus would be on "operational improvements and not growth initiatives."

195.    As GreatBanc later explained it, "when [Wynnchurch] look[ed] to acquire companies, they try to bring a value-added in terms of operational improvements. Mary Lee already brought that, and they didn't feel [Wynnchurch] was as focused on growth-initiatives."

196.    Essentially, Wynnchurch didn't add anything to Segerdahl in terms of management that Defendant Schneider did not already bring.

197.    The ESOP, which had been the sole owner of Segerdahl and whose interest was being bought out, had no interest whatsoever in "strategic fit" or whether a buyer would fire management.

198.    Nor did the ESOP have any interest in whether Mary Lee Schneider or Wynnchurch was responsible for "operational improvements" after the sale.

199.    Instead, the ESOP's only interest was in maximizing the price it would receive for its 100% ownership of Segerdahl.

200.    Yet Defendants made the conscious decision not to pursue a transaction with Wynnchurch because they wanted to preserve Mary Lee Schneider and her strategies in control of the company after the sale.

201.    Even when ICV eventually dropped its offer price, Defendants never reached back out to Wynnchurch to determine whether Wynnchurch would still be willing to pay $270-293 million.

202.    The reason is evident: the Defendants were not interested in obtaining the best price for the ESOP. Defendants' focus was on protecting management and their strategies.

203.    Another of the four proposals came from a firm called Madison Dearborn Partners ("Madison Dearborn").

204.    Madison Dearborn offered $270-$280 million, representing 7.0 – 7.3x LTM June 30, 2016 estimated EBITDA of $38.5 million.

205.    A third proposal came from ICV.

206.    ICV Partners offered $300 million, representing a 7.0x LTM on June 30, 2016 estimated EBITDA of $42.6 million.

207.    However, only $80 million of ICV's equity would be provided by ICV itself, the remaining $220 million would be provided by limited partners as direct co-investors.

208.    On September 9, 2016, ICV Partners submitted a revised indication of interest of $250 million, with a $15 million potential earn out payment based on Segerdahl achieving $45 million in adjusted EBITDA.

209.    At that stage, Madison Dearborn dropped out of the sale process.

210.    After further negotiation, on October 14, 2016, Segerdahl received a revised proposal from ICV with a purchase price of $265 million and no earn out.

211.    ICV sent a memorandum to its potential co-investors on October 19, 2016 describing the transaction. The memorandum explained that:

a.    The investment bidder only process that Defendants pursued was a "busted auction";

b.    Segerdahl's strong August numbers gave ICV "another opportunity … to review" the potential transaction;

c.    ICV estimated the transaction price to be 6.1x 2016 estimated EBITDA of $43 million; and

d.    Segerdahl "has hired CBRE and has already started the sale-leaseback process approaching 25 buyers" and ICV expected the sale-leaseback "will provide $24 million after fees in 2016" while reducing EBITDA $10-$15 million over time "in hold period"—thus yielding an immediate profit of more than $9 million.

212.    Segerdahl accepted ICV's offer of $265 million and began finalizing the deal.

### GreatBanc's Imprudent and Disloyal Decision to Approve the ESOP Buyout

213.    Starting in April of 2016, and continuing throughout the process of marketing Segerdahl described above, Defendant Schneider was one of two named fiduciaries of the ESOP,

the other being another human resources officer of Segerdahl who appears to have played no role in Segerdahl's Board or the marketing process.

214.     On July 21, 2016, Defendant Schneider and Bradshaw contacted GreatBanc regarding the pending transaction.

215.     Defendant Schneider explained that the Board was conducting the sale process, "but at this point, there were two lead candidates to buy the company: ICV and Madison Dearborn Partners."

216.     Management and the Board were "leaning towards ICV as it was thought to be the highest bidder and best strategic fit for SG360."

217.     Defendant Schneider and Bradshaw requested that GreatBanc accept an expanded role—transitioning from simply a directed trustee with no discretionary authority to a full trustee with final authority to approve the sale on behalf of the ESOP.

218.     GreatBanc requested that Segerdahl approve GreatBanc's retention of separate legal counsel, Drinker Biddle & Reath ("DBR"), and the business valuation firm SRR to advise GreatBanc with respect to the sale. Schneider and Bradshaw approved.

219.     GreatBanc informed Schneider and Bradshaw that GreatBanc would need to "holdback" a portion of the sales proceeds from the ESOP "while awaiting the determination letter from the IRS."

220.     Between July 29, 2016 and August 18, 2016, GreatBanc, DBR and SRR were all retained with respect to the ESOP Buyout.

221.     On August 18, 2016, GreatBanc, SRR and DBR interviewed the Board about the rationale for the sale and the sales process.

39

222.    On August 30, 2016, Jim Staruck from GreatBanc, Andy Ward and Mike Poteracki from SRR, Defendant Schneider and Bradshaw met to discuss the sale. The notes from that meeting reflect that:

a.  Only ICV Partners and Madison Dearborn remained as potential purchasers in the sale process;

b.  They hoped to close the deal by September 15, 2016;

c.  Staruck indicated that he would need to consider what GreatBanc needed to approve by September 15. Staruck indicated that "normally we would have a first pass through the committee" and SRR "would present to the committee and we would have some indication… before we sign want to make sure that from SRR and GreatBanc's we are comfortable.";

d.  "338h10 – leaseback: proceeds could be in the 25-34 million range. ***__Has to be factored into purchase price.__*** Who identified leaseback opportunity? Company as a matter of course. 7x multiple – far more proceeds in excess. No way they could close that leaseback during this process. They have chosen a broker… Data room CBRE and Newkirk" (emphasis added);

e.  "No current waterfall of what the proceeds look like to the various parties"

f.  "Of course, need to see the contract";

g.  Two documents in the data room, 2.21 and 2.22, "are the two sale leaseback analysis from the two firms";

h.  "found some inefficiencies in Wolf Road. Vendor messed with hours numbers. Wolf road fraud where hours were being mis-reported. … **It's a positive to**

**EBITDA plus a potential claim against the supplied.**" (emphasis and color in original).

    i.    **"A wave of consolidation that we can't participate in. Company is missing opportunities.**" (emphasis in original).

223.    On November 29, 2016, GreatBanc, SRR and DBR had a final meeting to discuss the proposed sale to determine whether to approve it.

224.    Minutes of the November 29, 2016 meeting appear in both raw form and a near final, edited draft.

225.    In raw form, the minutes disclose that:

    a.    The impetus for the deal was concern about ESOP repurchase liability;

    b.    Staruck from GreatBanc explained that: "We know this [deal] is not a slam dunk. It's not a typical deal, but you have to consider the context of what the company is facing and by not accepting the offer, we need to consider the restraints put on the company.";

    c.    Staruck explained that Defendant Schneider and Bradshaw would be purchasing and receiving equity interests in the post-sale Segerdahl, and would be receiving new contracts "almost identical to their existing contracts";

    d.    A portion of the deal price will be "financed through senior debt available to the buyer";

    e.    ICV "expect[s] to make a 338h10 for income tax purposes";

    f.    At that point, one of GreatBanc's attorneys asked whether "we are comfortable that [the equity compensation arrangements] is not out of the ordinary with regard to the incentive compensation plans," to which Ward from SRR replied that "a 10%

pool is not uncommon" and they were "not aware of anything that the aspects related to incentives could be deemed disguised purchase price.";

g. Nothing in the minutes reflects consideration of whether the value that Defendant Schneider and Bradshaw would receive from ICV would exceed, for them, the value of a sale to a higher bidder (*see infra* at ¶¶ 240-262);

h. Nothing in the minutes reflects consideration of the fact that, because the buyer would be using debt financing, that it would be in Defendant Schneider and Bradshaw's interest to minimize the purchase price, so as to minimize the dilution of their post transaction equity (*see infra* at ¶¶ 257-262);

i. Then, the raw minutes reflect the following:

*[Ward]*: **maybe don't include in minutes** our understanding that people will automatically receive this value. Rick [Joutras] has also put a majority of his shares back to the company. Don't have all the facts, but based on a conversation with [Bradshaw] and [Schneider], they had referenced if he was trying to put his shares back in and they would take a lower price if it wasn't subject to the holdback. Was told verbally that [Joutras] put a majority of his shares back to the company. The value of Rick's stock was about 27 million.

…

*[Staruck]*: Has there been an update about the plan dealing with [Joutras]?

*Howard*?: Someone revised the distribution policy to reflect that. There will be a valuation of that accounting date that will be the date used for distribution post-closing. The mere fact he applied for a distribution pre-closing doesn't mean he is entitled to a valuation as of the June 30th date. The other question was whether he is subject to the holdback. Termination letter. … So he may not be subject to the holdback. Anyway, a still in a bit of flux.

*Dave*: Also received an update that [Schneider] was discussing this with him over the weekend and he was sabre-rattling about how he could take action, he wanted his money. My understanding was that by the time they came out of the meeting he had retracted and said he would support the deal fully. That was just my update from Vedder.

…

*Howard*: Historically the window for the June valuation is October. That didn't happen. I assume we'll have a distribution for this transaction.

*Greatbanc*: If there is a process going on, you hold off on making those distributions because it could impact a forthcoming transaction.

42

*Howard*: There is usually a 90 day period. Unusual where prior to the transaction we would be pushing through distributions. We also don't have the problem where someone would be foregoing some value because the prices are so close.

