**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| BRUCE RUSH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 19-cv-00738 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| GREATBANC TRUST COMPANY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Segerdahl Corporation ("Segerdahl") is a printing company in the direct mail industry, headquartered in Wheeling, Illinois. In 2016, Segerdahl was sold and a portion of the sale proceeds were distributed to employee-participants in the company's Employee Stock Ownership Plan ("ESOP"). Plaintiff Bruce Rush, an ESOP employee-participant, has sued Defendants, who include former executives and Board members of Segerdahl, alleging that in selling the company they violated the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* Rush has now moved to certify a plaintiff class of ESOP plan participants. (Dkt. No. 89.) For the reasons that follow, the Court grants Rush's motion.

## BACKGROUND

This action arises out of the December 7, 2016 sale of Segerdahl to ICV Partners, LLC, an outside investment capital firm. The ESOP owned 100% of the outstanding common stock of Segerdahl at the time of the sale, meaning that Segerdahl employees who participated in the ESOP had a significant interest in ensuring that the company was sold for the best possible price. (Answer to First Am. Compl. ("Answer") ¶ 6, Dkt. No. 78.) Rush was Segerdahl's Vice President of Manufacturing at the time of the sale. Defendant GreatBanc Trust Company was the trustee of

the ESOP prior to the sale. (*Id.* ¶ 39.) Defendant Mary Lee Schneider was the Chief Executive Officer ("CEO") and President of Segerdahl during and after the sale, and Defendants Richard Joutras, Rodney Goldstein, Peter Mason, and Robert Cronin were members of Segerdahl's Board of Directors. (*Id.* ¶¶ 40–42.)[1]

In 2015 and 2016, Segerdahl's Board sought to sell the company and retained JP Morgan to pursue a sale. (*Id.* ¶¶ 94, 111–21, 127, 145–51.) Ultimately, Segerdahl was sold to ICV Partners for $265 million. (*Id.* ¶ 44.) Rush's primary allegation in this case is that Defendants chose not to pursue a sale with competitor companies (which would have been more profitable) because Segerdahl's executives sought to retain their own jobs and capture transaction bonuses through the sale with ICV Partners, at the expense of the ESOP participants. Rush also alleges that Defendants failed to bargain diligently for full value in the sale to ICV Partners. Rush has brought claims against Defendants pursuant to ERISA for breaching their fiduciary duties, 29 U.S.C. § 1104(a)(1); engaging in a prohibited transaction, 29 U.S.C. §§ 1106(a)(1), (b); breaching a co-fiduciary duty, 29 U.S.C. §§ 1105(a)(1)–(3); and knowing participation in and receipt of benefits from ERISA violations, 29 U.S.C. § 1132(a)(3).

## DISCUSSION

Federal Rule of Civil Procedure 23 permits individual plaintiffs to sue as representatives of an aggrieved class. *See* Fed. R. Civ. P. 23. The district court has broad discretion to determine whether to certify a class action. *Mira v. Nuclear Measurements Corp.*, 107 F.3d 466, 471 (7th Cir. 1997). To be certified, a proposed class must first satisfy all four requirements of Rule 23(a): (1) the class must be so numerous that joinder of all members is impracticable ("numerosity"); (2) there must be questions of law or fact common to the class ("commonality"); (3) the claims or

---

[1] Segerdahl is also named as a nominal defendant in this action. (*Id.* ¶ 43.)

defenses of the representative parties must be typical of the claims or defenses of the class ("typicality"); and (4) the representative parties must fairly and adequately protect the interests of the class ("adequacy"). Fed. R. Civ. P. 23(a). A proposed class must also satisfy one of the Rule 23(b) requirements. Here, Rush moves for certification pursuant to Rule 23(b)(1), which allows for class certification when plaintiffs suing individually would risk "inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct" for defendants, or when "adjudications with respect to individual class members . . . would be dispositive of the interests of the other members." Fed. R. Civ. P. 23(b)(1). In the alternative, Rush moves for Rule 23(b)(3) certification, which requires predominance of common questions of law or fact and that a class action be superior to other methods of adjudication.

Plaintiffs bear the evidentiary burden with respect to class certification motions: they must "prove that there are ***in fact*** sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). The Court must engage in a "rigorous analysis" to confirm that Rush has met this burden. *Gen. Tel. Co. of Sw. v. Falcon,* 457 U.S. 147, 161 (1982). This analysis engages "considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Id.* at 160 (internal quotation marks omitted). Ultimately, Rush need not show that the class satisfies each requirement "to a degree of absolute certainty;" instead, he must establish each requirement by a preponderance of the evidence. *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012).

