IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BRUCE RUSH, as a participant in and on behalf of the Segerdahl Corporation employee stock ownership plan, and on behalf of a class of all others who are similarly situated,<br><br>            Plaintiff,<br><br>   v.<br><br>GREATBANC TRUST COMPANY; MARY LEE SCHNEIDER; RICHARD JOUTRAS; RODNEY GOLDSTEIN; PETER MASON; ROBERT CRONIN; JOHN DOE DEFENDANTS 1-10; and SEGERDAHL CORP. (d/b/a SG360),<br><br>           Defendants. | Case No.: 1:19-cv-00738<br><br>Judge Andrea R. Wood<br>Magistrate Judge Susan E. Cox |

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO BAR THE TESTIMONY OF DEFENDANTS' EXPERT LEE BLOOM**

Lee Bloom should be excluded from testifying as an expert witness in this case because his opinions fail to satisfy Federal Rule of Evidence 702. Most importantly, Lee Bloom's reports[1] and testimony are unreliable. In opining that the valuation and fairness opinion performed by Stout Risius Ross ("Stout" or "Stout Risius") was "comprehensive, appropriate for the situation, and consistent with prevailing valuation practices,"[2] Bloom omitted any criticism of Stout Risius' application of an arbitrary, purely subjective 4% company specific risk premium ("CSRP") which reduced the fair market value of Segerdahl by $92 million, from $370 million to $278 million.

In 2016, Lee Bloom testified at a trial in this Court that he "never" applied a CSRP because it is "theoretically wrong." *See infra* Part II.A. Ignoring a salient issue with Stout's valuation is troubling. But what renders Bloom entirely unfit to serve as an expert witness is that, at his deposition, he refused to give the same answers to the same questions he gave in his testimony at the trial in 2016. Bloom persisted in his altered testimony even when shown the transcript of his prior testimony.

Separately, Lee Bloom cites no outside support for his opinions or methods and is not qualified to give the opinions he offers. In particular, by his own admission, Bloom lacks expertise in either sale-leasebacks or 338(h)(10) elections, two crucial omissions from Stout's report. However, Bloom did not spend any time educating himself about the appropriate valuation of such transactions and did not cite or rely on a single article, treatise, textbook or other academic or professional publication. Consequently, it is unsurprising that Bloom's opinion is not simply flawed, but replete with significant errors of fact. As set forth in more detail below, the Court

---

[1] This motion to bar the reports of Lee Bloom address the opinions in the Opening Report of Lee Bloom ("Bloom Opening Rep."), Dep. Ex. 344, and the Rebuttal Report of Lee Bloom ("Bloom Rebuttal Rep."), Dep. Ex. 345,, which are attached as Exhibits A and B to the Declaration of Michael M. Mulder (the "Mulder Decl.), filed herewith..
[2] Bloom Opening Rep., Dep. Ex. 344, at 16 of 29.

1

should preclude Lee Bloom from testifying as an expert in this case given his demonstrated unreliability, lack of qualifications and disregard for the basic facts of the case.

## I. LEGAL STANDARD

Federal Rule of Evidence 702 provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Rule 702 imposes a "gatekeeping" responsibility on district courts to ensure that any proposed expert testimony "is not only relevant, but reliable." *Kirk v. Clark Equip. Co.*, 991 F.3d 865, 872 (7th Cir. 2021). "The party seeking to introduce the expert witness testimony bears the burden of demonstrating that the expert witness testimony satisfies the [*Daubert*] standard by a preponderance of the evidence." *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 782 (7th Cir. 2017). Expert witness testimony is unreliable when it was "improperly based upon 'speculation' and 'unfounded inferences.'" *Id.* at 783. Lee Bloom's opinions fail to satisfy the standards of Rule 702 and should therefore be excluded.

