**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| BRUCE RUSH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 19-cv-00738 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| GREATBANC TRUST COMPANY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Prior to its December 2016 sale to ICV Partners, LLC ("ICV"), Segerdahl Corp.

("Segerdahl") was wholly owned by Segerdahl's Employee Stock Ownership Plan ("ESOP").

Plaintiff Bruce Rush represents a class of Segerdahl employees who owned shares in the ESOP.

He alleges that the sale was a sham, rushed through to benefit of a handful of Segerdahl

executives and ultimately resulting in a lower sale price than the company would otherwise have

fetched. For this reason, Rush has sued Segerdahl, its Board of Directors ("Board"), several

individual Segerdahl executives, and GreatBanc Trust Company ("GreatBanc"), which was the

trustee retained to approve the sale, alleging that they breached their fiduciary duties to the ESOP

in violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C.

§ 1101 *et seq.*, based on the marketing and terms of the sale. Now before the Court are the

parties' motions to exclude expert testimony and for summary judgment. For the reasons stated

below, all five motions to exclude or limit expert testimony are denied. The motions for

summary judgment are granted with respect to the diversion claims but otherwise denied.

**BACKGROUND**

**I.     Parties and Procedural Posture**

Rush is a former executive for Segerdahl, a direct-mail printer. (Pl.'s Resp. to Segerdahl SOF ("PRSSF") ¶ 1, Dkt. No. 245.) Rush has brought this suit against a number of defendants. Defendants Mary Lee Schneider and Richard Joutras are the "Board Defendants." Joutras served as Chief Executive Officer ("CEO") of Segerdahl until December 2015, after which Schneider assumed that role. (*Id.* ¶ 2.) Joutras also served as Chair of the company's Board from April 2015 until December 2016, and Schneider served on the Board starting in December 2015. (*Id.*) Additionally, Joutras was the ESOP's named fiduciary until 2016, when Schneider succeeded him. (Segerdahl Resp. to Pl.'s SAF ("SRPSAF") ¶¶ 1, 33, 55, Dkt. No. 270.)[1] Defendants Rodney Goldstein, Peter Mason, and Robert Cronin, referred to herein as the "Outside Director Defendants," are three non-employees who were appointed to the Board in April 2015 and served until the completion of the company's sale to ICV in December 2016.[2] (*Id.* ¶ 3.) Segerdahl, a nominal defendant, was a printing company wholly owned by the Segerdahl ESOP. (*Id.* ¶ 4.) And Defendant GreatBanc was the ESOP's institutional trustee charged with reviewing and approving the sale. (Pl.'s Resp. to GreatBanc SOF ("PRGSF") ¶¶ 2, 18, Dkt. No. 244.)

Rush's First Amended Complaint ("FAC") asserts five counts against various configurations of Defendants. Count I names all Defendants and asserts a claim for breach of fiduciary duty under 29 U.S.C. § 1104(a)(1). Specifically, Rush alleges that in connection with

---

[1] Segerdahl Defendants contend that Joutras resigned as named fiduciary. (SRPSAF ¶ 55.) Rush contends that the Board removed Joutras. (*Id.*)

[2] Rush disputes that these directors were actually "'outside' in the sense of being independent." (PRSSF ¶ 3.) For purposes of this opinion, the Court offers no opinion on their independence; rather, the characterization "Outside Directors" is used solely to refer to the fact that they were not Segerdahl employees.

the sale process for Segerdahl, Outside Director Defendants and Board Defendants (i) excluded certain higher-paying strategic buyers in favor of investment buyers that would preserve their management roles, and (ii) were aware of Schneider's conflicts of interest yet allowed her to handle aspects of the sales process. As to Board Defendants, Rush further alleges that they breached their fiduciary duties by appointing Schneider as a named fiduciary despite knowing about her conflicts of interest. And GreatBanc allegedly breached its fiduciary duty by approving a sale that it knew had resulted from a flawed sale process. Rush also alleges that all Defendants breached their fiduciary duties by diverting ESOP sale funds in the form of payments to Schneider, Joutras, Paul White (the Executive Vice President of Sales), and Marcus Bradshaw (the Chief Financial Officer).

Count II names only Schneider and Joutras, and asserts a claims for breach of fiduciary duty under 29 U.S.C. § 1104(a)(1) and a prohibited transaction under 29 U.S.C. § 1106(b). With respect to the former, Rush claims that Schneider and Joutras used their authority to influence the shopping process in their favor and used their influence to divert ESOP funds to "insiders" (similar to the diversion claims asserted in Count I). As to the prohibited transaction, Rush alleges that Schneider and Joutras dealt with the plan's assets in service of their own interest.

Count III names only GreatBanc and asserts a claim based on a prohibited transaction under 29 U.S.C. § 1106(a)(1). Here, Rush alleges that GreatBanc knowingly approved of Schneider's prohibited transaction from Count II.

Count IV names all Defendants and asserts claims for breach of co-fiduciary duties under 29 U.S.C. § 1005(a)(1)–(3). Put simply, to the extent there was a breach of fiduciary duty as alleged under Counts I, II, or III, Count IV seeks to impute liability for that breach to any other fiduciary who knowingly participated in or concealed it, failed to comply with their fiduciary

duties so as to allow it to occur, or knew of it yet failed to reasonably attempt to remedy it. (FAC ¶ 433.)

Finally, Count V asserts a claim against Schneider and Joutras under 29 U.S.C. § 1132(a)(3) for knowing participation in and receipt of benefits from an ERISA violation. Thus, Rush seeks equitable relief from Schneider and Joutras because they profited from a fiduciary breach or prohibited transaction with "actual or constructive knowledge of the circumstances that rendered the transaction unlawful." *Harris Tr. & Sav. Bank v. Salomon Smith Bank, Inc.*, 530 U.S. 238, 251 (2000).

Two sets of motions are presently before the Court. The first set consists of five motions challenging the parties' respective proffered expert testimony. Defendants challenge three of Rush's expert witnesses, moving to exclude the testimony of Daniel Galente and Andrew Stumpff entirely and to exclude portions of the testimony to be offered by Daniel Van Vleet. Rush, in turn, seeks exclusion of the expert testimony to be offered by Lee Bloom and Mark Hahn. In the second set of motions, Defendants seek summary judgment on various claims and issues raised by the FAC. First, GreatBanc seeks summary judgment in its favor on Counts I, III, and IV. (Dkt. No. 206.) Second, all Defendants other than GreatBanc ("Segerdahl Defendants") seek summary judgment as to the sales claims, *i.e.*, the issues relating to the company's sale process, in Counts I and IV. (Dkt. No. 213.) Finally, the Segerdahl Defendants seek summary judgment as to the diversion claims, *i.e.*, those claims arising from various post-sale payments to company executives, in Counts I, II, IV, and V. (Dkt. No. 210.) Defendants do not seek summary judgment on the sales claims in Counts II and V.

## II.     Facts

The following facts are drawn from the parties' submissions pursuant to Local Rule 56.1.[3] To the extent there is a factual dispute that is material to the summary judgment motions, the Court views the facts, and all reasonable inferences from them, in the light most favorable to Rush as the non-moving party. *Grant v. Trs. of. Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017).

### A.     The Industry and Shopping Process

This action arises out of the December 2016 sale of Segerdahl to ICV. Rush alleges that the sale process was a sham, intended to preserve jobs for a handful of executives at the cost of selling the company for less than fair market value. (FAC ¶ 13, Dkt. No. 77.) Obtaining fair market value was particularly important because Segerdahl was wholly owned by the ESOP, which was funded mainly through employees' 401(k) rollovers. (PRSSF ¶ 18.) Because Segerdahl was not a publicly-traded company, Stout Risius Ross ("Stout"), an investment bank, conducted a semi-annual valuation analysis. (*Id.* ¶ 19.) The main purpose of the valuation was to determine Segerdahl's stock value for share redemption. (*Id.*)

In April 2015, Segerdahl either started or reorganized its Board—Rush contends that it was formed for the first time at that point, whereas Segerdahl contends that it had always had a Board but its members were replaced in April 2015. (SRPSAF ¶ 33.) Either way, the parties agree that starting in April 2015, the Outside Directors were added to the Board. None of the

---

[3] Rush, GreatBanc, and Segerdahl Defendants each object that the opposing party's Statements of Fact are not concisely stated and contain legal arguments. Local Rule 56.1 requires that each statement of material facts or additional facts "consist of concise numbered paragraphs." L.R. 56.1(d)(1). The Court does not find any violation sufficiently egregious as to prevent the Court from properly assessing the extent of the parties factual disputes. Thus, rather than strike statements of fact, the Court exercises its discretion to excuse the parties' excess verbiage. *See, e.g.*, *Oxford Bank & Tr. v. Village of La Grange*, 879 F. Supp. 2d 954, 960 (N.D. Ill. 2012) ("The Court is capable of disregarding statements or responses that contain legal conclusions or argument, are evasive, contain hearsay or are not based on personal knowledge, or contain unfounded, irrelevant, or unsupported assertions of fact.").

three were employees, but Rush notes that each had some preexisting connection to Joutras. (PRSSF ¶ 28.) The three of them, along with Joutras, made up the full Board. (SRPSAF ¶ 33.) In November 2015, the Board went through its final reconfiguration: Schneider was added as a member, while Joutras became its Chairman. (PRSSF ¶ 34.)

During the thirteen years that the ESOP owned Segerdahl, the company's value increased over 8,000% (*id.* ¶ 20), including a 62% jump in value between the end of 2015 and March 2016. (*Id.* ¶ 37.) Each employee's ESOP shares operated as put options, obligating Segerdahl to repurchase the employees' shares "when employees terminated, or when their age and years of service qualified them to diversify their shares." (*Id.* ¶ 37(b).) The 62% jump in value increased the repurchase exposure to around $80 million. (*Id.*) Rush agrees that the repurchase liability had increased but further states that the company had financed its repurchase liability in the past and could continue doing so. (*Id.*) In April 2016, the Board decided to explore selling the company, retaining JPMorgan to lead the shopping process with a direction to contact financial buyers as opposed to strategic buyers.[4] (*Id.* ¶¶ 14, 38.) The parties dispute the extent to which the Board considered other options before pursuing a sale: Rush contends that the only other option considered was a restructuring of the ESOP itself, while Defendants claim that the decision to sell came after considering several options. (*Id.* ¶ 38.)

