**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| BRUCE RUSH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 19-cv-00738 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| GREATBANC TRUST CO., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

In 2016, the Segerdahl Corporation ("Segerdahl") sold all shares of its common stock to ICV Partners, LLC ("ICV") for $265 million after a long sales process. Prior to the sale, Segerdahl's common stock was entirely owned by an Employee Stock Ownership Plan ("ESOP"), a type of trust covered by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* Bruce Rush, a vice president at Segerdahl, sued in the wake of the sale, alleging that the company could have sold for a significantly higher price, which would have increased the post-sale distributions to ESOP participants. Rush brought five counts sounding in breach of fiduciary duty, conducting a prohibited transaction, and benefitting from a fiduciary breach against Segerdahl's Board of Directors ("Board")—each member named individually—and GreatBanc Trust Company ("GreatBanc"), the ESOP's independent trustee. The Court previously certified a plaintiff class consisting of ESOP shareholders at the date of the sale. After a bench trial and careful consideration of the record, the Court finds that Rush has failed to prove any of his claims and accordingly enters judgment in favor of Defendants on all counts.

**TRIAL EVIDENCE**

The Court held a 14-day bench trial. During the trial, the Court heard testimony from 13 fact witnesses, including:

- Bruce Rush, the lead plaintiff and former Senior Vice President of Manufacturing at Segerdahl;

- Marcus Bradshaw, Segerdahl's former Chief Financial Officer ("CFO");

- Jeff Vergamini, an investment banker at JPMorgan Chase ("JPMorgan"), who was retained by the Board to lead the sale process;

- Lloyd Metz, a partner at ICV Capital Partners ("ICV");

- Jim Staruck, President and Chief Executive Officer ("CEO") of GreatBanc, who had primary responsibility for its Segerdahl account;

- Rick Joutras, the former CEO of Segerdahl;

- Mary Lee Schneider, Joutras's successor as CEO;

- Andrew Ward, an appraiser at Stout Risius Ross ("Stout"), who handled Segerdahl's valuations along with valuations for other ESOP-owned companies;

- Brian Crumbaugh, an employee at the private equity firm Wynnchurch Capital ("Wynnchurch");

- David Rubenstein, an attorney at the law firm of Faegre Drinker—formerly Drinker, Biddle, & Reath ("Drinker")—who advised GreatBanc during the transaction; and

- three non-employee Board members ("Outside Directors")—Bob Cronin, Rod Goldstein, and Peter Mason.

In addition to those fact witnesses, the Court heard testimony from four expert witnesses:

- Andrew Stumpff, a lecturer at the University of Michigan School of Law and University of Alabama Law School and shareholder at the law firm of Butzel Long, offered by Rush to opine on the consequences of tax issues involved with the ESOP's distribution structure;

- Daniel Van Vleet, managing partner of the Griffin Group, a valuation consulting firm, and Rush's valuation expert;

- Greg Brown, an attorney at the law firm of Polsinelli PC and Defendants' expert on issues relating to tax consequences of the ESOP's distribution structure; and

- Lee Bloom, Defendants' valuation expert, who worked in the valuation group at Duff & Phelps from 1985 until 2006, at which point he opened a solo practice that advises ESOPs on, among other things, finance-related issues.

Along with the live trial testimony, the parties also offered into evidence deposition testimony from two experts: Mark Hahn, the owner of a mergers and acquisitions ("M&A") advisory service and Defendants' expert on M&A aspects of the transaction; and Daniel Galante, the managing director of a consulting firm and Plaintiff's expert on the effect of strategic buyers on a sale. By agreement, each expert's written report was also included as part of the trial record.[1] There are 406 exhibits in the record (not counting the duplicative annotated expert reports): 288 submitted by Plaintiff, 30 submitted by Defendants, and 88 submitted jointly. Any objections to exhibits raised at or before trial are addressed below, as necessary. Finally, the parties agreed to a number of stipulated facts. (Dkt. No. 338-4.)

The trial evidence before the Court is summarized as follows.

## I. History of the ESOP

### A. Formation and Valuation

Segerdahl, founded in 1956, was a commercial direct-mail printer. Direct-mail printing, at least in the niche Segerdahl occupied, consists of printing advertising material for higher-end companies that primarily advertise to their customers through the mail, such as Tiffany's or Costco. According to Joutras, due to the need for expensive fixtures, such as printing presses and other equipment, direct-mail printing is a capital-intensive industry. Moreover, it is a seasonal

---

[1] The parties supplemented the record with annotated versions of each expert report. For example, Galante's report is Plaintiff's Exhibit 260; his annotated expert report is Plaintiff's Exhibit 260a. The only difference between the original and annotated reports is the addition of notes indicating the trial exhibit numbers, if appliable, for various documents on which the expert relied.

industry, with demand for direct-mail services increasing around the Easter, Thanksgiving, and Christmas seasons.

In 2003, Segerdahl's founder approached Joutras to gauge his interest in buying the company. After exploring different acquisition structures, Joutras chose to use an ESOP structure for several reasons, including tax benefits that would aid the company with capital expenses and Joutras's belief in collective ownership by the workers. The ESOP bought all shares of Segerdahl's stock for $162.50 per share in 2003.

Stout, a valuation firm, conducted regular valuations of Segerdahl's share price. While Segerdahl was privately owned and not available for public purchase, Stout calculated share prices for redemption purposes. Employees who owned shares in the ESOP could, at defined times, cash in their shares at Stout's calculated valuation. From 2003 to 2010, Stout conducted yearly valuations at the end of each calendar year, then, beginning in 2011, it moved to semi-annual valuations on June 30 and December 31 of each year. Stout's valuations of the ESOP are stated in the table below:

| Date of Valuation | Price Per Share | Percent Change in Share Price from Previous Valuation |
|---|---|---|
| December 31, 2003 | $366.80 | |
| December 31, 2004 | $1,203.90 | 228.2% |
| December 31, 2005 | $754.65 | -37.3% |
| December 31, 2006 | $1,012.05 | 34.1% |
| December 31, 2007 | $1,733.00 | 71.2% |
| December 31, 2008 | $1,949.90 | 12.5% |
| December 31, 2009 | $1,344.90 | -31.0% |
| December 31, 2010 | $1,532.40 | 13.9% |
| June 30, 2011 | $1,670.90 | 9.0% |
| December 31, 2011 | $2,678.75 | 60.3% |
| June 30, 2012 | $2,761.10 | 3.1% |
| December 31, 2012 | $2,914.55 | 5.6% |
| June 30, 2013 | $3,898.80 | 33.8% |
| December 31, 2013 | $4,025.90 | 3.3% |
| June 30, 2014 | $4,230.35 | 5.1% |
| December 31, 2014 | $5,719.55 | 35.2% |
| June 30, 2015 | $7,792.45 | 36.2% |
| December 31, 2015 | $12,638.00 | 62.2% |
| June 30, 2016 | $13,066.00 | 3.4% |

Joutras testified that he attributed Segerdahl's growth—particularly its significant increase in value beginning in 2014—to three things: Segerdahl's purchase of a competitor, Lehigh Direct ("Lehigh"), in 2014; hiring salespeople from two other competitors, Quad/Graphics ("Quad") and R.R. Donnelley & Sons, Inc. ("RRD"); and a 2014 buyback of roughly 8,000 shares of ESOP stock.

The acquisition of Lehigh gave Segerdahl increased volume, additional equipment, and more capabilities. It also informed Joutras's thinking during the sale of his own company. Segerdahl had hired several of Lehigh's salespeople prior to the sale, which Joutras testified benefited Segerdahl and harmed Lehigh. As a result, he felt it was important to retain salespeople while negotiating or contemplating a transaction. Joutras also testified that his experience with Lehigh clarified for him the danger of letting competitors conduct due diligence on a company as it reinforces the insular, gossipy nature of the industry.

Segerdahl also hired salespeople from Quad and RRD who brought profitable clients to Segerdahl from their former companies. Segerdahl had a strategy of identifying competing salespeople with significant accounts and attempting to hire them, gaining additional clients in the process. Indeed, at least two large clients came to Segerdahl through this strategy. Given the free movement between companies during the company's sale process —and the fact that Segerdahl did not use non-compete agreements for its salespeople— Joutras remained concerned that a competitor could ascertain which salespeople held large accounts, make them tempting offers, and hire them away along with their business.

The buy-out had the most direct effect on the company's share price. Segerdahl, which had previously allowed former employees to remain ESOP participants, forced out all former employees in 2014 and bought back their shares at a valuation of $4,230.35 per share. Rather

than pay the full value of each ESOP participant's account, Segerdahl structured the buyout such that 20% of the purchase price was paid upfront, with the remaining 80% covered by promissory notes payable over four years in equal annual installments. In total, Segerdahl issued 16 notes to former ESOP participants. These notes were secured with a Stock Pledge Agreement; their combined face value was $24,598,673.91. Segerdahl had used this securitization structure prior to 2014, but it is not clear for how long. The buy-out increased the value of the remaining shares by concentrating the value of the company in a smaller number of shares; in total, the company bought out roughly 8,000 shares of the ESOP, with roughly 12,000 remaining post-buy-out.

Segerdahl's lawyers cautioned the company about using company stock as collateral for the four-year notes. Specifically, Susan Schaefer—Segerdahl's ESOP lawyer who, at the time, was a partner with the law firm of McDermott Will & Emery—cited a provision of the Internal Revenue Code of 1986 requiring promissory notes used to secure put options to require "adequate security." 26 U.S.C. § 409(h)(5). The Internal Revenue Service ("IRS") does not define adequate security but has provided guidance that "[p]romissory notes secured by a company's full faith and credit are not adequate security." Internal Revenue Manual § 4.72.4.2.8.1. IRS guidance is just that: guidance. It does not carry the force of law or compel particular actions by IRS agents conducting an investigation. The company considered securing the notes with a money market account but decided against it—if the company had sufficient funds to stock a money market account, they would simply pay out the notes in one payment. Instead, Segerdahl considered the notes to be backed by the company's full faith and credit. At trial, Stumpff, one of Rush's expert witnesses, testified that the promissory notes were subordinate to debt held by Bank of America, and, in the event Segerdahl became insolvent, Bank of America would be paid in full before any payouts on the promissory notes.

### B.     Management and Compensation

Prior to 2014, Segerdahl used stock appreciation rights ("SARs") as a form of management compensation. Early in 2014, Segerdahl adopted a new SARs plan that granted appreciation rights that vested over three years or completely at a change of control. The "strike price" of the shares was set at the then-prevailing share price of $4,025.90. A strike price sets the baseline value from which a SARs total award is calculated. SARs operate in a similar manner as options but do not require an initial investment—instead, when redeemed, the holder of the SARs would receive the difference between the share price at vesting and the strike price. For example, if someone was awarded SARs units at the initial strike price of $4,025.90 and redeemed them at a share price of $13,072 (the approximate sale price), they would receive $9,046.10 per SARs unit.

Several employees, including Rush, were awarded SARs units at the $4,025.90 strike price as part of the 2014 plan. Joutras received 800, Rush 200, and Bradshaw 300. Schneider received 800 when she joined the company in November 2015 at the higher strike price of $7,792.45 per share. Each of these employees redeemed their units following the sale for approximately $13,072 per share.

## II.     Lead-Up to the Sale

### A.     Formation of the Board

In April 2015, a Board of Directors was formed for Segerdahl, chaired by Joutras. Three Outside Directors—Cronin, Goldstein, and Mason—were also appointed to the Board. The Outside Directors each were awarded 100 SARs units at a strike price of $5,719.35. Mason, a partner at the law firm of Freeborn & Peters ("Freeborn"), was required by his partnership agreement to remit any of his SARs units, and any other payment he received from Segerdahl, to his firm. Joutras testified that he sought to bring in the Outside Directors to help run the company

8

because its rapid growth after the Lehigh acquisition had made hands-on management more difficult. Staruck, the GreatBanc trustee, also encouraged bringing in the Outside Board members, something done by "[a] lot of [GreatBanc's] ESOP companies."