(emphasis in original).

j.   Based on the foregoing, Defendant Joutras decided to put back the majority of his ESOP shares to the company in the midst of negotiations about the sale. Joutras's motivation appears to have been to avoid having any portion of his ESOP proceeds subject to GreatBanc's 25% holdback pending IRS determination. Joutras's decision to put his shares, during a time when he was a member of Segerdahl's Board, put enormous pressure on Segerdahl to go through with the transaction to ICV;

k.   The raw minutes reflect a discussion of the 338(h)(10) election, and reflect that SRR affirmatively decided not to consider the value of the 338(h)(10) election to ICV Partners. Thus GreatBanc was actually aware that despite ICV's intent to take a 338(h)(10) election worth millions of dollars, the ESOP would receive no money in exchange and that SRR's valuation report gave it no credit;

l.   The raw minutes note the Wind Point offer was "around a multiple of 7";

m.   The raw minutes then state: "The company and J.P. morgan looked at potential buyers, discussing why certain buyers were not interested or they didn't reach out to others. Why didn't the company present this offer to some of the 800 pound gorillas in the industry, but the Company's management decided it would be too damaging to share information with their competitors and then have the deals fall through... They were very proactive about why they did not go to the Donnolleys and Quads of the world.";

n. The raw minutes note that Wynnchurch "was likely a poor fit because when they look to acquire companies, they try to bring a value-added in terms of operational improvements. Mary Lee [Schneider] already brought that, and they didn't feel [Wynnchurch] was as focused on growth-initiative.";

o. The raw minutes explained that the leaseback "has not been incorporated into this analysis due to the execution risk if you were on the buyside and someone said you could do a leaseback. There's certainly execution risk. We spoke to [Bradshaw] about it. They were just in the process of retaining the firm to put that into play. They have done zero due diligence as of this point. Then they would need to raise the funds and perform the leaseback transaction."; and

p. As set forth below, this discussion of the sale-leaseback is erroneous. By November 29, 2016, the company had received five offers in the anticipated range of $22-25 million and had accepted one of those offers for $25 million. Thus whatever execution risk may have existed in the abstract, in actuality, the transaction was well on its way to completion and the value was readily ascertainable.

226. Nevertheless, despite its limited understanding of the terms of the deal, its apparent ignorance of the terms of the sale-leaseback, the massive confusion relating to Defendant Joutras's put—which GreatBanc sought to exclude from the meeting minutes, management's failure to market to competitors ("the 800 pound gorillas"), and the flaws in SRR's Analysis of Transaction Fairness (*infra* ¶¶ 326-364), GreatBanc decided to approve the transaction on behalf of the ESOP.

227. GreatBanc's decision to approve the sale was imprudent and disloyal. GreatBanc was actually or constructively aware that Segerdahl's management violated the duty of loyalty by ignoring a potentially better deal price in a sale to a competitor to protect their own interests by

seeking only a deal to an investment buyer. GreatBanc was actually or constructively aware of the value represented by the sale-leaseback and 338(h)(10) elections, knew that the ESOP was receiving no value for the sale-leaseback or 338(h)(10) election, had previously determined that those "ha[ve] to be factored into purchase price," and approved the deal anyway.

228. At best, GreatBanc's decision to approve the deal was based on a hurried, inadequate investigation into the material facts. But even if GreatBanc's failures were purely innocent, ERISA fiduciary duties are "not a search for subjective good faith -- a pure heart and an empty head are not enough." *Keach v. United States Tr. Co., N.A.*, 240 F. Supp. 2d 840, 845 (C.D. Ill. 2002).

229. As the Seventh Circuit has explained:

> Whether an ERISA fiduciary has acted prudently requires consideration of ***both*** the substantive reasonableness of the fiduciary's actions and the procedures by which the fiduciary made its decision: 'In reviewing the acts of ESOP fiduciaries under the objective prudent person standard, courts examine ***both*** the process used by the fiduciaries to reach their decision as well as an evaluation of the merits.'

*Fish v. Greatbanc Tr. Co.*, 749 F.3d 671, 680 (7th Cir. 2014) (citations omitted).

230. Here, there are significant flaws with ***both*** GreatBanc's fiduciary process and the "substantive reasonableness" of the transaction. As set forth above, GreatBanc approved the transaction despite its inadequate investigation, despite the red flags about management's interests, despite the failure to obtain any value for the sale-leaseback, 338(h)(10) election or Wolf Road Fraud, and despite the obvious flaws with SRR's Analysis of Transaction Fairness (*infra* ¶¶ 326-364). Moreover, those same factors also demonstrate that the ESOP Buyout was substantively unreasonable from the ESOP's perspective.

231. In *Montgomery*, this Court held that when an ESOP sells its interest, a determination of "fairness from a financial point of view must also consider relative fairness to the

ESOP compared to other parties to the transaction." *Montgomery v. Aetna Plywood, Inc.*, 39 F. Supp. 2d 915, 938 (N.D. Ill. 1998). Thus "[a]n analysis of the potential benefits to the buyer was and is a necessary part of establishing the fair market value of the ESOP shares." *Id.*

232.    In determining whether to approve the sale of the ESOP's shares, GreatBanc:

a.    had actual knowledge of, but expressly refused to analyze the value of the 338(h)(10) election—a significant "potential benefit" to ICV Partners or any other prospective buyer;

b.    had actual knowledge of, but failed to consider, the value of the Wolf Road Fraud, another significant "potential benefit" to ICV Partners or any other prospective buyer;

c.    had actual knowledge of the value of the sale-leaseback, a multi-million dollar "potential benefit" to ICV Partners or any other prospective buyer, and had actual knowledge at the time it approved the deal that by October of 2016 that management had received multiple bids in the $25 million range for the properties, and knew or should have known that Defendant Schneider had in fact accepted an offer to purchase the real estate on November 23, 2016 for $25 million; and

d.    failed to appropriately consider the benefits of the transaction to Defendant Schneider including "the opportunity for substantial dividends," a significant ongoing salary, and "large bonuses"—all factors the Court in *Montgomery* held were relevant to assessing the fairness of the transaction and all of which in this case gave Defendant Schneider, who was primarily responsible for marketing Segerdahl and negotiating with prospective purchasers, a significant interest to

focus the search on investment buyers who would pay less but preserve management.

233. GreatBanc accordingly had actual or constructive knowledge of many key aspects of the ESOP Buyout that benefitted the other parties to the transaction, but not the ESOP, yet GreatBanc expressly did not take those benefits into account when determining the fairness of the transaction to the ESOP.

### *Vergamini Confirms that No Strategic Buyers Were Contacted and that a Strategic Buyer Would Have Paid Much More than ICV Did*

234. On December 1, 2016, Vergamini, the employee of JPMorgan advising the Segerdahl Fiduciary Defendants on the transaction, led an information session with Defendant Schneider for many of Segerdahl's senior managers about the pending transaction with ICV Partners.

235. At that information session, Vergamini stated that the total purchase price for the ESOP's shares in the ESOP Buyout, which Vergamini quoted as $265 million, would have been much higher, even as high as $320 million, had Segerdahl been sold to a competitor.

236. Notably, Vergamini's figure of $320 million is within the range of valuations for Segerdahl pursuant to the guideline public company method described by SRR in the Analysis of Transaction Fairness, *infra* ¶ 354. In addition, Vergamini's figure of $320 million is within the range of valuations for Segerdahl in light of the precedent transactions Vergamini identified in his presentations to the Board and prospective purchasers (*supra* at ¶¶ 108, 155).

### *Defendant Schneider Confirmed that No Strategic Buyers Were Contacted*

237. On several occasions prior to the sale to ICV, including during round table discussions with senior management, Defendant Schneider stated that marketing efforts had

focused on investment buyers—like ICV Partners, and no attempt had been made to market Segerdahl to any of Segerdahl's competitors.

238.    Typically, investment buyers allow management to remain in place after a sale. By contrast, strategic buyers may replace management but typically pay a much higher price.

239.    Defendant Schneider also stated that they did not put out a deal book about the potential sale to their competitors (and potential strategic buyers) including RR Donnelly, Quad or other competitors to see if those companies were interested in making an offer for Segerdahl.

### *The Equity Interests and Employment Contracts Received by Defendant Schneider and Bradshaw, Segerdahl's CFO*

240.    After the ESOP Buyout, ICV Partners in fact retained Schneider and the great majority of other Segerdahl insiders as CEO and management, and left them in control of Segerdahl's operations after the ESOP Buyout.

241.    As alleged above, Schneider received 800 SARs effective 12/1/2015 with a strike price of $7,792, and Bradshaw received 300 SARs effective 1/1/2014 with a strike price of $4,026.

242.    In the sale to ICV, where the $265 million purchase price yielded a per share price for Segerdahl's 9,138 outstanding shares of $13,072, Schneider received $4.2 million on her SARs, Bradshaw received $2.7 million on his SARs, and Bradshaw received $459,612 on his ESOP shares.

243.    Had the ESOP's shares of Segerdahl been sold for $320 million, the share price would have been $17,004.28.

244.    Thus in a sale at $320 million, Schneider would have received $7.4 million on her SARs (an increase of $3.1 million), Bradshaw would have made $3.9 million on his SARs (an increase of $1.2 million), and Bradshaw would have received $506,375 for his ESOP shares (an increase of $50,000).

245.     Those numbers, standing alone, suggest that Schneider and Bradshaw would have been incentivized to sell Segerdahl for as much as they could get.

246.     But those numbers do not tell the whole story.

247.     Schneider and Bradshaw received significant additional compensation from ICV Partners that more than offset the amounts they would have received from a sale at a higher price, even a sale at $320 million (the potential price Vergamini quoted in the meeting attended by Plaintiff Rush, Defendant Schneider and other Segerdahl employees).

248.     Schneider received a five-year employment agreement from ICV with $600,000 per year in base salary and a potential $600,000 annual bonus. Over five years that arrangement was worth between $3 million and $6 million.