ERISA regulates most private employee benefit plans. ERISA imposes duties on plan fiduciaries, including requiring fiduciaries to "discharge [their] duties . . . solely in the interest of the participants and beneficiaries," prohibiting fiduciaries from participating in or concealing the

fiduciary breaches of co-fiduciaries, prohibiting certain transactions between the plan and interested parties, and prohibiting transactions between the plan and fiduciaries (*i.e.*, self-dealing). 29 U.S.C. §§ 1104–1106. Fiduciaries that breach their fiduciary obligations are personally liable to the plan for losses resulting from their breach. *Id.* § 1109. Plan participants may bring a civil action under ERISA to enjoin fiduciary breaches or to obtain other equitable relief to remedy ERISA violations or enforce ERISA's requirements. *Id.* § 1132(a)(3). Such injunctive relief may be sought not only against fiduciaries but also against any person with respect to whom equitable relief could appropriately remedy an ERISA violation or enforce compliance with ERISA. *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 246–47 (2000).

## I. Factual Findings

The Court conducts a "rigorous analysis" of the evidence presented by the parties to determine whether a class should be certified. *Falcon*, 457 U.S. at 161. Here, many of the relevant facts are uncontested.

The ESOP, an employment pension benefit plan covered by ERISA, owned all the outstanding stock of Segerdahl between January 1, 2003 and December 7, 2016, when the ESOP sold its 100% stake in Segerdahl to ICV Partners. (Answer ¶¶ 6, 8–9.) On January 20, 2016, Jeff Vergamini, a JP Morgan investment banker, delivered a presentation to Segerdahl's Board regarding various options for selling the company. (*Id.* ¶ 145; Pl.'s Reply, Ex. A, Jan. 20, 2016 JP Morgan Board Presentation, Dkt. No. 156-3.) Vergamini proposed that "strategic buyers" (*i.e.*, competitors) be excluded from the first stage of the sale process. (JP Morgan Board Presentation at SRR00000312.) The presentation described potential benefits (including a higher sale price) and risks (including disruption to the company's culture and employees) of selling to a

competitor. (*Id.* at SRR00000309.) Ultimately, Segerdahl's Board decided not to include competitors in the first phase of its sales process. (Answer ¶ 13.)

At the time of the sale, Rush was Senior Vice President of Manufacturing at Segerdahl. (Defs.' Resp., Ex. B., Marcus Bradshaw Decl. ¶ 7, Dkt. No. 95-2.) He was not an ESOP fiduciary. (Pl.'s Reply, Ex. E, Joutras Resp. to Req. for Admis. ("Joutras Admis.") ¶¶ 1–2, 4–5, Dkt. No. 156-7; Pl.'s Reply, Ex. F., Schneider Resp. to Req. for Admis. ("Schneider Admis.") ¶¶ 1–2, 4–5, Dkt. No. 156-8.) Rush learned of the sale to ICV Partners only a few weeks before it occurred; his involvement with the sale was limited and peripheral. (Pl.'s Reply, Ex. N., Rush Dep. 117:2– 117:15, Dkt. No. 156-16.) Rush was not involved in devising, structuring, or negotiating the sale. (Pl.'s Reply, Ex. O, Rush Decl. ¶¶ 27–43, Dkt. No. 114-16.)[2] Instead, according to Joutras's and Schneider's admissions, CEO Schneider and Chief Financial Officer ("CFO") Marcus Bradshaw worked with JP Morgan to sell the company; Schneider also states that former CEO and then-Board Chair Rick Joutras and Vice President of Finance Teri Berglund were involved. (Joutras Admis. ¶ 6, Schneider Admis. ¶ 6.) Rush was not invited to, and never attended, any Board meetings in 2016, the year of the sale. (Rush Decl. ¶ 11.) The sale closed on December 7, 2016. (Answer ¶ 9.) Rush took no action to stop the sale. (Resp., Ex. A., Rush Dep. 168:10–168:24.)

Rush received a $1.8 million payment at the time of the sale through the exercise of his stock appreciation rights shares ("SARs"), which he had been awarded in 2014. (Rush Decl.

---

[2] The Court does not solely rely on Rush's declaration to reach this conclusion but considers the submissions of the parties and the record before it in its entirety. For example, Rush sent the following request for admission to Joutras and Schneider: "Admit that Bruce Rush did not participate in any negotiations with any prospective buyers for Segerdahl during 2015 or 2016." (Joutras Admis. ¶ 8; Schneider Admis. ¶ 8.) Both responded with the following objection: "[the request] is vague and ambiguous with respect to the undefined phrase 'participate in any negotiations.' For that reason, [the recipient] cannot truthfully admit or deny the asserted fact or otherwise respond to this request." (*Id.*) The Court considers these responses to be evasive—a responsive answer would use the usual meaning of "participate" and "negotiations" or provide an answer subject to stated assumptions or definitions. Rush credibly denies participating in negotiations and Defendants produce no evidence that he did so.