## II. ARGUMENT

This case involves the sale of the ESOP's 100% interest in the Segerdahl Corp. in 2016. The ESOP Trustee, Defendant GreatBanc Trust Co. ("GreatBanc"), received a valuation report and fairness opinion from Stout Risius before signing off on the ESOP sale. Dep. Ex. 38, Mulder Decl. Ex. C. Defendants offer Lee Bloom to opine in support of Stout's work, and as a rebuttal expert to certain opinions from Plaintiff's proffered experts.

There are many problems with Stout's valuation report. *See, e.g.,* First Amended Class

Action Complaint (Dkt. No. 77), at ¶¶ 326-364, Opening Report of Daniel Van Vleet, ASA, Mulder Decl. Ex. C, at 15-28. Three of Stout's errors are germane to this motion:

(1) Stout applied an arbitrary and purely subjective 4% CSRP in its discounted cash flow method ("DCF")[3] that reduced the value of Segerdahl by $92 million; Dep. Ex. 38 at 55, Mulder Decl. Ex. C; Mulder Decl. ¶ 8 & Tables 1-4;

(2) Stout did not mention the pending sale-leaseback transaction in its valuation report, even though documents produced in discovery (Dep. Ex. 346, Mulder Decl. Ex. D) showed that Stout apparently looked at value of the sale-leaseback and concluded that it increased Segerdahl's value by $19.4 million, and had that been included in Stout's final valuation, the purchase price of Segerdahl would have fallen below the range of value Stout determined; Dep. Ex. 346, Mulder Decl. Ex. E; Mulder Decl. ¶ 10, and

(3) Stout failed to attribute any value to the 338(h)(10) tax election, which was a term of the sale, and which the buyers and JPMorgan both showed was worth more than $40 million in tax savings. Stout's report mentions the expected 338(h)(10) election, Dep. Ex. 38, Mulder Decl. Ex. C, at 7, but contains no discussion of its value.

**A.      Lee Bloom Is Unreliable Because He Provided Inconsistent Testimony**

A company specific risk premium ("CSRP") is a type of discount that business valuators sometimes apply when performing a discounted cash flow analysis. Essentially, a valuator applying a CSRP computes the subject company's "weighted average cost of capital" with an extra equity discount to reflect specific risks to the company's business that are not shared by other companies. Courts have routinely criticized valuations that include a CSRP. The Delaware Chancery Court explained that:

> Much more heretical to CAPM, however, the build-up method typically

---
[3] Stout also used a flawed a guideline public company analysis, which is beyond the scope of this motion.

3

>incorporates heavy dollops of what is called "company-specific risk," the very sort of unsystematic risk that the CAPM believes is not rewarded by the capital markets and should not be considered in calculating a cost of capital. The calculation of a company specific risk is highly subjective and often is justified as a way of taking into account competitive and other factors that endanger the subject company's ability to achieve its projected cash flows. **In other words, it is often a back-door method of reducing estimated cash flows rather than adjusting them directly. To judges, the company specific risk premium often seems like the device experts employ to bring their final results into line with their clients' objectives, when other valuation inputs fail to do the trick**.

*Del. Open MRI Radiology Assocs v. Kessler*, 898 A.2d 290, 339 (Del. Ch. 2006) (Strine, J.) (emphasis added). "Proponents of a company-specific risk premium thus not only bear a burden of proof but also must overcome some level of baseline skepticism founded upon judges' observations over time of how parties have employed the quantitative tool of a company-specific risk premium." *In re Sunbelt Bev. Corp. S'holder Litig.*, 2010 Del. Ch. LEXIS 1, at *46 (Ch. Jan. 5, 2010). Pratt and Grabowski's *Cost of Capital* ("Pratt & Grabowski") describes the CSRP as a "fudge factor" that "may seriously undervalue long-lived projects." Mulder Decl. Ex. F, at 374.