According to Segerdahl, the increased repurchase exposure provided the impetus to explore a sale; Rush disputes this, again noting that Segerdahl had been successfully financing that exposure. (*Id.* ¶¶ 37–38.) For his part, Rush contends that the company faced a more existential threat than just ESOP payout exposure. He offers Promissory Notes and Stock

---

[4] "Financial buyers" are those who intend to make an investment, such as private equity purchasers. By contrast, "strategic buyers" are generally same-industry companies seeking efficiencies, whether vertical or horizontal. ICV was a financial buyer.

Purchase Agreements showing that in 2014, Segerdahl redeemed roughly 8,000 ESOP shares owned by former employees but did not pay out the full amount in cash—instead, 20% of the value of the settled shares was paid in cash and 80% was in the form of a four-year promissory note. (SRPSAF ¶ 25.) Later in the sale process, outside counsel warned that the structure might expose Segerdahl to significant risk, including disqualification of the ESOP and revocation of Segerdahl's S Corp. election. (*Id.* ¶ 27.)[5] The day after this warning, Segerdahl—which had just rejected a $250 million offer from ICV—resumed talks with ICV. (*Id.* ¶¶ 30–31, 68–69.) The Segerdahl Defendants dispute that there was any correlation between the two events as well as the underlying substance of the memo from outside counsel. (*Id.* ¶ 31.)

The parties also disagree about why the Board decided not to market the company to competitors. Defendants contend that strategic buyers were too risky with which to negotiate, and that the two most likely targets—Quad/Graphics ("Quad") and RR Donnelley ("RRD")—were not in a position to pay a premium for Segerdahl. (PRSSF ¶¶ 10–11.) But Rush presents evidence that JPMorgan identified five strategic buyers it felt were likely to pay a premium price, and also that Schneider felt that a strategic buyer would pay over $300 million. (*Id.* ¶ 9–10.) Rush contends that the company ignored strategic buyers so that management, particularly Schneider and Chief Financial Officer ("CFO") Marcus Bradshaw, could preserve their jobs despite knowing that this would lower the buying price—and, by extension, the payout to each employee with a stake in the ESOP. (SRPSAF ¶¶ 2–6.) The Segerdahl Defendants dispute this, noting not only that management continuity post-sale is a boon to potential buyers, but also that

---

[5] The Segerdahl Defendants dispute this fact for reasons contained in their *Daubert* motion challenging Stumpff's expert testimony. They argue that there is no evidence that the Internal Revenue Service would have enforced its rules in this manner. Moreover, Segerdahl argues, if the IRS decided to press the issue, it would have provided Segerdahl ample opportunity to resolve the issue amicably before taking such drastic steps as disqualifying the ESOP and revoking Segerdahl's S Corp election. (SRPSAF ¶ 27.)

Schneider and Bradshaw had significant financial interests in the sale. (*Id.*) According to the Segerdahl Defendants, those financial interests were more concrete than continued employment. (*Id.* ¶ 7.)

### B. The 2016 Sale Process

Segerdahl's Board chose to have JPMorgan, led by Jeff Vergamini, lead the sale process. (PRSSF ¶¶ 30–31.) Rush notes that at the time of Vergamini's appointment, Segerdahl was not going through a full sales process; rather, it was negotiating only with Wind Point Partners ("Wind Point"), a private equity firm. (*Id.* ¶ 31.) By July 2016, Vergamini and JPMorgan had contacted eighteen potential financial buyers, eventually receiving indications of interest from four: ICV, Madison Dearborn Partners, Wynnchurch, and The Stephens Group. (*Id.* ¶¶ 39, 44.) ICV's letter of interest in early July 2016 was for $300 million, which disappointed Defendants as it did not include any value for a potential sale-leaseback or 338(h)(10) election.[6] (SRPSAF ¶ 60.) The Stephens Group and Wynnchurch quickly fell out of the process, although JPMorgan still considered them active participants so as credibly to represent that there were multiple bidders, though Rush disputes to what extent JPMorgan considered them active participants. (PRSSF ¶¶ 45–46.) Rush, for his part, contends that Wynnchurch did more than just fall out of the process: he claims that it offered a bid higher than the eventual winner, but was rejected because it was a poor strategic fit, (*id.* ¶ 45), while the Segerdahl Defendants claim that Wynnchurch chose not to pursue the transaction of its own volition. (SRPSAF ¶ 60.)

---

[6] The sale-leaseback transaction would entail selling two Segerdahl plants for an infusion of cash, followed by a long-term lease with Segerdahl as the lessee and the buyer as lessor. (PRGSF ¶¶ 25(b), 31(h).) A 338(h)(10) tax election "allow[s] a buyer to treat a stock purchase as an asset acquisition for purpose[s] of raising the depreciable basis of the underlying assets acquired." (*Id.* ¶ 25(b).) Segerdahl ultimately received a $25 million offer on the sale-leaseback, and JPMorgan estimated that, at a sale price of $265 million, the 338(h)(10) would be worth around $46 million; ICV believed it was worth around $40.7 million. (SRPSAF ¶¶ 73–74.)

During this time, potential buyers conducted due diligence and Segerdahl's sales lagged behind the targets contained in the initial pitch material. (PRSSF ¶¶ 46–48.) With this knowledge, ICV made an offer of $250 million, plus $15 million if Segerdahl's Earnings Before Interest, Taxes, Depreciation, and Amortization ("EBITDA") reached $45 million. (*Id.* ¶ 49.) But Segerdahl's EBITDA was unlikely to reach $45 million, rendering it effectively a $250 million offer; in any case, ESOP Trustees generally favored cash over earn-outs. (*Id.*) Insulted by the offer, Segerdahl ended talks with ICV and shut down its data room. (*Id.*) Around that time, Madison Dearborn backed out. (*Id.* ¶ 50.) Despite alleged disappointment with the offer, Segerdahl did not reach out to strategic buyers and instead dealt with ICV, now the sole bidder.[7] (SRPSAF ¶ 67.) ICV then eliminated the earn-out and submitted a full-price $265 million offer. (PRSSF ¶ 50–53.) Around that time—Rush contends after the offer—JPMorgan informed ICV of the potential benefits of a sale-leaseback of two of Segerdahl's plants and the possible benefits of a 338(h)(10) tax election. (*Id.* ¶ 52.) As part of ICV's offer, Schneider, Bradshaw, and other executives received long-term employment contracts and option awards with the post-sale entity—contracts that Segerdahl points out were terminated in 2018 for Schneider and 2019 for Bradshaw, resulting in forfeited option awards upon termination. (SRPSAF ¶ 77.)

Rush also points to evidence that the company could have sold for more than $265 million. For one thing, Rush presents his own recollection of a meeting with Vergamini just before the sale closed during which Vergamini told Segerdahl management that he could have sold the company for $320 million because he knew the owner of Quad. (*Id.* ¶ 76.) Segerdahl vigorously disputes that this occurred, stating that is unsupported, contrary to how a banker would speak to management, and a misunderstanding on Rush's part. (*Id.*) Rush also offers

---

[7] The Segerdahl Defendants dispute this, but primarily on the grounds that reaching out to strategic buyers was not optimal rather than disputing the underlying substance.

evidence that Schneider knew strategic buyers would likely pay more, and that the company could have followed that course. (*Id.* ¶ 4.)

### C. GreatBanc

As the trustee charged with approving the deal, GreatBanc reviewed the sale, relying on a law firm for legal advice and Stout for financial advice, including an Analysis of Transaction Fairness ("Fairness Analysis") completed by Stout. Rush also presents evidence that keeping employees' jobs at the post-sale entity was a driving goal in selecting a partner, and that Schneider was aware it could hurt sale value. (GreatBanc Resp. to Pl.'s SAF ("GRPSAF") ¶¶ 4– 6, Dkt. No. 267.) Defendants vigorously dispute this, pointing out context and business climate. As to context, they note that by telling employees the sale process sought to protect employees and their families, Schneider was merely trying to boost morale. (*Id.* ¶ 5.) And they contend that there was no purpose in seeking out strategic buyers—to which a sale would likely ***not*** result in preservation of jobs—because the two most likely buyers, Quad and RRD, were not in a position to purchase. (*Id.* ¶¶ 4, 6, 11.) Rush also notes that, when Stout conducted its Fairness Analysis, it did not list obtaining maximum value for the ESOP as a criteria used to select a buyer, but Defendants contend that such criteria was a given and need not have been explicitly stated as a goal. (*Id.* ¶ 3.)

In addition, Rush raises a number of concerns with GreatBanc's oversight, all of which GreatBanc disputes. Rush contends that GreatBanc failed to review some of the compensation decisions into which Segerdahl had entered (and discussed in greater detail below). He also contends that GreatBanc missed information about the Outside Directors' alleged conflicts, as well as those of Joutras, which GreatBanc flatly denies. (*Id.* ¶¶ 17–18.) Rush takes issue with the Company Specific Risk Premium ("CSRP") that Stout applied in its Fairness Analysis as overly

subjective, implying that it was unreliable. (*Id.* ¶¶ 33–34.) And he contends that GreatBanc failed to account for any benefit from the sale-leaseback or 338(h)(10) election. (*Id.* ¶¶ 36–47.)

### D. Management and Compensation

Also at issue in this case are a number of executive compensation decisions, set forth below.

#### 1. Reworked Agreements for Executives and New CEO

Schneider, a former RRD executive, acted as a consultant to Wind Point during Segerdahl's earlier negotiations with the private equity firm. (PRSSF ¶ 34.) After that sale fell through, Segerdahl brought on Schneider as its new CEO; Joutras had been hoping to step down as CEO and with Schneider's hire, he transitioned to Chairman of the Board.[8] (*Id.* ¶¶ 26, 34.)

Schneider's hiring also prompted a round of contract renegotiations for Joutras, Bradshaw, and Paul White, the Executive Vice President of Sales ("EVP Sales"). Just before Schneider became CEO, the Board entered into a new agreement with Bradshaw. However, Segerdahl introduced the Board's written consent approving Bradshaw's transaction bonus (as well as the other compensation adjustments). (SRPSAF ¶ 46.) Bradshaw's agreement doubled his salary if he was terminated without cause before Schneider took over as CEO and added a $1 million bonus if Segerdahl closed a sale by the end of 2016. (PRSSF ¶ 55.) Joutras signed Bradshaw's agreement about two weeks before Schneider became CEO. (SRPSAF ¶ 46.) Rush disputes the extent to which the Board approved Bradshaw's agreement, noting that the record merely reflects that they discussed it. (*Id.* ¶ 55.)