Each new Board member had printing industry or board of directors experience. Cronin had served on the board of eleven printing companies (out of thirteen total boards), had formed a consulting company for the printing industry called The Open Approach, and had taken part in over 65 M&As on both the buy and sell sides. He had also served as the CEO of several companies. Though Goldstein and Mason did not have the same level of experience in the printing industry as Cronin, each brought other relevant business experience to the Board. Goldstein's experience included 32 years at the private equity firm Frontenac, which he chaired for 22 years. During his time as chair of the firm, Frontenac's assets grew from $20 million to nearly $1 billion as a result of more than 200 acquisitions, roughly 25 of which Goldstein personally led. He served on the board of approximately 20 Frontenac-owned companies. However, Goldstein had not participated in a transaction with an ESOP-owned company before. Meanwhile, Mason, a lawyer and founding member of Freeborn, practiced corporate law from 1976 to 1997. His clients included printing companies such as Segerdahl. Mason returned to Freeborn in 2002, where he stayed until his retirement in 2016—shortly after the Segerdahl sale was completed. After interviewing all three Outside Directors, GreatBanc approved their appointment to the Board and their Directors' Agreement GreatBanc sent Bradshaw the signed unanimous consent on April 27, 2015.

Rush points to several examples of what he portrays as conflicts for Board members. In the 1980s, Goldstein had helped Joutras buy out his father's interest in Bradley Printing, another printing company; a few years later, Goldstein helped Joutras sell Bradley Printing to a

competitor. The two did not have contact between the latter of these transactions in the late 1980s and 2013 or 2014. Rush also notes that Goldstein described himself as Joutras's partner in a post-sale congratulatory email, but Goldstein explained during his trial testimony that his view of the partnership went no further than their shared end goal. As to Mason, Freeborn had an ongoing relationship with Segerdahl, including advising on the retention of JPMorgan to run the sale process in 2015 and the hiring of Schneider as CEO that same year. In both cases, Jeff Mattson, another lawyer at Freeborn, represented Segerdahl. Additionally, at trial, Mason testified that at times he acted as counsel to Segerdahl in his capacity as a Freeborn partner. After GreatBanc raised concerns that an ongoing relationship with Freeborn could result in Mason "not be[ing] considered independent," Schneider ended the relationship with the firm in July 2016.

### B. The Shopping Process

In July 2015, at which point Stout valued Segerdahl at $7,792.45 per share, Joutras raised concerns about Segerdahl's redemption liability at a Board meeting. The primary concern with redemption liability had to do with liquidity: when ESOP shareholders redeemed shares, the company would have to pay them for those shares. And with a rising share price and aging shareholders (over half of the ESOP's shareholders in 2016 were over the age of 60), the company risked a run on the ESOP in which an outsized group of shareholders would redeem shares. This, in turn, could greatly increase the company's expenses and decrease its cash on hand, a serious concern in a capital-intensive industry. Given the unpredictability of the timing of redemption liability and the uncertainty it introduced to the business, Joutras felt it was time to

consider selling Segerdahl. Vergamini, an investment banker with JPMorgan, was present at

Segerdahl's July 2015 Board meeting, although JPMorgan had not yet been retained.[2]

### 1. *Wind Point*

In June 2015, the Board discussed upcoming meetings with Wind Point Partners ("Wind

Point"), a private equity firm. While not yet retained, JPMorgan and Vergamini represented

Segerdahl in those discussions. Vergamini summarized the Wind Point talks to the Board at an

August 26, 2015 Board meeting, which led the Board to authorize Joutras to enter into a letter of

intent with Wind Point on Segerdahl's behalf. Wind Point submitted a non-binding offer, dated

August 26, 2015 to acquire 100% of Segerdahl's outstanding stock for the greater of $280

million or seven times Segerdahl's earnings before interest, taxes, depreciation, and amortization

("EBITDA") on December 31, 2015. At the time of the offer, Stout's valuation of Segerdahl was

$204 million. When Wind Point submitted its non-binding offer, it had not yet performed due

diligence and anticipated signing a definitive agreement on October 15, 2015 and closing the

transaction on November 2, 2015. Joutras accepted the non-binding offer on August 27, 2015.

Wind Point began its due diligence, which the Board discussed at its October 7, 2015

meeting. Shortly thereafter, the deal fell apart. Joutras terminated discussions on October 13,

2015, emailing Wind Point that he had "purposely chosen not to pursue the value maximizing

alternative for my shareholders and me" by choosing to sell to Wind Point, and that Wind Point

had ignored the impact of a 338(h)(10) tax election that would "reduce[] your purchase multiple

meaningfully below 7x." For purposes of the trial, the parties stipulated that when the deal

eventually fell through, it was "due to issues unrelated to Segerdahl."

---

[2] Segerdahl ultimately retained JPMorgan in December of 2015, with its obligation to Segerdahl
backdated to July 21, 2015—the date of the Board meeting.

Schneider, not yet a part of Segerdahl at the time of the Wind Point talks, advised Wind Point on the potential acquisition. In fact, Wind Point's non-binding offer expressed its intent that Schneider assume the role of President and CEO after closing. And once the deal fell through, the Board met with Schneider on October 23 and "concluded that it would be in the Company's best interest to pursue hiring [Schneider] as the Company's future Chief Executive Officer . . . ." With no deal on the table, Vergamini initiated a long discussion as to whether a different private equity firm could fulfill Wind Point's deal terms.

### 2. Retention of JPMorgan

At the July 2015 Board meeting, Vergamini made a presentation to the Board pitching JPMorgan's qualifications and its plans for a sale of Segerdahl. The presentation touted his (and JPMorgan's) experience selling similar companies. Vergamini specifically highlighted his work selling World Color Press to Quad, a transaction that Joutras was familiar with. The presentation proposed several options for selling Segerdahl, including sale to a financial buyer, which is a buyer who intends to own the company as part of a portfolio; sale to family investors; and sale to strategic buyers, which are companies either already in the field of direct marketing or seeking to expand their operations into direct marketing. After that meeting, the Board decided that "it was in the company's best interest to move forward on the [sale or strategic restructuring] process and to attempt to engage JPMorgan to lead the effort, provided that Jeff Vergamini would be the key point person throughout the process."

Segerdahl's relationship with JPMorgan remained unofficial until December 29, 2015, when they entered into an investment letter banking agreement ("IBA") with an effective date of July 21, 2015—the date of the Board meeting at which Vergamini made his pitch to the Board. The IBA capped JPMorgan's transaction fee at $8,000,000, to be calculated as follows: $3,000,000 with respect to the first $280,000,000 of the sale price; 2.5% of the next $20,000,000;

10% of the next $30,000,000; and, if the sale closed before December 31, 2016, 2% of any amount above $330,000,000. If the sale closed after December 31, 2016, the parties agreed to negotiate any over-$330 million fee "in good faith."

### 3.     December 31, 2015 Valuation

After the negotiations with Wind Point fell through, Stout released another semi-annual valuation. During the Wind Point process, Stout valued the company at $7,792.45 per share, but in late March 2016, it released its 2015 end-of-year valuation: $12,638.00 per share, a 62.2% increase. Joutras, who had been considering cashing out his shares in the ESOP since at least July 2015, discussed redeeming his shares with his wife. As such, Joutras informed the Board that he and his wife had decided to put their shares to the company and cash out. Ultimately, at the Board's request, Joutras withdrew his intent to cash out.

Schneider testified that when the $12,638 per share valuation came out, a large portion of the ESOP's shares were held by participants of retirement age, with six people over 60 years old (including Joutras) owning over half the shares. At the time, Joutras was both the ESOP's administrator and the participant with the greatest share. Concerned that it was not prudent to have Joutras continue as administrator, the Board removed Joutras from that position at its April 11, 2016 meeting and replaced him with Schneider and Rick Plotz, the head of Segerdahl's Human Resources department. Schneider recused herself from the appointment decision. As Schneider testified, her duties as ESOP administrator included responsibility for logistics and the hiring of outside counsel and experts to provide ESOP advice. As administrator, she was not able to make decisions about the sale or disposition of ESOP assets. Instead, according to her, those decisions were "solely reserved for GreatBanc and Jim Staruck."

4.     *Expansion of the Shopping Process and Exclusion of Strategic Buyers*

For a period of time after the Wind Point deal fell through, Segerdahl was informally on the market. At a January 2016 meeting, the Board set an aspirational goal to initiate a sale process led by Vergamini and JPMorgan in the second calendar quarter of 2016. By April 2016, with a higher valuation in hand, the Board decided to open the shopping process. The Board set criteria for Vergamini to consider in finding a potential buyer:

  a.   The firm would be growth oriented with philosophies regarding investment and debt that are consistent with Segerdahl's management's views for running the business.

  b.   Segerdahl would fit within the firm's investment strategy.

  c.   The firm would have experience in or exposure to direct marketing / advertising industries.

  d.   The firm has the ability to accelerate management's growth strategy through access to capital.

  e.   The firm has the ability to complete a transaction.

Segerdahl also instructed Vergamini to focus on contacted financial buyers at the exclusion of strategic buyers. While JPMorgan and Vergamini were in charge of the process, Segerdahl retained at least some control. According to the IBA and Vergamini's testimony, the company could refuse to meet with potential buyers. Schneider and Vergamini both acknowledged that the sale process was limited or selective.

The Board noted a number of reasons to justify excluding strategic buyers. JPMorgan initially identified five potential strategic buyers: Quad, RRD, IWCO Direct, MacAndrews & Forbes, and Alliance Data. There were immediate issues with three of these companies. First, IWCO Direct was in the process of trying to exit the printing business. Second, MacAndrews & Forbes owned a company, Harland Clarke, which in turn had recently acquired Valassis, a direct

mail printer. However, Joutras testified that he did not see Valassis as being in the same business as Segerdahl; rather, Valassis's work focused on printing newspaper inserts and the like, as opposed to Segerdahl's direct mail marketing. Third, Alliance directed its business towards digital marketing and analytics, not direct mail printing.

That left Quad and RRD. The Board, however, decided to exclude Quad and RRD from the marketing process for several reasons. First, both were publicly traded companies trading at EBITDA multiples well below that at which Segerdahl hoped to sell. Quad's trading value was between 4.2 times and 4.4 times EBITDA, and RRD's was 5.4 times EBITDA. This raised concerns from the Board that an acquisition of Segerdahl, which it hoped would be at a higher EBITDA multiple than that at which either Quad or RRD were trading, would be dilutive for Quad or RRD—that is, it would diminish the acquirer's value and thus not be an appealing transaction. Second, RRD was in the process of splitting into three new public companies and, in 2014, had purchased a similar company, Consolidated Graphics. Third, Joutras testified that Quad was struggling financially and, according to Vergamini, would not be ready to make an acquisition for two to three years. As a result of these conditions, Goldstein testified that Quad and RRD—both of which were publicly traded companies—had announced plans to reduce their balance sheet debt.

The Board identified additional risks that would arise if a potential buyer engaged in due diligence but ultimately chose not to acquire Segerdahl. Multiple witnesses testified regarding the insular nature of the direct mail printing industry—*i.e.*, there are a handful of players, bids are contentious, and even a slight edge or insight into a competitor's ability to make certain bids can confer a significant competitive advantage. A diligence report prepared by Ernst & Young in August 2016 shows some of these risks. For example, the report contains granular details

regarding the profitability of Segerdahl's top 15 customers, how Segerdahl managed to achieve those margins, and its strategy as to its largest customer. Joutras testified that such information would be important to a competitor. Schneider testified that even if customer names were anonymized, competitors could reasonably ascertain their identities. She went on to testify that earlier in her career, while at RRD, "without ever having violated [a non-disclosure agreement], a bright spot of my day was when I was offered a book on one of my competitors. And there are things I learned from that that I never could unlearn." Similarly, Joutras testified about the benefits a competitor could reap without violating a non-disclosure agreement ("NDA"). Expert testimony at trial corroborated these concerns. For example, Rush's expert, Galante, proffered several safeguards a company could use, including NDAs and clean rooms, which are data rooms managed by third parties that redact sensitive information. Speaking from his personal experience, Defendants' expert Hahn challenged the efficacy of NDAs, noting an instance in which a potential buyer of his company signed a non-disclosure agreement but, shortly after, took one of Hahn's top accounts and showed knowledge of the account's specifics.