249.     Bradshaw received a five-year employment agreement from ICV with $350,000 per year in base salary and a potential $210,000 annual bonus. Over five years that arrangement was worth between $1.75 million and $2.8 million.

250.     Schneider also rolled over $1,195,000 of her SARs proceeds in exchange for 1,195 Class A Units in reorganized Segerdahl. She also received 4,483 Class B "incentive" Units. Altogether, that gave her a 4% ownership interest in Segerdahl after the sale. At the time of the sale, the total shareholder equity was approximately $128 million—meaning that Schneider's ownership interest in Segerdahl after the deal was worth in excess of $5 million.

251.     Bradshaw also rolled over $750,000 of his SARs proceeds in exchange for 750 Class A Units in reorganized Segerdahl. He also received 3,138 Class B "incentive" Units. Altogether, that gave him a 2.7% ownership interest in Segerdahl after the sale. At the time of the sale, the total shareholder equity was approximately $128 million—meaning that Bradshaw's ownership interest in Segerdahl after the deal was worth in excess of $3.5 million.

252.   Thus the value of the deal with ICV, which would retain management, was worth more to Schneider and Bradshaw in monetary terms than a transaction at a much higher price with a strategic buyer that would not retain management.

253.   It is easy to see why Defendant Schneider was not interested in pursuing a sale to a competitor that would not retain her as management, even if it would have meant a higher price for her SARs: she stood to make millions of dollars more through retaining her position as CEO.

254.   As an equity holder in reorganized Segerdahl after the sale, Schneider's interest would benefit from the post-sale sale-leaseback transaction, the 338(h)(10) election, and the Wolf Road Fraud.

255.   Thus Schneider had a direct, conflicting interest with the ESOP to defer the benefits of those transactions until after the sale, and to ensure that her equity would not be diluted by ICV actually paying the fair market value for Segerdahl that took into account the value of the sale-leaseback transaction, the 338(h)(10) election, and the Wolf Road Fraud.

256.   In addition, Schneider and Bradshaw would obtain significant intangible benefits from being the CEO and CFO, respectively, of a large, well-established and successful printing company for many years after the transaction.

257.   Moreover, the equity interests that Defendant Schneider and Bradshaw received in post-transaction Segerdahl created another conflict of interest between their interests and the interests of the ESOP.

258.   Defendant Schneider and Bradshaw expected to participate as equity owners of post-transaction Segerdahl *in pari passu* with ICV.

259.   But ICV Partners financed more than half of the purchase price of Segerdahl with debt—that is, ICV borrowed money to buy Segerdahl.

260. Because ICV Partners would have to borrow more money to pay any higher purchase price, any higher purchase price would have simply diluted the equity position in the post-transaction Segerdahl.

261. Defendant Schneider and Bradshaw thus had an affirmative interest in minimizing the amount of debt taken on during the deal.

262. Accordingly, Defendant Schneider and Bradshaw had an affirmative interest in lowering the price paid by ICV.

### C. The Sale-Leaseback of Segerdahl's Real Estate

263. In the ESOP Buyout, ICV Partners did not pay a price for the ESOP's shares of Segerdahl that adequately reflected the value of certain real estate owned by Segerdahl.

264. Instead, ICV Partners was able to purchase Segerdahl, and thereby the real estate it owned, at a lower price than it would have paid had the sale-leaseback financing been appropriately included in the price of the company.

265. By purchasing Segerdahl for a price that did not adequately reflect the realizable cash value of Segerdahl's real estate assets, ICV Partners was able to profit by, shortly after the ESOP Buyout, selling the real estate that had belonged to Segerdahl and causing Segerdahl to lease that property from the purchasers. This kind of transaction is referred to as a "sale-leaseback."

266. ICV Partners, as such, underpaid for Segerdahl's shares at the ESOP's expense.

267. During a meeting of Segerdahl executives in December of 2016, just a few days prior to the ESOP Buyout, at which Vergamini and representatives of ICV Partners were present, Plaintiff Rush heard one of the representatives of ICV Partners discussing the real estate aspects of the pending ESOP Buyout. Vergamini explained that the real estate portion of the transaction

represented a "$7 million arbitrage opportunity" for the buyer, who could immediately realize the cash value of those properties through a sale-leaseback arrangement.

268. The two parcels of real estate involved in the sale-leaseback were large industrial facilities owned by Segerdahl. One of the properties is located at 1351 Wheeling Road, in Wheeling, Illinois ("1351 Wheeling"). The other property is located at 1900 S. 25th Avenue, in Broadview, Illinois ("1900/Broadview").

269. 1351 Wheeling serves, and has served, as Segerdahl's corporate headquarters and is Segerdahl's largest manufacturing site by size and revenue. 1351 Wheeling has a clear height of 16 to 24 feet, 27 loading docks and 279 surface parking spaces. 1351 Wheeling houses nine printing presses including a newly acquired printing press that prints or has printed advertising for Costco of approximately 28 million pieces per month.

270. 1900/Broadview is Segerdahl's second largest manufacturing site by size and revenue and is located 12 miles from downtown Chicago. 1900/Broadview has clear heights of 14 to 23 feet, 11 loading docks and 195 surface parking spaces. 1900/Broadview houses eight printing presses as well as a secured analytics server room which houses significant customer data.

271. And, in fact, just three months after the ESOP Buyout, on February 7, 2017, Segerdahl did sell 1351 Wheeling and 1900/Broadview to AGNL Mail, LLC.

272. Segerdahl entered into lease agreements with AGNL Mail, LLC for both properties that same day.

273. 1351 Wheeling and 1900/Broadview appraised on March 1, 2017 for $14.9 million and $10.1 million, respectively (for a total of $25 million).

274. Discovery has confirmed the price ICV Partners paid for Segerdahl failed to include any adjustment whatsoever for the cash value of Segerdahl's real estate.

275.     Thus when ICV Partners sold the real estate, it received millions of dollars for the two properties that it should have paid, but did not pay, for the Segerdahl shares during the ESOP Buyout.

276.     A sale-leaseback allows a company that owns real estate to realize the cash value of the real estate, and either take the cash out of the business or reinvest the cash and achieve the company's rate of return (sometimes called a "WACC" or "Weighted Average Cost of Capital") on the cash. The difference between the rate of return on the cash, and the rental payments on the ensuing lease, represent the company's profit on the sale-leaseback transaction.

277.     Discovery has confirmed that Defendants were actually or constructively aware of the significant value of the real estate, but failed to capture the value of the real estate for the ESOP during the sale to ICV. In fact, Defendants and their agents used the real estate as a selling point when approaching potential buyers.

278.     However, because of the equity interests Schneider and other executives received in the reorganized entity, they stood to personally realize profits from the sale of the real estate after the transaction.

279.     First, it is clear that the value of the real estate was not included in the transaction price paid by ICV.

280.     Defendant GreatBanc and SRR (the valuation firm hired by GreatBanc) held a meeting on November 29, 2016, just a week before the closing of the ESOP Buyout.

281.     At the November 29, 2016 meeting, SRR explained that the sale-leaseback transaction was "not included in the valuation…" The minutes of the November 29, 2016 meeting reflect that the purported reason the sale-leaseback was not included was because of "execution risk."

282.    Another version of the minutes from the November 29, 2016 meeting show that Staruck, GreatBanc's employee, asked "how, if at all, the real estate sale/leaseback factored into the valuation and projected cash flows."

283.    SRR's employee "Mr. Ward explained that [the sale/leaseback] had not been incorporated into the analysis due to the execution risk, particularly because the Company was just in the process of retaining the firm to put that into play and has done zero due diligence."

284.    The minutes then state that "[n]o educated value could be assigned at this point."

285.    Segerdahl and its advisors long understood that the sale/leaseback would be highly lucrative:

   a.    For example, the "Due Diligence Report" prepared by DBR for GreatBanc's review in determining whether to approve the sale stated that "the result" of the "sale-and-leaseback opportunity" will "likely be a positive to EBITDA."

   b.    At the July 6, 2016 meeting of the Board of Directors, Defendant Schneider and Bradshaw "led a discussion about a potential sale/leaseback of the Company's real property which they believe will add **significant value** to a prospective buyer." (emphasis added)

286.    Far from any significant execution risk, however, by October 16, 2016, Segerdahl had already received "five bids on the potential sale-leaseback transaction in the range of $22-25 million," as reflected in the minutes of Segerdahl's Board of Directors meeting on that date.

287.    On November 23, 2016 Segerdahl actually accepted one of the offers – for $25 million from AG Net Lease. The transaction would eventually close in February of 2017 with the buyer identified as AGNL Mail, an affiliate of AG Net Lease.

54

288.    The minutes of the November 4, 2016 Board of Directors meeting, at which Defendants Schneider, Joutras and the other Board of Director Defendants were present, state that Defendant Schneider "led a discussion on the sale/leaseback" including a "summary of proposals prepared by CBRE… the bidding process, the comparison of the proposals, and the state of due diligence."

289.    Thus the November 4, 2016 Board meeting minutes show that due diligence on the potential transaction was underway well before the transaction. Moreover, the company had bids in-hand at that time.

290.    Therefore GreatBanc's fiduciary committee minutes reflect that GreatBanc at best was mistaken when it concluded that Segerdahl had done "zero due diligence" and "no educated value" could be assigned to the transaction.

291.    In addition, the bids in the $22-25 million range were in line with the estimates prepared by CBRE and Newmark Grubb:

    a.    An undated presentation prepared by Newmark Grubb, that JPMorgan provided to at least one of the bidders (Madison Dearborn) during the negotiations, estimated a purchase price for the real estate in the range of $23.7-$27.1 million.

    b.    A July 2016 presentation prepared by CBRE, the broker, showed a valuation range for $22.6 - $29.1 million for the properties.