¶¶ 45–47; Defs.' Resp., Ex. C, SAR Release, Dkt. No. 95-4.) Rush signed a SAR release to receive this payment. He was also offered an opportunity to invest in the post-sale company as one of its senior managers, but he declined to do so. (Rush Dep. 178:2–178:14.) He brought this case on February 5, 2019.

Rush describes his knowledge of and involvement in the sale as minimal. He claims that his role at Segerdahl involved managing two factories. (Rush Decl. ¶ 23.) He further contends that he was not informed when Defendants began to plan a sale of Segerdahl, he never spoke with anyone who he then knew to be a potential investor in Segerdahl, and he only learned that ICV Partners might buy Segerdahl a few weeks before the transaction closed. (*Id.* ¶¶ 27, 30, 33.) Instead, he interacted with the agents and advisors involved in the sale on only two occasions—at an information session led by Jeff Vergamini for senior managers on December 1, 2016 and at a meeting of Segerdahl executives and ICV Partners representatives held a few days before the sale closed. (Rush Decl. ¶ 42; Answer ¶¶ 234, 267, 296.) At the December 1 meeting, Vergamini stated that he could have gotten $55 million more for the company if it had been shopped to competitors. (Rush Dep. at 148:1–150:19, 154:7–156:11.)

Defendants contradict Rush's account, relying on sworn declarations from then-Board Chairman Joutras, then-CFO Bradshaw, and then-CEO Schneider. Defendants claim that Rush actively tried to prevent Segerdahl from being marketed to competitors, the opposite of his present stance in this litigation. First, Joutras claims that Rush warned him that if Segerdahl was shopped to competitors, it would disrupt Segerdahl's business because the unionized workforce, which faced a greater risk of job loss in a competitor sale, would be upset. (Joutras Decl. ¶¶ 26–27.) Joutras claims that this anticipated disruption was "part of the mix of information that

influenced my decision" to exclude competitors from the first round of selling the company and to accept ICV Partners' $265,000 offer. (*Id.* ¶ 27.)

Joutras's declaration lacks certain indicia of reliability, as he describes touring a facility and conversing with concerned union members and Rush, but he does not state a date or timeframe when those interactions happened; similarly, Joutras states that Rush "continued to express" concerns about union disruption "whenever I saw him," but he does not provide specific details regarding these interactions. (*Id.*) Bradshaw makes similar generalized statements in his declaration, stating that Rush talked with him "often" for updates on the sales process, that Rush "repeatedly stated that he was adamantly against" a sale to competitors because it would make the union employees redundant, and that Rush expressed concern about losing his own job in a sale. (Bradshaw Decl. ¶¶ 8–10.) Although Defendants broadly allege that Rush participated in the marketing of Segerdahl, their evidence shows only that Rush was listed among the company's senior managers in sales materials. (Joutras Decl. ¶ 20.)

Bradshaw and Schneider both deny that Vergamini told senior managers he could have sold the company for $55 million more if it had been shopped to competitors. (Bradshaw Decl. ¶¶ 14–15; Schneider Decl. ¶¶ 23–24). They claim that Rush was upset when he signed his SAR release, but his dissatisfaction had nothing to do with Vergamini's statements; instead, Rush complained that Joutras had told him he could expect $4 million when the company was sold and wanted to preserve his right to sue Joutras for the difference. (Schneider Decl. ¶ 26; Bradshaw Decl. ¶ 17.) Notably, Segerdahl's Board members and executives held significant equity in Segerdahl as ESOP participants and through SAR awards and would themselves have benefited from a higher sale price. (Bradshaw Decl. ¶ 13–14; Schneider Decl. ¶ 23.)

The Court concludes, based on the record before it and for the purposes of class certification only, that Rush played no meaningful role in the sale of Segerdahl to ICV Partners. Defendants' evidence does not put Rush close to the sale. Instead, Joutras states vaguely that Rush's warnings regarding potential union disruption informed his analysis in selling the company. The generalized assertions in Defendants' declarations do not establish that Rush was meaningfully involved in the execution of the sale or in a good position to influence or stop it.