In its DCF analysis in its valuation of the ESOP's shares of Segerdahl, Stout applied a 4% CSRP. Mulder Decl. Ex. C, Dep. Ex. 38 at 55-56. Stout did not cite any support from any of the industry publications that provide tables for determining CSRPs. *Id.* Nor did Stout perform a build-up to support its CSRP, and Stout did not perform any cross-checks on its CSRP of the sort described by Pratt & Grabowski, Mulder Decl. Ex. F, at 374-399. At deposition, Andy Ward (from Stout) testified that the 4% number was purely "subjective," and not the result of any mathematical formula. Mulder Decl. Ex. G, Ward Dep. at 121-122. The purely subjective 4% CSRP Stout applied here discounted Segerdahl's value by **$92 million.** *See* Mulder Decl. ¶ 5. Without that discount, which Stout admitted was purely subjective and not determined by reference to any of the published standards for CSRPs, it would have been impossible for Stout to generate an opinion justifying the $265 million purchase price being paid by ICV for the ESOP's shares of Segerdahl.

4

Bloom previously criticized, under oath, the use of a CSRP in *Fish v. GreatBanc.*, No. 09 C 1668, 2016 U.S. Dist. LEXIS 137351 (N.D. Ill. Sep. 1, 2016) ("*Fish*"). In *Fish*, Bloom had provided a fairness opinion to an ESOP Trustee and was testifying as a fact witness for the defendants. In *Fish*, Bloom did not apply a CSRP in his valuation.

When asked about the CSRP at trial in *Fish*, Bloom was unequivocal. He testified that he "never" applied CSRPs, because it is "theoretically wrong" and "you're not supposed to" apply a CSRP. In pertinent part, Bloom testified on direct examination by defense counsel, that:

> Q [by defense counsel]. What about a company-specific risk type of premium, did Duff incorporate that into its weighted average cost of capital analysis?
> A [by Lee Bloom]. So some other premium in addition to the small stock premium?
> Q. Correct.
> A. **No, we did not. And I never do.**
> Q. Why?
> A. **Because it's – it's theoretically out – it's theoretically wrong** . . .

*Fish,* Trial Transcript, Dep. Ex. 347, Mulder Decl. Ex. H, at 4291:13-23.

> Q [by defense counsel]. I see. There's been some criticism of Duff's work put into evidence in the plaintiffs' case, principally for not using a company-specific risk premium. And the rationale was that Duff did not take into account any company-specific risk. Having time to reflect on your work all these years, do you believe that's an appropriate criticism?
> . . .
> A [by Lee Bloom]. I do not believe it is an appropriate criticism.
> Q. Why not?
> A. Two reasons. First, as I've said, we factored in the company-specific issues into the cash flows, which is where they are appropriately incorporated. And we – it's true, **we did not include any additional premium in our discount rate or development of our required rate of return. We didn't increase our required rate of return to reflect company specific risk because you're not supposed to. And we didn't do it.**
> Q. Well, when you say you're not supposed to, why do you say that?
> A. **Because it's – as I've said earlier, it's just theoretically wrong. You capture it in the cash flows not in the discount rate.**

*Fish,* Trial Transcript, Dep. Ex. 347, Mulder Decl. Ex. H, at 4293:4 - 4294:16. The Court in *Fish* specifically cited Bloom's testimony. *Fish*, 2016 U.S. Dist. LEXIS 137351, at *88 ¶ 183

5

Bloom's deposition testimony in this case was different. At deposition, Bloom refused to testify that he "never" applied a CSRP, as he testified in *Fish*. Instead, Bloom testified that he may well have applied a CSRP in prior valuations but could not remember for sure. Mulder Decl. Ex. I, Bloom Dep. at 97:17–23. Bloom claimed that his testimony here was consistent with his testimony in *Fish*, because, he explained, in the prior valuations where Bloom did apply a CSRP he was not the "lead." *Id.* at 101:18-102:21. Bloom made no such clarifying statements in *Fish*.