---

[8] Both sides acknowledge that Joutras was ready to step down and that he had recently had health issues. But Rush also presents evidence that, along with his health conditions, Joutras was "burned out" and wanted to liquidate his Segerdahl interest, growing anxious to sell by 2016. (Pl.'s Resp. to Segerdahl SOF ¶ 26.)

During his tenure as CEO, Joutras enjoyed protection from termination without cause and was subject to non-compete and non-solicitation agreements. (PRSSF ¶ 54(a).) Once Schneider took over the CEO position, Joutras's reworked agreement reclassified him as an employee, extended his pay and benefits for three years while also extending his non-compete and non-solicitation agreements, and excluded him from the executive bonus pool after 2015. (*Id.* ¶ 54(b).) The Outside Directors negotiated the new agreement (*id.* ¶ 54), the Board approved it, and Bradshaw signed Joutras's agreement the same day Joutras signed his. (SRPSAF ¶ 46.)

Finally, Schneider altered the management team after taking over as CEO. Specifically, she "exited" White as EVP of Sales in December 2015, placing another Segerdahl employee into that role. (PRSSF ¶ 57.) Rather than simply fire White, she instead renegotiated his contract: his $300,000 salary would continue through the end of 2016 (with benefits but without participation in the executive bonus pool), and he had a non-solicitation and a newly imposed non-compete agreement that extended for one year past his termination. (*Id.* ¶ 58.) Schneider's purported reason for renegotiating White's contract was that White was skilled in recruiting salespeople and, given that Segerdahl's salespeople were not subject to non-compete agreements, she hoped to mitigate any risk of White poaching talent. (*Id.* ¶ 58(a).)

### 2.     *Other Executive Compensation*

Another relevant aspect of executive compensation at issue is Segerdahl's practice of issuing Stock Appreciation Rights ("SARS") interests. SARS awards are similar to stock options, but the redemption value is equal to the difference between value at redemption and value when granted. (PRSSF ¶ 24.) In other words, there is no need to sell the stock as with an option; awardees are granted the difference in value upon redemption. Several high-ranking Segerdahl employees and Board members were awarded SARS. Each of the three Outside Directors was

granted 100 SARS upon their appointment in April 2015. (*Id.* ¶ 29.) Mason, an attorney, had to pay any proceeds from the SARS to his law firm. (SRPSAF ¶ 19.) At the time they were granted, the Outside Directors' shares were valued at $5,719; when the company sold, each share was worth $13,072. (PRSSF ¶ 29.) This resulted in a SARS award of roughly $735,000 to each Outside Director. (*Id.*)

Schneider received 800 SARS when she took over as CEO; at that time, the share price was $7,792. (*Id.* ¶ 35.) At sale, her SARS units were worth around $4.2 million. (*Id.* ¶ 36(c).) Like Schneider, Joutras owned 800 SARS. (*Id.* ¶ 36(a).)[9] Paul White also had SARS units. (SRPSAF ¶ 48.) Notably, Rush contends that according to the terms of Segerdahl's SARS plan, both Joutras and White—who are related by marriage—should have forfeited their unvested SARS units upon termination but were instead permitted to keep them. (*Id.*) However, the record evidence to which Rush cites establishes only that White and Joutras are related by marriage; there is no support for the statement that their SARS arrangement was contrary to Segerdahl's SARS plan. (*Id.* (citing Decl. of James Bloom, Ex. DDDDD ("Joutras Dep.") at 142:12–25, 1:23,[10] Dkt. No. 290-3).) Indeed, Segerdahl notes that neither employee was actually terminated—rather, each continued their employment, albeit in different roles, which meant that their SARS continued to vest. (*Id.*)

---

[9] Rush disputes Paragraph 36 of Segerdahl's SOF but does not dispute the underlying numbers. Rather, he disputes certain characterizations made in that paragraph.

[10] Page 1 does not contain testimony, so it is not clear to what Rush intends to cite. However, there is no reference to the SARS plan in the excerpted deposition testimony, with the exception of Joutras confirming the value of his SARS award.

**DISCUSSION**

**I.      Challenges to Expert Testimony**

The Court first addresses the parties' motions directed toward expert testimony under

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). "The admission of expert

testimony is governed by Federal Rule of Evidence 702 and the principles outlined in *Daubert*."

*Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893 (7th Cir. 2011). Under the *Daubert*

standard, the district court acts as a gatekeeper to "ensure the reliability and relevancy of expert

testimony." *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 607 (7th Cir. 2006) (quoting *Kumho

Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 153 (1999)). And Rule 702 also provides that a

qualified expert may testify as to their opinion if their specialized knowledge will help the trier

of fact to determine a fact in issue, their testimony is based on sufficient facts or data and is the

product of reliable methods, and the expert has reliably applied those methods to the facts of the

case. Fed. R. Evid. 702.

Accordingly, a district court must engage in a three-step analysis before admitting expert

testimony. *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010). "It must determine

whether the witness is qualified; whether the expert's methodology is scientifically reliable; and

whether the testimony will assist the trier of fact to understand the evidence or to determine a

fact in issue." *Id.* (internal quotation marks and citation omitted). But this gatekeeping

responsibility "does not render the district court the trier of all facts relating to expert

testimony. . . . The jury must still be allowed to play its essential role as the arbiter of the weight

and credibility of expert testimony." *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 780

(7th Cir. 2017) (internal quotation marks omitted). While "'shaky' expert testimony may be

admissible, subject to attack on cross-examination," the district court has an obligation to

exclude any testimony that crosses the line from shaky to unreliable. *Bielskis*, 663 F.3d at 894 (citation omitted). That said, any expert testimony here will occur in a bench trial, not a jury trial. When it comes to relevance and reliability, "the usual concerns of the rule—keeping unreliable expert testimony from the jury—are not present in [a bench trial]." *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 760 (7th Cir. 2010). "When the gatekeeper and the factfinder are one and the same—that is, the judge—the need to make such decisions prior to hearing the testimony is lessened." *In re Salem*, 465 F.3d 767, 777 (7th Cir. 2006).

### A.    Defendants' Motion to Exclude Expert Testimony of Daniel Galente

Defendants first move to strike the expert testimony of Daniel Galente, who opined on the effect of strategic buyers on a sales process and how sellers can limit risk when shopping to strategic buyers. Defendants argue that Galente's testimony should be stricken because his qualifications do not match his opinions, his opinions are so limited and generalized as to be unreliable and unhelpful, and he applied incorrect standards when formulating his opinions. The Court disagrees.

First, Galente is qualified. He has advised on more than 700 buy- or sell-side transactions over the course of twenty-five years, including both private equity and ESOP transactions, providing a basis for his opinions on the effect of strategic buyers' involvement in the shopping process. He also has significant experience on the diligence portion of transactions, which provides a basis for his opinions on ways that firms can ameliorate risk when negotiating a sale with a strategic buyer. Galente's experience thus qualifies him as an expert. *Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 591 (7th Cir. 2000).

Second, Galente's opinion is reliable and helpful to the finder of fact. Defendants argue that the opinion is overly generalized, opining on the principles applicable to mergers and

acquisitions ("M&As ") rather than the specific facts of *this* transaction. But as explained by the advisory committee notes, the Federal Rules of Evidence contemplate such testimony:

> It might also be important in some cases for an expert to educate the factfinder about general principles without ever attempting to tie them to the specific facts of the case. . . . For this kind of generalized testimony, Rule 702 simply requires that (1) the expert be qualified; (2) the testimony address a subject matter on which the factfinder can be assisted by the expert; (3) the testimony be reliable; and (4) the testimony "fit" the facts of the case.

Fed. R. Evid. 702 advisory committee's notes (2000 amends.). Galente's testimony fits specific facts of the case and does so in a way that assists the factfinder. For example, his report opines on ways that Segerdahl could have ameliorated the risk of negotiating with a strategic buyer, such as using "clean rooms" or redacting certain information. (Decl. of Robert Rachal in Supp. of Galente Mot., Ex. A ("Galente Report"), ¶¶ 40–42, Dkt. No. 201-1.) He points to specific strategic buyers, indicating, for example, that the fact that JPMorgan was precluded by its engagement letter with Segerdahl from contacting Quad or RRD affected the price—that is, that the specific examples of Quad and RRD are applications of the general principles on which he opines. (Dkt. No. 251-13 at 8.) Galente did clarify in his deposition that he is not opining specifically that Quad or RRD, or any specific company, would have paid more—but Quad and RRD are clearly companies to which his general testimony applies. (Decl. of Robert Rachal in Supp. of Galente Mot., Ex. B ("Galente Dep."), at 144:6–15; 156:6–24, Dkt. No. 201-1.) Galente's testimony about general practices in M&A transactions can also buttress fact evidence, providing explanation for why certain actions were (or were not) taken. *See CDX Liquidating Tr. ex rel. CDX Liquidating Tr. v. Venrock Assocs.*, 411 B.R. 571, 587 (N.D. Ill. 2009) (permitting testimony that "provide[d] a backdrop against which the jury may view this case").

Lastly, Defendants argue that Galente failed to apply the proper legal standard in his opinion. This argument is unavailing. Galente need not opine on whether a legal standard was

met for his opinion to be reliable; indeed, doing so could run the risk of rendering his testimony inadmissible. *See Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003) (affirming a district court's exclusion of "expert testimony as to legal conclusions that will determine the outcome of the case"); *George v. Kraft Foods Glob., Inc.*, 800 F. Supp. 2d 928, 934 (N.D. Ill. 2011) ("[A]ny attempt by Pomerantz to define what the prudence requirement would say is improper." (internal quotation marks and ellipses omitted)).

As it is, Galente's testimony assists the factfinder in understanding a number of issues in the case, including (without limitation) methods to ameliorate risk of sensitive information falling into a competitor's hands, the role of strategic buyers in a sale, and Segerdahl's leverage with buyers throughout the sale process. Defendants' motion to exclude Galente's expert testimony is thus denied.