Showing equipment to a competitor risks the competitor gleaning a more efficient equipment setup.  Joutras also testified on how even the appearance of shopping the company can spark concern among the workforce. Through familiarity with the industry, competitors can ask detailed questions to glean the rise and fall of volumes, pricing, commission plans, and the like. Knowledge of commission structures was particularly troubling to Schneider because Segerdahl did not use non-compete agreements for its salespeople, leaving the company vulnerable to poaching.  Schneider testified that if a large client left because of information (or salespeople) taken by a competitor, the company risked losing value and ultimately selling for less than it otherwise would.

5.    *First Indications of Interest*

JPMorgan contacted 18 firms as potential buyers. In May and June of 2016, 11 of those firms received presentations from management and tours of the facility. Of those 11, four firms, each of which was a financial buyer, submitted indications of interest ("IOIs"): Wynnchurch, Madison Dearborn Partners ("Madison Dearborn"), ICV, and the Stephens Group. The pre-due diligence offers were as follows: ICV's was $300 million, Wynnchurch's between $270 million and $293 million, Madison Dearborn's between $270 million and $280 million, and the Stephens Group's between $250 million and $270 million. Madison Dearborn's offer had the potential to be between $306 million and $318 million, depending on whether certain add-backs were financeable. Each offer was inclusive of a 338(h)(10) tax election, described in more detail below. Wynnchurch, Madison Dearborn, and the Stephens Group eventually dropped out of the bidding. ICV was the ultimate buyer.

The Stephens Group was eliminated from consideration by July 7. Vergamini testified that not only was its bid meaningfully below the other bids, but the firm had communicated to him that they were closer to the low end of their value range: $250 million. Crumbaugh, a Wynnchurch employee who worked on the Segerdahl IOI, testified that Wynnchurch dropped out of the bidding of its own accord after conducting initial due diligence. He testified that even with the value of the sale-leaseback touted by Vergamini—$10 million to $14 million on a pre-tax basis—Wynnchurch ultimately did not consider an acquisition to be the right opportunity. Wynnchurch dropped out shortly after the Stephens Group: it submitted its IOI on July 1, and withdrew on July 11. While Schneider testified that Segerdahl did not consider Wynnchurch to be a good strategic fit, there is no indication that Segerdahl caused the cession of talks with Wynnchurch. While Madison Dearborn did not submit a revised IOI, neither did it withdraw or get eliminated from the bidding process. In fact, three days after receiving a revised IOI from

ICV for a lower value on September 9, 2016, JPMorgan contacted Madison Dearborn to see whether it would reengage in the bidding. Madison Dearborn informed JPMorgan that it would not on September 15.

### 6. Special Committee

On September 4, 2016, the Board unanimously approved the creation of a Special Committee in connection with the sale consisting of Goldstein, Mason, and Cronin. At that time, ICV had not yet revised its IOI; however, Board minutes indicate that Vergamini expected its revised bid to be below its $300 million IOI. According to the Board minutes from the meeting at which the Special Committee was unanimously approved, the Special Committee was granted:

> [T]he power and authority to (1) oversee the process relating to a Possible Transaction on behalf of the Board insofar as such transaction presents actual or potential conflicts of interest, (2) consult with and/or advise management, on behalf of the Board, in connection with discussions and/or negotiations concerning such conflicts, (3) consider such other matters as may be requested by the Board and (4) make any recommendations to the Board concerning the Possible Transaction that the Special Committee deems appropriate, including recommendations with respect to any matters requested by the Board.

In an earlier draft of these Board minutes, sent from Mason to Schneider and Joutras, point (1) included additional language, instead ending with the additional language emphasized: "actual or potential conflicts of interest, *including, by way of example and not limitation, the negotiation of arrangements relating to post closing employment, compensation, and equity ownership of management*." Mason testified that he proposed this change after a discussion with Schneider and Joutras. As Mason explained, the stricken language simply provided an example of the Special Committee's power to oversee the process and potential conflicts. And Schneider testified that, as far as she knew, the Special Committee did, in fact, review her agreements regarding investment with and employment by the post-sale entity.

C.      **ICV**

ICV was the successful bidder. Its IOI, dated June 30, 2016 and submitted prior to full due diligence, was for $300 million inclusive of a 338(h)(10) election. Metz testified that he and Willie Woods, another ICV partner, never expressly discussed the 338(h)(10) election because it was built into ICV's valuation methodology and was simply part of the business's value, not an independent item. At that time, ICV's IOI stated that its due diligence had consisted of a meeting with Schneider, two meetings with the "broader team," and one meeting with management. ICV believed that it had six areas of diligence to explore: accounting; insurance and benefits; legal; confirmation that June financials were on track; confirmation by an industry consultant as to the size, depth, and competitive environment of the industry; and select customer calls.

Before submitting its offer, ICV circulated an internal deal memo indicating its belief that "SG360 [Segerdahl] is being marketed by JP Morgan on a *very* limited basis," with only one or two other groups interested and ICV being the strong favorite. Regarding the basis for this belief, Metz testified that ICV had called numerous lenders and other industry sources to determine the scope of the marketing process and, given the lack of response from the firms they called, concluded that the process was limited. When ICV submitted its initial offer, its internal memo stated that Segerdahl management projected sales growth of 6% in 2016 and each year going forward, and adjusted EBITDA growth in 2016 of 15.3%, followed by 11.6% in 2017, 8.4% in 2018, 8.0% in 2019, 6.5% in 2020, and 6.0% in 2021. Segerdahl's May 10, 2016 presentation to ICV projected 15% yearly growth in EBITDA.

On September 9, 2016, ICV submitted a first revised bid for $250 million in cash and a $15 million earnout if Segerdahl achieved a 2016 adjusted EBITDA of at least $45 million. At the time, Segerdahl's EBITDA was roughly $37.9 million. Metz testified that ICV lowered its bid because the company's profit projections had dropped from $42.6 million in June, when it

made the initial offer, to $38 million at the time of the first revised offer. Segerdahl rejected the offer. Schneider referred to the offer in an e-mail as one-sided, insulting, and onerous, and noted in another email that she found it outrageous that the revised offer would require Segerdahl to pay ICV's transaction expenses, as well as a 1.5% transaction fee. While Schneider testified that the offer could have been worse, Segerdahl closed the data room to ICV a few days after receiving the revised bid.

Shortly after Segerdahl received ICV's revised offer, it unsuccessfully attempted to reignite negotiations with Madison Dearborn. According to Schneider's testimony, Segerdahl did not contact Quad or RRD for at least two reasons: first, Segerdahl anticipated that Quad and RRD were dealing with the same market downturn as was Segerdahl, and second, that they still expected Quad and RRD to not have a balance sheet to support the transaction. Vergamini testified that he continued monitoring Quad and RRD from their initial determination not to shop to either one through at least September, and that any change in the two companies' performance during that time was for the worse. Vergamini also remained optimistic that ICV believed that it was in competition with other bidders and that Segerdahl could drive ICV's offer up.

ICV's $250 million offer sparked a vigorous response from Vergamini. This involved shutting off the data room and telling ICV that its offer was materially deficient, a means of punishing the poor offer. Vergamini also used Stout's valuation of Segerdahl to drive the price up, fearing ICV would discern that it was the sole bidder and exert its leverage. Vergamini testified that he relied on Stout's December 31, 2015 valuation to impress on ICV that there was a floor to what the Board would accept. And in a follow-up e-mail with ICV, Vergamini stated that an enterprise value of $265 million was non-negotiable. Then, on October 14, 2016, ICV submitted a second revised offer for $265 million with no earn-out. And the evidence bears out

that Vergamini succeeded in the face of resistance by ICV, who internally considered $265 million to be too high: Metz felt that $260 million was appropriate, and other ICV deal team members advocated for $250 million. Metz testified that $265 million was ICV's cap, and that it would absolutely not bid any higher than that.

### III. GreatBanc's Review

The offer still required approval by GreatBanc, which served as the ESOP trustee at all relevant times prior to the sale. GreatBanc's involvement in the sale process began on August 18, 2016, at which point it entered into an amended trustee agreement that created its authority with respect to the sale. The amended agreement provided for a $250,000 fee to GreatBanc and allowed it to retain an independent financial advisor (Stout) and an independent legal counsel (Drinker) at Segerdahl's expense for the purpose of evaluating the sale. Staruck testified at trial that each firm was chosen for particular reasons: Stout because they were the gold standard of ESOP valuations and Drinker because of its two experienced and skilled ERISA attorneys, Dave Rubenstein and Howard Levine. At the time that Segerdahl and GreatBanc entered the amended agreement, ICV had not yet submitted its first revised offer.

Before GreatBanc approved the sale, it obtained a fairness analysis from Stout and a due diligence report from Drinker. GreatBanc, Drinker, and Stout also met with and interviewed the Board on August 18, 2016 about the rationale and process for the sale. GreatBanc, Drinker, and Stout also met with management—namely, Schneider and Bradshaw—on August 30, 2016 to discuss the sales process, and with one another on November 29, 2016 to discuss whether to approve the proposed sale to ICV.

### A. Fairness Analysis

Stout produced a fairness opinion, which is a short document outlining its approval of the sale, and a fairness analysis, a more detailed document outlining how it reached its conclusion.

The fairness analysis used two valuation methods to appraise the company: a guideline company method and a discounted cash flow method. The guideline company method resulted in an enterprise value for Segerdahl between $240 million and $280 million, and the discounted cash flow method resulted in an enterprise value of $278 million. Stout concluded with an estimate of Segerdahl's value ranging between $249 million to $293 million. It also conducted a capitalized cash flow analysis, which it did not formally rely upon as a reasonableness check on its discounted cash flow analysis. Ward, Stout's representative who had conducted between 50 and 100 fairness analyses in his career, testified that Stout used generally accepted ESOP valuation methodologies and industry standards in reaching its estimate of the enterprise value, including using a range of values rather than landing on a single valuation.

However, the fairness analysis did not expressly assign value to three elements that Rush argues should have been taken into account: the sale-leaseback, the 338(h)(10) election, or the Wolf Road fraud.[3] That said, Stout's working papers show consideration of the sale-leaseback that factored in both the sale price and the ongoing lease expenses. Ward testified that, when capturing both the proceeds of the sale and the ongoing lease expenses, Segerdahl would have a lower EBITDA and a lower enterprise value. As to the 338(h)(10) election, Ward testified that Stout declined to quantify its value because it had no place in a fair market value analysis. According to Ward, determining fair market value requires assuming a hypothetical willing buyer and a hypothetical willing seller, whereas a 338(h)(10) election can only be taken by certain buyers and certain sellers provided that both the buyer and seller agree. As a result, including the 338(h)(10) would have required a specific buyer and a specific deal structure,

---

[3] These alleged additional sources of value are further detailed through analysis of expert testimony in Section IV.

which rendered it inapplicable to the fair market value analysis. The 338(h)(10) only had value if the specific conditions were met; it did not, for example, have any value to the company on its own absent a transaction. And as to Wolf Road, Ward testified that Stout did not include the value of the settlement because he did not recall any assurance that the settlement was guaranteed.

### B.    Due Diligence Report

GreatBanc also commissioned a due diligence report from Drinker, which the law firm presented to GreatBanc on November 28, 2016. David Rubenstein, a Drinker attorney who represented GreatBanc during that time, testified that along with the diligence report, Drinker consulted with GreatBanc about its fiduciary duties, attended meetings of the internal committee responsible for reviewing transactions, reviewed the purchase agreement on GreatBanc's behalf, and spoke with Stout. Drinker's report looked at several things to identify potential issues: the ownership structure; union agreements; executive employment and transaction bonus agreements; change of control payments; assignment of various property and equipment lease agreements; potential claims, including Wolf Road; and environmental reports.

Rubenstein, GreatBanc's counsel, testified regarding the 338(h)(10) election and Wolf Road fraud. He stated that the 338(h)(10) election fell more within the ambit of accounting rather than legal analysis, but at a high level, Drinker did not consider it material to the transaction because the election could be offered, but a buyer would not likely pay more for any benefit received. As to Wolf Road, Rubenstein testified that there was no certainty Segerdahl would recover funds—for example, if the staffing agency was bankrupt when it came time to make a settlement payment or if internal issues were revealed in the litigation, Segerdahl might not be able to collect a payment. While Rubenstein did not testify regarding the sale-leaseback,

Drinker's due diligence report stated that a sale-leaseback transaction would likely be a positive to EBITDA.