292.    During a meeting during or about the last week of August 2016 including Defendant Schneider, Staruck (from GreatBanc), Ward (from SRR), and Bradshaw, the attendees discussed the sale-leaseback and the 338(h)(10) election, discussed in more detail below. Minutes of the meeting reflect the following discussion:

338h10 – leaseback: proceeds could be in the 25-34 million range. ***Has to be factored into purchase price.*** Who identified leaseback opportunity? Company as a matter of course. 7x

55

multiple – far more proceeds in excess. No way they could close that leaseback during this process. They have chosen a broker…Data room CBRE and [Newmark Grubb]. (emphasis added)

293. But, as noted above, it is clear that the sale-leaseback was not "factored into the purchase price."

294. GreatBanc's stated concerns about "execution risk" do not hold water. By the time GreatBanc met on November 29 to approve the deal and expressed concern about "execution risk," Segerdahl had ***already accepted a $25 million dollar offer from AG Net Lease*, the eventual buyer of the property**. And Segerdahl had received multiple offers from other bidders in the same $22-$25 million range, confirming that, even if the accepted offer fell through (it did not—the sale-leaseback to AG Net Lease closed in February of 2017), a reasonable estimate of the value of the transaction was readily available and was in line with the numerous financial projections prepared by Segerdahl's advisors. Those estimates were included in the documents made available to GreatBanc in the data room. GreatBanc, as the ESOP's trustee, had an affirmative duty to investigate and understand the terms of the transaction, including the sale-leaseback. Because of that duty, GreatBanc had at least constructive knowledge of the real facts about the sale-leaseback, and its failure to ensure the ESOP was properly compensated was a breach of GreatBanc's fiduciary duties.

295. The errors in GreatBanc's analysis on the eve of the transaction--that no due diligence had been undertaken, that no educated value could be assigned, that a broker had just been hired--each of which is contradicted by the foregoing, and each of which was evident in GreatBanc's prior notes and the documents available to GreatBanc, suggest that GreatBanc's omission of the sale-leaseback proceeds from the valuation and sale price was a deliberate and disloyal whitewash to justify a low purchase price. At best, these errors show reckless negligence

on GreatBanc's part regarding assets worth millions of dollars, which should have inured to the benefit of the ESOP.

296.     Moreover, this evidence is entirely consistent with Vergamini's statements at the meeting that Plaintiff Rush heard: that the sale-leaseback represented a benefit worth at least $7 million to the buyers. Vergamini euphemistically referred to the $7 million as "arbitrage." See *infra* ¶ 267. Arbitrage is the simultaneous purchase and sale of an asset to profit from an imbalance in the price. Here, the imbalance came at the expense of the ESOP. The ESOP gave up its interest in the real estate without receiving any compensation, and ICV was able to able to engage in the sale-leaseback and realize $7 million in profit.

297.     Documents produced in discovery further corroborate Plaintiff Rush's recollection that Vergamini stated the sale-leaseback represented a $7 million "arbitrage" opportunity for the buyer. In particular, in an email dated July 10, 2016 to bidder Wynnchurch, Vergamini stated that:

> Fyi. Third-party sales-leaseback analysis attached that we uploaded to the data room on Friday. This is worth ~$10-14mm net pretax and ~$6-9mm net after-tax (after cap gains taxes). … We (JPM) are spending a lot of time with clients w/ RE assets looking at sales-leasebacks….**very large multiple arb**…the implied EBITDA multiple on the sales-leaseback is ~14x…we just did one for Bob Evans Restaurants who has Sandell agitating. BOBE trades in the ~9x EBITDA area.

(emphasis added).

298.     "Arb" is a commonly used abbreviation for arbitrage, and the $6-9 million after tax range closely matches the $7 million figure Rush heard Vergamini quote.

299.     Vergamini's July 10, 2016 email was unknown to Plaintiff Rush at the time he filed the Complaint in this action. However, Vergamini's use of the word "arbitrage" in that email, including its cynical connotations, provides independent support for Plaintiff's allegation in the original Complaint that he heard Vergamini describe the sale-leaseback as an arbitrage opportunity. *See* Complaint, Docket No. 1, ¶ 58; *supra* ¶ 267.

300.     Thus the Board of Director Defendants and Defendant GreatBanc were actually or constructively aware of ICV Partners' plans to sell the real estate, and were aware of the value of the real estate. Despite that awareness, the Board of Director Defendants and Defendant GreatBanc took no action to ensure that ICV Partners paid a price for the Segerdahl shares that appropriately reflected the value of Segerdahl's real estate assets.

### D.  The Section 338(h)(10) Election

301.     ICV Partners also made what is called a section 338(h)(10) election under the tax code, obtaining significant additional value from the ESOP Buyout.

302.     Section 338(h)(10) elections are commonly utilized when the target company is structured as an S corporation, as Segerdahl was before the ESOP Buyout.

303.     Sellers of S corporations attain higher purchase prices due to the ability of the buyer to make the favorable 338(h)(10) election.

304.     Making a 338(h)(10) election would have been a "no brainer" for a purchaser of Segerdahl.

305.     In 2015, Wind Point intended to take a 338(h)(10) election, and Vergamini emphasized the value of the 338(h)(10) election to potential bidders in his marketing presentations.

306.     In October of 2016, for example, Vergamini gave a presentation to ICV Partners in which he estimated the "present value" of the 338(h)(10) election was **$46 million**.

307.     Vergamini estimated that including the value of the 338(h)(10) multiple lowered the effective EBITDA multiple in the ESOP Buyout to just 4.8x.

308.     GreatBanc was actually aware of these numbers, and received and reviewed a copy of Vergamini's presentation.

309. Here, GreatBanc and the Segerdahl Fiduciary Defendants were actually aware that ICV planned to make a 338(h)(10) election, and were actually aware that the ESOP received no value for the 338(h)(10) election in the deal.

310. Indeed, when GreatBanc first heard about the potential 338(h)(10) election, GreatBanc noted that it "[h]as to be factored into purchase price."

311. But it was **_not_** factored into the purchase price, and ICV paid no value for that valuable right.

312. The Segerdahl Fiduciary Defendants and GreatBanc were actually aware that the value of the 338(h)(10) election was not factored into the purchase price and were actually aware that ICV paid no value for it.

313. Any reasonably prudent and loyal fiduciary representing the ESOP in the Segerdahl buyout would have insisted on obtaining at least some value for the 338(h)(10) election.

314. The failure of the Segerdahl Fiduciary Defendants and GreatBanc to obtain any value for the ESOP was a breach of their fiduciary duties of prudence and loyalty under ERISA.

### E. The Wolf Road Fraud

315. DBR presented a final due diligence report to GreatBanc on November 28, 2016.

316. DBR's report stated that:

*Wolf Road Fraud*

Management has reported a potential claim against Workforce LLC d/b/a MVP based on its substantial misreporting to the Company of hours allegedly worked by its temporary workers. Given the large number of temporary workers the Company hires, the claims raise some concerns about the Company's internal processes, some of which may impact customer security and background screening policies to which the Company is required to adhere (e.g. Leo Burnett Background Screening Policy Amendment to Standard Provisions for Print and Digital Services).

Management informs us that it will likely take several years for this claim to be processed as the insurance companies are processing slowly and the vendor may argue that the

59

Company's processes enabled this to happen. Nevertheless, it seems likely the result will be a positive to EBITDA due to the increased efficiency at the facility plus a potential claim against the supplier, Workforce LLC d/b/a MVP. This is not currently reflected in the purchase price formula.

317.   The DBR report, on its face, shows that Segerdahl stood to obtain significant value, both in immediate productivity benefits and through a longer term litigation recovery which were "likely to be a positive to EBITDA" and yet were "not currently reflected in the purchase price formula."

318.   There is no legitimate business reason for Defendants to fail to obtain any value for these claims and increased productivity from ICV.

319.   Defendants' failure to obtain any value related to the Wolf Road Fraud was intentional and knowing, and appears on the face of DBR's report.

320.   Defendants' failure to obtain any value related to the Wolf Road Fraud was a violation of Defendants' ERISA fiduciary duties of prudence and loyalty.

### F.  The Diverted Purchase Proceeds

321.   The total purchase price for Segerdahl was approximately $265 million.

322.   The Segerdahl Fiduciary Defendants used their control over Segerdahl and the ESOP to wrongfully divert from the ESOP millions of dollars of the proceeds of the ESOP Buyout paid by ICV Partners.

323.   In particular, Defendant Joutras and his relative by marriage Paul White received $1.225 million out of the proceeds of the ESOP Buyout.

324.   In addition, Joutras and White were allowed to keep 100% of their SARs, despite effectively leaving the employment for which they received the SARs months in advance of the transaction.

325. In addition, a "transaction bonus" of $1 million was paid to Segerdahl's CFO, Bradshaw. That transaction bonus for Bradshaw was far in excess of reasonable compensation.

### G. SRR's Flawed Valuation

326. In approving the ESOP Buyout, GreatBanc received and purported to rely on a fairness opinion, supported by an "Analysis of Transaction Fairness," that GreatBanc commissioned from SRR.

327. The Analysis of Transaction Fairness dated December 7, 2016, is replete with red flags that are apparent on the face of the document.

328. The Analysis of Transaction Fairness reflects that a "sale to a strategic buyer" was "considered" but not pursued.

329. The Analysis of Transaction Fairness reflected that Segerdahl's management would receive approximately 10% of the equity in the company after the transaction.

330. The Analysis of Transaction Fairness reflects that "the Buyer and [Segerdahl] are anticipated to make a 338(h)(10) election for income tax purposes."