## II.     Class Certification

Rush seeks certification of the following class: "All participants in and beneficiaries of the Segerdahl Corporation Employee Stock Ownership Plan at the time the ESOP was terminated, with the exception of Defendants in this action and their beneficiaries." (Pl.'s Mem. in Supp. of Mot. for Class Certification ("Mot.") at 7, Dkt. No. 90.) To certify this class, Rush must establish each Rule 23 requirement by a preponderance of the evidence. *Messner*, 669 F.3d at 811. Defendants contest only the factors of typicality and adequacy; nevertheless, the Court has an independent obligation to ensure that all the Rule 23 requirements are met. *Davis v. Hutchins*, 321 F.3d 641, 649 (7th Cir. 2003) ("Rule 23(c) imposes an independent duty on the district court to determine by order that the requirements of Rule 23(a) are met regardless of the defendant's admissions.").

### A.     Numerosity

Rule 23(a)(1) allows for class certification where "the class is so numerous that joinder of all members is impracticable." Classes with as few as 40 members can meet the numerosity requirement. *See Swanson v. Am. Consumer Indus., Inc.*, 415 F.2d 1326, 1333 n.9 (7th Cir. 1969). Here, Rush has demonstrated that there were 464 participants with active account balances in the

ESOP at the end of the 2016 plan year. (*See* Mot., Ex. A, 2016 Segerdahl ESOP Annual Report at 2, Dkt. No. 90-2.) Thus, Rush has easily cleared the numerosity threshold.

### B.    Commonality

To satisfy the commonality requirement, the claims of the proposed class members "must depend upon a common contention that is capable of class-wide resolution." *Chi. Tchrs. Union, Local No. 1 v. Bd. of Educ. of City of Chi.*, 797 F.3d 426, 434 (7th Cir. 2015). The determination of the truth or falsity of the common contention must "resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350. District courts in the Seventh Circuit have held that because ESOP-related fiduciary breaches affect all plan members in the same way (and plan members likewise receive a common benefit if relief is granted), the commonality requirement is generally met in ERISA class actions. *See, e.g.*, *Chesemore v. All. Holdings, Inc.*, 276 F.R.D. 506, 510 (W.D. Wis. 2011); *Neil v. Zell*, 275 F.R.D. 256, 260–61 (N.D. Ill. 2011).

Here, Rush has raised numerous common questions of fact and law. These include whether Defendants conducted prohibited transactions or otherwise breached their fiduciary duties, whether Defendants Schneider and Joutras knowingly participated in and benefited from those transactions, and whether those breaches damaged the ESOP. If Rush succeeds in his claims that Defendants breached their fiduciary duties, and the ESOP recovers funds to be distributed the plan members, all plan members will share in that benefit. Thus, the Court finds that Rush has established commonality.

### C.    Typicality and Adequacy

Because Defendants combine their objections to typicality and adequacy, the Court considers those factors together. A representative party's claim must be typical of the class. Fed.

R. Civ. P. 23(a)(3). "A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983) (citation omitted). Meanwhile, the adequacy requirement tests the suitability of the named plaintiff and the proposed class counsel. Individually, Rush "must be part of the class and possess the same interest and suffer the same injury as the class members." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 625–26 (1997) (internal quotation marks and citation omitted). The purpose of the adequacy inquiry is to uncover conflicts of interest between named parties and the proposed class. *Id.* at 625. The requirement considers whether a class representative's "claims are not antagonistic to or in conflict with those of the proposed class" and whether the representative "has sufficient interest in the outcome of the case." *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 256 F.R.D. 586, 599 (N.D. Ill. 2009). Separately, Rush must demonstrate that the proposed class counsel has the necessary experience and competence to litigate the case. *Gomez v. St. Vincent Health, Inc.*, 649 F.3d 583, 592 (7th Cir. 2011). Typicality and adequacy, like other class certification requirements, must be supported by a factual showing, which is Rush's burden to make. *See Wal-Mart*, 564 U.S. at 350; *Berger v. Compaq Comput. Corp.*, 257 F.3d 475, 481 (5th Cir. 2001) ("Adequacy is for the plaintiffs to demonstrate; it is not up to defendants to disprove the presumption of adequacy.").

Rush contends that his claims are typical of those of other class members because all class members were harmed by Defendants' failure to obtain the best possible price for the sale of the company, all class members would share in the benefit of a recovery, and all class members suffered the same breach of fiduciary duty. Rush also represents that his participation in the ESOP class, the common goal of maximizing recovery, and his active engagement in the case (including

participation in case development and discovery) render him an adequate class representative. Finally, declarations submitted by proposed class council demonstrate that Rush's attorneys have the experience and resources to represent the class effectively. (Mot., Ex. 2, Schneider Decl., Dkt. No. 90-4; Mot., Ex. 3, Mulder Decl., Dkt. No. 90-6.) Defendants do not contest whether Rush has adequately participated in this case or whether proposed class counsel are capable of litigating it adequately, but instead challenge Rush's suitability as a class representative.