At his deposition, prior to being shown his trial testimony from *Fish*, Bloom refused to say whether he believed it was "theoretically wrong" to apply a CSRP, as he had testified in *Fish*. *Id*. at 98:25-99:14. On the contrary, Bloom testified that there were some cases "where you probably have to include" a CSRP. *Id.* Then, after being shown his testimony from *Fish*, Bloom changed his testimony. Instead of just admitting the CSRP was "theoretically wrong," as he testified in *Fish*, Bloom invented a third approach. Bloom then testified that while he personally believed that the CSRP was *not* appropriate, "it didn't matter what I say." *Id.* at 96:15-97:16. Instead, Bloom testified, while his opinion was that a CSRP should *not* be applied, and that he agreed with the characterization of the CSRP as a "fudge factor," *Id.* at 110:5–12, Bloom believed it common in practice to apply a CSRP, so it was appropriate for Stout to do so here. *Id.* Again, Bloom made no such qualification in *Fish*.

Lee Bloom also explained that his testimony in *Fish* was "out there," apparently meaning it was inconsistent with industry norms. *Id.* at 104:2-105:8. Again, however, Bloom made no such acknowledgement on the record in *Fish*. Bloom's willingness to change his opinions about proper valuation standards and misleading testimony about when his opinions reflect industry norms disqualify him as an expert under Fed. R. Evid. 702.

6

### B. Bloom Neither Cited Nor Relied on Any Outside Sources

There is a robust body of academic and professional literature regarding business valuation standards and practices. Yet Lee Bloom, who holds no professional certifications in valuation, did not cite or rely on any texts, treatises, articles, professional standards, professional literature or the like to support his opinions. Bloom Dep. at 126:11–14. Courts routinely disqualify experts who do not demonstrate that their opinions are consistent with methods widely used in the relevant communities, much less, in Bloom's case, offer no external support for their opinions whatsoever.

After Defendants served Bloom's rebuttal, Plaintiff's counsel reached out to Defense counsel, noting that Bloom had not cited any sources. Defense counsel claimed that Bloom's work "relies on foundational treatises on these topics," and identified two treatises that were not cited in Bloom's report. Mulder Decl. Ex. J, Rachal Email Dated Nov. 17, 2021 (one of the two treatises is Pratt & Grabowski, which is cited herein as Ex. E to the Mulder Decl.). At his deposition, however, Bloom denied that he understood what it meant to "rely" on such a source. Bloom Dep. at 126:15-127:13. Moreover, Bloom refused to testify that he relied on the books Defense counsel identified, because, he explained, "there are plaintiff attorneys out there looking for opportunities to find, you know, where you don't agree with this page in the book, even though you agreed with that page in the book." *Id.* at 127:14-129:13. Lee Bloom's testimony reflects of a profound bias against "plaintiff attorneys"—whom Lee Bloom is apparently concerned will take the time to read books that he cites to check whether his opinions are meritorious and consistent with community standards. While it is surprising that a purported expert would intentionally refuse to cite any industry standards to preclude comparison of their opinions to those standards, that is, according to his testimony, what Bloom did here. Bloom's conscious decision to eschew checks on the reliability of his testimony or to cite or rely on any texts, treatises, articles or the like that could be

7

used to assess his opinions is alone sufficient to disqualify him.

In *Kirk*, 991 F.3d at 873, the Seventh Circuit explained that "[w]hen evaluating the reliability of expert testimony, the district court must make 'a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid.'" (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592-93 (1993)). The Seventh Circuit identified a non-exhaustive list of factors that courts could look to, including:

> (1) Whether the particular scientific theory can be (and has been) tested;
> (2) whether the theory has been subjected to peer review and publication;
> (3) the known or potential rate of error;
> (4) the existence and maintenance of standards controlling the technique's operation; and
> (5) whether the technique has achieved general acceptance in the relevant scientific or expert community.