### B. Defendants' Motion to Exclude Expert Testimony of Daniel Van Vleet

Defendants next move to bar portions of valuation expert Daniel Van Vleet's testimony. Van Vleet opines on Segerdahl's fair market value ("FMV") for ERISA purposes and on whether the ESOP suffered damages under the FMV requirements. They argue that his damages analysis is unreliable and unhelpful because it is contrary to law, and that his opinion regarding a potential 338(h)(10) tax election violated ERISA's FMV standards.

Defendants do not challenge Van Vleet's qualifications, but he is clearly qualified. He holds a Master of Business Administration degree with a focus in Finance from the University of Chicago's School of Business. He has contributed to eight financial textbooks, served as a professor at the Kellstadt Graduate School of Business at DePaul University and at Northwestern University, and is the former President of the American Society of Appraisers.

Defendants nonetheless assert that Van Vleet's opinion is unreliable because ICV was not a party-in-interest under ERISA, so ERISA's FMV standards should not apply and were inappropriately considered by Van Vleet. Defendants argue that instead, the FMV analysis should be limited to Count III, which addresses Schneider's post-sale investment in the reconstituted Segerdahl. (Defs.' *Daubert* Mot. re: Daniel Van Vleet ("Van Vleet Mot.") at 9–10, Dkt. No. 203.) However, as discussed below, the allegation is that Schneider, not ICV, is the relevant party in interest. (FAC ¶ 425.) And the Court has declined to dismiss or otherwise limit Count III.

Rush's underlying argument as it relates to the prohibited transaction claim presented in Count III appears to be that because Schneider transacted with the ESOP, the validity of the entire transaction is called into question. Under this theory, Van Vleet did not "improperly appl[y] his adequate consideration/FMV analysis to calculate damages on the ICV sale." (Van Vleet. Mot. at 9.) Defendants are free to challenge his conclusion on cross-examination, or present rebuttal evidence to explain why Van Vleet's calculations are incorrect. But it is not appropriate to limit his testimony on the grounds presented.

Defendants also argue that Van Vleet improperly included value from a potential 338(h)(10) tax election in his FMV calculation. At bottom, they argue that an FMV calculation requires hypothetical parties, whereas a 338(h)(10) election's viability necessarily depends on the specific characteristics of the particular parties. Notably, Defendants offer no authority stating that 338(h)(10) elections, or any similar types of value, cannot be considered in an FMV analysis. The closest they come is *Hans v. Tharaldson*, No. 3:05-cv-115, 2011 WL 6937598, at *3–4 (D.N.D. Dec. 23, 2011). There, the district court excluded the testimony of an expert who opined on how a hypothetical hotel investor would have viewed a fiduciary's pre-transaction

investigation. But in *Hans*, a hotel investor would be focused on obtaining the "sharpest bargain possible maximizing the potential for a windfall," seeking out people desperate to sell. *Id.* at *4. ERISA FMV, by contrast, requires a "hypothetical willing buyer and willing seller under no compulsion to buy or sell." *Id.* The hypothetical investor in *Hans* had entirely different motivations than the hypothetical FMV buyer; ditto the hypothetical sellers. Here, however, a 338(h)(10) election is something buyers typically want to use—in other words, it fits more neatly into the framework of a willing buyer and willing seller under no compulsion to buy or sell. (Pl.'s Opp. to Van Vleet Mot. at 10, Dkt. No. 243.)

In short, Defendants have not shown that Van Vleet's methodology is so shaky as to be unreliable. Their motion to limit his testimony is accordingly denied.

### C. Defendants' Motion to Exclude Expert Testimony of Andrew Stumpff

The last *Daubert* challenge Defendants raise concerns the expert testimony of Andrew Stumpff, who opines on potential legal jeopardy Segerdahl faced as a result of its securitization practices regarding ESOP participants who had already cashed out from the ESOP. Defendants argue that Stumpff's testimony is inadmissible because it constitutes an impermissible conclusion of law and because his conclusions are speculative and not tied to any harm.

First, Stumpff is well qualified. He lectures at the University of Michigan Law School and is a professor in the LL.M taxation programs at the University of Alabama and Washington University in St. Louis. He advises and represents clients on ERISA matters at the law firm of Butzel Long, where he is a non-equity shareholder. He has published several law review articles and three casebooks on ERISA-related topics.

Defendants are correct that legal argument belongs in briefs, not expert reports. *RLJCS Enters., Inc. v. Pro. Benefit Tr. Multiple Emp. Welfare Benefit Plan and Tr.*, 487 F.3d 494, 498

(7th Cir. 2007). But Stumpff's report provides an explanation of potential legal exposure that Segerdahl risked, which risk could easily have motivated Segerdahl's decision-making. *See United States v. Blount*, 502 F.3d 674, 680 (7th Cir. 2007) ("There is a difference between stating a legal conclusion and providing concrete information against which to measure abstract legal concepts."). Here, Stumpff's testimony aids the factfinder in understanding what the securitization risk was and why Segerdahl may have been motivated to—as Rush argues—move too quickly in its sale. Stumpff is not offering his testimony for legal argument, such as opining on whether Segerdahl should pay damages for its securitization practices. Nor does he attempt authoritatively to interpret Internal Revenue Service guidelines as they relate to Segerdahl. *See Roundy's Inc. v. NLRB*, 674 F.3d 638, 648 (7th Cir. 2012) (affirming exclusion of expert testimony "about Wisconsin property law and the nature of Roundy's' property interests at each of its leased facilities"). Rather, he points to a concern—one apparently shared by Segerdahl's outside counsel—that plausibly motivated the company's reasoning.

Flowing from this, Defendants' second ground to exclude Stumpff's testimony is that the chain of events he sets out is too speculative. That concern goes to the weight of the testimony, however, not to its admissibility, and can be addressed on cross-examination at trial. *See Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000) ("The question of whether the expert is credible or whether his or her theories are correct given the circumstances of a particular case is a factual one that is left for the jury to determine after opposing counsel has been provided the opportunity to cross-examine the expert regarding his conclusions and the facts on which they are based.").

Defendants' motion to exclude the expert testimony of Andrew Stumpff is denied.

### D.       Rush's Motion to Exclude Expert Testimony of Lee Bloom

Rush moves to exclude the expert testimony of Defendants' valuation expert, Lee Bloom. Defendants proffered Bloom to opine on whether the valuation and fairness opinion tendered by Stout prior to the sale properly applied a CSRP to Segerdahl's valuation, and whether the potential for a 338(h)(10) tax election and a sale-leaseback transaction were properly factored in. Rush argues that Bloom's testimony should be excluded because it is inconsistent with Bloom's prior testimony in a separate case, he did not cite or rely on outside sources, he fails to support his opinions on the sale-leaseback transaction and makes mistakes of fact, and his opinions about the 338(h)(10) election are unsupported. Because Rush's arguments are better addressed on cross-examination than pre-trial by means of a *Daubert* motion, Bloom's testimony will be permitted.

As an initial matter, the Court notes that Bloom is well qualified. While Rush challenges his qualifications by noting that he does not hold a professional certification in valuation, Rush does not specify which, if any, certification would be adequate. Bloom is the former Chairman of the Valuation Advisory Committee of the ESOP Association, founded a firm that conducts valuations for ESOPs, and was professionally involved in ESOP valuation at another firm. (Decl. of Michael Mulder, Ex. A ("Bloom Report") at 1, 2, 24, Dkt. No. 219-1.) Lack of a specific professional credential does not disqualify Bloom's report—particularly when Rush fails to state which credential he would prefer Bloom to have. *Tuf Racing Prods., Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000) ("The notion that *Daubert* . . . requires particular credentials for an expert witness is radically unsound.").

### 1. Inconsistency with Prior Testimony

With respect to the inconsistency criticism, Rush argues that in a 2016 case Bloom, as an expert for GreatBanc, testified as a fact witness that he never applied a CSRP because they are "theoretically wrong." *See Fish v. GreatBanc Trust Co.*, No. 09 C 1668, 2016 WL 5923448 (N.D. Ill. Sept. 1, 2016). But in *Fish*, Bloom was not only a fact witness, he testified regarding a valuation that had already "accounted for Company-specific risks by lowering the Company's projections[.]" *Id.* at *28. Because there was already a downward adjustment on that Company's value, applying a CSRP "would have amounted to inappropriate double-counting." *Id.* No such double-downward-adjustment is present here. Thus, Bloom's prior testimony is not inconsistent on its face—it was rendered in a different capacity and in response to a different situation. More importantly, even if the prior testimony were inconsistent, that would be an issue to explore on cross-examination and not a reason to exclude Bloom's testimony altogether.

### 2. Sourcing

Next, Rush argues that Bloom did not cite or rely on any academic or professional literature on business valuation. As support, Rush cites Bloom's deposition, in which—as Rush describes it—Bloom "refused to testify that he relied on the books Defense counsel identified" out of fear that a plaintiffs' attorney would nitpick the book itself. (Pl.'s *Daubert* Mot. re: Lee Bloom ("Bloom Mot.") at 7, Dkt. No. 218.) But Rush misstates Bloom's deposition testimony. Bloom may not have used the word "rely," but when Rush's counsel defined "rely" as to "[p]hysically open up the book and review what it says," Bloom responded that he "opened up books and reviewed what they said," he just had not quoted them in his reports. (Decl. of Michael Mulder in Support of Bloom Mot., Ex. I ("Bloom Dep.") at 126:17–25, Dkt. No. 219-9.) Bloom testified that he did not cite the books about which he was asked because he viewed them

as "reference book[s]" rather than "the be all and end all of valuation or the only source that you

should look to." (*Id.* at 128:2–4.) This testimony does not lead to an inference that Bloom

"fail[ed] to cite or rely on industry sources or standards." (Bloom Mot. at 8.)

### 3. Sale-Leaseback

Rush also raises issues with Bloom's methodology in evaluating Stout's consideration of

a potential sale-leaseback of Segerdahl property. In Rush's reply brief, he claims that his attack

on Bloom's sale-leaseback opinions is not one of substance—a dispute over the accuracy of his

conclusions—but rather one of qualification and methodology. (Pl.'s Reply in Supp. of Bloom

Mot. ("Bloom Reply"), Dkt. No. 272 at 8. But at bottom, they read as disputes with the

conclusion Bloom reaches.