### C.    Meetings

GreatBanc, along with Drinker and Stout, also participated in at least two meetings to assess the propriety of the sale.

On August 30, 2016, the three firms met with Schneider and Bradshaw. Staruck, who attended on GreatBanc's behalf, testified that at this meeting, attendees received assurances that Vergamini had marketed the value of the sale-leaseback transaction and told potential buyers to "bake [the sale-leaseback] right into their offers." According to Staruck, the 338(h)(10) election and the Wolf Road settlement were treated in the same manner. Notes taken by Staruck and Drinker during the August 30 meeting indicate that topics ranged from those broad in scope— such as company and industry performance—to more targeted inquiries regarding the sale, including the sale-leaseback, 338(h)(10) election, Wolf Road fraud, and the desire to obtain purchase agreements from ICV and Madison Dearborn (the two remaining potential buyers) within a few days. They also touched on relationships with Segerdahl's unionized workforce, whether additional management hirings were needed, and Schneider's fear that if the company continued to operate as it was its value would not increase.

On November 29, 2016, Staruck, Drinker, and Stout met with GreatBanc's fiduciary committee. It was at this meeting that the fiduciary committee approved the sale. Staruck's notes from the meeting indicate that on two occasions over the prior few months, Segerdahl had lowered its forecast; this act factored into ICV's decision to lower its bid from its initial, pre-diligence offer of $300 million to the settled-upon $265 million. Staruck clarified in his testimony that two drops in financial projections in close proximity to one another present a significant risk that a bid will be lowered. Staruck's notes also indicate that ICV had insisted on

an $8 million escrow as recently as one week before the meeting. ICV agreed to eliminate the escrow, which, according to Staruck, enhanced the value received by the ESOP because it was cash in hand as opposed to contingent future money.

### D. Compliance Report

GreatBanc memorialized its reasoning in a Fiduciary Process Compliance Report ("Compliance Report") prepared by Staruck. Part of the Compliance Report addresses the prudence of the transaction, and states that it is prudent because Segerdahl faced significant repurchase liability that could cost the company capital, thereby limiting its ability to reinvest in the company, which could hamper its competitive edge. Additionally, the Compliance Report states that the sale process indicated that the company was not being sold for less than its fair market value.

Staruck's notes from the August 18, 2016 meeting—which involved the Board, Stout, Drinker, Staruck, and Vergamini—reflect GreatBanc's consideration of a variety of factors that went into the transaction. One potential course of action was a "ReSOP," which Schneider described as a recapitalization of the ESOP. Staruck testified that a ReSOP would not resolve the repurchase liability issues because any additional ESOP shares created through a ReSOP would eventually need to be bought out and a ReSOP would not change the value of the company. Another potential course of action was selling to a strategic buyer, but Staruck was satisfied by the Board's explanation for limiting the process to financial buyers. While the Board did not obtain its own fairness opinion, Staruck did not consider that to be indicative of a defective process because the Board had a qualified advisor—Vergamini—leading the transaction, and GreatBanc's retention of Stout to provide a fairness analysis obviated the need for a separate Board fairness analysis. Staruck also approved of the Board's focus on a clean transaction to a compatible buyer. Given the wasted time in 2015 on the Wind Point deal, Staruck considered it

important to find a buyer who was willing and able to complete a deal cleanly, and he testified that purchasers are generally more likely to pay more for a company that fits neatly into the buyer's current business.

### E. The Close of the Sale

The sale of Segerdahl to ICV closed on December 7, 2016, for a $265 million purchase price, yielding a per-share price of roughly $13,072 for the outstanding 9,138 shares of Segerdahl stock. Given how SARs operate, each participant's award was calculated by subtracting their strike price from $13,702 and multiplying by the number of SARs units held. As a result, Schneider—who held 800 SARs units with a strike price of $7,792—received roughly $4.2 million from her SARs holding and Bradshaw—who held 300 SARs units with a strike price of $4,026—received roughly $2.7 million. Joutras's 800 SARs units at the $4,026 strike price were worth approximately $7,236,800, and Rush's 200 SARs units at the same strike price were worth approximately $1.8 million. The Outside Directors, each of whom was awarded 100 SARs units at a price of $5,719.35, redeemed their awards for approximately $798,000 apiece.

Shortly before closing, on December 1, 2016, Vergamini held a meeting with Segerdahl's senior managers to discuss the sale. Rush testified at trial that he attended the meeting along with at least ten other people. He described the layout of the room where the meeting took place and where individual participants were seated. Rush also testified that during the meeting, Vergamini told the room that because he knew Joel Quadracci, the CEO of Quad, he could have sold Segerdahl to Quad for $320 million, going so far as to write "$320 M" on a whiteboard in the room.

Had the company actually sold for $320 million, rather than $265 million, the per-share price would have been higher—the parties stipulated that at a $320 million sale price, the per-

share price would have been roughly $17,191. In that scenario, the payout for any SARs recipient and any ESOP shareholder would have been higher. It also would have increased JPMorgan's fee from the sale—indeed, Vergamini testified that a sale at $320 million would have doubled his fee. Yet Rush's testimony was the only evidence offered at trial that Vergamini asserted he could have sold the company for $320 million. No other attendee at the meeting corroborated Rush's testimony, nor did any other party who stood to gain financially from a significantly higher share price. During his testimony, Vergamini surmised that if he mentioned a "$320 M" sales price (which he did not concede doing) it would have been merely to demonstrate how leveraged buyouts work and how different situations can lead to different results. As Vergamini put it, "[i]f we could have sold to Joel Quadracci at $320 million, we would have done so." Moreover, Schneider testified that Rush approached her after the December 1, 2016 meeting and did not mention anything about a higher purchase price, but he *did* express anger that he was receiving $2 million from the sale even though Joutras had, apparently, promised him $4 million.

## IV.    Other Sources of Value

Along with the value of the company itself, Rush points to three items that he believes added value to Segerdahl but were not properly valued, either as part of the sale price or as part of Stout's fairness opinion: (1) the value of a potential sale-leaseback of two company-owned facilities; (2) the 338(h)(10) tax election; and (3) the value of an incoming settlement regarding fraudulent billing by a contractor at the company's Wolf Road facility.

### A.    Sale-Leaseback

According to Rush's valuation expert, Daniel Van Vleet, "a sale-leaseback transaction occurs when a company sells a property and then leases it back from the buyer." In the abstract, a sale-leaseback can increase a company's value by maximizing the real estate's value. In addition,

according to Van Vleet's rebuttal report, if real estate value is left in the transaction, its full value is seldom recognized. According to Defendants' valuation expert, Lee Bloom, a sale-leaseback is a form of debt financing that benefits a company by moving its borrowing off its balance sheet. But as Bloom notes, accounting standards changed in February 2016. Prior to that date, while the lease payment portion of a sale-leaseback would be listed as rent on an income statement, the value of the future payments would not be listed as a liability. After February 2016, however, guidance required leases to be put "front and center," which eliminated off-balance sheet advantages from a sale-leaseback.

Segerdahl solicited a number of bids as part of its sale-leaseback shopping process; in an October 15, 2016 email, Schneider stated that Segerdahl had received five bids for the two facilities and expected two-to-four more within several days. On November 23, 2016, Segerdahl and AG Net Lease Acquisition Corp. ("AG") entered into a letter of intent for a sale-leaseback of two company-owned properties. According to the letter of intent, AG would purchase the two facilities for $25 million and would lease them back to Segerdahl at an annual rate of $1.75 million, increasing 2% each year going forward. The transaction was completed on February 7, 2017, after the close of the ICV deal. Vergamini testified that, had the sale-leaseback closed before the ICV deal closed, Segerdahl could have used some of the $25 million in proceeds to pay down debt, resulting in more money to ESOP shareholders after the ICV deal closed. But he couched this testimony with the likelihood that a buyer would have lowered their purchase price, negating the benefits of the sale-leaseback. Metz testified that ICV was indifferent as to whether the sale-leaseback closed before or after the sale of the company. As far as ICV was concerned, the sale-leaseback was "literally pennies marginal."

B. 338(h)(10) Election

Another source of value Rush identifies is a 338(h)(10) tax election. According to Van Vleet's report, a 338(h)(10) election allows for the stock of an S corporation to be recharacterized as an asset purchase, which in turn allows the buyer to increase the company's depreciable or amortizable tax basis. This lowers the target company's pretax earnings and allows the buyer to reduce income tax payments. Both the buyer and the seller must agree to a 338(h)(10) election. Not all buyers can benefit from a 338(h)(10) election—for example, an ESOP company with S corporation status cannot benefit because it does not pay federal income taxes, and companies with substantial net operating loss carryforwards can shield operating income from the target company without resorting to a 338(h)(10) election.

Each of the four IOIs that Segerdahl received at the start of the shopping process included value for the 338(h)(10) election. Vergamini had touted the value of a 338(h)(10) election to Wind Point during the earlier aborted sale, and he continued to tout the value during the wider shopping process. ICV's revised offers also baked in the value of a 338(h)(10) election. As Metz testified, while bankers seek to value a 338(h)(10) election, ICV felt that it did not make sense to do so. He further testified that language in ICV's initial IOI refers to the 338(h)(10) election as follows: "[T]he Transaction will provide a step-up in the basis of SG360 assets that will generate approximately $15.0 million of annual tax-deductible goodwill." Both revised offers include the same step-up language, indicating that ICV did not alter its consideration of the 338(h)(10) election.

C. Wolf Road Fraud

During the sale process, Segerdahl became aware that staffing agencies that provided it with employees at its Wolf Road facilities had defrauded the company. According to a disclosure schedule to the purchase agreement, a staffing agency billed Segerdahl for temporary workers

who did not exist, a circumstance Segerdahl discovered in February 2016. The company's estimated loss was between $1.4 million and $2.8 million, but as of the closing with ICV, it anticipated a settlement of roughly $1.2 million; Schneider testified that the settlement ultimately including a $700,000 cash payment and a $500,000 coupon on the staffing agency's services that took two to three years to work off. The parties entered into the settlement agreement on December 22, 2016, *i.e.*, shortly after the Segerdahl sale closed.

In an e-mail to Bradshaw, Vergamini, and a third attorney from the law firm of Vedder Price, Schneider identified the Wolf Road settlement as a potential pocket of value that ICV had not included in its valuation. But she clarified in testimony that this was a guess—they did not have access to ICV's internal models and were not certain of what ICV included in its price. Metz, for his part, testified that he was aware of the Wolf Road fraud but did not recall specific details because the settlement did not involve a material amount of money; moreover, ICV's offer accurately reflected its sense of value. Both Metz and Staruck testified that they did not believe the company left any money on the table as a result of the Wolf Road fraud.

## V.    The Post-Sale Entity

Upon closing, SGDL Intermediate, Inc. purchased all the ESOP's shares. SGDL Intermediate was, in turn, a wholly owned subsidiary of SGDL Holdings, LLC, which in turn was owned by ICV SGDL Co-Investment Holdings LLC and a combination of Class A and Class B units awarded to or purchased by Segerdahl's management and Frank Clark, ICV's agent.

A number of members of Segerdahl management chose to invest in the post-sale entity. Schneider invested $1,195,000 of her SARs award into Class A units—half of her after-tax SARs proceeds—and received Class B units worth $573,174 at the time her employment ended. Bradshaw invested $750,000 of his SARs award into Class A units and received Class B units

worth $491,850 when his employment ended. Several other members of Segerdahl's management, as well as Frank Clark, also invested. Schneider testified that such arrangements are typical when the buyer is a private equity firm—as she put it, she "d[id not] know of any private equity firm that takes over a company and doesn't have an expectation of management rolling money back into the company to keep their jobs. That's how it works." Metz testified that he did not believe that Schneider steered the transaction to benefit herself at the ESOP's expense, nor did he believe that such steering was possible.