331. The Analysis of Transaction Fairness does not attempt to quantify the value of the 338(h)(10) election.

332. The Analysis of Transaction Fairness reflected that the criteria set out in the April 11, 2016 Board meeting for a potential purchaser included "growth oriented firm with similar philosophies regarding investment and debt that are consistent with Segerdahl management's views for running the business" and "ability to accelerate management's growth strategy through access to capital," but did not include obtaining the best price for the ESOP.

333. The Analysis of Transaction Fairness reflected that Segerdahl's management chose not to pursue the indication of interest from Wynnchurch because Wynnchurch "was likely a poor

strategic fit given that its primary focus would be on operational improvements and not growth initiatives for Segerdahl."

334.    The Analysis of Transaction Fairness reflected that "[c]onsolidation has characterized the U.S. commercial printing industry since the 1990s, and is ongoing due to the dramatic changes in the marketplace. The latest major example of consolidation is R.R. Donnelley's acquisition of Consolidated Graphics in 2013. Much of the merger and acquisition activity in the commercial printing industry is being driven by companies seeking to diversify beyond traditional printing services, and into industries such as logistics, online document services, and financial data."

335.    The Analysis of Transaction Fairness reflected that Segerdahl's gross profits were projected to increase from $57.5 million in FY 2015 to $63.3 million in FY 2016, and Segerdahl's EBITDA was $40.2 million for the 12 months ending October 31, 2016.

336.    The Analysis of Transaction Fairness reflected that Segerdahl's "historical return on assets ratios are above the high end of the range of the guideline companies," Segerdahl's "historical EBITDA growth is within the range of the guideline companies," and Segerdahl's "projected growth rates in revenue and earnings are within the historical range of the guideline companies."

337.    The Analysis of Transaction Fairness then set out two valuation methodologies that it would use to assess the value of Segerdahl: the "guideline company method" and the "discounted cash flow method."

338.    SRR described the guideline company method as "estimat[ing] the value of a company (in this case, Segerdahl) by comparing it to similar public companies. Once a guideline company is selected, pricing multiples are developed by dividing the market value of equity or

Enterprise Value … by appropriate measures of operating results such as sales, operating income, or earnings. After analyzing the risk and return characteristics of the guideline companies relative to the subject company, appropriate pricing multiples are applied to the operating results of the subject company to estimate its value."

339.     SRR described the discounted cash flow method as "a valuation technique in which the value of the company is estimated based on the earning capacity of that company." The discounted cash flow method estimates the value of the company "based on the present value of its expected future economic benefits," in particular, "distributable cash flow."

340.     SRR elected not to use the "Transaction Method (Comparable Companies)" approach because "[a] search for transactions involving companies in related industries did not indicate a significant number of transactions with sufficient disclosure of financial terms to draw meaningful conclusions to rely on the Transaction Method."

341.     SRR's failure to identify such transactions is strange given that JPMorgan compiled a list of comparable transactions that it presented to Segerdahl's Board on more than one occasion and presented to potential bidders for Segerdahl (*supra* at ¶¶ 108, 155).

342.     It would have been appropriate for SRR to include and rely on the Transaction Method in this case given the context of the fairness analysis—that is, to review a proposed sale transaction.

343.     It is apparent from the study of precedent transactions compiled by JPMorgan that the Transaction Method would have yielded a higher value for Segerdahl than $265 million.

344.     GreatBanc had actual or constructive knowledge of the precedent transactions identified by JPMorgan, which were made available to GreatBanc in the deal room.

345. By contrast, SRR purported to apply the guideline public company method, and reached the following results:

**Conclusion**

| | | Guideline Company Method | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

*U.S. Dollars in Thousands*

| | Segerdahl Corporation and Subsidiaries Results | Indicated Pricing Multiples[a] | | | | Selected Multiples | | | Indicated Values | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Low | High | Mean | Median | | | | | | | |
| **Next Fiscal Year (2017):** | | | | | | | | | | | | |
| EBIT | 29,134 | 10.3x | 14.9x | 13.6x | 14.7x | 8.5x | - | 9.5x | 247,600 | - | 276,800 | |
| EBITDA | 47,286 | 5.9x | 14.2x | 9.4x | 9.4x | 5.0x | - | 6.0x | 236,400 | - | 283,700 | |
| **Latest Twelve Months:** | | | | | | | | | | | | |
| EBIT | 22,849 | 11.6x | 17.3x | 14.1x | 13.5x | 10.5x | - | 11.5x | 239,900 | - | 262,800 | |
| EBITDA | 40,206 | 5.4x | 18.1x | 11.9x | 12.3x | 6.0x | - | 7.0x | 241,200 | - | 281,400 | |
| **Three-Year Average [b]:** | | | | | | | | | | | | |
| EBIT | 21,365 | 7.8x | 17.4x | 13.1x | 13.7x | n/m | - | n/m | n/m | - | n/m | |
| EBITDA | 36,923 | 4.6x | 19.5x | 11.5x | 10.2x | n/m | - | n/m | n/m | - | n/m | |

| Enterprise Value, Controlling Interest Basis (Rounded) | $ 240,000 | - | $ 280,000 |
|---|---|---|---|

346. Thus, for example, the guideline companies traded at multiples of 10.3x – 14.9x estimated 2017 (next fiscal year) EBIT, with a mean of 13.6x and a median of 14.7x.

347. For Segerdahl, SRR chose values in range of 8.5x – 9.5x EBIT.

348. SRR therefore entirely ignored the range of the guideline companies for the next fiscal year EBIT metric, and picked a range for estimating Segerdahl's value the ***high end*** of which was below the ***low end*** of the range of the guideline public companies.

349. For last twelve months EBITDA, SRR calculated a range of 5.4x – 18.1x, with a mean of 11.9x and a median of 12.3x.

350. SRR chose a range of 6x-7x for Segerdahl—well below mean or median and only slightly above the bottom end of the guideline range.

64

351.    However, the range chosen by SRR, while bearing little, if any, relationship to the guideline public company analysis it set out, did neatly encompass the previously agreed upon $265 million price, which represented a roughly 6.6x EBITDA multiple.

352.    In every case, the high end of the range chosen by SRR for Segerdahl was below or near the low end of the range suggested by the guideline public company method, and in every case the high end of the range SRR chose for Segerdahl was well below mean or median for the guideline public companies.

353.    Conveniently, the range chosen by SRR for Segerdahl yielded a result that included the deal price with ICV: $240 million to $280 million, compared to a deal price of $265 million.

354.    If SRR had actually applied the ranges it deduced for the guideline companies, the range of values for Segerdahl stock would have been far higher: an absolute range of $217 million to as much as $728 million (with a midpoint of $472.5 million), a mean range from $321 million to $478 million, and a median range of $308 million to $494 million.

355.    SRR essentially ignored the results of its own guideline public company analysis.

356.    SRR's decision to depart from the guideline public company method was intentional and designed to justify the already agreed upon purchase price with ICV.

357.    SRR's decision to depart from the results of the guideline public company analysis was in stark contrast to its observation that Segerdahl's "historical return on assets ratios are above the high end of the range of the guideline companies," Segerdahl's "historical EBITDA growth is within the range of the guideline companies," and Segerdahl's "projected growth rates in revenue and earnings are within the historical range of the guideline companies."

358.    SRR then performed a discounted cash flow analysis.

359. SRR determined a range of values from the discounted cash flow analysis of $258 million to $306 million.

360. SRR adopted the midpoint of the range, estimating Segerdahl's value at $278 million—higher than the ESOP Buyout deal price of $265 million.

361. SRR's discounted cash flow analysis showed that the deal price of $265 million was much closer to the bottom of the range of the discounted cash flow analysis than it was to the midpoint of the range that SRR adopted.

362. SRR's Analysis of Transaction Fairness thus contains serious red flags on its face, including:

    a. A frank acknowledgment that the sale process was not designed to maximize the value to the ESOP and was instead designed to protect management and further management's strategies;

    b. A discussion of in-hand indications of interest at a higher price than the sale price that were ignored because of a desire to protect management;

    c. An acknowledgement that management would receive 10% of the equity in the company after the transaction;

    d. A notation that a 338(h)(10) election was planned but no discussion of the value of that election;

    e. A failure to consider numerous transactions of comparable companies in the years before the ESOP Buyout;

    f. A wholesale departure from the results of the guideline company analysis;

    g. A chart showing the trading multiples of the guideline companies suggesting the value of Segerdahl was between $300 million and $500 million; and

     h.   A discounted cash flow method analysis showing that ICV's purchase price was $12 million below Segerdahl's value.

363.   The Seventh Circuit has held that "[a]n independent appraisal is not a magic wand that fiduciaries may simply waive over a transaction to ensure that their responsibilities are fulfilled," and "soliciting outside advice does not operate as a 'complete whitewash' which, without more, satisfies ERISA's prudence requirement." *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011). "The fiduciary must (1) investigate the expert's qualifications, (2) provide the expert with complete and accurate information, and (3) make certain that reliance on the expert's advice is reasonably justified under the circumstances." *Montgomery v. Aetna Plywood, Inc.*, 39 F. Supp. 2d 915, 936 (N.D. Ill. 1998).

364.   Any reasonably prudent and loyal ESOP fiduciary reviewing SRR's Analysis of Transaction Fairness in an effort to "make certain that reliance" on the Analysis of Transaction Fairness was "reasonably justified under the circumstances" would and should have questioned these obvious problems with SRR's Analysis of Transaction Fairness. Moreover, any reasonably prudent and loyal ESOP fiduciary would have objected to the ESOP Buyout in light of the fundamental unfairness to the ESOP that the problems with SRR's Analysis of Transaction Fairness revealed. Putting aside the gross failure of SRR to even apply the valuation methods it set out, and its failure to consider the many precedent transactions available, the Analysis of Transaction Fairness on its face reflects breaches of the duty of loyalty including (a) marketing the company only to potential purchasers that would protect management and (b) a transaction in which management stood to directly profit as an equity holder in the post-transaction company at the expense of the ESOP.