### 1.   Whether Rush Participated in or Benefited from Defendants' Misconduct

Defendants argue that Rush tried to play both sides of the Segerdahl sale. Before the sale, they allege, Rush advocated against shopping Segerdahl to competitors and did not try to stop the sale to ICV Partners. But then, Rush made $1.8 million by redeeming his SARs. And now, Rush seeks to build on his gains without taking the risk involved in shopping the company to competitors. According to Defendants, Rush is therefore compromised and cannot adequately represent the class.

A plaintiff's participation in or acquiescence to an alleged wrong may subject him to equitable defenses. *See* 5 James Wm. Moore et al., *Moore's Federal Practice* § 23.1.09(5)(c) (3d Ed. 2018) ("If the plaintiff is alleged to have participated in the wrongdoing that is the subject of the derivative action, the plaintiff may not fairly and adequately represent the other shareholders."). However, it is not enough to raise the possibility of such a conflict, as "speculative conflicts cannot hinder the certification of a class." *Hamid v. Blatt, Hasenmiller, Leibsker, Moore & Pellettieri*, No. 00 C 4511, 2001 WL 1543516, at *6 (N.D. Ill. Nov. 30, 2001) (citing *Rosario v. Livaditis*, 963 F.2d 1013, 1019 (7th Cir. 1992)). Instead, the alleged wrongdoing must be substantial enough to prevent the proposed class representative from adequately representing the class.

As discussed above, the Court cannot conclude based on the record presently before it that Rush meaningfully participated in or acquiesced to the alleged misconduct. Defendants' primary factual contentions are that Rush was a member of the senior management team pitched to investors, he advocated against a sale to competitors to protect his job and the jobs of certain employees, he chose not to invest his own money in the post-sale company, he knew the sale was wrongful on December 1, 2016 (six days before the sale closed) but did not act to stop it, and he signed a release related to his SAR award. While Defendants assert that Rush advocated against shopping the company to competitors, they do not contend that he had any reason—at least until the December 1, 2016 meeting with Vergamini—to believe that a sale to competitors would bring a higher price. Rush's role at Segerdahl was to manage printing facilities, not to provide stewardship of the ESOP or make strategic decisions on behalf of the company. Bradshaw, Segerdahl's CFO, states in his declaration that Rush spoke to him for updates on the sales process because Rush knew that he was "financially sophisticated." (Bradshaw Decl. ¶ 8.) Considered together, this evidence does not suggest that Rush understood the potential risks and benefits of a sale to competitors (except, allegedly, for the potential for union-related disruption) until just before the sale closed. So while Defendants contend that Rush acquiesced to the decision by not taking further action to stop the sale, it is not clear what Rush could have done to timely intervene. Rush was not a fiduciary of the ESO and trying to stop the sale on the eve of closing likely would have been futile and potentially contrary to his duties as a senior manager, which presumably did not involve reviewing the Board's decisions.

On December 6, 2016, Rush signed a SAR release which allowed him to redeem his 200 SARs, receiving a $1.8 million payment. In doing so, Rush acknowledged and agreed that he had "ample opportunity to ask the Company's senior management questions about the impact of the

Purchase Agreement on the SARs and has received satisfactory answers thereto." (SAR Release ¶ 5.) Defendants contend that this release contradicts Rush's class claims because Rush acknowledged at the time that he had received satisfactory answers regarding the sale to ICV Partners but now contends that the sale is unsound. But the plain language of the release states only that Rush is satisfied by the answers regarding ***how the sale impacts the SARs***, not the fairness of the sale itself. (*Id.*) There is no contradiction between understanding how the sale affects the SARs and contesting whether the sale was responsibly conducted, which is the claim Rush pursues now. And as Bradshaw attested, Rush could not have redeemed his SARs without signing the release. (Bradshaw Decl. ¶ 18.) In sum, the record does not support Defendants' allegations of speculation and gamesmanship.

Next, Defendants contend that Rush contradicts himself because he had the opportunity to invest his own money in the post-sale company created by ICV Partners but declined to do so. The crux of this argument is that if Rush really believed that the company was undervalued in the sale, he should have invested his own money in it because he would be getting a good deal on the undervalued company. But this conflict is merely speculative at present. The claims in this case concern whether Defendants appropriately exercised their fiduciary responsibilities, not Rush's personal beliefs about the value of the company. Considering that Rush retired in 2018 (*see* Rush Decl. ¶ 43), Defendants' argument is based on unsubstantiated assumptions about Rush's investment priorities, risk tolerance, and other factors.