991 F.3d at 873 (citations and editing marks omitted).

Here, Lee Bloom's failure to cite or rely on industry sources or standards reflects fundamental problems with his opinions. As shown above, had Bloom relied on Pratt & Grabowski's text or any other valuation texts, it would have drawn attention to Stout's improper, subjective CSRP. As another example, Bloom opines that Stout should have applied a novel $3 million per year deduction to the value of the ESOP's shares of Segerdahl, which Bloom called an "LTI" deduction. Bloom Opening Rep. at 15-16; Bloom Rebuttal Rep. at 18, 31 34. According to Bloom, the LTI represents value of long-term incentive compensation that the buyers would pay to executive management, such as Defendant Schneider. At deposition, when Bloom was asked whether he was "aware of any valuation text or treatises or articles that would support taking" the LTI adjustment he proposes, Bloom conceded that he was "not sure [he'd] ever seen the subject covered one way or the other." Bloom Dep. at 210:8–13.

Defendants bear the burden of establishing that Lee Bloom's testimony reflects reliable

methods. *Gopalratnam*, 877 F.3d at 782. They do not carry that burden with respect to Bloom's opinions, as Bloom neither cited nor relied on any support from recognizable authorities. That is especially true because, as explained above, in crucial respects Bloom's opinions deviate from the standards set out in the community.

## C. Bloom's Opinions About the Sale-Leaseback Are Unreliable Because He Fails to Support His Opinions and Makes Critical Mistakes of Fact

During the process of marketing Segerdahl for sale, Segerdahl's management realized that Segerdahl had a significant opportunity to sell and leaseback its most important real estate. Accordingly, Segerdahl marketed the sale-leaseback starting in the fall of 2016, while it was in the process of selling Segerdahl. Segerdahl signed a Letter of Intent with the sale-leaseback counterparty for $25 million in November of 2016 (prior to the close of the ESOP sale in December of 2016), Mulder Decl. Ex. K; Dep. Ex. 32 (signed LOI for $25 million), and the sale-leaseback in fact closed for $25 million in February of 2017. Answer, Docket No. 78, at ¶ 16. The record conflicts about why Segerdahl and the buyers decided to delay the closing of the sale-leaseback until after the sale of Segerdahl. However, documents produced in discovery show that ICV hoped to delay the sale-leaseback until after the sale of Segerdahl so that it could keep the proceeds for itself. Mulder Decl. Ex. L, JPMC_00052326 ("ICV wants to close its acquisition first so [sale leaseback] will reduce overall leverage and proceeds wont go to existing shareholders").

It is undisputed that Stout's valuation report neither mentioned the pending sale-leaseback transaction nor attributed any value to it. Mulder Decl. Ex. C; Dep. Ex. 38. However, Stout's work papers produced in discovery show that Stout determined that the sale-leaseback increased the fair market value of Segerdahl by $19 million. Mulder Decl. Ex. E; Dep. Ex. 346. Had Stout included that $19 million and the deductions for rents from its work papers in its final fairness opinion, it would have increased the value of Segerdahl so much that the purchase price would have been

9

below the low end of the value range determined by Stout. Mulder Decl. ¶ 10. And, *on that basis alone,* Stout's fairness opinion would no longer have supported the ESOP sale transaction.

Lee Bloom conceded that he is not an expert on sale-leaseback transactions. Bloom Dep. at 39:19 – 20; 49:2 – 15. Nor did his reports cite any other sources about how to value a pending sale-leaseback transaction. *Id.* at 40:14 – 18. Bloom was also unaware that Segerdahl's management retained two major commercial real estate consulting firms—CBRE and Newmark Grubb—to provide estimates of the value of the sale leaseback transaction, and consequently Bloom did not review the presentations from CBRE or Newmark Grubb while preparing his report. *Id.* at 51:19 - 52:20. Bloom has never valued a company with a pending sale-leaseback transaction in progress as of the valuation date. *Id.* at 52:21 – 24. Bloom's lack of expertise and careless and haphazard investigation into the relevant facts renders his opinion unreliable. *See Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 802 (7th Cir. 2013) (excluding expert testimony "based simply on assumptions, rather than reliable principles and methods").