Rush raises four main grounds of contention. First, he argues that Stout's valuation report

failed to attribute value to the sale-leaseback transaction and raises a number of points

questioning Bloom's qualifications to opine on sale-leaseback valuation. To be sure, Bloom is

not an expert on constructing sale-leaseback transactions. (Bloom Dep. at 39:19–20.) But that is

not the scope of his report. Rather, he was asked to what extent such a transaction would affect

valuation. (Bloom Report at 4.) And as discussed previously, Bloom is well-qualified to opine on

valuation. Given that Bloom's opinion sounds in his area of expertise, the Court finds his opinion

sufficiently reliable to be heard.

Second, Rush argues that Stout's work papers use different weighted average cost of

capital ("WACC") assumptions than its final report, which Bloom allegedly failed to factor in to

his opinion. But that change does not appear to be a material one; indeed, as Defendants note,

Van Vleet does not discuss the draft WACC assumptions in his rebuttal to Bloom's report.

Presumably, if this were so glaring a reliability error as to warrant exclusion, it would be raised

23

in the report responding directly to it. In any case, Bloom's WACC opinions can be attacked on cross-examination. *Metavante*, 619 F.3d at 762.

Third, Rush argues that Bloom erroneously opines that the sale-leaseback would have lowered Segerdahl's borrowing capacity and valuation. But Segerdahl's credit agreements prohibited sale-leaseback transactions without lender approval and counted lease payments against EBITDA. (Defs.' Opp. to Bloom Mot. at 10 & n.39, Dkt. No. 236.) Again, this is a challenge better raised by Rush on cross-examination. *Metavante*, 619 F.3d at 762.

Fourth, Rush raises Bloom's discussion of "off balance sheet" benefits of the sale-leaseback. As Bloom describes it, the off-balance sheet benefit of a properly structured sale-leaseback essentially hides the lease payments—the lease payment appears on the income statement but the "value of the future payment stream would not be included as a liability on the balance sheet." (Bloom Report at 10.) Rush contends that Bloom's opinions lack support and are unrelated to the case. But Bloom's qualifications as an expert provide a basis to conclude that his opinion is reliable. And understanding why a company might benefit from a sale-leaseback transaction aids the factfinder in determining why such a transaction would be a point of contention.

### 4. *338(h)(10) Election*

Finally, Rush argues that Bloom improperly gives no value to a potential 338(h)(10) tax election, despite JPMorgan and ICV estimating the benefit to be greater than $40 million. This contention appears to misread Bloom's report, which states that the tax election "is not an intrinsic source of value ***necessarily included in the assessment of a company's fair market value . . . or in considering the financial fairness of a transaction***." (Bloom Report at 12.) It can simultaneously be true that there is value to the parties in a specific transaction in a

338(h)(10) election, while at the same time the election does not factor into FMV. Rush is free to chip away at Bloom's basis for his conclusion on cross-examination, but Rush does not show that the opinion crosses the line into unreliability.

Rush's motion to bar the expert testimony of Lee Bloom is denied.

### E. Rush's Motion to Bar Testimony of Defendants' Rebuttal Expert Mark Hahn

Finally, Rush moves to bar the testimony of rebuttal expert Mark Hahn. Defendants proffer Hahn to rebut the expert reports of Galente and Van Vleet. Specifically, Hahn was asked to respond to: (1) whether Van Vleet's analysis used reasonable comparators for Segerdahl; (2) whether Galente's analysis used reasonable comparators; (3) whether Galente's line between financial and strategic buyers reflected the industry and Segerdahl's marketing; and (4) whether Galente showed that either strategic competitor—Quad or RRD—would likely have paid more for the company. Rush challenges Hahn's qualifications, argues he employed unreliable methodology, and contends that he opined outside the scope of a rebuttal report.

The Court first finds that Hahn is qualified to opine on these topics. He founded and is the Senior Managing Director of a firm that advises and consults printing industry clients on M&A issues. (Decl. of James Bloom, Ex. A ("Hahn Report") at 49, Dkt. No. 224-1.) He runs a blog, *The Target Report*, that publishes monthly summaries of printing industry M&A activity, and which is republished by a number of industry publications each month. (*Id.* at 5.) He has spoken at a number of industry events on topics like valuation and M&A trends. (*Id.* at 52.) Each of these qualifications relates to the subject matter of his opinion, which at a high level is an industry-specific look at the characteristics of various M&A partners. Hahn's experience qualifies him as an expert. *See Tuf Racing Prods.*, 223 F.3d at 591 ("[A]nyone with relevant

expertise enabling him to offer responsible opinion testimony helpful to the judge or jury may qualify as an expert witness.").

The thrust of Rush's methodological challenge is that Hahn's report simply counts transactions and does not take into account their broader context, and that he fails to account for transactions in 2016 and 2017 in his "Setting the Stage for 2016" section. Rush only seems to challenge Tables 1 through 4 of Hahn's report, which purport to do no more than count transactions, notably including distressed transactions, in 2015. (Hahn Report at 11–15.) It is not clear how including transactions that took place in 2016 and 2017 would assist Hahn in "Setting the Stage for 2016." Rush further ignores the remainder of Hahn's report in arguing that he failed to include relevant information in reaching his conclusion. Hahn may not have used the precise methodology that Rush wants him to have used, but *Daubert* motions are not vehicles to argue for a party's preferred methodology. Besides, Hahn considered the effect of a unionized workforce—which Segerdahl had—on price, the effect of the growing digital sector, and the characteristics of market competitors. All of this is relevant context.

Lastly, Rush argues that Hahn exceeded the scope of rebuttal in relation to Galente's report because Galente did not opine on whether Quad or RRD would have paid more than ICV, but rather opined on the vaguer point that strategic buyers (a category Galente acknowledges includes Quad and RRD) often pay more and that their presence can help drive up a negotiated price. If anything, however, the scope of Hahn's rebuttal is narrower than Galente's report. Indeed, Galente notes that JPMorgan was not permitted to contact strategic buyers, and was "specifically precluded from contacting two major strategic buyers—[Quad] and [RRD]." (Galente Report at 8.) The clear inference is that when Galente opines on how strategic buyers can affect a sale, Quad and RRD are directly implicated. Hahn's report directly responds to a

specific subset of companies discussed in Galente's report. Because "[t]he proper function of rebuttal evidence is to contradict, impeach or defuse the impact of the evidence offered by an adverse party," it fits the scope of rebuttal. *Peals v. Terre Haute Police Dep't*, 535 F.3d 621, 630 (7th Cir. 2008).

Rush's motion to exclude Mark Hahn's rebuttal testimony is thus denied.

## II.      Summary Judgment

Having determined the *Daubert* motions, the Court next turns to Defendants' motions for summary judgment. In considering summary judgment, the Court must determine if a genuine issue of material fact exists such that a reasonable jury could return a verdict for the nonmoving party. *Ziccarelli v. Dart*, 35 F.4th 1079, 1083 (7th Cir. 2022). To prevail, the party seeking summary judgment must identify "specific, admissible evidence showing there is a genuine dispute of material fact for trial." *Grant*, 870 F.3d at 568. Once a properly supported motion for summary judgment is made, the opposing party must respond by setting forth specific facts showing that there is a genuine factual issue for trial. *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018). The Court's function is not to "weigh the evidence" or "determine the truth of the matter," but rather "determine whether there is a genuine issue for trial." *Austin v. Walgreens Co.*, 885 F.3d 1085, 1088 (7th Cir. 2018) (internal quotation marks omitted). In doing so, the Court must view all evidence in the light most favorable to the nonmovant and draw all reasonable inferences in the nonmovant's favor. *Grant*, 870 F.3d at 568.

### A.      Count I

Count I, which is asserted against all Defendants, implicates both the sales claims and the diversion claims. The sales claims relate to the sale of Segerdahl (Defs.' Mot. for Summ. J. on Sales ("Sales Mot.") at 1, Dkt. No. 214), while the diversion claims relate to various

27

compensation packages paid out to certain executives after the sale. (FAC ¶¶ 321–25.) Count I asserts claims for breach of fiduciary duty under 29 U.S.C. § 1104(a)(1). That statute sets out the standard of care required of an ERISA trustee, demanding that they "discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a)(1). To demonstrate a breach of fiduciary duty under ERISA, a plaintiff must show "(1) that the defendants are plan fiduciaries; (2) that the defendants breached their fiduciary duties; and (3) that the breach caused harm to the plaintiff." *Jenkins v. Yager*, 444 F.3d 916, 924 (7th Cir. 2006) (internal quotation marks omitted).

### 1. *Fiduciary Capacity*

With respect to the first element, the plaintiff must show not simply that the defendant was nominally a fiduciary but that the defendant was acting in a fiduciary capacity. *Brooks v. Pactiv Corp.*, 729 F.3d 568, 766 (7th Cir. 2013). That is because an ERISA fiduciary does not always act in a fiduciary capacity. Speaking generally, an act is made in a fiduciary capacity if it involves "'the management and administration of the plan, the management and disposition of plan assets, the dispensation of investment advice,' and benefits determinations." *Svigos v. Wheaton Securities, Inc.*, No. 17-cv-04777, 2018 WL 587190, at *7 (N.D. Ill. Jan. 29, 2018) (quoting *Brooks*, 729 F.3d at 766). Thus, for example, an ERISA fiduciary does not act in a fiduciary capacity when deciding to fire an employee, *Brooks*, 729 F.3d at 766, or when acting as a settlor who "sets, changes, or enforces contribution rates," *Bator v. District Council 4*, 972 F.3d 924, 932 (7th Cir. 2020), or when adopting, amending, or terminating a benefits plan. *Lockheed Corp. v. Spink*, 517 U.S. 882, 890–91 (1996).