Schneider became CEO of the post-sale entity. Her employment agreement provided for a five-year term with possible one-year extensions, but the agreement could be terminated at any time by either party with written notice at least 90 days prior to the expiration of a term or by the company at any time for cause. Within three years of the sale, every member of Segerdahl management with the exception of Ted Gaillard, the Vice President of Sales, no longer worked at the company.

## VI.    Litigation and Procedural History

Rush brought this lawsuit in February 2019, seeking to represent a class of similarly situated persons for purposes of challenging whether a fiduciary duty was breached and alleging that the company sold for less than adequate consideration. (Dkt. No. 1.) After Rush amended his complaint, (Dkt. No. 77), the Court granted his motion to certify a class, (Dkt. No. 188). The certified class is defined to include "all participants in and beneficiaries of the Segerdahl Corporation Employee Stock Ownership Plan at the time the ESOP was terminated, with the exception of Defendants in this action and their beneficiaries." (*Id.* at 21.) The Court then granted in part and denied in part Defendants' motions for summary judgment, dismissing Rush's claims relating the purported diversion of plan assets but preserving his remaining claims,

including those alleging breach relating to the sale process. (Dkt. No. 325.) The Court also allowed testimony from all proffered experts. (*Id.*)

## DISCUSSION

Based upon the evidence presented at trial, and having considered the parties' post-trial submissions, the Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52.[4]

### I. Counts I and IV: Fiduciary Breach and Co-Fiduciary Breach

Count I of Rush's amended complaint asserts a claim for breach of fiduciary duty under 29 U.S.C. § 1104(a)(1) against all Defendants. The Court previously granted summary judgment on a portion of Count I. The claims that remain relate to alleged breaches of fiduciary duty regarding the "sales claims"—*i.e.*, breaches relating to GreatBanc's approval of the sale and the remaining Defendants' actions during the sale process. Count IV alleges co-fiduciary breach; that is, Count IV seeks to hold any non-breaching fiduciaries liable for their knowledge of a co-fiduciary's breach.

Section 1104(a)(1) requires an ERISA trustee to "discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1194(a)(1). To establish a violation of this ERISA provision, a plaintiff must prove three things: "(1) that the defendants are plan fiduciaries; (2) that the defendants breached their fiduciary duties; and (3) that the breach caused harm to the plaintiff." *Jenkins v. Yager*, 444 F.3d 916, 924 (7th Cir. 2006) (internal quotation marks omitted).

---

[4] This Court has subject-matter jurisdiction over the case because it "aris[es] under the . . . laws . . . of the United States." 28 U.S.C. § 1331. Each of Rush's claims arises under provisions of ERISA, a federal statute. *See also* 29 U.S.C. § 1132(e) (subject to exceptions not present here, "the district courts of the United States shall have exclusive jurisdiction of civil actions under [29 U.S.C. §§ 1101–1193c] brought by . . . a participant, beneficiary, fiduciary, or any person referred to in section 1021(f)(1) of this title.").

### A.     Fiduciary Status

GreatBanc's status as a fiduciary for purposes of the transaction is not contested. But the parties dispute the status of Schneider, Joutras, and the three Outside Directors (collectively, "Board Defendants"). For purposes of § 1104, being a named fiduciary is not enough to confer fiduciary status; rather, the defendant must have acted "as a fiduciary . . . when taking the action subject to the complaint." *Pegram v. Herdrich*, 530 U.S. 211, 212 (2000). For example, a party does not act in a fiduciary capacity when deciding to fire an employee, *id.*, or when acting as a settlor who "sets, changes, or enforces contribution rates," *Bator v. District Council 4*, 972 F.3d 924, 932 (7th Cir. 2020), or when adopting, amending, or terminating a benefits plan, *Lockheed Corp. v. Spink*, 517 U.S. 882, 890–91 (1996). On the other hand, a party acts as an ERISA fiduciary when he or she "exercise[s] discretionary authority or control over plan administration or management, exercise[s] authority or control over management or disposition of the plan's assets, dispense investment advice, or make[s] benefit determinations." *Bator*, 972 F.3d at 931 (citing 29 U.S.C. § 1002(21)(A); *Brooks v. Pactiv Corp.*, 729 F.3d 758, 765–66 (7th Cir. 2013)). Rush focuses on the fiduciary's role in "exercising authority or control over management or disposition of plan assets" and contends that marketing a company qualifies.

Rush contends that Schneider and Joutras were fiduciaries for the sale process in their individual capacities—that is, outside of their roles on the Board. Schneider was named the ESOP's fiduciary on April 11, 2016, and Joutras served as named fiduciary from 2014 until April 11, 2016. But as noted above, simply being named as a fiduciary does not establish fiduciary status for purposes of § 1104(a)(1); rather, "the threshold question is . . . whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to the complaint." *Pegram*, 530 U.S. at 212. The Supreme Court has explained that this distinction is necessary because of the distinction between a common law trustee and an

ERISA fiduciary: "the trustee at common law characteristically wears only his fiduciary hat when he takes action to affect a beneficiary, whereas the trustee under ERISA may wear different hats." *Id.* at 225. Thus, the mere fact that Joutras and Schneider were named fiduciaries does not establish that they acted in a fiduciary capacity for purposes of Rush's claims. *See Burke v. Boeing Corp.*, 42 F.4th 716, 725 (7th Cir. 2022) ("Fiduciary status thus depends not on formal titles but on ***functional*** terms of control and authority over the plan." (internal quotation marks omitted)).

Rush further contends that Schneider and Joutras, along with the Outside Directors, were fiduciaries with respect to the sale process because of their positions on the Segerdahl Board. According to Rush, the Board Defendants acted in a fiduciary capacity because they appointed GreatBanc to approve the sale and participate in the marketing and shopping process. Defendants respond that the Board acted in its corporate capacity during the shopping process because its financial incentives aligned with those of the ESOP and GreatBanc held the authority to approve the sale.

"To determine whether a corporate officer's decision involves a fiduciary act under ERISA, a court must determine whether the decision gives rise to an incompatibility between the interests of the fiduciary and plan participants that is a permissible tension or an impermissible conflict of interest." *Godfrey v. GreatBanc Trust Co.*, Case No. 18 C 7918, 2020 WL 4815906, at *8 (N.D. Ill. Aug. 19, 2020) (citing *Pegram*, 530 U.S. at 225). Courts in this District have relied on Ninth Circuit authority to find that "when a plan's assets include employer stock, ERISA fiduciary standards apply to a corporate officer's 'business decisions from which that individual could directly profit.'" *Id.* at *9 (quoting *Johnson v. Courtier*, 572 F.3d 1067, 1077 (9th Cir. 2009)); *Svigos v. Wheaton Sec., Inc.*, Case No. 17-cv-04777, 2018 WL 587190, at *9

(N.D. Ill. Jan. 29, 2018). The Board Defendants did not all have the same financial interests in the sale. The Outside Directors received SARs units upon their appointment but had no other financial incentive in the sale. Joutras and Schneider, however, held SARs units and shares in the ESOP itself. Additionally, Schneider invested in the post-sale entity and entered into a new employment agreement to remain as CEO for the post-sale entity.

Rush points to two actions that he claims led to a breach of fiduciary duty. First, he claims that the Board's appointment of GreatBanc to approve the transaction and its appointment of Joutras, and later Schneider, as the named fiduciary was a fiduciary act. He goes on to argue that the Board "ha[d] an ongoing fiduciary duty under ERISA to monitor the activities of [its] appointees." *Howell v. Motorola, Inc.*, 633 F.3d 552, 573 (7th Cir. 2011). But "[t]he duty to monitor requires only monitoring 'at reasonable intervals' to ensure that 'performance has been in compliance with the terms of the plan and statutory standards, and satisfies the needs of the plan.'" *Fish v. GreatBanc Trust Co*., No. 09 C 1668, 2016 WL 5923448, at *52 (N.D. Ill. Sept. 1, 2016) (quoting *Howell*, 633 F.3d at 573, and 29 C.F.R. § 2509.75-8). To the extent a duty to monitor implicates the sale process, the Board met its duty. In multiple meetings between the Board and GreatBanc, the Board was able to ascertain GreatBanc's responsibilities, the nature of its work, and that its role was to act in the best interests of the ESOP. *See id.* at *53. Indeed, interfering with the independent trustee would undermine the very reason the Board appointed GreatBanc to approve the transaction: it wanted certainty from an independent body that the sale was proper. *See Fish*, 2016 WL 5923448, at *53 ("It would have made no sense to go to the great expense of hiring an independent trustee, only to interfere with the trustee's work.").

But it is not so clear that appointing GreatBanc to approve the sale rendered the Board Defendants fiduciaries for the entire sale process. The Board amended the trustee agreement with

GreatBanc such that GreatBanc was entirely independent, and there is no indication that the Board appointed GreatBanc to rubber-stamp a deal or abdicate responsibility. Staruck testified that he did not consider GreatBanc to have any duty to accept direction from the company relating to the sale. The Board met with GreatBanc on several occasions to ensure, among other things, that the information GreatBanc independently gathered accorded with the Board's information. Even if the duty to monitor had rendered the Board members fiduciaries, the Board ably satisfied that duty.

Second, Rush argues that the Board Defendants played a lead role in the marketing and sale process, and as a result acted in a fiduciary capacity. Not so. To be sure, the Board "set the machinery of the [t]ransaction in motion and supported the [t]ransaction, in part by communicating with participants." *Fish*, 2016 WL 5923448, at *49. But nothing could happen without GreatBanc, which had sole authority to approve or deny the transaction. As Vergamini testified, GreatBanc had to sign the sales document for the sale to take place. Schneider was clear in her testimony that administrators, such as herself, were "not . . . allowed to make any decisions around the sale of the company or the disposition of assets. That was reserved solely for GreatBanc and Jim Staruck." Staruck approved of this arrangement, testifying that while it was not typical for a company seeking a sale to retain an investment banker like JPMorgan to lead the process, when a company chose to do so, it deferred to the experts. Appointing GreatBanc as an independent trustee to approve the sale meant that only GreatBanc, "an independent party without any conflicts of interest[,] could determine whether the [t]ransaction was in the ESOP's best interest." *Fish*, 2016 WL 5923448, at *49. That rendered the actions of other parties to facilitate the sale "as ancillary, non-fiduciary actions that are outside the scope of any fiduciary duty that the Plan allocated to defendants rather than to GreatBanc." *Id.* True, the

Board may have made decisions when shaping the transaction. But those decisions were ancillary to the ERISA decision reserved solely for GreatBanc: whether to consummate the sale.

In sum, the Court finds that Rush has failed to prove by a preponderance of the evidence that the Board Defendants acted in a fiduciary capacity for purposes of the Segerdahl sale. Nevertheless, for the sake of completeness, the Court will proceed to analyze the elements of breach and damages.

### B. Breach

Even if Rush had shown that Defendants acted as fiduciaries regarding the sale, he still would have to prove that they breached their fiduciary duties. Rush argues that Defendants breached their duties of prudence and loyalty. As to the duty of loyalty, Rush points to four actions: the decision to market the company only to financial buyers, the decision to resume negotiations with ICV after its first revised offer, the decision to delay the sale-leaseback until after the close of the sale to ICV, and Joutras's alleged leak of confidential information to Clark. As to the duty of prudence, Rush identifies two actions: (1) the Board causing Segerdahl to turn over the ESOP's valuation to ICV, and (2) GreatBanc failing to participate in negotiations and failing to identify alleged disloyalty and an imprudent sale process.

### 1. Standard of Review

"In general, judicial review of the decisions of an ERISA trustee as of other trustees is deferential unless there is a conflict of interest." *Armstrong v. LaSalle Bank Nat'l Ass'n*, 446 F.3d 728, 732 (7th Cir. 2006). After considering the evidence presented at trial, the Court concludes that Defendants had no such conflict. While certain members of the Board (namely, Schneider) obtained equity in and remained employed by the post-sale entity, there is no indication that any potential conflict affected the Board's decision-making. Schneider's employment agreement and equity stake were reviewed by GreatBanc in its approval of the sale.