## DEFENDANTS' FIDUCIARY STATUS UNDER ERISA

365.    ERISA requires that every plan identify "one or more" "named fiduciaries" with general responsibility for administering the plan. ERISA § 402(a)(1).

366.    According to the Conformed Plan, Segerdahl's Board of Directors created an "ESOP Committee" and appointed the members of the ESOP Committee. Under the terms of the Conformed Plan, the ESOP Committee was the plan administrator of the ESOP and the ESOP's named fiduciary, with general authority to carry out essentially all fiduciary functions for the ESOP.

367.    Defendant Joutras was the only member of the ESOP Committee from 2014 until April 11, 2016, when he resigned. Defendant Schneider was appointed by the Board of Directors to the ESOP Committee that same day, and served on the ESOP Committee until the termination of the ESOP in December of 2016. Defendants Joutras and Schneider were, accordingly, express fiduciaries of the ESOP under ERISA § 402(a)(1) during all or part of the relevant period.

368.    The Conformed Plan provided that "[i]n the event of a tender offer or other offer to purchase shares of [Segerdahl] Stock held by the Trust, the Trustee shall tender or sell shares as it is directed by the Administrator [the ESOP Committee], subject to the Trustee's fiduciary duties under ERISA."

369.    Thus the ESOP Committee and the Trustee GreatBanc both had express fiduciary duties with respect to the ESOP Buyout. The ESOP Committee was responsible for the sale process of Segerdahl up until the time GreatBanc was appointed in August of 2016.

370.    From that point, GreatBanc shares responsibility for the imprudent and disloyal marketing of Segerdahl, and has primary responsibility for the ultimate decision to accept ICV's offer.

371. ERISA also defines fiduciary status so that anyone is a fiduciary "to the extent" they *in fact* perform a fiduciary function. *See* ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Thus in addition to expressly designated fiduciaries, anyone is a fiduciary "to the extent" he "exercises any discretionary authority or discretionary control respecting management of such plan" or "exercises any authority or control respecting management or disposition of its assets" or "has any discretionary authority or discretionary responsibility in the administration of such plan." *Id.*

372. The Seventh Circuit has applied a "consistently broad reading" to the functional definition of fiduciary under ERISA. *Baker v. Kingsley*, 387 F.3d 649, 663–64 (7th Cir. 2004)).

373. In particular, appointing another ERISA fiduciary is itself a fiduciary function, and carries with it fiduciary duties to prudently and loyalty appoint, monitor the performance of, and, if necessary, remove an appointee. *Leigh*, 727 F.2d at 133 ("selecting and retaining plan administrators" is an ERISA fiduciary function).

374. Here, Schneider and Joutras effectively exercised complete control over Segerdahl and the ESOP, including appointments to the Board of Directors and ESOP Committee. Schneider and Joutras used that control to ensure that the Board of Directors and ESOP Committee included only members who were primarily loyal to Schneider and Joutras, not the ESOP.

375. Schneider and Joutras are also ERISA fiduciaries by virtue of their appointment and effective control over the ESOP's other fiduciaries, including the Board of Directors, ESOP Committee and Trustee. Schneider and Joutras are also fiduciaries by virtue of their control over Segerdahl itself, which was a plan asset of the ESOP.

376. The Board of Directors Defendants, in turn, are fiduciaries because they had formal authority under the Plan to appoint the ESOP's Trustee as well as the members of the ESOP Committee, and thus had fiduciary duties with respect to those appoints, duties to monitor the

69

performance of the Trustee and the ESOP Committee members and duties to remove the Trustee and ESOP Committee members if they failed to fulfill their fiduciary duties.

## ERISA'S FIDUCIARY DUTIES

377.    ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

378.    These fiduciary duties under ERISA §§ 404(a)(1)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence.

379.    "[T]he duties charged to an ERISA fiduciary are 'the highest known to the law.'" *George v. Kraft Foods Glob., Inc.*, 814 F. Supp. 2d 832, 852 (N.D. Ill. 2011). ERISA's duty of prudence "is not that of a prudent layperson but rather that of a prudent fiduciary with experience dealing with a similar enterprise." *Whitfield v. Cohen*, 682 F. Supp. 188, 194 (S.D.N.Y. 1988). Put another way, ERISA fiduciaries must "act in good faith as an objectively prudent fiduciary would act, not simply as a prudent layperson would act." *Chesemore v. All. Holdings, Inc.*, 886 F. Supp. 2d 1007, 1041 (W.D. Wis. 2012), *aff'd* 829 F.3d 803 (7th Cir. 2016).

380.    ERISA's fiduciary duties entail, among other things:

(a) The duty to conduct an independent and thorough investigation into, and to continually monitor the merits of all the investment alternatives of a plan;

(b) The duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the

participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor; and

(c) The duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

381.    According to Department of Labor ("DOL") regulations and case law interpreting these statutory provisions, in order to comply with the prudence requirement under ERISA §404(a), a fiduciary must show that: (a) he has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role the investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties; and (b) he has acted accordingly.

382.    Again, according to DOL regulations, "appropriate consideration" in this context includes, but is not necessarily limited to:

- A determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or, where applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties), to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action; and

- Consideration of the following factors as they relate to such portion of the portfolio:

- The composition of the portfolio with regard to diversification;

- The liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the plan; and

- The projected return of the portfolio relative to the funding objectives of the plan.

383.    A fiduciary that undertakes to sell plan assets is bound by the duties of prudence and loyalty when they do so. A prudent and loyal fiduciary with experience selling large private companies would make sure that they identified and solicited offers from all types of potential buyers, including competitors.

384.    ERISA § 405 renders Plan fiduciaries liable for the breaches of other fiduciaries under certain circumstances, such as when a fiduciary knowingly participates in or conceals the breach of another fiduciary, if the fiduciary's own breach enables the breach by the other fiduciary, or if the fiduciary is aware of the other fiduciary's breach yet makes no reasonable effort to correct the breach.

385.    ERISA § 406 prohibits Plan fiduciaries from entering into transactions between the plan and a party in interest or from entering into various transactions involving the plan and a fiduciary that directly involve, or raise a heightened risk of, self-dealing by the plan's fiduciary.

386.    ERISA § 206(d)(4) provides that courts may order an offset of all or part of a participant's benefits against the amount the participant is ordered or required to pay to the plan, if, among other things, the participant breached his ERISA fiduciary duties.

**CLASS ACTION ALLEGATIONS**

387.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), authorizes any participant or beneficiary of a retirement plan to bring an action individually on behalf of that plan to enforce a

breaching fiduciary's liability to the plan under 29 U.S.C. § 1109(a). Such claims are brought "in a representative capacity on behalf of the plan as a whole." *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 142 (1985).

388.     The claims set forth in this action meet the requirements of Rule 23, and class certification would be appropriate with respect to the following class (the "Class"):

> All participants in and beneficiaries of the Segerdahl Corporation Employee Stock Ownership Plan at the time the ESOP was terminated, with the exception of Defendants in this action and their beneficiaries.

389.     The Class includes at least 400 participants in the ESOP, and is therefore so numerous that joinder of all class members would be impracticable.

390.     There are numerous questions of law and fact common to the Class because the claims asserted herein arise out of a singular course of common conduct by Defendants that affected all class members through their participation in the ESOP in precisely the same way, in violation of precisely the same legal duties. Common questions of law and fact include the following:

a.  whether Defendants GreatBanc or the Board of Directors Defendants breached their fiduciary duties with respect to the ESOP Buyout;

b.  whether Defendants Schneider and Joutras breached their fiduciary duties or engaged in self-dealing prohibited transactions;

c.  whether Defendants GreatBanc or the Board of Directors Defendants breached their duties as cofiduciaries; and

d.  whether Defendants Schneider or Joutras knowingly participated in and benefitted from the ESOP Buyout and the other misconduct described above, and, if so, whether they are subject to equitable remedies for such conduct.

391.     Plaintiff Rush's claims are typical of the claims of the Class because Mr. Rush was an ESOP participant who received less than adequate consideration for the shares of Segerdahl in his ESOP account as a result of the ESOP Buyout and the other misconduct described herein in precisely the same way that all other Class members received less than adequate consideration for the shares of Segerdahl in their ESOP accounts as a result of the ESOP Buyout and the other misconduct described herein.

392.     Plaintiff Rush is an adequate representative of the Class because he is a participant in the ESOP who received less than adequate consideration for the shares of Segerdahl in his ESOP account as a result of the ESOP Buyout and the other misconduct described herein; has no interest that conflicts with other members of the proposed Class; is committed to the vigorous representation of the Class; and has engaged experienced and competent attorneys to represent the Class.

393.     Certification of the claims asserted herein would be appropriate under Rule 23(b)(1)(A) or (B). Prosecution of separate actions by the ESOP participants for the breaches of fiduciary duty and prohibited transactions described herein would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct. In addition, an adjudication of the claims asserted herein by any ESOP participant would, as a practical matter, be dispositive of the interests of all other ESOP participants. As this Court has recognized several times, "[b]ecause of ERISA's distinctive 'representative capacity' and remedial provisions, ERISA litigation of this nature presents a paradigmatic example of a [Rule 23](b)(1) class." *Neil v. Zell*, 275 F.R.D. 256, 267 (N.D. Ill. 2011).

394.     Alternatively, this action should be certified as a class under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) or (B). A class action is the superior method for the fair and

efficient adjudication of this controversy because common questions of law and fact predominate over questions affecting only individual class members, and because, in light of the representative nature of the claims at issue, a class action would be superior to other available methods for fairly and efficiently adjudicating the controversy.