While Defendants are correct that certain conflicts between a proposed class representative and the class can defeat typicality or adequacy, *see, e.g.*, *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 724 (7th Cir. 2011) (rejecting proposed class representative due to serious credibility concerns and vulnerability to unique defenses);

*Langbecker v. Elec. Data Sys. Corp.*, 476 F.3d 299, 315–16 (5th Cir. 2007) (rejecting adequacy because of conflicts between class members regarding optimal legal theories), Defendants identify no authority suggesting that the sort of speculative conflicts raised here can defeat typicality or adequacy. Representative plaintiffs must be adequate and faithful representatives of the class but need not be so unblemished that a skilled attorney could not find any flaw with which flaw to take issue. *See Dubin v. Miller*, 132 F.R.D. 269, 272 (D. Colo. 1990) ("Few plaintiffs come to court with halos above their heads; fewer still escape with those halos untarnished.").

### 2. Whether Rush Has Demonstrated a Conflict in this Litigation

Defendants further contend that Rush has demonstrated his inadequacy as a class representative by prioritizing his own interests over those of the class in this litigation.

Named plaintiffs may not prioritize their own interests over those of the class. *See CE Design Ltd.*, 637 F.3d at 726 ("A named plaintiff who has serious credibility problems or who is likely to devote too much attention to rebutting an individual defense may not be an adequate class representative."); *Langbecker*, 476 F.3d at 316 n.28 ("A few class members cannot hijack litigation 'on behalf of the plan' to pursue their preference at the expense of others who are not given notice of this purported representation. The interests of all class members must be fundamentally consistent."). A plaintiff's litigation decisions may create or reveal a class conflict. *See Stampley v. Altom Transp., Inc.*, 958 F.3d 580, 585–86 (7th Cir. 2020) (plaintiff's tactical litigation decisions, which increased the risk of class decertification, demonstrated that plaintiff was "clearly focused on protecting his own claim against a contractual defense, rather than representing the class as constituted").

After Rush filed his complaint, Defendants asserted counterclaims against Rush seeking $1.8 million—the amount he received for his SARs—and arguing that if Rush prevailed in this case, he would also be obligated to return his ill-gotten gains as an executive who participated or acquiesced in the challenged conduct. (Dkt. No. 23.) After Rush moved to dismiss the counterclaim and filed an amended complaint, Defendants voluntarily dismissed their counterclaim. (Dkt. No. 75.) Defendants now contend that Rush abandoned certain claims to save himself from the $1.8 million counterclaim, demonstrating his inadequacy as a class plaintiff. Specifically, Rush initially alleged that ESOP funds were wrongfully diverted to Defendants and other insiders through transaction bonuses and SAR payments. (Compl. ¶ 71, Dkt. No. 1.) Rush's amended complaint does not include identical language but does still allege that the transaction bonuses were wrongfully diverted and that it was inappropriate for Joutras to retain all his SARs after he stepped down as CEO. (Am. Compl. ¶¶ 321–25.)

Defendants, however, have not shown that Rush amended the complaint at the expense of the class to protect himself from a counterclaim. Defendants were entitled under Federal Rule of Civil Procedure 13(b) to raise any proper counterclaim against Rush and could have continued to pursue the counterclaim they did bring. It does not appear that Rush abandoned a meritorious claim on behalf of the class—in filing his amended complaint, Rush retained his initial four counts and added a fifth. Finally, neither the initial complaint nor the amended complaint challenges the SARs awarded to senior managers in 2014, which is the reason Rush received a $1.8 million SAR payment upon the sale of the company. Rush's consistent theory has been that he, like other ESOP participants, should have gotten more money for the sale of the company.[3]

---

[3] Defendants contend in a footnote that Rush also demonstrated a conflict with the class by challenging Segerdahl's decision to buy back the ESOP shares of former employees in 2014. (Am. Compl. ¶¶ 70–81.) This decision benefited the proposed class, which captured a greater share of the subsequent rise in the company's value. Therefore, according to Defendants, any remedy "correcting" that past decision would

Defendants also take issue with the following allegation in the First Amended Complaint:

> The primary drawback to the SARs from the ESOP's perspective was that the SARs could dilute the ESOP's interest. However, the SARs were designed to incentivize the employees who received the SARs to increase the value of the Segerdahl [*sic*], which would, theoretically, benefit both the ESOP and the SARs holders.