It is accordingly unsurprising that Bloom's opinions about the sale-leaseback are premised on errors of fact. Most notably, Bloom's report overlooks the fact that Stout's workpapers for the sale-leaseback used different WACC assumptions compared to Stout's final valuation report. Thus Bloom missed the fact that, had the sale-leaseback been included in the final valuation, the purchase price would have been below the low end of the fair market value range determined by Stout. Indeed, Bloom went one step further, and erroneously opined that the sale price still would have been in the range had the sale-leaseback been included in Stout's valuation. Bloom Opening Rep. at 11. Bloom admitted that he did not evaluate whether the equity paid in the transaction of $119.5 million would still be within the range if one included the 12.5% WACC from Stout's final valuation report instead of the 13.0% WACC in Stouts' work papers. Bloom Dep. at 75:18 – 23.

Bloom's failure to do that analysis is striking because he included the inconsistent range figures in his report. Bloom Opening Rep. at 11.

Thus, at best, Lee Bloom offered his opinion without performing even the most basic check to compare the two documents he was opining about. As the Seventh Circuit has explained, the inquiry whether to admit expert testimony focuses on "the soundness and care with which the expert arrived at her opinion." *Kirk*, 991 F.3d at 873. Whatever else can be said about Lee Bloom's opinions, he did not arrive at them with soundness or care.

Bloom also opined that entering into the sale-leaseback transaction would have reduced Segerdahl's borrowing capacity. Bloom Opening Rep. at 5. However, Bloom performed no quantitative analysis of Segerdahl's borrowing capacity, and did not compare Segerdahl's borrowing capacity to that of any other companies either in the printing industry or in other industries that had similar size or business and risk characteristics. Bloom Dep. at 43:13 - 44:2. Bloom offered no basis to understand what, if any, impact a supposed decrease in Segerdahl's borrowing capacity from the sale-leaseback transaction would have on Segerdahl's valuation. Notably, Bloom did not cite a single contemporaneous source where anyone—including Segerdahl's management, ICV, JPMorgan, Stout Risius or the brokers on the sale-leaseback transaction—evaluated the sale-leaseback transaction as a transaction that would impact Segerdahl's borrowing capacity. As can be seen in Exhibit L, above, the parties at the time looked at the sale-leaseback as way to *reduce* Segerdahl's overall leverage.

At his deposition, Bloom testified that, after sitting through the deposition of Plaintiff's expert Van Vleet, he and Defense counsel went in search of documents to retrospectively justify his opinion that the sale-leaseback impacted Segerdahl's borrowing capacity in any way. Bloom Dep. at 50:3 - 51:17. The only document Bloom was able to find was a commercial loan agreement

called the Amended and Restated Credit Agreement ("ARCA") between Segerdahl and Bank of America, dated months prior to the sale of Segerdahl. *Id.*; Segerdahl 0033213, Mulder Decl. Ex. M. Defendants waited until during Bloom's deposition to identify the 274-page ARCA. That is, when Bloom was asked at deposition whether he was "aware of any contemporaneous documents from Segerdahl, from JP Morgan, from ICV produced in this case that analyze the sale-leaseback in context of it using up borrowing capacity," none having been identified in his reports, Bloom identified the ARCA for the first time, which Bloom said "specifically precludes sale-leaseback transactions.". Bloom Dep. at 50:3 - 51:17. Bloom was not aware of any other documents analyzing the sale-leaseback's impact on Segerdahl's borrowing capacity. *Id.* at 50:17-50:21.