To prevail on his claim against each Defendant, Rush must first show that the Defendant acted in a fiduciary capacity. Courts have held that when an ESOP fiduciary is also a corporate

officer, ERISA imposes fiduciary duties "on business decisions from which that individual could directly profit." *Svigos*, 2018 WL 587190, at *9 (following *Johnson v. Courtier*, 572 F.3d 1067, 1077 (9th Cir. 2009)). ERISA applies if "'the plan's assets include employer stock and the officer's decision is one from which he could directly benefit.'" *Godfrey v. GreatBanc Trust Co.*, No 18 C 7918, 2020 WL 4815906, at *8 (N.D. Ill. Aug. 19, 2020) (quoting *Johnson*, 572 F.3d at 1077)). Courts must identify whether a particular action is one that could give rise to a breach under § 1104(a)(1)—that is, whether it is a decision from which the fiduciary ***could*** directly benefit. *Id.* That necessarily requires looking to the substance of the alleged breach, albeit perhaps somewhat superficially. If it is such a situation, the plan fiduciary acted in a fiduciary capacity, and the analysis moves to the substantive breach itself.

Liability for breach attaches when the fiduciary is "acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000). As it relates to the Segerdahl Defendants, there are two actions at issue: the sale of the company and the post-sale payments to certain executives. For GreatBanc, it is the approval of the sale.

### a. Sales Claims

With respect to the sales claims, the "action subject to the complaint" is the shopping process of Segerdahl. *Pegram*, 530 U.S. at 226. Here, Rush focuses on three events: (1) the Board's decision to appoint Schneider as fiduciary despite its alleged knowledge that her intent in pursuing a sale was to seek future employment for herself as opposed to maximize sale value; (2) Segerdahl Defendants' failure to ensure that the sale was for fair market value; and (3) Segerdahl Defendants' general failure to protect the ESOP. (FAC ¶¶ 400, 402, 406.)

29

In both *Godfrey* and *Svigos*, the courts found that plan fiduciaries acted in a fiduciary capacity because their actions raised the risk of self-benefit. To be sure, the actions alleged in *Godfrey* and *Svigos* were more obviously self-interested than here. For example, in *Svigos*, the plaintiff alleged that ERISA fiduciaries invented sham fees to be paid to themselves, "divert[ing] Plan assets." *Svigos*, 2018 WL 587190, at *8. Likewise, in *Godfrey*, the Court found that plaintiffs had adequately pleaded a fiduciary breach claim because, on behalf of the employer, two directors made stock distributions to themselves and other high-ranking members that diminished the ESOP's ownership interest in the company from 95% to around 60%, with the individuals' equity interests correspondingly increasing. *Godfrey*, 2020 WL 4815906, at *9. But the standard elucidated in both cases does not speak to the magnitude of self-dealing's harm—it simply asks whether the officer will benefit from her actions involving the plan and whether the action involved plan assets.

Here, there are several disputes of material fact as to whether officers benefited personally from their actions. For example, the Segerdahl Defendants contend that the fact that Schneider and Bradshaw remained with the post-sale entity was part and parcel of a corporate acquisition—just a part of doing business. Rush, however, asserts that it illustrates that Defendants engaged in self-interested attempts to secure a long-term benefit that caused the company to be sold for less than it otherwise would, resulting in a lower payout for ESOP shareholders. That Schneider and Bradshaw both had substantial financial interests from their SARS awards in the sale itself does not negate that both also had substantial interests in the post-sale entity—indeed, as Rush contends, their shares in the post-sale entity may have been ***more*** substantial. The Board's refusal to market to strategic buyers raises disputed issues as well. Rush has presented evidence that Schneider knew that a strategic buyer would pay more than ICV

30

offered and that Vergamini had said he could have sold the company for more than $320 million, both points that the Segerdahl Defendants dispute. Additionally, the temporal connection between the Board being informed of potential IRS liability and the return, "hat in hand," to ICV after rejecting their offer could be seen by a reasonable factfinder as indicative of a sale rushed through so as to ensure a personal employment benefit rather than a maximum return.

This is not a circumstance where Rush claims that the only self-interest implicated by the sales process was payout of ESOP shares and SARS awards. After all, it would be unreasonable to suggest that a fiduciary who participates in an ESOP can never cash out if the company is sold. Here, by contrast, Rush has pointed to sufficient evidence from which a reasonable juror could find that self-dealing motivations may have been at play and each of the Segerdahl Defendants is implicated by that possibility. The Board appointed Schneider and Joutras as named fiduciaries, and a reasonable juror could find that the Outside Directors had conflicts of interest in the first place. (SRPSAF ¶¶ 17–20.) Likewise, a reasonable juror could find that the Board Defendants were so motivated to sell that they overlooked the potential for better offers, either out of eagerness to leave the company for Joutras or out of hope for stock awards and longer-term employment for Schneider.

In short, there remains a genuine question of material fact as to whether the Segerdahl Defendants acted as fiduciaries while shopping the company.

b.    *Diversion Claims*

The diversion claims are those relating to the various compensation packages paid out to Joutras, Bradshaw, and White after the sale of Segerdahl. (FAC ¶¶ 321–25.) As described in greater detail above, each of the three executives signed a revised employment agreement some time before the ICV sale. Joutras became an employee, rather than the CEO, and as a result his

compensation was altered and his non-compete and non-solicitation agreements were extended. Bradshaw, the CFO, was provided with a transaction bonus if the Segerdahl sale closed before the end of 2016. Meanwhile, White, who was the EVP Sales when Schneider took over as CEO, did not fit into Schneider's plans. She chose to "exit" him in favor of a different candidate, but rather than cut him loose, he agreed to a $300,000 separation package and—most importantly to Schneider and the Board—a non-compete and non-solicitation agreement, by neither of which was he was previously bound. After the sale to ICV closed, Segerdahl paid out Bradshaw's bonus and continued paying out its obligations to Joutras and White. According to Rush, this impermissibly diminished the ESOP's funds.

The main ground Defendants advance for summary judgment in their favor on the diversion claims is that the record establishes that the post-sale payouts simply complied with contractual obligations—ones that the Board entered into in its corporate, rather than fiduciary, capacity—and that no reasonable factfinder could find otherwise.

In contrast to the sales claims, with respect to the diversion claims, Rush fails to demonstrate a genuine dispute of fact as to whether these were transactions from which the acting fiduciary could directly benefit. *Godfrey*, 2020 WL 4815906, at *8 (noting that the relevant officer's decision must be one from which he could directly benefit). Even when viewed in the light most favorable to him, Rush's evidence consists of coincidence and conjecture. For example, he notes that Bradshaw signed Joutras's agreement after Joutras signed Bradshaw's agreement, implying a quid pro quo arrangement. (SRPSAF ¶ 46.) But this does not create a dispute of material fact as to the existence of collusion. Either the agreements would be signed at the same time or one would be signed before the other. Rush's evidence of collusion goes no farther than stating that such occurred. Rush also points out that White was related to Joutras by

marriage, again suggesting that this fact alone evidences a quid pro quo. But this is nothing more than innuendo. Indeed, Rush's most glaring accusation—that Joutras and White received SARS awards contrary to the SARS plan because they were forfeited on termination—is not supported by the record. (Pl.'s Opp. to Summ. J. ("Sales Opp.") at 29, Dkt. No. 238; SRPSAF ¶ 48.) Moreover, as the Segerdahl Defendants point out, neither Joutras nor White was actually terminated; rather, their employment simply continued in different roles under their revised employment agreements.

Rush also points out that the Board discussed the reworked agreements with Joutras and Bradshaw at their meeting but did not finalize or approve them. But Segerdahl has presented the Board's written consent to, among other things, Joutras and Bradshaw's employment agreements. Rush also contends the agreements were not presented to GreatBanc, but it is not clear why this is important. It does not appear that GreatBanc had to approve compensation decisions—and if there was fear of self-dealing, GreatBanc reviewed the agreements before approving the sale.

Defendants, by contrast, present evidence of clear reasons why the agreements were amended. As to Joutras, the Outside Directors decided to rework his title and compensation because he did not want to remain as CEO, but they wanted to ensure his continued employment with the company. They also wanted to ensure that he was under a non-compete and non-solicitation agreement during the shopping process. (PRSSF ¶ 54.) As to Bradshaw, the Board determined that a transaction bonus was beneficial so as to keep Bradshaw with the company until a transaction closed; ensuring that the CFO did not depart during that process, they felt, was important for continuity. (*Id.* ¶¶ 55–56.) And as to White, Schneider quickly decided after becoming CEO that she did not want to keep him as EVP of Sales but she wanted him to stay on

board until a sale was completed. Moreover, she wanted to ensure that he could not easily join a competitor—after all, he had significant knowledge of Segerdahl's customers, sales processes, and compensation to salespeople, and she feared he could easily poach Segerdahl salespeople with this knowledge. This was heightened due to the fact that few, if any, Segerdahl salespeople were subject to non-compete agreements. (*Id.* ¶¶ 57–58.)

Rush's only response is that the Board discussed, but did not approve, the transactions and that Joutras and Bradshaw signed each others' agreements on the same day. (PRSSF ¶¶ 54–58.) Yet the Board minutes at that meeting also discuss "the plan to circulate written resolutions to approve the actions contemplated by the Board . . . and the execution of the agreements." (Decl. of K. Harrell at 213, Dkt. No. 216-3.) And the timing of Joutras's and Bradshaw's signatures is indicative of little more than that they were in the same place at the same time.

For these reasons, Rush fails to present evidence that creates a genuine issue of material fact as to whether the Segerdahl Defendants acted in a fiduciary capacity with respect to the "diversion claims." Accordingly, the Court need not assess whether they breached their fiduciary duties with respect to those claims. As a result, The Segerdahl Defendants' motion for summary judgment on the diversion claims in Counts I and IV is granted.[11]

### 2. Breach

Turning to the "sales claims," the Segerdahl Defendants argue they are entitled to summary judgment because even if the factfinder finds they acted as fiduciaries, they adhered to the "careful rather than bold" standard that governs fiduciary acts under ERISA. *See Armstrong*

---

[11] GreatBanc's summary judgment argument focuses on whether was a breach of its fiduciary duty, not whether it was acting in a fiduciary capacity. This is unsurprising given that, while GreatBanc's role in the sale is subject to some dispute, both sides agree that it did not participate in the negotiation or shopping process. (PRSSF ¶ 16.)