Indeed, such arrangements are typical in private equity deals and any inference of conflict from the financial arrangement cannot withstand scrutiny. The interests of Schneider and the other Board Defendants were cleanly aligned with the ESOP—as one example of this, their SARs units depended on the per-share sale price, as did the payout of ESOP shares.

Specifically with respect to Joutras, Rush points to a number of e-mails in which Joutras expressed an eagerness to complete a deal. Indeed, Joutras stood to gain in the neighborhood of $27 million when the Segerdahl sale closed. But the Court is not persuaded that the colorful discussion in the emails reflect a conflict on Joutras's part. Instead, the Court finds that Joutras—to the extent he played a role—helped to facilitate a sale in the ESOP's best interest. Nor is the Court convinced that Joutras leaked any information to Clark. Metz himself convincingly testified that ICV relied on its own legwork in conducting due diligence of acquisition targets, and Rush relies on mere innuendo to argue the contrary.

Likewise, there is no evidence from which to conclude that the Outside Directors were conflicted. Each of the three Outside Directors was highly qualified. While Cronin may have dealt with Joutras previously, the evidence at trial demonstrated that the printing industry is relatively small and it stands to reason that long-tenured executives in the industry would have encountered one another. It would be unreasonable—particularly in a small industry—to require that any individual appointed to a board of directors have never interacted with the CEO prior to their appointment. Perhaps more troubling was the appointment to the Board of Mason, a partner at Freeborn & Peters, a law firm that worked with Segerdahl until Schneider ended the relationship. At trial, Staruck testified about notes written by a different member of GreatBanc's fiduciary committee suggesting that Mason may have been conflicted due to his position with Freeborn. However, Staruck did not recall the details of the meeting that was the subject of the

notes, and the author of the notes did not testify. At most, the notes suggest that members of GreatBanc's fiduciary committee were aware of a potential conflict but did not consider it to be disqualifying. There is no evidence that Mason's position on the Board was actually influenced or affected by his role at Freeborn.

In short, with no evidence of any conflict of interest, the breach of fiduciary duty claims must be assessed under the typical abuse of discretion standard. *Armstrong*, 446 F.3d at 734; *see also Brieger v. Tellabs, Inc.*, 629 F. Supp. 2d 848, 860 (N.D. Ill. 2009) ("So long as they do not have a conflict of interest, ERISA trustees are entitled to deferential judicial review.").

### 2. Duty of Loyalty

ERISA's duty of loyalty "protects beneficiaries by barring any conflict of interest that might put the fiduciary in a position to engage in self-serving behavior at the expense of beneficiaries." *Halperin v. Richards*, 7 F.4th 534, 546 (7th Cir. 2021). A fiduciary must "discharge [their] duties . . . solely in the interest of the participants and the beneficiaries and . . . for the exclusive purpose of . . . providing benefits to participants and their beneficiaries." 29 U.S.C. § 1104(a)(1)(A)(i). Several circuits—including the Seventh Circuit— have indicated that to establish a breach of the duty of loyalty, a plaintiff must show that "the fiduciary's operative motive was to further its own interests." *Brotherston v. Putnam Invs., LLC*, 907 F.3d 17, 40 (1st Cir. 2018) (internal quotation marks omitted); *see also Albert v. Oshkosh Corp.*, 47 F.4th 570, 583 (7th Cir. 2022) (finding that the lack of allegations that a fiduciary "engaged in self-dealing at the expense of the Plan" failed to state a claim for breach of the duty of loyalty); *Forman v. TriHealth, Inc.*, 40 F.4th 443, 450 (6th Cir. 2022) (holding that an operative motive of self-interest is "required to show a breach of the fiduciary duty of loyalty").

*a.*      *Excluding Strategic Buyers*

Rush argues that the Board purposely chose not to seek the best price for Segerdahl so that Schneider could obtain equity in the post-sale entity for a cheaper price. According to Rush, the Board achieved this, in part, by choosing to market the company only to financial buyers to the exclusion of strategic buyers. Additionally, Rush argues that the sale was structured such that Segerdahl's employees would retain their jobs. But Rush has not offered sufficient evidence to prove either point. Moreover, Rush has failed to offer evidence from which the conclusion could be drawn that any Defendant was so self-interested as to implicate the duty of loyalty.

To the contrary, every witness who testified regarding the sale process offered reasonable explanations for the decision to exclude the potential strategic buyers. For example, there were serious doubts about Quad's and RRD's financial health at the time. RRD was in the midst of splitting into three entities and took on substantial debt in doing so. Meanwhile, Quad was struggling financially, and Vergamini did not feel it would be able to make a transaction of this size for two to three years. In the face of declining projections and missed sales targets, nobody felt it would be prudent to wait two to three years for Quad or RRD. Moreover, by opening itself up to due diligence by its competitors, Segerdahl would risk losing its salespeople or exposing its pricing information. The resulting harm to Segerdahl's business during the sale process could lead to a lower sale value. Most of Segerdahl's largest customers already used Quad and RRD for other projects, and it is not difficult to imagine how those competitors might use information gleaned from due diligence to entice Segerdahl's customers to transfer more business to them. The same holds true for Segerdahl's employees, as the company did not use non-compete agreements that might have limited the poaching of its salespeople.

Quad and RRD were also public companies trading at EBITDA multiples well below that at which Segerdahl hoped to sell. As Cronin testified, publicly traded companies are loath to engage in dilutive transactions, which include those at which a company buys another for an EBITDA multiple higher than the one at which the buyer is currently trading. The other three potential strategic buyers that JPMorgan identified in its initial presentation to the Board were unlikely to pursue a purchase of Segerdahl. In short, Rush has produced little evidence that the decision to market to financial buyers derived from any Board member's self-interest. And the evidence indicates that the Board took great pains to act in the ESOP's (and their own) best interests. The duty of loyalty does not require an ESOP to market itself relentlessly to any buyer, regardless of whether doing so would harm the ESOP's own interests.

Rush also has not proved that Schneider's "operative motive was to further [her] own interests," particularly with respect to her financial interest in employment with the post-sale entity. *Brotherston*, 907 F.3d at 40 (internal quotation marks omitted). Such arrangements are common. Staruck, who had handled numerous ESOP transactions, testified that "[a]lmost every time we sell an ESOP company and management is being asked to stay on, they're being asked to roll equity." Moreover, Schneider held one Board vote out of five, and Rush has offered no evidence from which to conclude that another member of the Board would tank a sale—thereby lowering their own proceeds from that sale—so that someone else could invest at a cheaper price. Indeed, the most reasonable conclusion from the trial evidence is that the Board's interests were aligned with those of the ESOP. SARs units paid out based on the per-share sale price; Rush offered no evidence from which to conclude that the Board members, each of whom had SARs units, had any motive whatsoever to reduce their own payout. The same is true of their ownership of regular shares of the ESOP, which also paid out based on the per-share sale price.

Accordingly, the Court finds that Defendants did not breach a duty of loyalty in connection with their decisions to market only to financial buyers or regarding Schneider's equity in and employment with the post-sale entity.

<em>b.    Resuming Negotiations with ICV</em>

Rush next takes issue with the decision to resume negotiations with ICV after receiving its disappointing second bid rather than initiate talks with Quad and RRD. Relatedly, Rush claims that the sale was rushed because Segerdahl, and potentially individual Board members, faced liability due to the Plan's distribution procedures. Rush argues that the notes Segerdahl issued to participants who cashed out of the ESOP lacked adequate security, and that the company failed to adhere to its own distribution policies. Facing these latter two issues, the Board chose to rush the sale to ICV, a known entity, rather than engage with Quad or RRD.

Considering the issue of adequate security, the Court concludes that the choice not to alter the securitization practice was a calculated risk that reflects an appropriate exercise of business discretion. The opinion letter from Segerdahl's ESOP counsel at the time, Mark Bogart of Vedder & Price, does raise concerns about the company's securitization practices. But the letter is worded as cautionary, not as sounding an alarm—it notes that the practice "creates a Plan qualification risk which, in turn, could jeopardize the S corporation election." Schaefer's memo was more emphatic, but also sounded more cautionary than alarmist. Rush's own expert testified that the securitization guidelines were just that: guidelines. Furthermore, Defendants' expert Greg Brown explained that, in his experience, the IRS was unlikely to disqualify a plan for this method of securitization—indeed, it had become a more common practice that "quite a few" companies used. Moreover, Brown testified that he had advised ESOP-owned companies

that used the same securitization practice and that underwent audits by both the IRS and the Department of Labor, after which neither agency required changes to the securitization practices.

The one case on which Rush relies for support, *Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915 (8th Cir. 1994), provides little help, as it found adequate securitization to be a fact-specific inquiry. The Eighth Circuit stated that there "is no formula . . . for determining whether an ERISA fiduciary's conduct was reasonable, so the court should take into account all relevant circumstances." *Id.* at 921. The speculative nature of the hypothetical harm eliminates concern over the timelines; that is, given that Segerdahl was not facing immediate risk of disqualification, that they returned to ICV shortly after receiving the opinion from Vedder & Price did not indicate desperation. This is especially so given the explanation behind the decision to go back to ICV: Segerdahl was missing sales targets and experiencing an industry-wide downturn that Schneider suspected Quad and RRD were also experiencing. Other financial buyers had dropped out. The potential sale price was dropping. It made sense, then, that Segerdahl would return to ICV—the one plausible buyer—and resume negotiations. Indeed, in doing so, JPMorgan encouraged ICV to increase its bid by converting the $15 million earnout that the company did not think it would meet into $15 million cash in the sale price. The decision to continue with the existing securitization practices was not an abuse of discretion, and there is no evidence that looming liability forced disloyal or imprudent action.

The other compliance issue that Rush contends prompted a disloyal rush back to ICV is Segerdahl's purported lack of compliance with the ESOP's own procedures regarding in-service distributions of participants' 401(k) accounts. The plan allowed for the four-year promissory note payment discussed above for payment of a participant's full balance. But for distributions of less than the full balance, the plan required the company to distribute Segerdahl shares to the

employee, who would then immediately put the shares to the company, after which the company was required to pay for the shares within thirty days. This included distribution of a full 401(k) account, which was not considered a total distribution. But Rush does not point to evidence of a single in-service distribution that failed to comply with the plan. Schneider stated in an e-mail that the Board had "some discretion" as to structuring one round of in-service distributions, and a memorandum written by Susan Schaefer, Segerdahl's ESOP counsel, indicates that Schneider and Plotz had asked her to assess whether they could restructure in-service distributions. Rush adduced testimony from Brown that, in the abstract, violating the plan's terms regarding in-service distributions would present serious issues to the IRS. A memorandum written by Bogart appears to imply that the ESOP had improperly distributed funds in the past, but it is not clear whether this is in reference to the four-year note process generally, or the in-service distribution issue specifically. But, as explained in discussing the four-year note procedure, the IRS would generally attempt to negotiate with the ESOP so as to bring it into compliance, not immediately disqualify the ESOP and impose individual liability on trustees. Absent more, the Court cannot conclude that the return to negotiations with ICV was motivated by pressure regarding in-service distributions, nor can it find a breach due to plan non-compliance.

Rush relies heavily on Vergamini's posturing between ICV's second bid—the bid that included the earnout—and the resumption of negotiations with ICV. During that time, Vergamini described the offer as a nonstarter, expressed his distaste with the offer directly to ICV, and shut off the data room to ICV. Rush claims these actions indicate a desire to cut ICV out completely, such that going back to ICV indicated bad faith and desperation. But Vergamini described the same actions as a negotiation tactic, and the Court finds his explanation credible. Vergamini repeatedly described his negotiating strategy as abrasive, confrontational, and aggressive. He saw

shutting down the data room as punching ICV in the nose—an attempt to humiliate them into accepting a better offer. The Court is persuaded that the decision to return to ICV and Vergamini's subsequent conduct were simply aggressive negotiation tactics.

*c.     Sale-Leaseback Timing*

Rush next argues that the Board chose to delay the sale-leaseback until after the ESOP sale closed to prevent the ESOP from obtaining the benefits of the sale. Instead, because ICV owned Segerdahl when the sale-leaseback closed, it could use the proceeds to pay down debt and allow Schneider to buy in to the post-sale entity at a cheaper price. Rush further argues that ICV paid nothing for the sale-leaseback.