395.    Plaintiff Rush's counsel will fairly and adequately represent the interests of the Class and is best able to represent the interests of the Class under Rule 23(g).

### CLAIMS FOR RELIEF

### COUNT I

### Breach of Fiduciary Duty
### ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1)
### All Defendants

396.    Plaintiff repeats and realleges each of the allegations in the foregoing paragraphs as if fully set forth herein.

397.    ERISA § 404, 29 U.S.C. §1104, requires ERISA fiduciaries to perform their fiduciary duties and responsibilities prudently, as would an experienced ERISA fiduciary, and loyally, exclusively in the interest of the plan and its participants for the purpose of providing benefits.

398.    As alleged above, Defendant GreatBanc, the Board of Directors Defendants, and the Segerdahl Fiduciary Defendants were express or *de facto* fiduciaries for the ESOP.

399.    As fiduciaries for the ESOP, the Board of Director Defendants and the Segerdahl Fiduciary Defendants failed to prudently and loyally fulfill their fiduciary duties to the ESOP when they engaged in a short sighted and self-interested sale process that excluded higher-paying strategic buyers in favor of investment buyers that would preserve management. Moreover, the Board of Director Defendants and the Segerdahl Fiduciary Defendants were actually or

constructively aware of Defendant Schneider and Bradshaw's conflicts of interest with the ESOP, yet permitted Schneider and Bradshaw to handle aspects of marketing Segerdahl to potential buyers.

400.    The Board of Director Defendants also breached their fiduciary duties when they appointed Schneider the named fiduciary of the ESOP, despite their actual knowledge of her plan to focus the sale on lower paying investment buyers that would retain her as CEO.

401.    Defendant GreatBanc failed to prudently and loyally fulfill its fiduciary duties when, acting in a fiduciary capacity on behalf of the ESOP, it approved the ESOP Buyout despite actual or constructive knowledge that the sale process leading to the ESOP Buyout was flawed, and that the price received by the ESOP was inadequate and below fair market value for at least the following reasons:

a.    it knew or should have known that the Segerdahl Fiduciary Defendants had focused on a sale to a buyer that would preserve management, including Schneider and other insiders, and that the Segerdahl Fiduciary Defendants did not market Segerdahl to other potential buyers, including competitors, who would have paid more but would likely have replaced management (*supra* ¶¶ 85-262);

b.    it knew or should have known that the Segerdahl Fiduciary Defendants and their advisors failed to pursue in-hand indications of interest to purchase at a higher price than ICV eventually paid because of concerns that the buyer was incompatible with existing management (*supra* ¶¶ 192-202);

c.    it knew or should have known that Defendant Schneider and other senior management at Segerdahl were receiving equity interests in and lucrative

employment contracts from ICV that gave them substantial interests conflicting with the ESOP's interests (*supra* ¶¶ 240-262);

d.  it knew or should have known that the price the ESOP received for its Segerdahl shares in the ESOP Buyout did not take into account the immediately realizable fair market value of Segerdahl's real estate assets, the value of the 338(h)(10) election, or the value of the Wolf Road Fraud (*supra* ¶¶ 263-320);

e.  it knew or should have known that the Analysis of Transaction Fairness prepared by SRR contained numerous red flags and grossly undervalued the ESOP's shares (*supra* ¶¶ 326-364); and

f.  it knew or should have known that a significant portion of the purchase price paid by ICV Partners was being diverted away from the ESOP to the Segerdahl Fiduciary Defendants and other Segerdahl insiders (*supra* ¶¶ 321-325).

402.    As alleged above, as fiduciaries of the ESOP, Defendant GreatBanc, the Board of Directors Defendants, and the Segerdahl Fiduciary Defendants failed to ensure that the ESOP received the fair market value of its shares. Fair market value measures what a hypothetical willing buyer would pay to a hypothetical willing seller, when neither party is under any compulsion to buy or sell. Determining fair market value requires considering the highest and best use of the asset in question, which requires evaluating the characteristics of likely potential buyers, and should take into account the population of potential willing buyers. That includes buyers who, for a variety of reasons, might want to pay more than others. This certainly requires evaluating the characteristics of types of likely potential willing buyers. In addition, as this Court has held, in the context of a sale of ESOP stock, determining the fair market value of the ESOP's shares requires the evaluation of the benefits of the transaction of the counter-parties. Determining fair market

value in the context of the ESOP Buyout was especially important, because all of the ESOP's assets were to be liquidated in that transaction, and the ESOP was permanently giving up its stake in Segerdahl. Because other types of buyers, such as competitors, would have paid a higher price for the ESOP's shares than did ICV Partners, the fair market value of the ESOP's shares was higher than what ICV Partners would have paid. Defendant GreatBanc, the Board of Directors Defendants, and the Segerdahl Fiduciary Defendants relied on a valuation of the ESOP in approving the transaction that failed to consider the characteristics of likely potential buyers, including operating companies like competitors, and failed to consider what those likely potential buyers would have paid. Defendant GreatBanc also failed to appropriately consider the specific benefits of the transaction to the ESOP's counterparties, including Defendant Schneider, the other Segerdahl executives who received equity awards in post-transaction Segerdahl, and ICV Partners. Defendant GreatBanc knew or should have known that the valuation failed to take that higher potential price into account, and knew or should have known that the valuation failed to represent the fair market value of the ESOP's shares for that reason. In the case of the ESOP Buyout that obligation was especially important, because it represented a sale of 100% of the ESOP's Segerdahl shares.

403.    In addition, as fiduciaries for the ESOP, Defendant GreatBanc, the Board of Directors Defendants, and the Segerdahl Fiduciary Defendants failed to prudently and loyally fulfill their fiduciary duties when they failed to act to protect the ESOP's interests when the Segerdahl Fiduciary Defendants diverted millions of dollars of the purchase proceeds in the ESOP Buyout away from the ESOP and to Defendant Schneider, Defendant Joutras, Paul White and Marcus Bradshaw. *See* ¶¶ 321-325.

404. The Board of Directors Defendants violated their duties of prudence and loyalty when they appointed and failed to monitor or remove Defendant GreatBanc, Defendant Schneider or Defendant Joutras, even though the Board of Directors Defendants knew or should have known that Defendant GreatBanc, the Board of Directors Defendants, and the Segerdahl Fiduciary Defendants were preparing to and in fact did approve the ESOP Buyout even though the ESOP Buyout was not fair to the ESOP.

405. Any of these fiduciaries could, and should, have taken any number of actions to protect the ESOP's interests, but they did not. For example, a fiduciary uncertain of the proper course to take and confronted by a situation involving conflicts of interest—as was the case with the ESOP Buyout—could have come to court and obtained direction from the court as the appropriate course of action to protect the ESOP.

406. But Defendant GreatBanc, the Board of Directors Defendants, and the Segerdahl Fiduciary Defendants did not take action to protect the ESOP, and instead allowed the ESOP Buyout to close despite their actual or constructive knowledge of the flawed process leading to the ESOP Buyout described above.

407. These actions, and failures to act, violated the duties of prudence and loyalty contained in ERISA § 404(a).

408. Under ERISA § 409(a), 29 U.S.C. § 1109(a), a fiduciary that violates any of ERISA's duties, including ERISA § 404(a), must "make good" to the plan the losses to the plan resulting from its violations, and is "subject to such other equitable or remedial relief as the court may deem appropriate."

409. Thus, under ERISA §§ 502(a)(2) and 409(a), 29 U.S.C. §§ 1132(a)(2) and 1109(a), Defendant GreatBanc, the Board of Directors Defendants, and the Segerdahl Fiduciary Defendants

are liable, in an amount to be determined at trial, for the losses to the Plan caused by their violations of ERISA § 404(a), and are "subject to such other equitable or remedial relief" as the Court "may deem appropriate."

410.    Under ERISA § 502(a)(3), Defendant GreatBanc, the Board of Directors Defendants, and the Segerdahl Fiduciary Defendants are also subject to appropriate equitable relief including, but not limited to, constructive trust and equitable surcharge.

## COUNT II

### Breach of Fiduciary Duty and Prohibited Transaction
### ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1)
### ERISA § 406(b), 29 U.S.C § 1106(b)
### Defendants Schneider and Joutras

411.    Plaintiff repeats and realleges each of the allegations in the foregoing paragraphs as if fully set forth herein.

412.    ERISA § 404, 29 U.S.C. § 1104, requires ERISA fiduciaries to perform their fiduciary duties and responsibilities prudently, as would an experienced ERISA fiduciary, and loyally, exclusively in the interest of the plan and its participants for the purpose of providing benefits.

413.    ERISA § 406(b)(1) prohibits plan fiduciaries from "deal[ing] with the assets of the plan in [their] own interest or for [their] own account."

414.    As alleged above, Defendants Schneider and Joutras were members of the ESOP Committee and in that capacity were named fiduciaries for the ESOP.

415.    As alleged above, Defendants Schneider and Joutras were also *de facto* fiduciaries for the ESOP by virtue of the control they exercised over the ESOP and its assets.

416.    As fiduciaries for the ESOP, Defendants Schneider and Joutras used their control over the ESOP to influence the terms of the ESOP Buyout and preceding sales process and to cause

the ESOP to engage in the ESOP Buyout despite the fact that the ESOP Buyout was the result of a flawed sale process and was not in the ESOP's best interests.

417.    In addition, Defendants Schneider and Joutras used their control over the ESOP and Segerdahl:

> a.   to divert millions of dollars of the sale proceeds away from the ESOP and to themselves and other Segerdahl insiders (s*ee* ¶¶ 321-325),
>
> b.   to obtain for Defendant Schneider and other senior management of Segerdahl equity interests in reorganized Segerdahl as well as lucrative employment contracts after the sale; and
>
> c.   to prevent the ESOP from protecting its rights as a shareholder of Segerdahl.