(Am. Compl. ¶ 69.) Defendants describe this as a harmful "admission" protecting Rush's SARs at the expense of the class. The supposed admission is that the SARs were designed to incentivize employees. But Rush has never argued that ***all*** the Segerdahl SARs were illegitimately granted. Instead, Rush's theory has been (and continues to be) that Defendants must "make good" the losses to the plan, and that Schneider and Joutras wrongfully profited from the fiduciary breaches for which they were responsible. Ultimately, Defendants have not explained why the purported admission harms Defendants in any way.

Finally, Defendants contend that Rush has only avoided a conflict by waiting until after the sale to bring this case. They state that pursuing a sale to competitors carried risks that would have harmed the class because competitors would have been more likely to fire certain workers and the sale would have been more likely to fall through. Defendants describe shopping the company to competitors as a "swing-for-the-stars/lose-your-job" strategy. But Defendants do not explain why a conflict that exists solely in the past is relevant to the class certification analysis undertaken today. The appropriate question is whether the class representative can presently pursue the class's interests without conflict. "Relevant case law suggests that the conflicting economic interest necessary to render a representative inadequate must be of the type that, if that plaintiff succeeds, would result in identifiable harm to some member of the class." *Zell*, 275 F.R.D. at 265. Whatever his interests at the time of the sale, Rush's present interests are aligned

---

dilute the class's interests by reversing the buyout. But Rush never challenges that decision or seeks its reversal. He merely discusses it in the amended complaint's background section. Thus, those allegations do not demonstrate a conflict.

with the proposed class. If Rush succeeds in his claims, the recovery will go to the ESOP and be distributed to its members. Rush's interest in this litigation is to maximize the recovery received by the plan, a portion of which would accrue to him. Defendants provide no reason to conclude that Rush's present interests diverge from the class.

### 3. Whether Rush Has Demonstrated Credibility Issues

Defendants also allege that Rush has impugned his credibility. A representative plaintiff who lacks credibility may be unable to adequately represent a class, especially where their testimony is important to the case. For example, class representatives have been disqualified for testifying falsely at depositions, especially on issues important to the case. *See, e.g.*, *Brider v. Nationwide Credit, Inc.*, No. 97 C 3830, 1998 WL 729747, at *3–4 (N.D. Ill. Oct. 14, 1998); *Kaplan v. Pomerantz*, 132 F.R.D. 504, 510 (N.D. Ill. 1990). The bottom line is whether the credibility issue is likely to harm the class, and a court need not resolve the credibility issue to determine that it may be harmful. *See Wagner v. Lehman Bros. Kuhn Loeb, Inc.*, 646 F. Supp. 643, 660–61 (N.D. Ill. 1986) (disqualifying class representative who, among other things, attempted to pay witness for favorable testimony). Actions that are sufficiently inconsistent with class claims can also disqualify a proposed representative. *See Sunbird Air Servs., Inc. v. Beech Aircraft Corp.*, No. CIV. A. 89-2181-V, 1992 WL 193661, at *3 (D. Kan. July 15, 1992) (airline was inadequate class representative because it continued to fly planes it alleged to be unsafe, posing a credibility issue).

Defendants contend that Rush is not credible because he did not try to stop the sale and instead signed his SAR release, even though he admitted knowing six days before the sale that the company was being sold for less than its value. They further claim that Rush's decision not to invest in the post-sale entity impugns his credibility. Finally, they argue that because Rush's

deposition testimony and declaration contradict the declarations submitted by Defendants, Rush is not credible. Among other things, Rush has stated that Vergamini told Segerdahl's senior managers that he could have gotten more money by selling the company to a competitor. Defendants describe this claim as facially implausible, comparing it to a realtor saying at closing that the seller could have gotten $100,000 more for the house.

But Defendants' credibility challenges are merely speculative. Defendants have not presented anything more than their declarations to indicate that Rush lied in his declaration or at his deposition. Those declarations do not establish a substantive credibility dispute. The Court declines, at this stage, to speculate as to why Vergamini might tell senior managers that he could have gotten more money from a sale to competitors. Similarly, as discussed above, Rush did not endorse the sale by signing the SAR release, nor does Rush's decision not to invest in the post-sale company indicate that his claims of fiduciary breach are made in bad faith.