Whatever else it may contain, the ARCA does not contain any analysis about Segerdahl's borrowing capacity. Accordingly, even if the Court were inclined to listen to testimony about such a late-disclosed document, the truthful answer to the question of whether any contemporaneous documents analyzed the sale-leaseback transaction in terms of Segerdahl's borrowing capacity would still have been "no." The ARCA's boilerplate language prohibiting sale-leaseback transactions generically is entirely irrelevant to whether the sale-leaseback in this case impacted Segerdahl's borrowing capacity, and certainly says nothing about the impact a sale-leaseback would have on Segerdahl's value or capital structure. Moreover, as can be seen from the JPMorgan's presentations to ICV partners and the revised credit agreement signed simultaneously with the sale of Segerdahl, which specifically permitted the sale-leaseback, Segerdahl's lenders were nothing if not enthusiastic about the prospects of the actual sale-leaseback. Mulder Decl. Ex. N; Depo Ex. 302, at 21 (JPMorgan presentation discussing sale-leaseback); Mulder Decl. Ex. O, Dep. Ex. 106 (Dec. 7, 2016 credit agreement expressly permitting sale-leaseback transaction).

If Lee Bloom had any experience with sale-leaseback transactions, he likely would not

have made an argument about "borrowing capacity" in the first place. Bloom's lack of expertise with sale-leasebacks and failure to support his opinions are glaring, and the Court cannot be asked to simply take his word for it. Bloom's late citation to the ARCA to retrospectively justify his irrelevant work about borrowing capacity only underscores the sloppy, *ipse dixit* nature of his work in this case. That is far below the standard set by Rule 702.

Bloom's report also contains a discussion of supposed "off balance sheet" benefits of the sale-leaseback transaction. Bloom Opening Rep. at 10. Again, Bloom cites no contemporaneous documents suggesting that any "off-balance sheet" borrowing considerations entered into Segerdahl management's or the buyers' considerations regarding the sale leaseback, nor does he even cite contemporaneous documents describing or characterizing any such "off-balance sheet" benefits, whatever those may be. Bloom admitted at his deposition that Stout's work papers regarding the sale-leaseback do not consider or discuss any such "off-balance sheet" benefits. Bloom Dep. at 78:2-79:8. Whatever else they may be, then, Bloom's opinions about off-balance sheet considerations and the pending sale-leaseback transaction lack any sort of external support and are, unrelated to the issues in this case.

Bloom's opinions regarding the sale-leaseback demonstrate a fundamental lack of qualification on this subject, are entirely unsupported, and reflect a complete lack of factual investigation, at best. *See Rowe v. Gibson*, 798 F.3d 622, 627 (7th Cir. 2015) ("A court should not admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."). Bloom's opinions about the sale-leaseback are, accordingly, unreliable.

> D.     **Bloom's Opinions About the 338(h)(10) Are also Unsupported**

The 338(h)(10) election eliminated Segerdahl's corporate income tax obligations after the ESOP sale, a benefit which JPMorgan and ICV estimated to be worth more than $40 million. *See*

13

Declaration of Defendant Schneider Docket No. 95-004, at 31 of 39 (JPMorgan presentation estimating 338(h)(10) was worth $67 million based on a $350 million purchase price); Mulder Decl. Ex. N; Depo Ex. 302 (JPMorgan presentation estimating 338(h)(10) was worth $46 million based on a $265 million purchase price); Mulder Decl. Ex. P; Depo. Ex. 311 (ICV memo stating belief 338(h)(10) "will eliminate tax payments over the holding period."); Mulder Decl. Ex. Q; ICV-000604 (338(h)(10) had a present value of $40.7 million).