*v. LaSalle Bank Nat'l Ass'n*, 446 F.3d 728, 733 (7th Cir. 2006). But the "careful rather than bold" language oft-repeated by the Segerdahl Defendants, while vivid, is not the actual legal standard but rather a gloss on the prudent man standard of care, 29 U.S.C. § 1104(a), which applies to ESOP trustees in all relevant respects. *Fifth Third Bancorp v. Dudenhoffer*, 573 U.S. 409, 418–19 (2014).[12]

ERISA defines the prudent man standard of care, in part, as a requirement for a fiduciary to "discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries . . . ." 29 U.S.C. § 1104(a)(1). The Seventh Circuit has identified three non-exhaustive factors to determine "whether the plan administrators acted solely in the interest of the plan beneficiaries": (1) risk of conflicts of interest; (2) fiduciaries with divided loyalties; and (3) consistent management of the plan over a substantial period of time. *Leigh v. Engle*, 727 F.2d 113, 127 (7th Cir. 1984).

*a.     Sales Claims*

The Segerdahl Defendants center their argument for lack of a breach on their substantive and procedural prudence during the sales process. Specifically, they point to two decisions they claim were prudent: the decision to shop first to financial buyers (as opposed to strategic buyers) and the decision to recommend that GreatBanc approve ICV's offer. Rush responds that the Segerdahl Defendants' conflicts of interest led to imprudence on both fronts and that the sale process was rushed.

The Segerdahl Defendants argue that offering the company to financial buyers allowed the company to capture illiquid gains in value while avoiding risks inherent in shopping to

---

[12] An ESOP trustee, unlike a typical trustee, does not have the duty to "diversify the ESOP's holdings." *Dudenhoeffer*, 579 U.S. at 419. This makes sense, because an ESOP by definition does not have diversified holdings. But diversification is irrelevant to this case.

strategic buyers. Such inherent risks included the possibility of Quad or RRD obtaining private "pricing, marketing, technological capabilities, and compensation information" during the sales process, as well as potential loss of salesmen, upon whom Segerdahl did not impose non-compete agreements. (Sales Mot. at 15.) But Rush has presented evidence that the decision not to shop to strategic buyers may have been motivated by a desire to preserve jobs rather than to maximize value; indeed, he offers disputed evidence that at least Schneider and Vergamini knew that strategic buyers would have paid more than ICV. (SRPSAF ¶ 76; PRSSF ¶ 9.) And Rush disputes that strategic buyers posed an inappropriate risk to Segerdahl's business, offering expert evidence of often-used ameliorative techniques. (PRSSF ¶ 11.) Moreover, there is a dispute as to whether the Outside Directors were fully independent or whether they were following along with Joutras and Schneider's strategy. (*Id.* ¶ 26.)

Viewed in the light most favorable to Rush, this evidence could lead a reasonable factfinder to conclude that the shopping process was imprudent. Given the benefits that strategic buyers often bring, the fact that there are ways to reduce risk of information loss, and the possibility of more expensive offers, a reasonable factfinder could find that Segerdahl acted imprudently in omitting strategic buyers from the sales process.

With respect to their recommendation that GreatBanc approve the offer, the Segerdahl Defendants argue that they retained an experienced bank, JPMorgan, to shop the company, rejected one bad offer from ICV before accepting a better offer, and adequately liquidated Segerdahl's increased value. They also note that Segerdahl touted the benefits of a sale-leaseback transaction and 338(h)(10) election. But retaining JPMorgan, while "certainly evidence of prudence, is not sufficient to entitle defendants to judgment as a matter of law." *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 799 (7th Cir. 2011). Moreover, Rush presents disputed

evidence that just prior to closing the sale, JPMorgan told the company's management that the company could have sold for $320 million, likely to Quad. (SRPSAF ¶ 76.) And just one day before negotiations with ICV resumed—eventually resulting in a deal—Segerdahl's outside counsel had informed the Board that they were potentially open to significant liability due to inadequate securitization of ESOP payouts made in 2014. (*Id.* ¶¶ 31, 68–69.) Taken in the light most favorable to Rush, a reasonable factfinder could determine that JPMorgan refused to contact (or was prevented from contacting) viable buyers who would have paid more for Segerdahl. Such a factfinder could also conclude that the "better deal" Segerdahl obtained from ICV was not all that much better, only entered into in a rush to avoid liability from the 2014 payouts.

As to procedural prudence, the Segerdahl Defendants' argument mainly centers around the Board's hiring of JPMorgan to advise and guide the sale, but also includes Joutras's adherence to best practices in hiring the Outside Directors. Segerdahl Defendants also argue that there are no allegations of wrongdoing or misconduct against the Board. As already discussed, however, reliance on advisors is not dispositive as to prudence. *George*, 641 F.3d at 799. Rush has presented evidence regarding the conflicts of each Board member appointed by Joutras, all of which is in dispute. (SRPSAF ¶¶ 17–20.) For one Board member, Peter Mason, Rush notes that GreatBanc's counsel expressed concern with the fact that Segerdahl's corporate counsel now sat on its board. (*Id.* ¶ 20.) Another saw himself as Joutras's partner. (*Id.* ¶ 17.) And Rush clearly argues that the Board engaged in wrongdoing and misconduct. Looking to the evidence he presents, view in the light more favorable to him, it was the Board who directed that ongoing employment was a primary goal of the sale. (*Id.* ¶ 55.) He also presents evidence that the Board, immediately after being informed of the risk of personal liability due to past securitization

decisions, chose to "go back to ICV 'hat in hand'" after refusing an inadequate deal from ICV. (*Id.* ¶ 69.)

The Segerdahl Defendants also argue that GreatBanc's role as the ultimate approver of the sale insulates Segerdahl Defendants from liability. They cite *Neil v. Zell*, 677 F. Supp. 2d 1010, 1023 (N.D. Ill. 2010), and *Sommers Drug Stores Co. Employee Profit Sharing Trust v. Corrigan Enterprises, Inc.*, 793 F.2d 1456, 1459–60 (5th Cir. 1986), for the proposition that GreatBanc essentially removes Segerdahl Defendants as fiduciaries by virtue of its authority to review and approve the sale on the ESOP's behalf. (Sales Mot. at 13.) Rush responds that even though GreatBanc was the fiduciary responsible for approving the sale, it was not the only fiduciary. (Sales Opp. at 15.) Indeed, *Neil* is inapposite because it addresses a different alignment: an ESOP had been created, and the Board's decision was whether to sell the company to the ESOP, not whether the ESOP should sell the company. *Neil*, 677 F. Supp. 2d at 1022. "Generally speaking, the act of creating a plan and decisions leading up to that act are not fiduciary acts." *Id.* By contrast, the actions at issue in this case pertain not to the creation of a plan but rather decisions leading up to the sale of a plan-owned company.

There are cases holding that, in some situations, the presence of an independent trustee whose role is to approve a transaction can ensure that a sale is in the ESOP's best interests. *See Fish*, 2016 WL 5923448; *Foster v. Adams & Assocs., Inc.*, No. 18-cv-02723-JSC, 2020 WL 3639648 (N.D. Cal. July 6, 2020). But those cases address a different ERISA provision, one which asks whether the ERISA trustee "cause[d] the plan to engage in a transaction." 29 U.S.C. § 1106(a)(1). The presence of an independent trustee to approve a transaction can plausibly insulate a director from causal liability. But here, the question is whether a fiduciary duty was breached. This differs materially from the underlying "causation" action in a § 1106(a) claim. An

independent trustee retained to approve a transaction can insulate the negotiator from liability for causing the transaction, particularly when the negotiator simply presented a deal to the trustee for evaluation and asked the independent trustee for approval. But it is less clear that an independent trustee can do the same regarding a breach that occurred during the shopping process.

Because the retention of GreatBanc does not, as a matter of law, relieve the Segerdahl Defendants from liability for any breach during the shopping process, there remains a genuine question of material fact as to whether Segerdahl Defendants breached a fiduciary duty to the plan during the sales process. Accordingly, Rush has demonstrated a genuine issue of material fact as to whether the Segerdahl Defendants adhered to the prudent man standard of care set out in ERISA.

### b.  GreatBanc

In arguing that it did not breach a fiduciary duty, GreatBanc similarly points to its substantive and procedural prudence during the sales process. As to substantive prudence, GreatBanc argues that Quad and RRD were not viable partners because they could not pay a premium for the company as strategic buyers typically do. As a result, the underlying sale process—which JPMorgan carried out on behalf of the company—was proper. And the underlying propriety of the sale process, GreatBanc argues, insulates its approval of the sale from liability.

It is certainly plausible that Quad and RRD would not be able to pay a premium and thus their exclusion from the sale process was proper. The Segerdahl Defendants present expert testimony that both Quad and RRD, despite having engaged in M&A activity in 2014 and 2015, were no longer in a position to acquire another firm, let alone pay a premium to do so. RRD had recently announced that it would split into three publicly-owned companies, and Quad was over-

leveraged. (Decl. of Katelyn Harrell, Ex. B ("Vergamini Dep.") at 164:7–165:11, Dkt. No. 216-3.) On the other hand, Rush presents evidence that GreatBanc ignored signs that management failed to pursue a potentially larger sale because they felt the buyer was a poor strategic fit. (Pl.'s Resp. to GreatBanc SOF ¶ 17(b).)

And as to procedural prudence, GreatBanc notes that Segerdahl retained JPMorgan to shop the company and followed best practices in the retention of the three Outside Directors. It argues that Segerdahl's procedural prudence insulates GreatBanc because a prudent process makes a breach of fiduciary duty impossible. But while hiring consultants—and even following their advice—is "evidence of prudence, it is not sufficient to entitle defendants to judgment as a matter of law." *George*, 641 F.3d at 799. This is especially so when the scope of the consultants' independence is limited. (*See* GRPSAF ¶¶ 1, 5; PRSSF ¶¶ 10–12, 38.)

To be sure, limiting the search to strategic buyers might have benefits outside the ESOP, like continued employment for at least some employees. But taking the facts in the light most favorable to Rush, there is a genuine question of material fact as to whether the sale process was prudent. Eliminating several possible sale targets raises questions as to whether the shopping process prioritized the ESOP. And the Court rejected similar arguments in response to Segerdahl's motion for summary judgment on the sales claims.

When viewing the facts in the light most favorable to Rush, a reasonable factfinder could conclude that GreatBanc rubber-stamped a deal it was given despite knowledge (or willful ignorance) that it did not represent the best possible return for the ESOP.