The Court again notes that this would require all Board members to decide to reduce their own payouts so that Schneider could get a more favorable investment. That alone raises serious doubts as to whether the timing of the sale-leaseback closing was deliberate. Moreover, Schneider feared that engaging too heavily in sale-leaseback negotiations would spark rumors of a sale in the industry. She also had concerns about the viability of running two simultaneous sales processes: one of the company and the other of its facilities. And ICV was agnostic as to timing—Metz testified that ICV was indifferent to whether the sale-leaseback closed before or after the ESOP sale closed. Given all this, Rush has failed to present sufficient evidence for the Court to conclude that the timing of the sale-leaseback transaction was a breach of fiduciary duty.

*d.     Leaks to Frank Clark*

Finally, Rush argues that Joutras leaked confidential information about the sale to Clark, who acted as a conduit between ICV and Segerdahl during the sale. Rush contends that Clark

45

and Joutras had a long phone call in August 2016, and that the preponderance of evidence indicates that Joutras told Clark on that call that ICV was the only remaining bidder.

While Metz testified that ICV had gleaned it was the sole remaining bidder, he denied that this knowledge came from Clark. Indeed, Metz denied that ICV ever heard from Clark that it was the sole bidder. Rather, ICV came to that conclusion based on its experience. Vergamini's "punch in the nose" strategy appears to have been correctly read by Metz as arising from a need to close the sale. As Metz put it, "[Vergamini's] begging and pleading . . . suggests that they don't have anybody." Typically, according to Metz, if there are multiple bidders and one bidder's offer is far off the others, the only communication is a call from the seller that the lower bidder was out of the process. He took the ongoing communication in the face of a purportedly unacceptable offer as indicating ICV was the sole bidder. The Court finds Metz's testimony convincing. And Rush points to no evidence to rebut it. Instead, he relies on connecting the dots between Joutras and Clark having a phone call, offhand comments from others that Joutras had a history of leaking information, and ICV gleaning its status as sole bidder to conclude that Joutras leaked information. But Metz's testimony persuades the Court that ICV learned what it did through its own legwork, not through backdoor leaks. Since there is no evidence that Joutras leaked information to ICV, there was no breach of the duty of loyalty.

### 3.    *Duty of Prudence*

Rush also argues that Defendants breached their fiduciary duty of prudence. He points to two actions: Segerdahl's decision to turn over the ESOP's valuation to potential buyers, and GreatBanc's failure to participate in the negotiation process and failure to detect and prevent the purportedly disloyal and imprudent sale process.

a.    *Sharing the ESOP Valuation*

Rush faults Vergamini for sharing the valuation with the Board's permission, arguing that by divulging the lowest price the Board would accept, Vergamini undermined the ESOP's negotiating position. In particular, he argues, ICV's initial bid of $300 million was later lowered to $250 million with a $15 million earn out, purportedly indicative of ICV simply adjusting its offer to the valuation. As to the latter point, Rush ignores another likely reason for the lowered offer: Segerdahl was underperforming, and ICV's $300 million offer was made before it had conducted due diligence. Metz testified that its $300 million bid was premised on a $42.6 million EBITDA for the full year. But by the time ICV submitted its first revised offer, the EBITDA forecast had dropped. As a result, the first revised offer was based off a $38 million EBITDA. In other words, ICV lowered its offer not because of a shared valuation but because the company was not performing up to projections.

Vergamini testified about his reasoning behind sharing the December 31, 2015 valuation with potential buyers. Recall that the year-end 2015 report valued Segerdahl at $12,638 per share, a 62.2% increase from the mid-year 2015 valuation. Vergamini testified that by sharing the valuation, buyers "would have to use it for due diligence, and it told a good story of why this business should be valued highly because it's growing and it's got high EBITDA and the margin profile is strong." The Court finds that Vergamini's decision to share the valuation reflects his experienced business judgment.

Staruck, an experienced ESOP trustee, testified that he deferred to Vergamini's business judgment as it related to the shared valuation, further undercutting the argument that sharing it violated a fiduciary duty. True, Staruck testified that GreatBanc ***generally*** does not share valuations with anyone other than the company itself. But in response to the next question, he

stated that it was not improper for Vergamini to share the valuation, because "[i]f in his best judgment that's the best way to get the price up or buoy it or to get it even higher, then we have to defer a little bit to that." Staruck further stated that he was confident there were no inappropriate disclosures during the sale process. The Court finds this testimony persuasive; finding otherwise would require concluding that an experienced ESOP trustee, several law firms, several accounting firms, JPMorgan, the Board, and Segerdahl's management all overlooked an inappropriate disclosure of information. Nothing indicates that occurred.

### b.    GreatBanc's Role

Rush points to several decisions GreatBanc made that purportedly violated its duty of prudence. One relates to GreatBanc's failure to prevent disclosure of Stout's June 30, 2016 valuation. For reasons explained above, the Court does not believe that GreatBanc violated a fiduciary duty relating to disclosure of valuation reports. Rush also faults GreatBanc for approving a sale where the process excluded strategic buyers. Again, for reasons explained above, the exclusion of strategic buyers did not breach a fiduciary duty and GreatBanc cannot be held liable under that theory. Since the underlying valuation disclosure and exclusion of strategic buyers did not violate a fiduciary duty, GreatBanc's approval similarly violated no fiduciary duty. Outside of those arguments, Rush argues that GreatBanc failed to ascertain conflicts when it interviewed and ultimately approved appointment the Outside Directors; did not apply appropriate scrutiny to JPMorgan's engagement agreement; and did not participate in negotiations during the sale process.

**_Outside Directors._** Rush contends that Staruck's alleged failure to ascertain the Board members' prior connections with Joutras and Freeborn's work for Segerdahl violated its fiduciary duty to the ESOP. Rush specifically faults GreatBanc's investigation relating to

Cronin's relationship with Joutras, Mason's legal work for Joutras in an individual capacity, Goldstein's business history with Joutras, and the amount of work and fees Freeborn received from the ESOP in connection with the sale.

As to Cronin and Goldstein, the Court finds any connection to Joutras too remote to constitute a conflict. Five or so years before the sale, Cronin met with Joutras to discuss the direction of the printing industry, but Joutras never retained Cronin's advising firm and the two never had a personal relationship. Goldstein's firm worked on a transaction with Joutras in the 1980s, and the two had three or four encounters between then and when he joined the Board. There is no indication they had a personal relationship or that Goldstein's business history with Joutras presented any sort of conflict.

Staruck testified as to his due diligence regarding the three Outside Directors prior to their appointment to the Board. Staruck testified that he came away from his interview with Mason very impressed: Mason was a lawyer, so he understood the corporate law side of the company; he had advised boards; he had served on boards; he had run companies. In line with that impression, Staruck did not consider an attorney-client relationship between Mason's law firm and Segerdahl as raising concerns regarding his judgment or loyalty to the ESOP. Likewise, Staruck came away from his interviews with Cronin and Goldstein impressed: Cronin struck him as sophisticated in the industry with an understanding of board duties and governance, and Goldstein struck him as possessing sophistication as to financing and dealmaking.

In short, the Court concludes that Staruck conducted an adequate investigation into the Outside Directors' backgrounds. Moreover, he took potential conflicts into account and considered relevant aspects of the Outside Directors' qualifications that reflected their fitness to

serve as Board members. There was no breach of fiduciary duty by GreatBanc relating to the Outside Directors' appointment to the Board.

**JPMorgan's Engagement Agreement.** Rush also contends that GreatBanc violated its fiduciary duty by failing to review JPMorgan's engagement agreement. This was an error, Rush claims, because the agreement provided that JPMorgan's principal duty was to the Board, not the shareholders. Even if this were the case, there is no harm to the ESOP in such an arrangement because every involved party's interests pointed towards obtaining the highest sale price possible. JPMorgan's fee depended on the sale price and would increase with a higher sale price. The Board's SARs and ESOP interests aligned them with the shareholders, and there is no evidence that the opportunity to make a speculative investment in the post-sale entity outweighed the certainty of cash in hand from the sale. While GreatBanc did not actively participate in negotiations, it **did** conduct an independent investigation into the propriety of JPMorgan's sale process. None of this adds up to an abuse of discretion as to GreatBanc's fiduciary duty of prudence.

**Negotiations.** Rush cites *Keach v. U.S. Trust Co.*, 419 F.3d 626 (7th Cir. 2005), as establishing that a trustee's lack of negotiation as to stock price is indicative of imprudence. *Id.* at 639 (citing *Chao v. Hall Holding Co.*, 285 F.3d 415, 429–31, 437 (6th Cir. 2002)). While *Keach* does observe that the Sixth Circuit relied on this as one of six factor in finding imprudence, read as a whole, the case undercuts Rush's argument. In finding that U.S. Trust was **not** imprudent, the Sixth Circuit noted that the trustee showed prudence by "hir[ing] a qualified financial advisor, conduct[ing] its own interviews and review of industry information and negotiat[ing] a price for the F & G shares that was twenty percent lower than the original offer price." *Id.* Here. GreatBanc retained a financial advisor (Stout) and legal counsel (Drinker), held

several meetings with the Board, and conducted its own internal review with its fiduciary committee before approving the sale. It did not participate in the day-to-day negotiations, but that is because the Board retained qualified, independent representation (JPMorgan) whose interests were aligned with the ESOP's: the higher the purchase price, the higher JPMorgan's fee. And in the face of a poor offer, JPMorgan negotiated a better deal. The Court does not consider GreatBanc's lack of day-to-day involvement to be imprudent given that it conducted a prudent investigation led by experienced advisors to ascertain whether the sale was in the ESOP's best interest.

### C. Damages

Finally, the Court turns to the element of damages. *Jenkins*, 444 F.3d at 924 ("[T]he plaintiff must establish . . . that the breach caused harm to the plaintiff." (internal quotation marks omitted)). As the Court has already found that there was no fiduciary duty for any party other than GreatBanc and no breach of fiduciary duty by anyone, the Court need not analyze damages. Nonetheless, the Court does so in the interest of completion.

Rush has not offered sufficient evidence of damages. His testimony that Quad would have paid $320 million for Segerdahl cannot sustain a finding of damages. Specifically, Rush's account of what Vergamini said at the Board meeting is uncorroborated by anyone else in attendance. While Vergamini conceded that he may have written the $320 million figure on the whiteboard, the Court finds it more likely that Vergamini either sought to educate meeting attendees on leveraged buyouts through hypotheticals or was engaging in puffery to tout his own dealmaking skills. Moreover, that Rush sought out the CEO to express distaste with the terms of the sale but did not mention the purported admission that the company could have sold for $55 million more than it, warrants discounting Rush's testimony on this point. Meanwhile, Metz testified that ICV under no circumstances would have increased its offer above $265 million.

51

Indeed, if not for Vergamini's feverish negotiations after ICV's first revised offer, the evidence indicates that the company would have sold for *less* than the ultimate sale price. Rush offers no evidence from which the Court can conclude that another buyer would have paid more than $265 million for the company.

Van Vleet estimates damages to be either approximately $39 million or approximately $16 million. This is based on his fair market value analysis, which presumes a hypothetical buyer and assigns damages regardless of whether there was a market for Segerdahl at the calculated fair market value. Fair market value is most at home in prohibited transactions claims, but can be used to calculate damages for a breach claim when stock price is at issue. *Chesemore v. Alliance Holdings, Inc.*, 948 F. Supp. 2d 928, 941 (W.D. Wis. 2013). The cases on which the *Chesemore* court relied for such use of fair market value held that it "may be an appropriate measure of a plan's loss" when damages arose "due to self-dealing, price manipulation or concealed information." *Id.* (citing *Roth v. Sawyer-Cleator Lumber Co.*, 61 F.3d 599, 602 (8th Cir. 1995); *Donovan v. Bierwirth*, 754 F.2d 1049, 1055 (2d Cir. 1985)). But Rush has not presented any meaningful evidence of self-dealing, price manipulation, or concealed information. Rather, there was a protracted negotiation among numerous sophisticated parties to sell a company for the highest price to which the one willing buyer would agree. To that end, the evidence shows that the realities of the market dictated the sale.