418.    This misconduct violated the duties of prudence and loyalty contained in ERISA § 404(a), and the prohibition on self-dealing with plan assets set forth in ERISA § 406(b)(1).

419.    Under ERISA § 409(a), 29 U.S.C. § 1109(a), a fiduciary that violates any of ERISA's duties, including ERISA § 404(a) or ERISA § 406(b)(1), must "make good" to the plan the losses to the plan resulting from its violations, and is "subject to such other equitable or remedial relief as the court may deem appropriate."

420.    Thus, under ERISA §§ 502(a)(2) and 409(a), 29 U.S.C. §§ 1132(a)(2) and 1109(a), Defendants Schneider and Joutras are liable, in an amount to be determined at trial, for the losses to the Plan caused by their violations of ERISA § 404(a) and ERISA § 406(b)(1), and are "subject to such other equitable or remedial relief" as the Court "may deem appropriate."

421.    Under ERISA § 502(a)(3), Defendants Schneider and Joutras are also subject to appropriate equitable relief including, but not limited to, constructive trust and equitable surcharge.

## COUNT III

**Prohibited Transaction: Sale of Plan Assets to a Party in Interest
ERISA § 406(a)(1), 29 U.S.C. § 1106(a)(1)
Defendant GreatBanc**

422.    Plaintiff repeats and realleges each of the allegations in the foregoing paragraphs as if fully set forth herein.

423.    ERISA § 406(a)(1), 29 U.S.C. § 1106(a)(1), categorically prohibits certain types of "direct or indirect" transactions between plans, like the ESOP, and parties in interest.

424.    ERISA § 406(a)(1)(A) prohibits the sale of assets of a plan to a party in interest, and ERISA § 406(a)(1)(D) prohibits the transfer of plan assets between a plan and a party in interest.

425.    As a named and de facto fiduciary of the ESOP, and as an officer of Segerdahl, Defendant Schneider was a party in interest under ERISA § 3(14)(A), 29 U.S.C. § 1002(14)(A).

426.    During the ESOP Buyout, Defendant Schneider acted as a buyer, directly or indirectly, of the ESOP's shares when she purchased equity interests in post-transaction Segerdahl.

427.    Defendant Schneider's purchase of shares is accordingly a prohibited transaction under ERISA § 406(a)(1).

428.    Defendant GreatBanc had formal authority to approve the ESOP Buyout, and did so with actual knowledge that Defendant Schneider would be purchasing shares, directly or indirectly, from the ESOP.

429.    Under ERISA § 409(a), 29 U.S.C. § 1109(a), a fiduciary that violates any of ERISA's duties, including ERISA § 406(a)(1), must "make good" to the plan the losses to the plan resulting from its violations, and is "subject to such other equitable or remedial relief as the court may deem appropriate."

430.    Thus, under ERISA §§ 502(a)(2) and 409(a), 29 U.S.C. §§ 1132(a)(2) and 1109(a), Defendant GreatBanc is liable, in an amount to be determined at trial, for the losses to the Plan caused by its violation of ERISA § 406(a)(1), and is "subject to such other equitable or remedial relief" as the Court "may deem appropriate."

431.    Under ERISA § 502(a)(3), Defendant GreatBanc is also subject to appropriate equitable relief including, but not limited to, constructive trust and equitable surcharge.

## COUNT IV

### Breach of Co-Fiduciary Duty
### ERISA § 405(a)(1)-(3), 29 U.S.C. § 1105(a)(1)-(3)
### All Defendants

432.    Plaintiff repeats and realleges each of the allegations in the foregoing paragraphs as if fully set forth herein.

433.    A fiduciary with respect to a plan is liable for the breach "of another fiduciary" for the same plan if "he participates knowingly in, or knowingly undertakes to conceal, an act or omissions of such other fiduciary, knowing such act or omission is a breach," ERISA § 405(a)(1), or if, "by his failure to comply with [his fiduciary duties] in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach," ERISA § 405(a)(2), or if "he has knowledge of a breach by some other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach." ERISA § 405(a)(3).

434.    Pursuant to § 405 of ERISA, 29 U.S.C. § 1105, Defendant GreatBanc, the Board of Directors Defendants, and the Segerdahl Fiduciary Defendants are also liable as co-fiduciaries with respect to the above-described violations because they participated knowingly in their co-fiduciaries' breaches; enabled other fiduciaries to violate ERISA by virtue of their own breaches

of fiduciary duty; knowingly undertook to conceal those breaches; enabled their co-fiduciaries to commit the breaches and failed to make any reasonable efforts to remedy the breaches.

435.     ERISA § 502(a)(2) permits plan participants, such as Plaintiff, to bring civil actions for "appropriate relief" under ERISA § 409.

436.     Under ERISA § 409(a), a fiduciary that violates any of ERISA's duties, including ERISA § 405(a)(1), (a)(2) and (a)(3), must "make good" to the Plans the losses to the Plans resulting from its violations of ERISA § 405(a)(1), (a)(2) and (a)(3), and is "subject to such other equitable or remedial relief as the court may deem appropriate."

437.     Thus, Defendant GreatBanc, the Board of Directors Defendants, and the Segerdahl Fiduciary Defendants are liable, in an amount to be determined at trial, for the losses to the ESOP caused by their violations of ERISA § 405(a)(1), (a)(2) and (a)(3), and are "subject to such other equitable or remedial relief" as the Court "may deem appropriate."

438.     Under ERISA § 502(a)(3), Defendant GreatBanc, the Board of Directors Defendants, and the Segerdahl Fiduciary Defendants are also subject to appropriate equitable relief including, but not limited to, constructive trust and equitable surcharge.

### COUNT V

**Knowing Participation in and Receipt of Benefit from Violations of ERISA**
**ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)**
**Defendants Schneider and Joutras**

439.     Plaintiff repeats and realleges each of the allegations in the foregoing paragraphs as if fully set forth herein.

440.     ERISA § 502(a)(3) permits a plan participant to bring a civil action to obtain appropriate equitable relief to enforce the provisions of Title I of ERISA or to enforce the terms of a plan.

441. The Supreme Court has held that anyone, including a non-fiduciary, who receives the benefit of conduct that violates ERISA may be subject to equitable remedies under ERISA § 502(a)(3) if they have "actual or constructive knowledge of the circumstances that rendered the transaction unlawful." *Harris Trust*, 530 U.S. at 251.

442. As a result of the fiduciary breaches and prohibited transactions described herein, Defendants Schneider and Joutras received millions of dollars that otherwise would have been paid to the ESOP.

443. Defendants Schneider and Joutras had full knowledge of the existence of the ESOP and the reasons why these transactions were unlawful and unfair to the ESOP.

444. Defendants Schneider and Joutras have profited from these fiduciary breaches and prohibited transactions in an amount to be proven at trial, and on information and belief they remain in possession of at least some of the proceeds that belong in good conscience to the Plans. All such money that belongs in good conscience to the Plans is subject to a constructive trust in favor of the Plans, for which Defendants Schneider and Joutras serve as constructive trustees. As constructive trustees, under ERISA § 502(a)(3), Defendants must disgorge to the Plans all such money or the product thereof that is traceable to the prohibited transactions as well as any profits made thereon.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A. Certify this action as a class action pursuant to Fed. R. Civ. P. 23(a);

B. Declare that Defendants breached their fiduciary duties to the ESOP;

C. Enjoin Defendants from further violations of their fiduciary responsibilities, obligations, and duties and from further engaging in transactions prohibited by ERISA;

D.      Order that Defendants make good to the ESOP the losses resulting from their serial breaches of fiduciary duty;

E.      Order that Defendants disgorge any profits that they have made through their breaches of fiduciary duty and prohibited transactions and impose a constructive trust and/or equitable lien on any funds received by Defendants therefrom;

F.      Order any other available equitable relief, or remedies, including but not limited to, the imposition of a surcharge, the restoration of the ESOP to the position they would have been but for the breaches of fiduciary duty and self-dealing; and any other kind of relief and/or damages available pursuant to ERISA §§ 409 and 502(a)(2) and (3);

G.      Order that Defendants' accounts in the ESOP be offset under ERISA § 206(d)(4) to cover the losses to the ESOP from Defendants' misconduct set forth herein;

H.      Award Plaintiff reasonable attorneys' fees and costs of suit incurred herein pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g), and/or for the benefit obtained for the ESOP;

I.      Order Defendants to pay prejudgment interest;  and

J.      Award such other and further relief as the Court deems equitable and just.

DATED: February 21, 2020

Respectfully submitted,

Bruce Rush, as a participant in and on behalf of the Segerdahl Corporation Employee Stock Ownership Plan, and on behalf of a class of all others who are similarly situated,

By: /s/ James A. Bloom

Michael M. Mulder
Elena N. Liveris
The Law Offices of Michael M. Mulder
1603 Orrington Avenue, Suite 600
Evanston, Illinois 60201
Telephone: (312) 263-0272
mmmulder@mmulderlaw.com
eliveris@mmulderlaw.com

Todd Schneider (admitted pro hac vice)
James A. Bloom (admitted pro hac vice)
Kyle G. Bates  (admitted pro hac vice)
SCHNEIDER WALLACE COTTRELL
KONECKY WOTKYNS LLP
2000 Powell Street, Ste. 1400
Emeryville, California  94608
Telephone: (415) 421-7100
tschneider@schneiderwallace.com
jbloom@schneiderwallace.com
kbates@schneiderwallace.com

*Attorneys for Bruce Rush*