### 4.    Whether Rush is Subject to Unique Defenses

Finally, Defendants contend that Rush is not a suitable class representative because he is subject to the unique defense of unclean hands. The essence of that defense is that where a plaintiff has participated or acquiesced in wrongful conduct, he may not seek equitable relief to challenge that same behavior.[4] *See Anweiler v. Am. Elec. Power Serv. Corp.*, 3 F.3d 986, 993 (7th Cir. 1993) (holding that a widow could not pursue equitable relief to secure insurance policy proceeds because she knew that her husband had wrongfully received double disability benefits and the proceeds were appropriately allocated to resolve that debt); *CE Design Ltd.*, 637 F.3d at 727 (substantial individualized defense, in addition to credibility problem, required district court to reconsider whether named plaintiff was proper class representative.) Even arguable defenses

---

[4] ERISA claims for breach of fiduciary duty are equitable in nature. *See Divane v. Nw. Univ.*, 953 F.3d 980, 993–94 (7th Cir. 2020).

may preclude a finding of typicality or adequacy, because "the named plaintiff [may] become distracted by the presence of a possible defense applicable only to him so that the representation of the rest of the class will suffer." *J.H. Cohn & Co. v. Am. Appraisal Assoc. Inc.*, 628 F.2d 994, 999 (7th Cir. 1980). But typicality is generally not affected by individual defenses, except when "a major focus of the litigation will be on an arguable defense unique to the named plaintiff or a small subclass." *Koos v. First Nat'l Bank of Peoria*, 496 F.2d 1162, 1164 (7th Cir. 1974). A representative plaintiff is not inadequate simply because an affirmative defense has been raised. Instead, a court may consider whether the affirmative defense "will swallow the case." *Chesemore*, 276 F.R.D at 513.

Here, on the record before the Court, Rush did not have reason to believe that Segerdahl would be sold for less than its value until a few days before the sale closed. He did not play a meaningful role in the sale and did not "sign off" on the decision. As discussed above, the SAR release only reflects that Rush understood how the sale impacted his SARs. This case is not analogous to *Anweiler*, 3 F.3d at 993, where the plaintiff was found to have unclean hands barring equitable relief where she had knowledge of her husband's improper receipt of benefits. Instead, on Rush's theory of the case, he (like the class members he seeks to represent) were entitled to the money they received from the sale of Segerdahl and are entitled to further recovery because Defendants breached their fiduciary duties. Defendants have not raised an affirmative defense substantial enough to preclude certification.[5]

*** 

---

[5] Defendants also cite *Recchion ex rel. Westinghouse Electric Corp. v. Kirby*, 637 F. Supp. 1309, 1316 (W.D. Pa. 1986), where a proposed class representative was found inadequate because he "admitted" to "participating in some of the alleged wrongful conduct alleged in the complaint with full knowledge that his actions were improper." But here, Defendants have not established that Rush admitted or participated in any wrongful conduct, or that whether he did so will become a substantial issue in this case.

In sum, Rush has demonstrated that his claims are typical of the class and that he will be an adequate class representative. It is true that Rush's credibility may be at issue at trial, as he has made claims regarding meetings he attended and Defendants contest the key details of those meetings. But Defendants have not shown that appointing Rush as a class representative will harm the class—indeed, his ability to testify about Defendants' words and actions may benefit the class. Further, Defendants have not shown that Rush has acted in conflict with the class. There is presently no sign that Rush influenced the negotiations or sale strategy or betrayed the class by failing to intervene. Thus, the Court finds that Rush has demonstrated typicality and adequacy.

### D.    Rule 23(b)(1)

Rush seeks certification pursuant to Rule 23(b)(1), which requires either (1) that bringing multiple individual suits against the defendant would risk contradictory resolutions, or (2) that the rights of other class members will be decided or meaningfully affected by resolution of the individual claim. Fed. R. Civ. P. 23(b)(1). ERISA actions alleging breach of fiduciary duty have been described as "paradigmatic" Rule 23(b)(1) class action cases. *Zell*, 275 F.R.D. at 267 (listing cases). Generally, in ERISA claims, the recovery goes to the plan (not the plaintiff), meaning that all plan members have a shared stake in the outcome. *Id.* Likewise, "defendant-fiduciaries are entitled to consistent rulings regarding operation of the plan." *Id.* Here, both prongs of the Rule 23(b)(1) analysis are satisfied and class certification is therefore appropriate. Defendants raise no arguments to the contrary. The Court need not consider Rush's request in the alternative for Rule 23(b)(3) certification because it finds ample reason to grant certification pursuant to Rule 23(b)(1).

**CONCLUSION**

For the foregoing reasons, Rush's motion for class certification (Dkt. No. 89) is granted. The Court certifies the following class pursuant to Federal Rule of Civil Procedure 23(b)(1): all participants in and beneficiaries of the Segerdahl Corporation Employee Stock Ownership Plan at the time the ESOP was terminated, with the exception of Defendants in this action and their beneficiaries. The Court appoints The Law Offices of Michael M. Mulder and Schneider Wallace Cottrell Konecky LLP as co-lead class counsel pursuant to Rule 23(g).

ENTERED:

Dated: June 16, 2021

_____
Andrea R. Wood
United States District Judge