Lee Bloom, however, opines that the 338(h)(10) election added nothing to the value of Segerdahl. Opening Rep. at 12-14. Like the sale-leaseback, Bloom is admittedly not an expert on 338(h)(10) elections. Bloom Dep. at160:24-161:1. As with the remainder of his report, Bloom did not cite or review any texts, treatises or articles in formulating his opinions about the 338(h)(10) election. Bloom Dep. at163:25-164:7. For example, Bloom did *not* review Myron S. Scholes, Mark A. Wolfson, et al., *Taxes and Business Strategy, A Planning Approach* (5th Ed., Pearson), Dep. Ex. 350, Mulder Decl. Ex. R ("Scholes, *Taxes and Business Strategy*"). Bloom Dep. at180:7-181:2. At his deposition, Bloom refused to answer whether he disagrees with Scholes, *Taxes and Business Strategy*'s conclusion that 338(h)(10) elections are "typically" shared with the seller. Bloom Dep. at181:25-183:4. Nor did Bloom review the specific transactions cited in Scholes, *Taxes and Business Strategy* which showed buyers paying specific value for 338(h)(10) elections agreed to with the sellers. Bloom Dep. at183:11–19. Nor did Bloom review Merle M. Erickson & Shiing-wu Wang, *Tax Benefits as a Source of Merger Premiums in Acquisitions of Private Corporations*, The Accounting Review, Vol. 82 (2007) prior to his opening report, which roughly quantified the premiums paid in 338(h)(10) transactions (at 12-17% of the sale price, implying a range here of $31.8 - $45 million). Bloom Dep. at174:3–15; Dep. Ex. 349, Mulder Decl. Ex. S.

Instead, Bloom opined—without any support—that the value of the 338(h)(10) is limited

14

to incremental tax costs sometimes incurred by sellers in 338(h)(10) transactions. But, at his deposition, Bloom admitted that he has no idea how to calculate those incremental tax costs, Bloom Dep. at167:15-168:1, and did no research into that or into what premiums buyers typically pay for 338(h)(10) elections. *Id.* at170:8 – 20.  The only support Bloom provides for his opinions is that "[i]t strikes me as unlikely" that a buyer would be willing to share the benefits of a 338(h)(10) with a seller, Bloom Rebuttal Rep. at 23, even though the consent of the seller is required to take a 338(h)(10) election. All Bloom offers the Court on the 338(h)(10) election is, accordingly, speculation, unsupported by expertise or research into relevant standards. "An expert, however, must 'substantiate his opinion,' rather than assume it to be true." *Kirk*, 991 F.3d at 876, *see also Rowe*, 798 F.3d at 627 (7th Cir. 2015). Bloom's testimony should therefore be excluded.

### III. CONCLUSION

Lee Bloom changes his sworn testimony from case to case. He fails to support his opinion by reference to any recognized standard, fails to cite any outside support, and offers significant opinions based on a near total lack of factual investigation.  For these reasons, Bloom is not a qualified, credible or reliable witness as detailed above, and the Court should exclude Lee Bloom from testifying in this matter under Federal Rule of Evidence 702.

Dated: January 31, 2022

                      Respectfully Submitted,

                By:    /s/ *Michael M. Mulder*
                        Michael M. Mulder
                        Elena N. Liveris
                        LAW OFFICES OF
                        MICHAEL M. MULDER
                        1603 Orrington Avenue, Suite 600
                        Evanston, Illinois 60201
                        Telephone: 312-263-0272

mmmulder@mmulderlaw.com
eliveris@mmulderlaw.com

Todd Schneider (*pro hac vice*)
James A. Bloom (*pro hac vice*)
SCHNEIDER WALLACE
COTTRELL KONECKY LLP
2000 Powell Street, Ste. 1400
Emeryville, California 94608
Telephone: (415) 421-7100
tschneider@schneiderwallace.com
jbloom@schneiderwallace.com

*Counsel for Plaintiff and the Certified Class*

**CERTIFICATE OF SERVICE**

Pursuant to Federal Rule of Civil Procedure 5 and Northern District of Illinois Local Rule 5.5, the undersigned, an attorney of record in this case, hereby certifies that on January 31, 2022, a true and correct copy of the foregoing document was filed electronically by CM/ECF, which caused notice to be sent to all counsel of record.

<i>/s/ James A. Bloom</i><br>
James A. Bloom