### 3. *Damages*

#### a. *Sales Claims*

Finally, the Segerdahl Defendants argue that Rush cannot prove damages, a necessary element to a fiduciary breach claim under ERISA. *Jenkins*, 444 F.3d at 924. As support, the Segerdahl Defendants contend that Rush does not argue that the company should not have been sold in December 2016, and that he cannot show that another buyer would have paid more for Segerdahl.

As to what another buyer might have done, Rush has presented evidence that JPMorgan's representative told him and other management that the company could have sold for $320 million but that the Board would not permit it. The Segerdahl Defendants respond that Rush's testimony on this point is either a misunderstanding or a fabrication. Certainly, the Segerdahl Defendants can challenge this evidence at trial, but summary judgment is not the place to weigh the believability of competing testimony. At the very least, Rush's evidence regarding the potential of a $320 million sale creates a genuine issue of material fact as to damages.

#### b. *GreatBanc*

Lastly, GreatBanc argues that Rush fails to prove damages. It argues that there is no breach without damages, similarly noting that Rush neither contends that Segerdahl should have sold before December 2016 nor shows that another buyer would have paid more money for Segerdahl.

But Rush has presented evidence that Vergamini, the JPMorgan employee in charge of the Segerdahl shopping process, told Rush and other management that he could have sold the company to a strategic buyer for $320 million. (SRPSAF ¶ 76.) As discussed in relation to Segerdahl's motion, summary judgment is not the appropriate posture for resolving this claim.

Taking the facts in the light most favorable to Rush, there is a genuine question as to whether Segerdahl's sale price would have been higher if the company was shopped to a strategic buyer.

***

In sum, for the reasons discussed above, the Court concludes that summary judgment on Count I must be denied as to GreatBanc. As to the Segerdahl Defendants, however, summary judgment is granted on Count I as to the diversion claims but denied as to the sales claims.

### B.        Counts II and V

Defendants also seek summary judgment as to Counts II and V, which are asserted only against Schneider and Joutras and do not include the Outside Directors. Count II alleges breach of fiduciary duty and a prohibited transaction regarding Schneider's post-sale interest in ICV and Joutras's payouts pursuant to his SARS award and employment contract. Count V alleges that, as non-fiduciaries, Schneider and Joutras knowingly participated in breaches of fiduciary duties, unlawfully profiting as a result. It appears that the breach from which they allegedly benefited is the diversion of assets. (FAC ¶ 442 ("As a result of the fiduciary breaches and prohibited transactions described herein, Defendants Schneider and Joutras received millions of dollars that otherwise would have been paid to the ESOP.").)

Yet the Court has dismissed the underlying claims of breach regarding the diversion claims. That alone supports granting summary judgment—after all, if the payout under Joutras's contract and the money that Rush alleged would have otherwise gone to the ESOP is permissible as a matter of law, Joutras and Schneider cannot have caused any breach to occur as it relates to those payments. The same is true of Count V, to the extent that it implicates the diversion claims—if there was no breach, there can be no ill-gotten gains from that breach for these purposes.

But Count II also includes claims relating to the sale itself. (FAC ¶ 416.) The prohibited transaction claims, for example, appear to arise entirely as sales claims because the sale is the transaction that Rush alleges to have been prohibited. The Segerdahl Defendants, though, only seek summary judgment as to Count II with respect to the diversion claims. Thus, Count II cannot be dismissed in full on this motion—rather, to the extent Ruch asserts claims in Count II relating to the sale of Segerdahl, it survives the motion. Likewise, Count V appears to assert at least some claims implicating the sales claims. (*See* FAC ¶ 442 ("As a result of the fiduciary breaches and prohibited transactions described herein . . . .").) The language appears to subsume sale-related benefits.

Summary judgment is granted on Counts II and V only to the extent that they implicate the diversion claims.

### C. Count III

Count III alleges that GreatBanc approved a prohibited transaction because it approved the Segerdahl sale "with actual knowledge that Defendant Schneider would be purchasing shares, directly or indirectly, from the ESOP." (FAC ¶ 428.) There are several types of transactions that are "flatly prohibited" under ERISA. *Allen v. GreatBanc Tr. Co.*, 835 F.3d 670, 674 (7th Cir. 2016). Here, Rush alleges that GreatBanc has violated 29 U.S.C. §1106(a)(1)(A), which provides that "[a] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect sale or exchange, or leasing, of any property between the plan and a party in interest." (FAC ¶ 424.)

GreatBanc first argues that ERISA's prohibited transaction rules should not be construed to cover Schneider's post-sale investment. It raises the point that Schneider did not buy stock from the ESOP—the ESOP sold Segerdahl to ICV and then, after the sale, Schneider used some

of the payout from her SARS award to invest in the post-sale entity. Rush responds that Schneider "was a co-investor with ICV in the ESOP sale, and purchased shares from the ESOP during the transaction by rolling her SARS proceeds into the transaction." (GRPSAF ¶ 26.) Both parties cite the same capitalization table to reach very different conclusions: GreatBanc concludes that it shows Schneider investing in a post-sale entity, and Rush concludes that it shows Schneider, a fiduciary, funding the buyout itself. (Decl. of K. Harrell, Ex. A at 1, Dkt. No. 209-2.) This difference is material because Schneider is the party-in-interest, and if she directly transacted with the ESOP, the transaction falls within § 406(a).

Rush goes further, arguing that Schneider purposely negotiated a lower sale price to allow her to purchase a larger stake in the post-sale entity as well as secure a position as CEO. For one thing, Rush presents evidence that Schneider did participate—at least to some extent—in the negotiation of the sale, contrary to GreatBanc's denial. (Mem. Order & Op. Granting Mot. to Certify Class at 5, Dkt. No. 188; PRGSF ¶¶ 50–52.) The parties also appear to conflate who Rush alleges is the party-in-interest. For example, GreatBanc argues that Schneider's continued employment after the sale does not "morph ICV into a party-in-interest." (Defs.' Reply in Support of Summ. J. at 15, Dkt. No. 266.) But the FAC alleges that Schneider, not ICV, was the party-in-interest. (FAC ¶ 425.) Elsewhere, GreatBanc argues that ICV is an unrelated party, which means that a party-in-interest (Schneider) transacting with it is not forbidden under 29 U.S.C. § 1106(a). (GreatBanc Mot. for Summ. J. at 12, Dkt. No. 207.) But this goes directly to the inconsistent conclusions drawn by the parties as to the capitalization table, and the Court declines to resolve that dispute at the summary judgment stage.

Rush has shown a genuine issue of material fact. He has presented evidence that Schneider participated in the negotiation process and that she immediately invested in the post-

sale entity. If the sale price was lower than it could have been, the same dollar value could purchase a higher percentage interest in the post-sale entity. GreatBanc's argument is not sufficient to eliminate any issue of material fact as to whether Schneider, a party-in-interest, transacted with the ESOP. GreatBanc also has not adequately established that Schneider did not transact, either directly or indirectly, with the ESOP.

But ERISA does not prohibit all transactions with a party-in-interest. Rather, if an "acquisition, sale, or lease is for adequate consideration," it falls outside the prohibited transaction rules. 29 U.S.C. § 1108(e). And GreatBanc argues that even if Schneider's investment was a prohibited transaction, it was for adequate consideration and therefore permissible under § 1108(e)(1). The material question is whether the sale of Segerdahl was for adequate consideration and, secondarily, whether GreatBanc properly relied on the fairness opinion prepared by Stout. This question is similar to that laid out in the fiduciary breach claim against GreatBanc in Count I. Both ask whether GreatBanc behaved properly in approving the sale and relying on the information it was provided, and whether Segerdahl's sale price was proper. The Court has denied summary judgment on Count I as to the sales claims. Based on the analogous analysis here, the Court finds a genuine question of fact regarding the adequacy of consideration.

### D.    Count IV

Count IV asserts a claim for breach of co-fiduciary duty under 29 U.S.C. §§ 1105(a)(1)–(3). Those provisions make a plan fiduciary liable for a breach by any other fiduciary when any of three conditions are met: a fiduciary participates in or knowingly conceals an "act or omission" of another fiduciary with the knowledge that the act or omission is a breach; a fiduciary enables another fiduciary to commit a breach by failing to comply with § 1104(a)(1); or

a fiduciary has knowledge of a breach by another fiduciary, unless the fiduciary attempts to remedy the breach.

Because Count IV imputes liability to plan fiduciaries if they had knowledge of an underlying breach, it requires an underlying breach in the first place. No party has presented evidence sufficient to determine as a matter of law that any Defendant—whether GreatBanc or one of the Segerdahl Defendants—lacked knowledge of a potential breach, affirmatively did not enable a potential breach, or attempted to remedy a potential breach. The Court has granted summary judgment on Counts I and II as to the diversion claims, so there can be no liability on Count IV for any violations stemming from the diversion claims. But as to Count I's sales claims and Count III, the Court has denied summary judgment and found that trial is appropriate. And as to the portion of Count II that implicates the sale of Segerdahl, Defendants have not sought summary judgment. As a result, there are still potential breaches of co-fiduciary duties with respect to Count I's sales claims, Count II's sales claims, and Count III. Summary judgment on Count IV is denied to that extent.

## CONCLUSION

For the foregoing reasons, Defendants' motions to bar the expert testimony of Daniel Galente (Dkt. No. 200), Daniel Van Vleet (Dkt. No. 202), and Andrew Stumpff (Dkt. No. 204) are denied. Rush's motions to bar the expert testimony of Lee Bloom (Dkt. No. 217) and Mark Hahn (Dkt. No. 222) are also denied. With respect to summary judgment, GreatBanc's motion (Dkt. No. 206) is denied, Segerdahl Defendants' motion on the sales claims (Dkt. No. 213) is denied, and Segerdahl Defendants' motion on the diversion claims (Dkt. No. 210) is granted. By count, summary judgment is denied as to the sales claims in Count I but granted as to the diversion claims in that count. Summary judgment is also granted as to the diversion claims in Count II. Summary judgment is denied on Count III. It is granted on Count IV as to any co-

fiduciary liability stemming from the diversion claims but denied as to any co-fiduciary liability stemming from the sales claims or from Count III. And finally, summary judgment is granted on Count V to the extent it implicates the diversion claims but denied to the extent it implicates the sales claims.

ENTERED:

Dated:  December 15, 2022

Andrea R. Wood
United States District Judge