*     *     *

For above reasons, the Court finds that Rush has failed to show by a preponderance of the evidence that any Defendant other than GreatBanc was a fiduciary; that even if they were fiduciaries, any Defendant breached a duty of prudence or loyalty; or that even if there had been a breach, it caused harm to the ESOP. As such, the Court finds in Defendants' favor on Count I.

### D.     Count IV: Co-Fiduciary Breach

In Count IV, Rush asserts a claim for co-fiduciary breach against all Defendants under 29 U.S.C. § 1105(a). "Co-fiduciary liability claims under [§ 1105] are derivative of an underlying breach of fiduciary duty, meaning that plaintiffs must prove a breach of fiduciary duty . . . in order to impose liability on defendants." *Fish*, 2016 WL 5923448, at *58 (citing *Gabriel v. Alaska Elec. Pension Fund*, 773 F.3d 945, 952 n.2 (9th Cir. 2014); *Monper v. Boeing Co.*, 104 F. Supp. 3d 1170, 1180 (W.D. Wash. 2015)). As explained above, the Court finds no fiduciary breach. Accordingly, there was no co-fiduciary breach. The Court finds for Defendants on Count IV.

## II.     Counts II and III: Prohibited Transaction

Count II, against Joutras and Schneider, and Count III, against GreatBanc, both assert that the sale was a prohibited transaction in violation of 29 U.S.C. § 1106. At the summary judgment stage, the Court dismissed the portion of Count II that addressed the diversion claims; therefore, the only surviving prohibited transaction claims against Schneider and Joutras concern the sale process. As with § 1104 claims, a claim under § 1106 requires not only that the defendant be a fiduciary to the plan, but also that they were "acting in [their] capacity as a fiduciary at the time [they] took the actions that are the subject of the complaint." *Chi. Dist. Council of Carpenters Welfare Fund v. Caremark, Inc.*, 474 F.3d 448, 472 (7th Cir. 2007).

### A.     Joutras and Schneider: 29 U.S.C. § 1106(b)

The claims against Joutras and Schneider arise under 29 U.S.C. § 1106(b), which provides that:

A fiduciary with respect to a plan shall not—

(1)     deal with the assets of the plan in his own interest or for his own account,

(2)     in his individual or any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or

(3)     receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

*Id.* § 1106(b)(1). Section 1106(b) is construed broadly. *Leigh v. Engle*, 727 F.2d 113, 126 (7th Cir. 1984). Rush argues that Schneider limited the sale only to buyers who would preserve her job and jobs of other executives, would provide equity in the post-sale entity, and would partner with her. He further argues that Joutras used the sale as a tool to increase his own liquidity and to preserve jobs of Segerdahl employees, many of whom were not ESOP shareholders.

The Court is unpersuaded. The evidence shows that the Board—not Schneider alone—limited the sale to financial buyers for legitimate business reasons that had nothing to do with Schneider's employment. Indeed, Schneider testified that it was her understanding that her continued employment ***added*** value to the sale and was part of what ICV paid for. Rather than Schneider seeking out a buyer who would permit her to invest, the evidence shows that post-sale investment is a typical requirement for buyers like ICV and that Schneider negotiated her post-sale investment ***down*** from ICV's requested amount—100% of her sale proceeds—to half that amount. And as to Joutras, the evidence does not show that he used the sale as a tool to increase his liquidity, outside of the obvious result that he would obtain cash in exchange for ESOP shares. But that would occur in any sale. And aside from a few impulsive e-mails, Rush has pointed to no evidence that a desire for liquidity motivated the sale.

### B.     GreatBanc: 29 U.S.C. § 1106(a)

The claims against GreatBanc arise under a different subsection of § 1106, which provides that:

(1)  A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—

    (A)  sale or exchange, or leasing, of any property between the plan and a party in interest;

    (B)  lending of money or other extension of credit between the plan and a party in interest;

    (C)  furnishing of goods, services, or facilities between the plan and a party in interest;

    (D)  transfer to, or use by or for the benefit of a party in interest, of any assets of the plan; or

    (E)  acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 1107(a) of this title.

29 U.S.C. § 1106(a)(1). Count III centers on Schneider's investment in the post-sale entity, which Rush contends is a prohibited transaction because she purchased the ESOP's shares. The claim is brought against GreatBanc because it approved the sale with knowledge that Schneider would be purchasing the shares from the ESOP.

The evidence indicates that ICV sought a post-sale investment from Schneider, not that Schneider sought a sale to an entity in which she could invest. Indeed, she testified that ICV originally wanted her to invest 100% of her proceeds from the sale in the post-sale entity, but she ultimately decided to invest 50% due to the risk that she would not remain with the post-sale entity long enough to see the benefits of that investment. Rush also overstates the facts relating to Schneider's role with the post-sale entity. He contends that Schneider used her control over the ESOP to cement her control over the company while removing the ESOP. Nothing in the record supports that view. True, the ESOP was removed and she remained with the post-sale entity. But her five-year employment contract could be terminated by either party with proper

notice. Such an arrangement does not indicate a CEO structuring a transaction to consolidate her control over a company.

Rush also appears to argue that the mere fact that Schneider invested in the post-sale entity constitutes a prohibited transaction because it meant she dealt with the ESOP. While the Seventh Circuit reads § 1106 broadly, it has indicated that some evidence of intent is required to prevail. *See Leigh*, 727 F.2d at 126 ("If the corporation which the fiduciary seeks to aid qualifies as a 'party in interest,' we see nothing in the language or legislative history of subsection (a)(1)(D) which would preclude a court from treating the purchase as the use of plan assets for the benefit of a party in interest, ***at least where other evidence shows the fiduciary's purpose***." (emphasis added)).

"[E]xamining closely the circumstances surrounding the alleged use of plan assets," *id.* at 127, the Court cannot conclude that Schneider's investment in the post-sale entity was a prohibited transaction that GreatBanc subsequently approved. Nothing indicates an intent to evade ERISA's rules; if anything, Schneider approached the post-sale investment with reluctance, not machination. To conclude that Schneider purposely lowered the sale price to obtain a favorable investment, the Court would also have to find that the remaining Board members went along with her scheme, GreatBanc approved it, multiple law firms overlooked it, multiple accounting firms found no issue with it, and Schneider herself found it acceptable to take less cash in hand from a sale in exchange for an investment in a printing company that had been missing sales targets in an industry that was in the midst of a decline.

### C.    Adequate Consideration

Even if there were a violation of § 1106 as alleged in either Count II or Count III, the sale was for adequate consideration. Under 29 U.S.C. § 1108(e)(1), a prohibited transaction is not a violation of ERISA "if such acquisition, sale, or lease is for adequate consideration." "Adequate

consideration" means, in relevant part, "in the case of an asset other than a security for which there is a generally recognized market, the fair market value of the asset as determined in good faith by the trustee or named fiduciary pursuant to the terms of the plan and in accordance with regulations promulgated by the Secretary [of Labor]." 29 U.S.C. § 1002(18). "Fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." *Eyler v. Comm'r of Internal Revenue*, 88 F.3d 445, 451 (7th Cir. 1996) (internal quotation marks omitted). The willing buyer and willing seller in a fair market value determination must be hypothetical. *Id.*

To determine fair market value, GreatBanc relied on a valuation prepared by Stout. Stout used two methods by which to conclude that the sale of Segerdahl at $265 million was for fair market value: a guideline company method and a discounted cash flow method. In each method, Stout arrived at a range of valuations; the guideline company method arrived at a range of $240 million to $280 million, and the discounted cash flow method at a range of $258 million to $306 million.

Rush correctly points out that reliance on advisors does not, by itself, create a prudent process. *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 799–800 (7th Cir. 2011). But he ignores that such reliance is "evidence that a trustee conducted a prudent investigation." *Fish*, 2016 WL 5923448, at *62 (internal quotation marks omitted); *George*, 641 F.3d at 799. To establish that the trustee reasonably relied on an advisor's valuation, "the degree to which a fiduciary makes an independent inquiry is critical." *Keach*, 419 F.3d at 637 (internal quotation marks and alterations omitted). The *Keach* panel listed three things a fiduciary must do in its independent inquiry: "investigate the expert's qualifications, provide the expert with complete

and accurate information, and make certain that reliance on the expert's advice is reasonably justified under the circumstances." *Id.* (internal quotation marks omitted). "The standard of care for investigating the fair market value under § [1108(e)(1)] is similar to the objectively prudent investor standard under § [1104(a)(1)(B)]." *Chesemore*, 886 F. Supp. 2d at 1047 (citing *Howard v. Shay*, 100 F.3d 1484, 1489 (9th Cir. 1996)).

The evidence supports GreatBanc's view that ICV paid fair market value, which was "determined in good faith by the fiduciary." *Chesemore*, 886 F. Supp. 2d at 1047 (quoting *Keach*, 419 F.3d at 637). GreatBanc outlined its thinking in its Compliance Report, the purpose of which was to memorialize the reasoning behind its decision. The Compliance Report addresses Stout's qualifications and concludes that because it had "extraordinary familiarity with the company, its business and its valuation," it was a qualified valuation advisor. GreatBanc participated in a number of diligence meetings with Stout and Segerdahl representatives, among others, at which meetings Stout gathered information necessary for its valuation analysis. While GreatBanc may not have handed information over, it was in a position to confirm the accuracy of what Segerdahl represented to Stout. Finally, the Compliance Report sets out GreatBanc's justifications for its reliance on Stout. Given Stout's expertise as a valuation firm, its familiarity with Segerdahl, and GreatBanc's memorialized review of its report, the Court concludes that GreatBanc's reliance on the Stout opinion "is reasonably justified under the circumstances." *Id.* (internal quotation marks omitted).

In Rush's post-trial briefing, he also contends that GreatBanc failed to consider the benefit to the ESOP of the 338(h)(10) election and the sale-leaseback. To Rush, this means that GreatBanc improperly relied on a low valuation. But contemporaneous notes show that both the 338(h)(10) election and the sale-leaseback were discussed at meetings between Stout,

GreatBanc, and Drinker. Stout justified its decision not to factor in the sale-leaseback due to the execution risk and the likelihood that it would lower EBITDA by adding a long-term lease that offset any sale proceeds. The Court is not convinced that the 338(h)(10) election was a required element of fair market value for ERISA purposes. Fair market value, as noted above, requires a hypothetical buyer and seller. But a 338(h)(10) election relies on specifics: it requires that the seller be an S-Corp whose owners all agree to use the 338(h)(10) election, and that the buyer be a taxpaying entity who also elects to use the 338(h)(10) election. Rush has pointed to no evidence or law requiring consideration of an entity-specific tax election when calculating fair market value for ERISA purposes. And in any event, each of the four IOIs stated that they were inclusive of the 338(h)(10) election and ICV's final offer also included its value.

### III.    Count V: Knowing Participation in and Receipt of Benefit From an ERISA Violation

Finally, Count V—brought against only Schneider and Joutras—asserts a violation of 29 U.S.C. § 1132(a)(3) for their alleged knowing participation in and receipt of a benefit from an ERISA violation. That statute provides that:

> A civil action may be brought . . . by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter under the terms of the plan.

29 U.S.C. § 1132(a)(3). While Rush's claim relies in part on the diversion claims, the Court granted summary judgment in Defendants' favor as to that theory; as such, only his claims relating to the sale of Segerdahl remain.

Count V fails for a simple reason: the sale did not "violate[] any provision of th[e] subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3). Rush's claim would require that Schneider and Joutras "knew or should have known of the existence of the trust ***and the***

*circumstances that rendered the transfer in breach of the trust*." *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 251 (2000) (emphasis added). As explained above, there was no breach of the trust. As such, Schneider and Joutras could not have participated in and benefited from an ERISA violation stemming from the sale. Because there was no conduct in this case that violated ERISA or that "rendered the transaction unlawful," *id.*, the Court finds for Schneider and Joutras on Count V.

## CONCLUSION

The Court finds in favor of Defendants on all remaining counts. Because the judgment is in Defendants' favor, there is no need to calculate damages. The Clerk of Court is directed to enter Judgment in favor of Defendants.

ENTERED:

Dated:  March 31, 2025

Andrea R. Wood
United States District Judge